**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

-------------------------------------------------------------X

GITA F. SANKANO                    :

                               :     Civil Case No.

            Plaintiff,    :

                               :

     v.                         :

                               :     **COMPLAINT**

TROUTMAN PEPPER HAMILTON    :

SANDERS LLP,               :

                               :     **Jury Trial Demanded**

            Defendant.   :

-------------------------------------------------------------X

Plaintiff Gita Sankano ("Plaintiff") hereby alleges as follows:

## PRELIMINARY STATEMENT

1.     Ms. Sankano was born in Harlem and grew up in the Bronx to parents who immigrated to the United States in search of a brighter future for their children. She was primarily raised by her mother, who worked multiple jobs to shape a life for Ms. Sankano beyond her own. Guided by her mother's unwavering belief in education, Ms. Sankano embraced her mother's mantra that good grades paved the path to success. Early on, Ms. Sankano set her sights on becoming a lawyer, consistently surpassing expectations. Ms. Sankano went on to graduate in the top 20% of her law school class. Her successes led her to a prestigious State Appellate Clerkship. Ultimately, she landed a dream Associate position at Pepper Hamilton LLP ("Pepper Hamilton") in 2019, which is now Troutman Pepper Hamilton Sanders LLP (the "Firm").

2.     The Firm holds itself out to be committed to diversity, equity and inclusion ("DEI"). So much so, that it claims DEI to be one of the Firm's "core values." To convince clients and potential recruits that the Firm actually lives up to these values, the Firm has engaged in a number of disingenuous internal and external public relations maneuvers.

3.      For instance, in June 2020, the Firm held a Town Hall in the wake of George Floyd's murder, during which the Firm purported to "st[an]d with its Black attorneys."  As explained in great detail herein – it does not.

4.      Similarly Black attorneys and attorneys of other protected classes are paraded around for photo opportunities at diversity events and events held for historically Black Colleges and Universities.

5.      Unfortunately, however, the Firm's actions have not lived up to its aspirations of an "equitable and inclusive environment."[1]  Instead, the Firm's practices when it comes to training and advancing Black attorneys, especially Black female attorneys like Ms. Sankano, perpetuate decades-old patterns of discrimination.

6.      On November 14, 2023, for example, just two weeks before she was fired for making complaints of discrimination, Ms. Sankano was asked to attend a Howard University School of Law Etiquette dinner hosted by the Firm.

7.      Ironically, at this dinner, Ms. Sankano spoke with a recruiter in the Firm's Atlanta office who told Ms. Sankano that there had been a "mass exodus" of Black Associates at the Firm.

8.      This information was sadly not surprising to Ms. Sankano.  In fact, being at the dinner at all was uncomfortable for her, as she knew very well that the Firm did not have a commitment to Black attorneys, especially Black women.  Indeed, when Ms. Sankano joined the Firm in 2019, she was the *only* Black attorney in the Firm's D.C. office, and, in the years since, had been subjected to constant discriminatory treatment by the Partners for whom she worked.

---

[1]      https://www.troutman.com/diversity/index.html (last visited January 10, 2024).

9.     The discrimination to which Ms. Sankano was subjected took many forms and is described in detail over the next 35 pages of this Complaint.  Over the years she complained about certain discriminatory conduct, but her complaints were often ignored, and, when they were not, met with gaslighting, apathy or swift retaliation.

10.     Ultimately however, the discrimination came to a head on August 3, 2023, when Ms. Sankano received yet another outrageously demeaning, dehumanizing and demoralizing email from a Partner with whom she worked (email depicted on p. 23, below), Matthew Bowsher.

11.     The email, in which Mr. Bowsher callously insulted Ms. Sankano's cognitive ability, was unfortunately characteristic of his behavior towards her and other Black women at the firm.

12.     Indeed, another Black woman in the same group, Whitney Loughran, had previously expressed her belief that Mr. Bowsher was discriminatory and requested not to work with him.

13.     Ms. Sankano complained about the August 3, 2023, email to various Multifamily Housing Practice Group leaders, including Brian Iwashyna, Blair Schiff, Nora Garcia Nickel, Lindsey Crawford, and Marshall Tucker.

14.     Not one of the five Partners referenced above took any remedial action.

15.     Then, on August 8, 2023, Ms. Sankano had a meeting with Jennifer Jana, her Career Coaching and Planning Manager.  After reading Mr. Bowsher's email, Ms. Jana said the email was "racist."  Still, Ms. Jana told Ms. Sankano that she could not help her.

16.     So, on August 10, 2023, Ms. Sankano filed a formal complaint with Denise Johnson, Senior Human Resources Manager, regarding Mr. Bowsher's discriminatory treatment.

17.     Ms. Sankano was not even interviewed until August 23, 2023, a full 19 days after she made her complaint.  In the meantime, the Firm shamelessly attempted to get her to resign so that it would not have to investigate her claims at all.

18.     Indeed, on August 14, 2023, four days after Ms. Sankano filed her complaint with HR, Dameon Rivers, a Partner in the D.C. office, stopped by Ms. Sankano's office under the guise of concern.  However, after Ms. Sankano explained to Mr. Rivers what had been going on with Mr. Bowsher, Mr. Rivers bluntly told Ms. Sankano, "If I were you, I would leave the Firm because I could not stand the sight of seeing Mr. Bowsher."

19.     Mr. Rivers proceeded to tell Ms. Sankano that she did not want to give the Partners in the Multifamily Housing Group the impression that she was bad at taking feedback. This was a direct admission that Partners at the Firm viewed and/or would view her complaints about racism negatively.

20.     It took the Firm 77 days to "investigate" Mr. Bowsher's discriminatory email.  Of course, as is the Firm's practice, no real investigation was done at all.  As such, it came as no surprise when, on October 27, 2023, the Firm concluded that Mr. Bowsher had not engaged in discrimination because he treated other people terribly too.

21.     It was just a couple of weeks later that Ms. Sankano sat at the aforementioned Howard University School of Law Etiquette dinner.  It was the second such DEI event to which the Firm carted her out since she had made her complaint of discrimination against Mr. Bowsher.

22.     Only two weeks after that, on November 29, 2023, Ms. Sankano was fired.  The purported basis for Ms. Sankano's termination was performance, but this is a completely preposterous explanation.  Ms. Sankano received no warning whatsoever, at any time, that her job was in jeopardy.  She received above average performance reviews each and every review

4

cycle, including in the performance review she received at the time of her termination.  Her colleagues and Partners routinely praised her work and told her that they could see her making Partner, and she received multiple, large *discretionary* bonuses, including one shortly before her complaint of discrimination.  Moreover, the attorneys who reviewed her work in November 2023 – the attorneys that she worked for – plainly had no idea that Ms. Sankano was going to be terminated, as their review comments clearly indicate their belief that she would be at the Firm in 2024.

23.    Perhaps most damning of all, the attorney for whom Ms. Sankano did 80%+ of her work was Ms. Loughran (a Black Partner, then Associate).  As it turned out, Ms. Loughran was not even informed that Ms. Sankano was going to be terminated, much less consulted, as she should have been.  It is impossible that the Firm terminated Ms. Sankano for "performance" without even communicating with the person for whom she did the vast majority of her work. To add insult to injury, Ms. Loughran was about to commence maternity leave and had planned to have Ms. Sankano provide seamless coverage on for her clients while on leave.  The termination decision left her scrambling and without adequate coverage when she went on leave.  So, not only did the Firm terminate Ms. Sankano for raising complaints about race discrimination, but left one of its few Black Partners – and her clients – completely in the lurch as she went out on leave.

24.    The Firm also did not bother to tell Ashante Smith, the DEI Partner for the Multifamily Housing Group and the only other senior Black Partner in the group, that Ms. Sankano was going to be terminated.

25.    Perhaps most pathetically of all, after Ms. Sankano, through counsel, put the Firm on notice of her decision to file these claims, the Firm did another "investigation."  Of course,

the Firm again denied engaging in discrimination, and patted itself on the back by noting that Ms. Loughran was recently elected to Partner.  Putting aside the fact that the Firm has already sabotaged Ms. Loughran, the Firm did not even reach out to her in connection with its "investigation" into Ms. Sankano's claims.  That is illustrative of just how little concern the Firm has for the opinion of its Black lawyers.

26.     The Firm's DEI webpage reads in part: "diverse teams achieve better results."[2] However, the Firm's actions have spoken louder than its words.

27.     Ms. Sankano now brings this action to redress the unlawful employment practices committed against her, including Defendant's discriminatory and retaliatory treatment of her due to her race and/or color in violation of Section 1981 of the Civil Rights Act of 1866, 42 U.S.C. § 1981 ("Section 1981") and the Washington D.C. Human Rights Act, D.C. Code §§ 2-1402.11 and 2-1402.61 ("DCHRA").

## JURISDICTION AND VENUE

28.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1343 as this action involves federal questions regarding the deprivation of Plaintiff's rights under § 1981.

29.     Venue is proper in this district pursuant to 28 U.S.C. § 1391 because Defendant Troutman Pepper Hamilton Sanders LLP has an office in Washington D.C., and a substantial part of the events or omissions giving rise to this action, including the unlawful discrimination and retaliation alleged herein, occurred in this district.

---

[2]      https://www.troutman.com/diversity/index.html (last visited January 11, 2024).

## PARTIES

30.     Plaintiff Gita F. Sankano is a citizen of Maryland and is a former employee of

Defendant.  At all relevant times, Plaintiff worked for Defendant and met the definition of an

"employee" as that term is defined by the applicable statutes.

31.      Defendant Troutman Pepper Hamilton Sanders LLP is Headquartered in Atlanta,

Georgia.  At all relevant times, Troutman Pepper Hamilton Sanders LLP met the definition of an

"employer" as that term is defined by all applicable statutes.

## FACTUAL ALLEGATIONS

### I.     Background

32.     In 2011, Ms. Sankano graduated from The City University of New York, John Jay

College of Criminal Justice ("CUNY John Jay") with a B.A. in political science.

33.     In 2014, Ms. Sankano graduated from CUNY John Jay with an M.A. in Public

Administration.

34.     Shortly thereafter, Ms. Sankano attended the University of Maryland Francis King

Carey School of Law, where she graduated *cum laude* in 2018.

35.     While in law school, Ms. Sankano was an associate symposium editor for the

*Journal of Business & Technology Law* and a staff editor for *The Authority National Affordable*

*Housing Digest.*

36.     After Ms. Sankano's graduation, she began a year-long Clerkship for the

Honorable Michael W. Reed on the Court of Special Appeals of Maryland.

37.     Following her Clerkship, on August 31, 2019, Ms. Sankano began her

employment in the Financial Services Practice Group in the Washington D.C. office of one of

the Firm's two predecessor firms, Pepper Hamilton LLP ("Pepper Hamilton").

38.     To Ms. Sankano, this was a momentous achievement and the first step in a legal career that she had been working towards her entire life.

## II.     Ms. Sankano's Primary Supervisor "Steals" Her Hours Because She Is Black

39.     During Ms. Sankano's tenure, she proved herself to be an incredible asset to the Firm.

40.     However, from early on, Ms. Sankano was set up to fail as her billable hours were micromanaged and she was treated differently from her white colleagues.

41.     Ms. Sankano was hired by Christine Waldmann Carmody, a Partner in the Pepper Hamilton D.C. office.

42.     Ms. Sankano initially began by working on Federal Housing Administration loans and was expected to bill around 1,800 hours in her first year.

43.     Ms. Sankano proved herself to be a quick learner and day in and day out she worked hard on behalf of her clients.

44.     Despite this, Ms. Carmody told Ms. Sankano that she could not bill the time she worked on client matters.

45.     Instead, Ms. Carmody required Ms. Sankano to email her hours to Ms. Carmody directly, and not enter them in the Elite System (the "System").

46.     This arrangement confused Ms. Sankano, as she was the only Associate who was required to email hours to Ms. Carmody for her approval.

47.     Ms. Sankano was also the only Black Associate reporting to Ms. Carmody and the only Black attorney in the Pepper Hamilton D.C. office.

48.     Ms. Sankano, understandably concerned, asked Ms. Carmody if she would be reprimanded by the Firm for not billing her hours directly through the System in accordance with the Firm's policy.

49.     Ms. Carmody told Ms. Sankano that she would not be reprimanded because Ms. Carmody "charged a flat rate fee to her clients and [Ms. Sankano's] billable hours did not matter."

50.     Since Ms. Carmody was the only Partner Ms. Sankano had worked with, Ms. Sankano did not question Ms. Carmody's response.

51.     However, when Ms. Sankano asked white attorneys in the Pepper Hamilton office if they were required them to submit their hours to a Partner prior to entering them into the system, they told her that they did not.

52.     Notably, Randall Hulbert, a white male Associate, who was also working with Ms. Carmody at the time, was not required to email his hours to Ms. Carmody for approval and could enter his hours directly into the System.

53.     What Ms. Carmody was doing would soon become obvious; namely, she was picking on Ms. Sankano because she is Black by intentionally reducing her hours to make Ms. Carmody look more profitable.

54.     As a first-year Associate and the only Black attorney in the Pepper Hamilton D.C. office, Ms. Sankano did not want to question Ms. Carmody's authority.

55.     So, she continued to email her hours to Ms. Carmody for approval.

56.     As a result, in or around the fourth quarter of 2019, Ms. Sankano had no billable hours logged into the System, despite the fourth quarter being the Financial Services Practice Group's busiest time of year.

57.     Around this time, Ms. Sankano received a call from a representative in Pepper Hamilton's billing department asking why she had no billable hours in the System.

58.     Ms. Sankano suggested that the representative reach out to Ms. Carmody for an explanation.

59.     To Ms. Sankano's surprise, the representative told Ms. Sankano that they had already spoken to Ms. Carmody.

60.     A few days later, Ms. Sankano told Ms. Carmody about her call with the billing department and Ms. Carmody told her to "not worry about it."

61.     Shortly thereafter, in or around February 2020, Ms. Sankano and Ms. Carmody went to the Housing and Urban Development office in D.C. to close a deal they had been working on together.

62.     Ms. Carmody mentioned to Ms. Sankano that Audrey Wisotsky, a Partner in the Princeton, New Jersey office, had called Ms. Carmody to discuss Ms. Sankano's billable hours.

63.     Ms. Carmody said she had to call back Ms. Wisotsky because Ms. Sankano's "billable rate was too high."

64.     At this time, Ms. Sankano's billable rate was commensurate with other Junior Associates.

65.     This was clearly an attempt by Ms. Carmody to distract Ms. Sankano from the real reason Ms. Carmody did not want her to bill her hours.

66.     In April 2020, Ms. Wisotsky reached out to Ms. Sankano to discuss her midterm evaluation.

67.     Clearly, Ms. Wisotsky understood exactly what was going on, as she directly asked Ms. Sankano whether Ms. Carmody was **"stealing her hours."**

68. This question shocked Ms. Sankano, as Ms. Carmody had led her to believe that her hours "did not matter."

69. Ms. Wisotsky instructed Ms. Sankano to begin billing her hours through the System, like every other Associate, and that she told Ms. Carmody to stop requiring Ms. Sankano to email Ms. Carmody her hours for approval.

70. Following her review, on April 26, 2020, Ms. Sankano emailed Ms. Carmody telling her that Ms. Wisotsky instructed her to begin billing her hours through the System.

71. However, Ms. Carmody responded, "I still need to see your time before it goes in…" This email further confused Ms. Sankano, as she was getting different directives from Ms. Carmody and Ms. Wisotsky—both Partners at the Firm.

72. Ms. Sankano responded by asking if Ms. Carmody and Ms. Wisotsky and herself could have a meeting to clear up the confusion, but Ms. Carmody outrageously refused – obviously hoping to continue to hide her discriminatory disparate treatment of Ms. Sankano – and made the entirely irrelevant statement that "not all work we do… is billable to a client."

73. After reading Ms. Carmody's response, Ms. Sankano called her assistant, Detra McRae, and told her about her review and conversation with Ms. Carmody.

74. Ms. McRae told Ms. Sankano that she was instructed by Blair Schiff, a Partner in the D.C. office, to not enter Ms. Sankano's time until after Ms. Carmody reviewed it.

75. Ms. McRae said that in her forty years of working at the Firm she has never seen this happen.

76. Notably, at the time, Ms. Sankano was the *only* Black attorney in the Pepper Hamilton D.C. office.

77.     From early on, the Firm treated Ms. Sankano differently than her similarly situated white colleagues.

78.     Knowing that a decrease in workload would significantly reduce her number of billable hours, Ms. Sankano contacted Kassem Lucas, a Diversity Partner in the Firm's Philadelphia office, to ask how to proceed.

79.     Mr. Lucas told Ms. Sankano that he would speak to Ms. Wisotsky.

80.     Fearful that she would be terminated if she did not start billing hours soon, Ms. Sankano also reached out to Ms. Wisotsky, who told Ms. Sankano she would "handle it."

81.     Shortly thereafter, Ms. Sankano fell out of favor with Ms. Carmody and she retaliatorily stopped giving Ms. Sankano work.

82.     At the time, Ms. Carmody was the only Partner giving Ms. Sankano assignments.

83.     As such, she was left with a substantially decreased workload.

84.     As a Black woman, Ms. Sankano had worked extremely hard to get to this point in her career.

85.     She grew up with the belief that she would be judged by her work, dedication and character, rather than the color of her skin.

86.     That aspirational belief was gravely undermined by Ms. Carmody's discriminatory conduct.

87.     Around May 2020, Ms. Wisotsky told Ms. Sankano that Pepper Hamilton was merging with Troutman Sanders.

88.     Ms. Wisotsky told Ms. Sankano that the merger would result in more work for everyone, including Ms. Sankano.

89.     However, in the meantime, she told her to "hold tight."

12

90.     Then, in late May or June 2020, in the wake of George Floyd's murder, the Firm held a Town Hall meeting in which it purported to "st[an]d with its Black attorneys."

91.     Not coincidentally, around this time, Ms. Sankano began receiving work from Partners again, including Ms. Carmody.

92.     Ms. Sankano viewed this as a performative attempt by the Firm to show that it cared for its Black attorneys, when really Ms. Sankano had just spent the last several months being sidelined by Ms. Carmody and other Partners at the Firm.

93.     Nevertheless, Ms. Sankano was happy to be receiving assignments again and took this as an opportunity to ask if she could be placed in the Multifamily Housing group after the Firm's merger.

94.     Ms. Sankano knew that if she were to be placed in this Multifamily Housing Group, she would be capable of meeting her billable hours requirement.

95.     Despite Ms. Sankano's request, she was not placed in the group.

96.     Nonetheless, Ms. Sankano continued to ask Partners in the Pepper Hamilton D.C. office if she could be placed in the Multifamily Housing Group.

97.     Again, Ms. Sankano was met with hostility from the D.C. Partners.

98.     By way of example, in or around late July 2020, Henry Liu, the then-Managing Partner in the D.C. office, stopped by Ms. Sankano's office.

99.     Mr. Liu told Ms. Sankano that he was aware that Ms. Sankano was having problems with Ms. Carmody and that his resolution was to move her office to the floor below.

100.    Mr. Liu asked if Ms. Sankano wanted to be the one to tell Ms. Carmody that she would no longer be working with her.

101.    Ms. Sankano told him "no," fearful that if she was the one to tell Ms. Carmody she would only be harassed more.

102.    Mr. Liu agreed to tell Ms. Carmody himself.

103.    Around this time, Ms. Sankano received an email from Ms. Carmody alleging that Ms. Sankano was leaving her with deals she did not close and no help to close them.

104.    Brian Iwashyna, the practice group leader of the Multifamily Housing Group and a Partner in the Richmond office, Mr. Liu and Ms. Wisotsky, were copied on the email as well.

105.    This was another discriminatory attempt by Ms. Carmody to undermine and disparage Ms. Sankano.

106.    In July 2020, Pepper Hamilton and Troutman Sanders merged.

107.    One month later, in or around August 2020, after months of asking for more work, Ms. Sankano was finally placed in the Multifamily Housing Group.

108.    Although Ms. Sankano was working in the D.C. Office, she began receiving most of her work from Troutman Sanders attorneys in the Richmond, Virginia office, most often from Whitney Loughran, a Senior Associate located in the Richmond office.

109.    Even after the merger, Ms. Sankano was, and remained throughout her employment, the only Black woman in the Multifamily Housing Group in the D.C. office.

110.    As described below, because of this, Ms. Sankano was consistently treated worse than her white colleagues.

111.    Despite the discriminatory treatment Ms. Sankano endured early on, she still managed to excel as an Associate at the Firm.

### III.    In 2020 and 2021, Ms. Sankano Continues to Excell at the Firm Despite Continued <u>Challenges</u>

112.    Due to Ms. Carmody's manipulation of Ms. Sankano's hours, she was unable to meet the Firm's billable hours requirement in 2020.

113.    During her review, Mr. Schiff apologized to Ms. Sankano for having to endure such negative treatment by Ms. Carmody as an entry-level Associate and Mr. Iwashyna acknowledged that Ms. Sankano was "not given a fair shake."

114.    To ensure Ms. Sankano was on a path to success, Ms. Sankano began "weekly check-ins" with Nora Garcia Nickel, the Professional Development Partner for the Multifamily Housing Group, and Mr. Iwashyna.

115.    From late-2020 to 2022, every Sunday Ms. Sankano would send Ms. Nickel and Mr. Iwashyna a chart outlining the assignments she completed and the Partners she worked with that week.

116.    Each week, Ms. Nickel and Mr. Iwashyna would remark on how impressed they were by Ms. Sankano's workload and work product.

117.    In 2020, Ms. Sankano's performance review contained the following:

> "Gita is still learning, but she eagerly dives into each new project and learns from each new assignment.  She needs to continue taking new assignments, but her current trajectory is very promising." – Nora Nickel

> "Gita has always been a pleasure to work with!  She's a quick learner, eager to take on more work and responsibilities.  I'm excited to have her on the team and look forward to working with her more!" – Virginia Stitzer

> "Gita has exceeded expectations at every turn for an early associate. I have been able to delegate tasks and feel confident that they will be completed on time and she has requested autonomy and run with it.  If she continues on this path, then I have great expectations for her future with this group." – Peter Strup

"As mentioned, Gita is a hard worker, always accessible, and seem[s] generally interested and willing to learn." – Henry Liu

"Gita's commitment to the client and his case is obvious.  Even in the busiest times in her practice, she makes time for his issues." – Andrew Rogoff

"Gita has shown great enthusiasm for her work." – David Wormser

118.    In 2021, Ms. Sankano continued her exceptional work:

"Gita's can do attitude and constant willingness to cover for colleagues who are sick, on paternity leave or simply not getting work done is beyond compare.  What she lacks in expertise or deep experience, she makes up for in willingness to try and desire to learn." – Lindsey Crawford

"Gita is eager to learn and stay on top of assignments and is responsive to feedback." – Kevin Dexter

"Gita is a reliable and dependable member of my team.  [She] is engaged and enthusiastic about our practice.  She is organized and quick to respond and complete tasks." – Whitney Loughran

"Gita is a true leader and I expect great things from her in the future.  She did an excellent job presenting to students at Penn Law on being a successful associate.  Her tips were well received and on point." – Kaseem Lucas

"Gita is a pleasure to work with.  She's very responsive, eager to help on projects and works well with clients." – Kelly Mufarrige

"Gita has been great to work with and has come a long way over the past year.  Her positive can-do attitude really makes her shine and an absolute pleasure to work with.  We are invested in her growth and success with the MFH team and look forward to continuing to work with her." – Nora Nickel

"Gita is a great team player – she is always willing to pitch in to put out fires.  She is also highly responsive.  Clients and borrowers enjoy working with her." – S.R. Sidarth

"I picked up two deals for an attorney in the group who was going on maternity leave.  Gita was already working on the deals.  She did an amazing job getting me up to speed on the deals and adjusting to

my work style versus the attorney who was previously working on the deal.  She handled all the work that I asked of her." – Marshall Tucker

119.   In 2021, Ms. Sankano billed 2,301 hours – 401 hours over the Firm's requirement.

120.   As a result, Ms. Sankano's salary increased, and she was given a discretionary bonus of $32,500, plus a $16,000 COVID-19 bonus only given to Associates who met the Firm's billable hours requirement.

121.   Given her success, Ms. Sankano was eager to start her third year at the Firm.

122.   However, as described below, Ms. Sankano was once again cast aside.

**IV.   Matthew Bowsher Begings to Question Ms. Sankano's Competency; Ms. Sankano's Concerns Fall on Deaf Ears**

123.   In or around March 2022, David McPherson announced his retirement from the Firm.

124.   As such, Mathew Bowsher, a Partner in the D.C. office, took over Mr. McPherson's deals.

125.   Ms. Sankano had worked on a handful of deals with Mr. McPherson and was familiar with many of his former clients.

126.   Also, around this time, Ms. Sankano had been asking Partners to place her on more complex deals, so Mr. Bowsher asked if Ms. Sankano could assist him with one of Mr. McPherson's former deals.

127.   Almost immediately Ms. Sankano began receiving belittling comments from Mr. Bowsher.

128.   For example, as part of most deals, some loan documents need to be notarized and recorded.

129.     At the Firm, this is customarily done by setting up a "signature block" for the client to sign and a "notary panel" for the notary to notarize on the same page.

130.     However, in this deal, the client asked Ms. Sankano if the notary's signature could be on a separate page from the client's signature.

131.     Ms. Sankano, who was familiar with this client's request, asked her Secretary, Katie Stratton, to place the client's signature block and the notary panel on different pages.

132.     Within minutes of the email being sent, Ms. Sankano received a call from Mr. Bowsher.

133.     In a disparaging tone, Mr. Bowsher began explaining to Ms. Sankano what a notary was.

134.     At this time, Ms. Sankano had been interacting with notaries since 2019 and was very familiar with their role.

135.     After Mr. Bowsher finished lecturing Ms. Sankano, she explained to him that she only had Ms. Stratton send the documents this way because she was familiar with the client's request.

136.     Mr. Bowsher responded "oh, okay" and hung up.

137.     This was only the first of many instances in which Mr. Bowsher belittled Ms. Sankano.

138.     In May 2022, Kelly Mufarrige, a Senior Associate in the D.C. office, reached out to Ms. Sankano to ask if she could cover some of her deals, as Ms. Mufarrige was going out on maternity leave.

139.     Unfortunately, most of Ms. Mufarrige's deals were with Mr. Bowsher.

140.    Although Ms. Sankano was still feeling uncomfortable about her last interaction with Mr. Bowsher, she was hopeful that her experience this time would be different.

141.    Unfortunately, almost immediately, Mr. Bowsher began sending Ms. Sankano aggressive emails, questioning her cognitive ability.

142.    Around this time, Ms. Sankano received a phone call from Ms. Loughran.

143.    At the time, Ms. Sankano was receiving most of her work from Ms. Loughran.

144.    On the call, Ms. Loughran told Ms. Sankano that Mr. Iwashyna told her that Mr. Bowsher had been complaining about Ms. Sankano.

145.    Ms. Loughran assured Mr. Iwashyna that any errors made by Ms. Sankano were consistent with those made by any other Associate at her level.

146.    Ms. Loughran also told Mr. Iwashyna that he should go to Ms. Sankano with his concerns rather than gossiping about her amongst others.

147.    Ms. Loughran warned Ms. Sankano that she needed to be extra careful when working with Mr. Bowsher.

148.    Ms. Loughran conveyed that she too felt discriminated against by Mr. Bowsher as a Black woman and requested to no longer work with Mr. Bowsher.

149.    Rather than engage in any productive dialogue with Ms. Sankano, Mr. Bowsher continued to belittle Ms. Sankano and question her cognitive ability.

150.    Ms. Sankano, once again feeling singled out by a Partner at the Firm, reached out to Ms. Loughran and Ashanté Smith, the DEI Partner for the Multifamily Housing Group.

151.    Ms. Sankano told Ms. Smith that Mr. Bowsher's communications with Ms. Sankano were microaggressions.

152.    Ms. Smith told Ms. Sankano that she had relayed Ms. Sankano's concerns to Mr. Iwashyna and that Mr. Bowsher was making Ms. Sankano doubt her work.

153.    Despite Ms. Smith's recognition that Mr. Bowsher was treating Ms. Sankano with hostility, no action was taken to correct his behavior.

154.    Ms. Sankano continued to be left out, othered and treated unfairly.

155.    By way of example, in early 2022, Ms. Sankano learned from Samson Nabozny, an Associate in the D.C. office, that the Firm had hosted a training for all junior Associates in the D.C. office.

156.    Although Ms. Sankano was a junior Associate, she had not been invited to the training.

157.    Further, Ms. Sankano had expressed countless times to Ms. Nickel and Peter Strup, both Partners in the Richmond office, that she felt she wasn't getting enough training in the D.C. office.

158.    Confused as to why she was left out, Ms. Sankano asked Lindsey Crawford, a Partner in the D.C. office, why she had not been invited to the training.

159.    Ms. Crawford did not give Ms. Sankano a reason; instead, she said, "I'm sorry you weren't included," and sent her a calendar invitation for future trainings.

160.    Despite facing growing hostility from Partners at the firm, Ms. Sankano continued to work diligently – billing 2,200 hours in 2022.

161.    In or around February 2023, Ms. Sankano received her annual performance review.

162.    Once again, Ms. Sankano received outstanding remarks from Partners and Senior Associates.

163.    Yet, one review stood out for Ms. Sankano – Mr. Bowsher's.

164.    Mr. Bowsher's review stated that Ms. Sankano was not performing at the appropriate level for a "2019 grad."

165.    This was the first time Ms. Sankano heard this kind of feedback, as she had been under the impression that she was performing well.

166.    As it is the Firm's practice to encourage Associates to speak directly with anyone who gives them critical feedback, after reading her review, Ms. Sankano went to Mr. Bowsher's office to discuss his comments in her evaluation.

167.    Ms. Sankano suggested that if Ms. Sankano and Mr. Bowsher continue to work on deals together, they should debrief after each closing.

168.    Mr. Bowsher quickly dismissed Ms. Sankano's request by saying "Okay, got it," and promptly ended the conversation.

169.    Ms. Sankano left Mr. Bowsher's office without clarity on why Mr. Bowsher gave her a negative review.

170.    On February 15, 2023, Ms. Sankano met with the Associate Review Committee (Mr. Schiff and Ms. Nickel).

171.    Ms. Sankano told them that Mr. Bowsher had never directly communicated his purported concerns, and that she was shocked given all the other positive reviews she received.

172.    The committee laughed off Ms. Sankano's concerns and assured her that she was performing well and that this type of behavior was typical for Mr. Bowsher.

173.    Ms. Sankano also told the Review Committee that she felt she was not getting enough training.

174.    Again, the Review Committee reassured Ms. Sankano that she was performing well.

175.    As such, Ms. Sankano's salary was increased again and she was given a discretionary bonus of $57,500.

## V.    **"I Worked Hard to Be Here and I deserve to Be Here Like Every Other Associate"**

176.    Ms. Sankano continued to work with Ms. Nickel and received positive feedback.

177.    On June 28, 2023, in addition to some constructive criticism, Ms. Nickel gave Ms. Sankano the following positive feedback:

- "You are always very timely, responsive and proactive.  You are so fast that I'm often behind and trying to catch up with you!  You understand the mechanics of a deal and the order of things that need to occur in connection with getting a deal to the finish line.  You also had a great catch with the borrower's org structure when comparing the org chart against the org docs received.  I also appreciate you sharing your thought process when reviewing diligence and documents.  It helps me better understand where you are coming from and gives me an opportunity to teach and provide answers.  A good example is our discussion as to which parties the survey certificate should be certified to."

178.    Ms. Sankano, wanting to work on more deals and having enjoyed working with Ms. Mufarrige, expressed to Ms. Mufarrige that she would like to work on more deals with her.

179.    Ms. Sankano did not expect Mr. Bowsher to be on those deals as well.

180.    However, in or around June 2023, Ms. Sankano was placed on a deal with Ms. Mufarrige and Mr. Bowsher, again.

181.    Although she was anxious about having to work with Mr. Bowsher, Ms. Sankano took on the deal with optimism and enthusiasm for her work.

182.    On August 3, 2023, Ms. Sankano opened a file for two deals, the Falls of Braeswood and Falls of Dairy Ashford, for Mr. Bowsher and Ms. Mufarrige.

22

183.    Ms. Sankano's initial email to the Firm's Administration Department indicated that there would be a 70/30 split between Mr. Bowsher and Ms. Mufarrige and that both attorneys would be the "Matter Responsible Attorney."

184.    However, when the Administration Department opened the file, Ms. Sankano realized that Ms. Mufarrige did not receive the proper credit.

185.    As such, Ms. Sankano emailed the Administration Department to inform them that they had made a mistake and reiterated that Ms. Mufarrige was the "Matter Responsible Attorney."

186.    Mr. Bowsher emailed Ms. Sankano back chastising her for her mistake.

187.    The email below speaks for itself:

From: Bowsher, Matthew R. <Matthew.Bowsher@troutman.com>
Sent: Thursday, August 3, 2023 12:44 PM
To: Sankano, Gita F. <Gita.Sankano@troutman.com>
Subject: RE: Falls of Braeswood and Falls of Dairy Ashford - NEW MATTER

I'm concerned that you thought you were "clear". In fact, you were the opposite of clear. And the fact that you still don't see this upon further reflection, even after I've taken the time to point it out, is what worries me.

In your first email below (from 11:09am this morning), you stated "**Kelly should be the matter responsible**". Anyone reading that sentence would reasonably interpret that as a request to make Kelly the matter responsible attorney, i.e. to switch it from 100% Matt to 100% Kelly. There is no other way to interpret that sentence. If you meant to ask for them to change it from Matt being 100% responsible to Matt only being 70% responsible, that is not what that sentence conveyed. You added a sentence which said "See below", and then you added a clip of the originally-requested 70/30 split at the end, but that clip with the correct split contradicted your initial sentence which requested that Kelly be 100% matter responsible; that contradiction is what made your communication anything but clear. Then, adding to the confusion, in your subsequent email, you doubled-down on your initial request, by again saying "**Kelly should be the matter responsible. So it should change from Matt to Kelly.**" Again, I'm not sure how anyone could read that sentence to mean anything other than what it very clearly says, which is that you're asking to make Kelly "the" matter responsible attorney, i.e. the 100% matter responsible, the only matter responsible attorney, not a 70/30 split with Matt.

This is very basic, elementary communication. This has nothing to do with training, or understanding of multifamily transactional law, this is daily required functioning. You expressed interest in receiving my input/feedback in real time as to your performance, so I am taking 20 minutes out of my morning right now to explain to you, in very clear objective detailed analysis, that when I see something like this, where it is so undeniably evident that you've made an obvious and surprising error, and you're saying you still don't see the error even after I've taken the time to point it out to you, and you're still saying you've done nothing wrong… I really just don't know what more I can say here. If you don't even see the problem, I'm not sure how you'll fix it, but it's definitely something you need to fix, because if you had this same type of miscommunication with a client or borrower's counsel rather than with our internal administrative team, I would have to drop everything and get on the phone immediately to do serious damage control, reassuring them that the deal is actually in capable hands. Bottom line: this is not something I would expect from a fourth-year associate.

I am in the office 4 days a week, every week, available to discuss this further in person any time you wish. Just so we are 100% clear, I have no intention of proactively contacting you to discuss this any further, as I've already given you my full and candid thoughts on the matter, nor am I necessarily implying that any further discussion need be had, rather I am merely clarifying that I leave it to your own initiative as to whether you wish to discuss it further.

Matt

**Matthew R. Bowsher**
Partner
troutman pepper
Office: 202.274.1939 | Mobile: 301.512.0423
matthew.bowsher@troutman.com

188.    Ms. Sankano was dismayed by Mr. Bowsher's email.

189.     As a Black woman, rising towards the upper ranks of the professional world, Ms. Sankano felt particularly threatened by Mr. Bowsher's demeaning attacks.

190.     She bravely responded to Mr. Bowsher, telling him that she appreciated his feedback, but would not tolerate Mr. Bowsher questioning her intelligence and belittling her.

191.     Ms. Sankano said, **"I worked hard to be here and I deserve to be here like every other associate."**

192.     Almost immediately, Ms. Sankano forwarded this email to the Multifamily Practice Group leaders, including Mr. Iwashyna, Mr. Schiff, Ms. Nickel, Ms. Crawford and Mr. Tucker.

193.     Ms. Sankano asked Mr. Iwashyna if she could speak with him regarding the email.

194.     She never received a response.

195.     Over the next two days, Ms. Sankano brought her concerns to five different Partners—all of whom sidelined her concerns.

196.     Ms. Sankano first spoke to Mr. Schiff, who did not take Ms. Sankano's concerns seriously.

197.     Unhappy with his answer, Ms. Sankano went directly to Ms. Crawford for advice.

198.     Ms. Crawford suggested Ms. Sankano reach out to Human Resources ("HR").

199.     Ms. Sankano called Mr. Tucker and told him that she did not feel comfortable having Mr. Bowsher evaluating her work, as he had exhibited biases towards her, and she knew it would only result in a bad performance review.

200.     Mr. Tucker seemed to agree with Ms. Sankano and told her he would bring her concerns to the Multifamily Housing Group leaders.

201.    Again, however, Ms. Sankano never heard back from Mr. Tucker or the practice group leaders.

202.    Such blatant disregard for Ms. Sankano's concerns was dispiriting to say the least and had a significant impact on her confidence and self-image.

203.    Ms. Sankano had a scheduled meeting with Jennifer Jana, her Career Coaching and Planning Manager, for August 8, 2023.

204.    After reading Mr. Bowsher's email, Ms. Jana said the email was **"racist"**, and asked Ms. Sankano how she felt when Ms. Jana called the email "racist".

205.    Ms. Sankano told Ms. Jana that she knew she was being treated differently than her white colleagues but knew if she brought her concerns to the Multifamily Practice Group leaders, she would immediately be dismissed, as she had been time and time again.

206.    Even though Ms. Jana acknowledged the legitimacy of Ms. Sankano's concerns, she told Ms. Sankano that she did not know how to help her, but that Ms. Sankano had the option of reporting Mr. Bowsher to HR or to General Counsel, because Mr. Bowsher's email was racist.

207.    Ms. Jana suggested Ms. Sankano reach out to her boss, Sona Spencer, Chief Legal Talent Officer, for advice.

208.    All these reactions are indicative of the dismissiveness and insensitivity Partners at the Firm showed Ms. Sankano.

## VI.    Retaliation Against Ms. Sankano For Filing an HR Complaint Against Mr. Bowsher

209.    One week after receiving the email described above, on August 10, 2023, Ms. Sankano had still not heard from Firm Leadership.

210.    Despite having reached out to six Partners in an effort to solicit advice and escalate her concerns, Ms. Sankano's concerns had once again been ignored by leadership.

211.    As such, Ms. Sankano decided her only recourse was to file an HR complaint.

212.    That day, Ms. Sankano filed a formal complaint with Denise Johnson, Senior Human Resources Manager, regarding Mr. Bowsher's discriminatory treatment.

213.    Ms. Sankano told Ms. Johnson that she knew Mr. Bowsher did not speak to her colleagues in a similar way and that she felt targeted as the only Black woman in the D.C. Multifamily Housing practice group.

214.    Ms. Johnson told Ms. Sankano that she would review Mr. Bowsher's email and get back to her.

215.    The next day, on August 11, 2023, Ms. Sankano met with Ms. Spencer.

216.    During their conversation, Ms. Spencer told Ms. Sankano that Mr. Bowsher's views did not represent the Firm's views and that Ms. Sankano was valued at the Firm.

217.    Ms. Spencer even set up a meeting with Ms. Sankano, Kalle Covert, Director of Professional Development and Mary Cabell Sulc, Practice Director, to discuss Ms. Sankano's **"continued success at the Firm."**

218.    Ms. Sankano felt hopeful that her concerns were finally being addressed.

219.    On August 14, 2023, four days after Ms. Sankano filed her complaint with HR, Dameon Rivers, a Partner in the D.C. office, stopped by Ms. Sankano's office under the guise of concern.

220.    It was obvious, however, that Mr. Rivers, one of the Firm's few Black Partners, was cynically sent by the Firm to try to "deal with" Ms. Sankano.

221.    After Ms. Sankano explained to Mr. Rivers what had been going on with Mr. Bowsher, Mr. Rivers bluntly told Ms. Sankano, **"If I were you, I would leave the Firm because I could not stand the sight of seeing Mr. Bowsher."**

222.    Ms. Sankano was completely taken aback by Mr. Rivers' comment.

223.    Mr. Rivers proceeded to tell Ms. Sankano that she did not want to give the Partners in the Multifamily Housing Group the impression that she was bad at taking feedback.

224.    This was a blatant attempt to push Ms. Sankano out, only four days after reporting to HR.

225.     A few days later, Ms. Sankano went to Mr. Rivers office to tell him that she would not be "pushed out by Mr. Bowsher."

226.    Mr. Rivers responded, "okay, conversations are being had."

227.    Shortly thereafter, an office-wide email was sent out regarding a DEI Town Hall to be hosted by Ms. Spencer.

228.    Given the proximity between the incident and the DEI Town Hall, Ms. Sankano thought this was another performative attempt by the Firm to "stand with their Black employees."

229.    On August 23, 2023, 19 days after Ms. Sankano first filed a complaint with HR, she heard back from Ms. Johnson who told her that the Firm would be launching a formal investigation into Mr. Bowsher's racist misconduct.

230.    Ms. Sankano provided Ms. Johnson with a formal statement, as well as her email communications with Mr. Bowsher.

231.    She also was told not to discuss her concerns with her colleagues, a blatant violation of the anti-discrimination laws.

232.    In the weeks that followed Ms. Sankano's HR Complaint, she was continuously told by Firm Leadership that she was an asset to the team.

233.    Below are a few examples of the praise Ms. Sankano received:

- On August 25, 2023, Kalle Covert, Director of Professional Development, and Mary Cabell Sulc met with Ms. Sankano to discuss her continued success at the Firm. Ms. Covert started off the conversation by telling Ms. Sankano that "her billable hours were great" and "many associates at the Firm would kill for her hours." Ms. Sulc told Ms. Sankano that she was a **"rockstar."** During this conversation, Ms. Covert and Ms. Sulc mentioned concerns highlighted in Ms. Sankano's 2022 performance review, which was never mentioned in her meeting on February 15, 2023, with the Review Committee. In response, Ms. Sankano expressed her concerns that she was not being trained, like her colleagues in the D.C. office. Ms. Sulc suggested that Ms. Sankano start working out of the Richmond, Virgina office to work more closely with Whitney Loughran. Ms. Sankano thought this comment was another attempt to push her out of the D.C. office, as she was sure her white colleagues were not being told the same.

- That same day, Ms. Sankano reached out to Mr. Strup, a Partner whom Ms. Sankano had been working with since late 2020. Ms. Sankano expressed her interest in becoming a Partner and Mr. Strup gave Ms. Sankano tips how to do so. Ms. Sankano mentioned to Mr. Strup that in her review, Mr. Bowsher said Ms. Sankano did not have a formal understanding of the practice. In response, Mr. Strup said "prove the haters wrong." Mr. Strup never once mentioned poor performance.

- Additionally, Ms. Sankano also spoke with Jennifer Bojorquez, a Partner in the Orange County office, on August 25, 2023. Ms. Sankano told Ms. Bojorquez that it was her goal to become a Partner and asked if Ms. Bojorquez could help Ms. Sankano get to the "next level." Ms. Bojorquez told Ms. Sankano that she was going to speak with Mr. Strup, Ms. Nickel and Ms. Crawford to develop a **"game plan"** for Ms. Sankano to **"get to the next level."** Similarly, Ms. Bojorquez did not mention poor performance.

- Two days later, on August 28, 2023, Ms. Sankano met with Ms. Crawford in her office. Ms. Crawford told Ms. Sankano, **"She could see her as a Partner."** Together, Ms. Crawford and Ms. Sankano created a roadmap, highlighting what Ms.

Sankano should focus on in the coming year.  In this meeting, Ms. Crawford made no indications that Ms. Sankano's job was at risk.

• On August 31, 2023, Kate Haeffner, DEI Manager, emailed Ms. Sankano asking if she would accept an award on behalf of the Firm at the HBCU Outreach & Empowerment Award show on September 23, 2023.  Ms. Sankano was under the impression this was because the Firm valued her work.

234.    On October 27, 2023, Ms. Johnson finally reached out to Ms. Sankano to tell her that HR had conducted its investigation and found that while Mr. Bowsher's email on August 3, 2023, was "inappropriate", it was not racist.

235.    Ms. Johnson told Ms. Sankano that they found that Mr. Bowsher treated people at his prior job in the same way, and thus he was not singling out Ms. Sankano.

236.    Ms. Sankano asked Mr. Johnson if they found that Mr. Bowsher treated other Associates at the Firm in the same way.

237.    She did not answer.

238.    Although Ms. Sankano was not happy with the result of the investigation, she nevertheless continued to work hard, feeling confident, based on her multiple conversations with Partners, that she was on track to becoming a Partner herself.

239.    On November 14, 2023, Ms. Sankano attended a Howard University School of Law Etiquette dinner hosted by the Firm.

240.    Notably, this was the second DEI event that the Firm insisted on Ms. Sankano attending since she filed her HR complaint.

241.    At the dinner, Ms. Sankano spoke with a recruiter in the Firm's Atlanta office, who told Ms. Sankano that there has been a "mass exodus" of Black Associates at the Firm.

242.    Ms. Sankano sensed her frustration as she told her that it was because Black Associates at the Firm do not receive the same training and support as their white colleagues.

243.    These statements resonated with Ms. Sankano and her experience working at the Firm.

244.    On November 29, 2023, only one month after the conclusion of the Firm's "investigation" and two weeks after parading Ms. Sankano around the Howard University School of Law Etiquette dinner, Ms. Sankano received an email from Ms. Covert.

245.    In her email, Ms. Covert apologized for the "last minute rush," but Ms. Covert, Mr. Schiff and Mr. Tucker wanted to meet with Ms. Sankano in a conference room at 1:30 p.m. that same day.

246.    Ms. Sankano replied, asking what the meeting was about.

247.    After not receiving a response from Ms. Covert, Ms. Sankano called Ms. Smith to ask if she knew what the meeting was about.

248.    Ms. Smith said she did not know.

249.    Ms. Smith further asked Ms. Sankano if she was on a Corrective Action Plan ("CAP"), Ms. Sankano replied that she was not.

250.    Ms. Sankano then went to Mr. Schiff's office to ask what the meeting was about. Mr. Schiff ominously said, "there have been conversations and it's best we wait to talk until 1:30 p.m."

251.    Ms. Sankano anxiously awaited the meeting for the rest of the morning.

252.    When she arrived, Ms. Covert was attending the meeting virtually and Mr. Schiff and Mr. Tucker were seated on the other side of the table.

253.    Before Ms. Sankano could even take her seat, Ms. Covert told Ms. Sankano that she was being terminated due to her "poor performance."

254.    After Ms. Covert finished going through Ms. Sankano's separation agreement, Mr. Schiff began reading from his prepared notes, stating that the Firm had seen errors in Ms. Sankano's work.

255.    Mr. Schiff specifically cited Ms. Sankano's 2023 performance review, which Ms. Sankano had not yet seen.

256.    As such, after the meeting Ms. Sankano requested a copy of her review from Ms. Covert, but she did not receive one.

257.    Ms. Sankano left the meeting feeling completely blindsided.

258.    Prior to this meeting, Ms. Sankano had not been put on a CAP or been told by anyone that she was not meeting her performance goals.

259.    In fact, up until this point, Ms. Sankano had only received positive feedback from Partners and Firm Leadership.

260.    Notably, upon information and belief, a similarly situated non-Black Associate was placed on a CAP prior to their termination.

261.    Once again, Ms. Sankano was not afforded the same treatment as her non-Black colleagues.

262.    Immediately after leaving the meeting, Ms. Sankano texted Ms. Loughran and Ms. Smith, letting them know she had just been terminated.

263.    Ms. Loughran immediately called Ms. Sankano, telling her that she had not been consulted by anyone at the Firm regarding Ms. Sankano's termination and that she was just as shocked as Ms. Sankano.

264.     This was absolutely unbelievable, as the vast majority of Ms. Sankano's work came from Ms. Loughran.

265.     Additionally, Ms. Loughran is about to go on maternity leave and had been preparing to have Ms. Sankano handle her deals while she is out on leave.

266.     So, not only did the Firm discriminatorily terminate Ms. Sankano, but they have also hung Ms. Loughran – another Black woman – out to dry.

267.     After speaking with Ms. Loughran, Ms. Smith called Ms. Sankano.

268.     Ms. Sankano immediately began crying to Ms. Smith.

269.     Ms. Smith told Ms. Sankano that she also felt blindsided by this decision.

270.     It is clear that the Firm kept the two most senior Black women in the Multifamily Housing Group from being involved in Ms. Sankano's termination.

271.     Notably, everyone else at the Firm received their 2023 performance reviews on December 1, 2023.

272.     However, Ms. Sankano, who had been terminated based on her performance review, did not receive a copy of her review until December 4, 2023, five days after requesting it.

273.     It is clear from Ms. Sankano's performance review that even her evaluators did not know she was going to be terminated.

274.     In Ms. Sankano's review, her evaluators discuss areas of improvement indicating that they expected to see Ms. Sankano's continued employment at the Firm.

275.     One such review states, "*Over the next year*, I'd like to see Gita work to not just understand the mechanics of a deal (which I think she knows very well), but substantively understand the reasoning behind each step" (emphasis added).

276.     This review clearly expresses the view that Ms. Sankano should and would have time to develop her skills as any other attorney would.

277.     Moreover, in averaging the various ratings, Ms. Sankano received a **3.5 out of 5** rating in her 2023 performance review.

278.     The close timing between Ms. Sankano's termination and her HR complaint overwhelmingly suggest a clear case of retaliation by the Firm against Ms. Sankano.

279.     Despite the Firm terminating Ms. Sankano for purported performance issues, in the weeks leading up to Ms. Sankano's termination she never received any negative comments regarding her work.

280.     In fact, during this time, Ms. Sankano accepted an award on behalf of the Firm and even had discussions with Firm leadership regarding being out on the "Partner track."

281.     Indeed, Ms. Sankano was never put on a CAP or given a warning prior to her termination.

282.     Perhaps most damning of all, on or about December 8, 2023, Ms. Sankano was informed that employees were being told that she was being fired because she filed a complaint against a Partner.

283.     Ms. Sankano was terminated not for "performance issues," but instead was fired in retaliation for filing a complaint of race discrimination.

284.     Finally, to add insult to injury, after learning that Ms. Sankano was represented by counsel and asserting legal claims against the Firm, her employment, which was to continue into 2024, was terminated without notice.

285.     This retaliatory decision will obviously harm Ms. Sankano's personal and professional relationships, as she left without any notice to her colleagues and while she was still performing work for the Firm.

## FIRST CAUSE OF ACTION
### (Discrimination in Violation of § 1981)

286.     Plaintiff hereby repeats and realleges each and every allegation in the preceding paragraphs as though set forth fully herein.

287.     As described herein, Defendant discriminated against Plaintiff because of her race, by, *inter alia*, summarily terminating Plaintiff, and thus subjecting her to disparate treatment.

288.     As described herein, Defendant discriminated against Plaintiff because of her race, by, *inter alia*, creating a hostile work environment for Plaintiff.

289.     As a direct and proximate result of Defendant's unlawful discriminatory conduct in violation of § 1981, Plaintiff has suffered and continues to suffer, economic damages for which she is entitled to an award of damages.

290.     As a direct and proximate result of Defendant's unlawful discriminatory conduct in violation of § 1981, Plaintiff has suffered, and continues to suffer, severe mental and emotional distress for which she is entitled to an award of damages.

291.     Defendant's discriminatory treatment constitute malicious, willful and wonton violation of § 1981 for which Plaintiff is entitled to an award of punitive damages.

## SECOND CAUSE OF ACTION
### *(Retaliation in Violation of § 1981)*

292.    Plaintiff hereby repeats and realleges each and every allegation in the preceding paragraphs as though set forth fully herein.

293.    Defendant retaliated against Plaintiff for engaging in protected activity, by, *inter alia*, terminating her employment.

294.    As a direct and proximate result of Defendant's unlawful retaliatory conduct in violation of § 1981, Plaintiff has suffered, and continues to suffer, economic damages for which she is entitled to an award of damages.

295.    As a direct and proximate result of Defendant's unlawful retaliatory conduct in violation of § 1981, Plaintiff has suffered, and continues to suffer, severe mental and emotional distress for which she is entitled to an award of damages.

296.    Defendant's unlawful retaliatory actions constitute malicious, willful and wonton violations of § 1981 for which Plaintiff is entitled to an award of punitive damages.

## THIRD CAUSE OF ACTION
### *(Discrimination in Violation of DCHRA)*

297.    Plaintiff hereby repeats, reiterates, and re-alleges each and every allegation as contained in each of the proceeding paragraphs, as though full set forth herein.

298.    By the actions described above, among others, Defendant discriminated against Plaintiff on the basis of her race and color, in violation of the DCHRA.

299.    Defendant has further discriminated against Plaintiff in violation of the DCHRA by creating, fostering, condoning, accepting, ratifying, and/or otherwise failing to prevent or to remedy a hostile work environment.

300.    As a direct and proximate result of the unlawful discriminatory conduct committed by Defendant in violation of the DCHRA, Plaintiff has suffered, and continues to suffer, monetary and/or other economic harm, including, but not limited to, loss of past and further income, for which she is entitled to an award of monetary damages and other relief.

301.    As a direct and proximate result of the unlawful conduct committed by Defendants in violation of the DCHRA, Plaintiff has suffered, and continues to suffer, mental anguish and emotional distress, including, but not limited to stress, anxiety, loss of self-esteem and self-confidence, embarrassment, as well as emotional pain and suffering for which she is entitled to an award of monetary damages and other relief.

302.    Defendant's unlawful discriminatory actions constitute malicious, willful, and wonton violations of the DCHRA, for which Plaintiff is entitled to an award of punitive damages.

## FOURTH CAUSE OF ACTION
### *(Retaliation in Violation of DCHRA)*

303.    Plaintiff hereby repeats, reiterates, and re-alleges each and every allegation as contained in each of the proceeding paragraphs, as though full set forth herein.

304.    By the actions described above, among others, Defendant retaliated against Plaintiff on for exercising her protected rights, including, but not limited to, reporting a Partner for his discriminatory conduct to HR.

305.    As a direct and proximate result of the retaliation by Defendant in violation of the DCHRA, Plaintiff has suffered, and continues to suffer, monetary and/or other economic harm, including, but not limited to, loss of past and further income, for which she is entitled to an award of monetary damages and other relief.

306.    As a direct and proximate result of the unlawful conduct committed by Defendants in violation of the DCHRA, Plaintiff has suffered, and continues to suffer, mental anguish and emotional distress, including, but not limited to stress, anxiety, loss of self-esteem and self-confidence, embarrassment, as well as emotional pain and suffering for which she is entitled to an award of monetary damages and other relief.

307.    Defendant's unlawful discriminatory actions constitute malicious, willful, and wonton violations of the DCHRA, for which Plaintiff is entitled to an award of punitive damages.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays that the Court enter judgment in her favor and against Defendants, containing the following relief:

A.    A declaratory judgment that the actions, conduct and practices of Defendant complained of herein violate the laws of the United States;

B.    An injunction and order permanently restraining the Defendant and its officers, officials, agents, successors, employees and/or representatives, and any and all persons acting in concert with and/or on behalf of them, from engaging in any such further unlawful conduct, including the policies and practices complained of herein.

C.    An injunction and order requiring the Defendant to take appropriate action to protect employees, prevent discrimination and provide avenues for prompt and immediate corrective action, with such measures to include, but not be limited to, the measures set forth above.

D.    An award of damages against Defendant in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all monetary and/or economic damages.

E.    An award of damages against Defendant in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all non-monetary and/or compensatory damages, including, but not limited to, compensation for emotional distress and/or mental anguish.

F.    An award of punitive damages and any applicable penalties in an amount to be determined at trial.

G.    Prejudgment interest on all amounts due.

H.    An award of fees and costs that Plaintiff has incurred in this action, including, but not limited to, expert witness fees, as well Plaintiff's reasonable attorneys' fees and costs to the fullest extent permitted by law.

I.    Such other and further relief as the Court may deem just and proper.

<u>**JURY DEMAND**</u>

Plaintiff hereby demands a trial by jury on all issues of fact and damages stated herein.

Dated: January 17, 2024
      New York, New York                    Respectfully submitted,

                                       **WIGDOR LLP**

                                       By: _Jeanne Christen_

                                       Jeanne M. Christensen
                                       Michael J. Willemin (*pro hac vice* motion forthcoming)

                                       85 Fifth Avenue
                                       New York, NY 10003
                                       Telephone: (212) 257-6800
                                       Facsimile: (212) 257-6845
                                       jchristensen@wigdorlaw.com
                                       mwillemin@wigdorlaw.com

                                       *Counsel for Plaintiff*