**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

**GITA F. SANKANO,**

                    **Plaintiff,**

             **v.**

**TROUTMAN PEPPER HAMILTON**
**SANDERS LLP AND BRIAN IWASHYNA,**

                 **Defendants.**

**Case No. 1:24-cv-00142-JMC**

---

**STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF**
**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Pursuant to Rule 56 of the Federal Rules of Civil Procedure and Rule 7(h) of the Local Rules of this Court, Defendants, by and through counsel, submit their Statement of Undisputed Material Facts in Support of their Motion for Summary Judgment.

**A.**     **Plaintiff's Hiring at Pepper Hamilton**

1.     In the summer of 2019, Plaintiff contacted Henry Liu, the managing partner of the Washington, D.C. office of Pepper Hamilton LLP, and expressed interest in working at the firm. Declaration of Henry Liu ("Liu Decl.") ¶ 4 (attached hereto as <u>Appendix A)</u> .

2.     Mr. Liu did not need a new associate, so he referred Plaintiff to Christine Waldmann Carmody, another partner at Pepper Hamilton who had indicated to Mr. Liu a potential need for a new associate to support her practice. Liu Decl. ¶ 4.

3.     Ms. Carmody made the decision to hire Plaintiff in 2019 as an associate to provide support for her practice. Declaration of Christine Waldmann Carmody ("Carmody Decl.") ¶ 5

(attached hereto as <u>Appendix B</u>); Gita Sankano Deposition Transcript ("Pl. Dep.") 47:10 (attached hereto as <u>Appendix R</u>).

4.      Ms. Carmody was a partner in Pepper Hamilton's Financial Services Practice Group, and she represents lenders in connection with loans insured by the Federal Housing Administration ("FHA"), which is part of Housing and Urban Development ("HUD"). Carmody Decl. ¶ 4; Pl. Dep. 47:10-12.

5.      Ms. Carmody interviewed Plaintiff, so Ms. Carmody was aware of Plaintiff's race when she decided to hire Plaintiff as an associate. Carmody Decl. ¶ 6; Pl. Dep. 44:10-12.

6.      In late August 2019, Plaintiff began as an entry-level associate, commonly referred to as a "first-year associate," at Pepper Hamilton in its Washington, D.C. office, exclusively working for Ms. Carmody on FHA/HUD loans. Carmody Decl. ¶¶ 5, 7; Pl. Dep. 47:10-10.

7.      Ms. Carmody understood that Plaintiff had graduated law school in 2018, but had spent the year after graduation clerking for a judge, and thus believed that Plaintiff did not have any experience working on FHA/HUD loans, or any other type of multifamily housing finance matters when Plaintiff began her employment at Pepper Hamilton. Carmody Decl. ¶ 6.

8.      During the time Plaintiff worked at Pepper Hamilton, the firm did not have a minimum number of hours that associates were required to bill, but it did have an annual billable target of 1940 billable hours for associates. Declaration of Audrey Wisotsky ("Wisotsky Decl.") ¶ 9 (attached hereto as <u>Appendix C</u>).

**B.      Plaintiff's Work with Christine Carmody in 2019 and Early 2020**

9.      Plaintiff was the first, and only, first-year associate who was hired to work with Ms. Carmody who had no relevant prior experience in the practice. Ms. Carmody was solely

responsible for supervising Plaintiff, training Plaintiff, and assigning sufficient work to keep Plaintiff busy. Carmody Decl. ¶ 5.

10.     Randy Hurlbut worked for Ms. Carmody as a first year and occasionally did work for Ms. Carmody in 2019 and early 2020. *Id*. at ¶ 20.

11.     Mr. Hurlburt was not a first-year associate in 2019 or early 2020. *Id*. at ¶ 20.

12.     Mr. Hurlburt had prior experience as a law clerk in the Financial Services Practice Group prior to going to law school, so he was familiar with financial services and MFH work, and he was also familiar with timekeeping and what should be billed to a client. *Id*. at ¶ 20.

13.     For a period of time until April or May 2020, Ms. Carmody asked Plaintiff to send draft time entries to Ms. Carmody before that time was inputted into the Pepper Hamilton timekeeping system. *Id*. at ¶ 7.

14.     Ms. Carmody asked to review Plaintiff's time before it was entered in part because Ms. Carmody knew that Plaintiff was a new associate and did not have experience with timekeeping or billing practices, and Ms. Carmody believed it was her responsibility to train Plaintiff on how to accurately record and bill her time. *Id*. at ¶ 7.

15.     Ms. Carmody asked to review Plaintiff's time before it was entered in part because Ms. Carmody believed it was her responsibility to supervise Plaintiff's work, which included reviewing Plaintiff's activities and how much time Plaintiff spent on assignments, so Ms. Carmody could provide feedback to Plaintiff and balance her workload. *Id*. at ¶ 7.

16.     As a new attorney, Plaintiff was less efficient and took longer to perform each task than a more experienced attorney would take—this was expected for all first-year associates, especially those with no prior experience in a specific practice area. *Id*. at ¶ 8.

17.     Ms. Carmody asked to review Plaintiff's time before it was entered in part because Ms. Carmody did not think that a client should be billed for all the time that Plaintiff worked on a matter, when some of that time was training for a first-year associate and some of the time was due to the inherent inefficiency of an inexperienced attorney. *Id*.

18.     Plaintiff does not know the real reason why Ms. Carmody asked her to move it to a non-billable training number or other non-billable firm code.  Pl. Dep. 92:22-93:5.

19.     During the period of time when Ms. Carmody was reviewing Plaintiff's time entries, Ms. Carmody would direct Plaintiff to move some of her time to a non-billable training number or other non-billable firm code, instead of a billable client number because Ms. Carmody did not think that a client should be billed for all the time that Plaintiff worked on a matter, when some of that time was training for a first-year associate and some of the time was due to the inherent inefficiency of an inexperienced attorney. Carmody Decl. ¶ 8.

20.     Although many of Ms. Carmody's deals were paid on a flat-fee basis, it was still important that the time billed is accurate, should the client ask to see an itemized bill of the hours worked, which occasionally occurred. *Id*.

21.     Ms. Carmody asked to review Plaintiff's time before it was entered in the timekeeping system and moved some of Plaintiff's time to a non-billable training number or other non-billable firm code.  Carmody Decl. ¶ 11.

22.     Ms. Carmody did not benefit, financially or otherwise, by adjusting Plaintiff's hours on the front end, prior to the time being entered into the system, versus allowing her to enter unreviewed time and have it cut (or written off) on the back end. *Id*.

23.     Towards the end of 2019, the head of the Associates' Committee at Pepper Hamilton, Audrey Wisotsky, reached out to Ms. Carmody after learning that Plaintiff had very few billable hours entered into the timekeeping system. Carmody Decl. ¶ 12; Wisotsky Decl. ¶ 4.

24.     Ms. Carmody explained to Ms. Wisotsky that Plaintiff had been working, but Ms. Carmody had asked to review Plaintiff's time entries before they were entered into the timekeeping system. Wisotsky Decl. ¶ 4.

25.     Although acknowledging that the ultimate decision on what and how much to bill to clients is generally made by the responsible partner, Ms. Wisotsky thought that Ms. Carmody's approach for previewing Plaintiff's time entries was less appropriate than the usual approach at Pepper Hamilton, which was for associates to enter their time into the timekeeping system under a billable client/matter number, and then the responsible partner could write off the time (or move the time to a non-billable number) before sending an invoice to the client. Wisotsky Decl. ¶ 6.

26.     There was no policy at Pepper Hamilton prohibiting a partner from moving an associate's time from a billable number to a non-billable number, either before or after it was entered in the firm's timekeeping system. *Id*. at ¶ 7.

27.     Neither Plaintiff nor any other entry-level associate at Pepper Hamilton received a bonus for their work in 2019. *Id*. at ¶ 12.

28.     In March 2020, when the COVID-19 pandemic began, the nature of Ms. Carmody's work changed substantially in two ways: (a) at first, clients asked Ms. Carmody to process more administrative paperwork associated with loan applications, as Pepper Hamilton attorneys were still largely going into the office, whereas clients' personnel were working remotely, and (b) subsequently, the workload decreased, as everyone struggled to navigate the pandemic. Carmody Decl. ¶ 17.

29.    Plaintiff began working remotely in or around the end of April or early May 2020, and because Ms. Carmody had less work that could be completed remotely, there was less for Plaintiff to do, and Plaintiff's hours dropped as a result. *Id*. at ¶ 18; Pl. Dep. 52:3-6.

30.    Ms. Carmody did not replace Plaintiff or otherwise work with a different associate during the time period from the end of April through early May 2020. Carmody Decl. ¶ 19.

**C.    Plaintiff's 2020 Interim Performance Review**

31.    At Pepper Hamilton, entry-level associates who begin in the fall generally received an interim evaluation in March or April of the following year. Wisotsky Decl. ¶ 10.

32.    In March 2020, Ms. Carmody completed a performance evaluation for Plaintiff. Carmody Decl. ¶ 13.

33.    In her March 2020 performance evaluation, Ms. Carmody praised Plaintiff's attitude and work ethic and stated that Plaintiff was "making good progress in developing proficiency in the many areas she needs to learn." *Id*.

34.    Ms. Carmody also commented that Plaintiff "needs to remember to re-read instructions and address comments exactly as requested while she is in the learning phase, and focus on getting each piece perfect and to use everything she knows for each task." *Id*.

35.    On April 21, 2020, Ms. Wisotsky met with Plaintiff to discuss her interim evaluation, and during that meeting, Ms. Wisotsky told Plaintiff that going forward, she should not wait for Ms. Carmody to review her time before it was entered into the firm's timekeeping system. Wisotsky Decl. ¶ 11; Pl. Dep. 63:8-10.

36.    As Ms. Wisotsky was aware of Ms. Carmody's prior instructions concerning Plaintiff's timekeeping, Ms. Wisotsky did not hold Plaintiff responsible for her billable hours and

ensured that Plaintiff did not suffer any adverse effects as far as her performance evaluation went, due to Ms. Carmody's actions. Wisotsky Decl. ¶ 11; Pl. Dep. 51:1-3, 63:6-15.

37.    After Plaintiff's interim evaluation meeting, Plaintiff contacted Ms. Carmody and informed her of Ms. Wisotsky's instruction to begin entering her time directly into the firm's timekeeping system. Carmody Decl. ¶14.

38.    In May 2020, Plaintiff stopped sending Ms. Carmody her time to review before it was entered in the timekeeping system. Carmody Decl. ¶¶ 14-15.

39.    Plaintiff told Ms. Wisotsky that she no longer wished to work with Ms. Carmody. Wisotsky Decl. ¶ 11.

40.    Ms. Wisotsky informed Mr. Liu that Plaintiff no longer wanted to work with Ms. Carmody and that Plaintiff wanted to move her office away from Ms. Carmody. *Id*.; Liu Decl. ¶ 6.

41.    Mr. Liu approved Plaintiff moving to a different floor away from Ms. Carmody. Liu Decl. ¶ 8; Pl. Dep. 101:15-102:6.

42.    After Plaintiff asked to stop working with Ms. Carmody, Mr. Liu was unable to provide Plaintiff with much work, as he already had associates working on his deals and that he was responsible for keeping busy. Liu Decl. ¶ 8; Pl. Dep. 147:12-15.

43.    Plaintiff had primarily worked with Ms. Carmody on FHA/HUD loans, whereas Mr. Liu handled Fannie Mae or Freddie Mac loans, which would have made it difficult for Plaintiff to transition quickly into Mr. Liu's deals. Liu Decl. ¶ 8; Pl. Dep. 147:16-148:12.

44.    After Plaintiff informed him that she no longer wanted to work with Ms. Carmody, Blair Schiff, another partner at Pepper Hamilton who worked on FHA/HUD loans, gave Plaintiff a few projects in or around May and June 2020. Declaration of Blair Schiff ("Schiff Decl.") ¶ 7 (attached hereto as <u>Appendix D)</u> ; Pl. Dep. 95:18-96:19.

45.     The projects that Mr. Schiff gave Plaintiff in May and June 2020 were the same type of projects that he typically assigned to first-year associates.  Schiff Decl. ¶ 8.

46.     No one told Ms. Carmody that Plaintiff believed Ms. Carmody was reviewing and reassigning her time because of her race. Carmody Decl. ¶ 16; Wisotsky Decl. ¶ 8.

**D.    Merger of Troutman Sanders and Pepper Hamilton on July 1, 2020, and Plaintiff's Transition to Agency Work**

47.     On July 1, 2020, Troutman Sanders LLP combined with Pepper Hamilton LLP, becoming Troutman Pepper Hamilton Sanders LLP ("Troutman" or the "Firm").  Declaration of Brian Iwashyna ("Iwashyna Decl.") ¶ 2 (attached hereto as <u>Appendix E</u>).

48.     Brian Iwashyna served as the Practice Group Leader of Troutman's Multifamily Housing Finance ("MFH") Practice Group. *Id*. at ¶ 4.

49.     Prior to the merger, Ms. Wisotsky and Mr. Liu asked Mr. Iwashyna if the MFH attorneys that worked on Fannie Mae and Freddie Mac loan transactions (*i.e.*, the "Agency team") could provide work to Plaintiff, and Mr. Iwashyna began efforts to integrate Plaintiff into the Agency team after the merger. *Id*. at ¶¶ 6-7.

50.     On July 1, 2020, the effective date of the merger, all attorneys from Pepper Hamilton's Financial Services Practice Group who practiced in the area of multifamily housing finance, including Plaintiff, were assigned to Troutman's MFH Practice Group. *Id*. at ¶ 5; Pl. Dep. 54:5-9.

51.     In July 2020, after the merger, Mr. Liu notified Plaintiff that she would begin working with the Agency team when she returned from her planned vacation in early August 2020. Liu Decl. ¶ 7.

52.     To assist Plaintiff's transition to the Agency team, and to ensure Plaintiff was getting enough work and exposure to different types of projects and attorneys, Mr. Iwashyna asked

Plaintiff to send him and Nora Nickel, one of the Professional Development Partners for the MFH Practice Group, also based in Richmond, an email every week describing her work assignments and hours.  Iwashyna Decl. ¶ 8.

53.    Plaintiff provided Mr. Iwashyna and Ms. Nickel her weekly reports from September 2020 through December 2021. *Id.*; Declaration of Nora Nickel ("Nickel Decl.") ¶ 5 (attached hereto as Appendix F).

54.    During Plaintiff's first year in the MFH Practice Group, Mr. Iwashyna and Ms. Nickel periodically checked in with Plaintiff to make sure she had enough work, and Plaintiff consistently assured Ms. Nickel and Mr. Iwashyna that she was doing well and getting helpful feedback. Iwashyna Decl. ¶ 10; Nickel Decl. ¶ 6.

55.    One MFH partner who gave Plaintiff training and feedback early in her transition working with the Agency team was Matthew Bowsher, a partner in the Washington, D.C. office. Declaration of Matthew Bowsher ("Bowsher Decl.") ¶¶ 2-3 (attached hereto as Appendix G).

56.    In November 2020, Mr. Bowsher contacted Plaintiff and asked her if she was interested in working with him. *Id.* at ¶ 4.

57.    To find Plaintiff's contact information, Mr. Bowsher searched the firm's directory on the intranet, which includes photographs, so Mr. Bowsher was aware that Plaintiff was Black prior to speaking with her and asking her to work with him on deals. *Id.*

58.    Mr. Bowsher primarily worked on Freddie Mac loans and understood that Plaintiff did not have any experience working on those types of loans, so he offered to provide her with weekly one-on-one training to get her up to speed and answer any questions she may have about the deals. *Id.* at ¶ 6.

59.     Mr. Bowsher conducted weekly, one-on-one training sessions for Plaintiff from November 2020 through February 2021. *Id.* at ¶ 7.

60.     Plaintiff began working on one of Mr. Bowsher's deals in December 2020 and continued to work on deals with Mr. Bowsher off and on into 2022. *Id.* at ¶ 9.

61.     Mr. Iwashyna worked on a few deals with Plaintiff in late 2020 and thought she did a good job as the junior associate on those deals, but after 2020, Mr. Iwashyna did not work on any deals with Plaintiff. Iwashyna Decl. ¶ 11.

62.     As the Practice Group Leader, Mr. Iwashyna was responsible for monitoring the performance of the associates, so he regularly solicited and received feedback from MFH partners about associates' performance. *Id.* at ¶¶ 12, 22.

63.     All of Mr. Iwashyna's impressions about Plaintiff's work product from 2021 through 2023 were based on both (a) feedback that he received from several MFH partners in emails and conversations and (b) what he read in Plaintiff's written performance evaluations. *Id.* at ¶ 11.

**E.     Evaluations of Plaintiff's 2020 Performance**

64.     In September 2020, Scott Fireison, a partner in the MFH Practice Group in the Washington D.C. office, informed Mr. Iwashyna that he had previously worked with Plaintiff and "did not find her ability acceptable (cost me more time than it saved me)." *Id.* at ¶ 13.

65.     In October 2020, Jonathan Lautt, another MFH partner in the Richmond office, communicated to Mr. Iwashyna that working with Plaintiff had been "a little rough" explaining that Plaintiff had a number of major "misses" due to failure to proofread and not paying attention, citing examples where Plaintiff had left in phrases and paragraphs from prior deals that were

inapplicable to the current deals. *Id*. at ¶ 14; Declaration of Jonathan Lautt ("Lautt Decl.") ¶ 9 (attached hereto as <u>Appendix H</u>).

66.     While Mr. Lautt was initially optimistic about Plaintiff's potential due to her positive attitude, in 2021, Mr. Lautt communicated to Mr. Iwashyna that he no longer intended to work with Plaintiff on his deals going forward. Iwashyna Decl. ¶ 15; Lautt Decl. ¶¶ 7, 10.

67.     Plaintiff's 2020 performance evaluation is Exhibit 7 to the Iwashyna Declaration (Appendix E) and Exhibit 7 to the Declaration of Kalle Covert ("Covert Decl.") (attached hereto as <u>Appendix I</u>) .

68.     For the 2020 performance review period, Plaintiff received written evaluations from the following partners: Andrew Rogoff, Peter Strup, Anthony Vale, David Wormser, Henry Liu, and Nora Nickel.  Iwashyna Decl. Ex. 7; Covert Decl. Ex. 7.

69.     Plaintiff's overall evaluation for 2020 was generally positive, with partners complimenting her eagerness to learn and good work ethic; however, several MFH partners noted that Plaintiff needed to improve in her lack of attention to detail.  Iwashyna Decl. Ex. 7; Covert Decl. Ex. 7.

70.     For her work in 2020, Plaintiff received the same lockstep salary increase as other associates at her class level.  Covert Decl. ¶ 38.

71.     Associates at Troutman were eligible for a bonus for 2020 only if they achieved 2100 hours through a combination of both billable hours and non-billable "Total Contribution Hours" or had very high levels of performance.  Wisotsky Decl. ¶ 13.

72.     Plaintiff did not receive a bonus for 2020 because she did not qualify for one; Plaintiff's billable hours plus her Total Contribution Hours did not exceed 2100 hours. *Id*. at ¶ 14.

**F.      Evaluations of Plaintiff's 2021 Performance**

73.      In 2021, MFH partners continued to express concerns about Plaintiff's performance, and those concerns were communicated to Mr. Iwashyna. Iwashyna Decl. ¶ 12.

74.      In early 2021, Mr. Bowsher voiced concerns about Plaintiff's performance to S.R. Sidarth, another MFH partner in the Washington, D.C. office, stating that while Plaintiff was proactive and had good attitude, she was particularly "raw" and asked some concerning questions, which demonstrated a lack of basic understanding of closing deals. Bowsher Decl. ¶ 12.

75.      In June 2021, Mr. Bowsher emailed Ms. Nickel about problems he saw with Plaintiff's performance, including her lack of substantive knowledge or progression since starting in MFH, and Ms. Nickel forwarded that email to Mr. Iwashyna. *Id*. at ¶ 14; Iwashyna Decl. ¶ 19.

76.      By August 2021, Mr. Bowsher had started to lose confidence in Plaintiff's ability to succeed in the MFH Practice Group after not seeing much improvement since she started working with the Agency team the year prior, and Mr. Bowsher told Mr. Iwashyna that he was "not bullish on her trajectory." Bowsher Decl. ¶ 15.

77.      In November 2021, Mr. Bowsher told Mr. Sidarth that he did not think that Plaintiff was even at the level of another associate who was two years her junior, in terms of ability to handle a deal independently. *Id*.

78.      In late 2021, Mr. Iwashyna also learned that Mr. Sidarth no longer wanted to work with Plaintiff, unless a senior associate was also involved, based on Mr. Sidarth's concerns with Plaintiff's performance. Iwashyna Decl. ¶ 17.

79.      Also in 2021, Peter Strup, a MFH Partner in the Richmond office, communicated to Mr. Iwashyna that Plaintiff did not seem to understand the substance of deals and she was unable

to apply learnings from one deal to the next. *Id*. at ¶ 25; Declaration of Peter Strup ("Strup Decl.") ¶ 11 (attached hereto as <u>Appendix J)</u> .

80.    Plaintiff's 2021 performance evaluation is Exhibit 8 to the Iwashyna Declaration (Appendix E) and Exhibit 8 to the Covert Declaration (Appendix I).

81.    For the 2021 performance review period, Plaintiff received evaluations from the following MFH partners: Lindsey Crawford, Kevin Dexter, Nora Nickel, S.R. Sidarth, Marshall Tucker, and a partner in another practice group, Kasseem Lucas, who commented on Plaintiff's non-billable contributions. Iwashyna Decl. Ex. 8; Covert Decl. Ex. 8.

82.    As with Plaintiff's 2020 evaluation, Plaintiff's 2021 evaluation included significant praise about her attitude, willingness to learn, and responsiveness. *Id*.

83.    Plaintiff's 2021 performance evaluation noted several areas that needed improvement, such as slowing down "so that she can better absorb the substance behind the matters"; "taking concepts/experience learned in deals and applying it to future transactions"; "increase[ing] her substantive knowledge of Freddie and Fannie"; "focus on higher level issues that arise on deals"; and "developing knowledge of the practice and her skill set." Iwashyna Decl. Ex. 8.

84.    Plaintiff received a copy of her 2021 performance evaluation.  Covert Decl. ¶ 4.

85.    Plaintiff received a lockstep salary increase and bonus commensurate with her hours and class year for her work in 2021.  *Id*. at ¶ 38.

G.    **Evaluations of Plaintiff's 2022 Performance**

86.    Mr. Bowsher worked with Plaintiff on a number of deals in 2022, and while he praised Plaintiff when she did a good job, Mr. Bowsher observed that Plaintiff made many

substantive mistakes and careless errors, which he recorded contemporaneously through direct written feedback to Plaintiff and in his own notes. Bowsher Decl. ¶¶ 16-19.

87.     Throughout 2022, Mr. Bowsher continued to express to Mr. Iwashyna his concerns about Plaintiff's performance, including her lack of substantive knowledge, despite receiving significant feedback and training, and sloppiness in her work product. Iwashyna Decl. ¶ 20, Bowsher Decl. ¶ 21.

88.     In November 2022, Mr. Bowsher also voiced his concerns with Plaintiff's inefficient time and complete lack of appropriate judgment on deals to other MFH partners besides just Mr. Iwashyna. Bowsher Decl. ¶ 20.

89.     By late 2022, Mr. Bowsher had completely lost confidence in Plaintiff's work and decided that he no longer wanted to work with Plaintiff, which he communicated to Mr. Iwashyna. Bowsher Decl. ¶¶ 20-21; Iwashyna Decl. ¶ 20.

90.     Plaintiff's 2022 performance evaluation is Exhibit 9 to the Iwashyna Declaration (Appendix E) and Exhibit 9 to the Covert Declaration (Appendix I).

91.     For the 2022 performance period, Plaintiff received evaluations from the following MFH partners: Nora Nickel, Jennifer Bojorquez, Matthew Bowsher, Lindsey Crawford, Peter Strup, and S.R. Sidarth.  Iwashyna Decl. Ex. 9; Covert Decl. Ex. 9.

92.     As with Plaintiff's 2020 and 2021 evaluations, Plaintiff's 2022 evaluations included praise for her responsiveness, eagerness to work, and great attitude.  *Id*.

93.     Plaintiff's 2022 performance evaluations continued to note several areas that needed improvement, such as "work on communication and making sure that the partner/senior associate has signed off on work product"; "greater depth of substance and the reasons behind why certain documentation is acceptable while other documentation is not"; "become more familiar

with complex deal types and issues"; need to see "her problem solving skill[s] develop and for her to develop more of a process to answer questions she may have on her own"; "general knowledge of the multifamily housing space"; "slow down a little in order to better understand the big picture"; "needs to become more thorough and more efficient"; "ask questions early and often when handling a transaction." *Id*.

94.     Mr. Bowsher's 2022 review of Plaintiff's performance praised Plaintiff for her responsiveness and follow up, but provided specific examples of mistakes Plaintiff made in his deals that illustrated what he noted as needed areas of improvement, which included "more attention to detail, more independent analysis, and demonstration of a deeper level of understanding of the underlying issues, rather than merely moving the checklist forward at lightspeed." *Id*.

95.     Mr. Sidarth's numerical ratings were the lowest of all reviewers in 2022, even noting her as a "2 – Needs Improvement" in several areas. *Id*.

96.     Plaintiff received a copy of her 2022 performance evaluation.  Covert Decl. ¶ 4.

97.     Plaintiff received a lockstep salary increase and bonus commensurate with her hours and class year for her work in 2022.  Covert Decl. ¶ 38.

**H.     Evaluations of Plaintiff's 2023 Performance**

98.     In late 2022, Mr. Iwashyna encouraged Dameon Rivers, a new partner who had joined the MFH Practice Group in the fall of 2022 in the Washington, D.C. office, to work with Plaintiff, and Mr. Rivers agreed.  Iwashyna Decl. ¶ 27.

99.     In April 2023, when Mr. Iwashyna checked in with Mr. Rivers on how things were going with Plaintiff, Mr. Rivers told Mr. Iwashyna that he thought Plaintiff had a "low ceiling" and was not picking up on substantive skills and knowledge, despite training and feedback that

Mr. Rivers and his senior associate, Lanre Popoola, had provided to Plaintiff. Iwashyna Decl. ¶ 28; Declaration of Dameon Rivers ("Rivers Decl.") ¶ 11 (attached hereto as <u>Appendix K</u>).

100.    Mr. Rivers communicated to Mr. Iwashyna in April 2023 that because he had not seen any improvement in Plaintiff's performance, he would no longer staff Plaintiff on his deals. Iwashyna Decl. ¶ 28; Rivers Decl. ¶ 11.

101.    Mr. Rivers feedback was a "tipping point" for Mr. Iwashyna since several MFH partners, including most of the MFH partners in Plaintiff's Washington, D.C. office, had decided to no longer work with Ms. Sanknao, and Mr. Iwashyna had hoped Mr. Rivers would be a lifeline for Ms. Sanako; however, after he received the negative feedback on Plaintiff's performance from Mr. Rivers in the spring of 2023, Mr. Iwashyna began to consider separating Plaintiff from employment with the firm. Iwashyna Decl. ¶ 34.

102.    On April 19, 2023, Mr. Iwashyna emailed Mr. Tucker and Ms. Nickel, both MFH partners, informing them that he thought they were "going to have to make a hard call on [Plaintiff] at some point." *Id*.

103.    Around the same time, in the spring of 2023, Mr. Strup spoke with Mr. Iwashyna about his continued concerns with Plaintiff, reporting that her performance had not improved, and things were not working out with her. Iwashyna Decl. ¶ 26; Strup Decl. ¶ 13.

104.    In yet another attempt to find a partner with whom Plaintiff could work satisfactorily, in May 2023, Mr. Iwashyna reached out to Mr. Lautt to ask that he try working with Plaintiff again, which Mr. Lautt agreed to do. Iwashyna Decl. ¶ 16; Lautt Decl. ¶ 11.

105.    Also in May 2023, Mr. Iwashyna attended a meeting of the Firm's Practice Group Leaders, where firm management asked them to "take a hard look" at their associates to determine their likely future path at the firm. Iwashyna Decl. ¶ 36.

16

106.    After the Practice Group Leader meeting in May 2023, Mr. Iwashyna emailed the MFH Practice Director, Mary Cabell Sulc, asking her for information about the MFH associates, the new "Career Track" option that the Firm planned to offer, and certain MFH associates who Mr. Iwashyna characterized as "problem people," which included Plaintiff. *Id.*

107.    On June 16, 2023, Mr. Iwashyna, as the MFH Practice Group Leader, participated in a meeting to discuss the associates in the MFH Practice Group and their path forward at the Firm; in attendance at that meeting were (a) the Chair of the Firm's Associate Development Committee ("ADC"), (b) representatives of the firm's Legal Talent department, including Kalle Covert, Director of Professional Development, (c) the MFH Practice Director, Ms. Sulc, and (d) the MFH partners responsible for MFH associate development—Ms. Nickel (who was one of the Professional Development Partners for the MFH Practice Group), Mr. Tucker (a member of the firm's ADC), and Mr. Schiff (who was the other MFH Professional Development Partner and a member of the firm's ADC). Iwashyna Decl. ¶ 37; Nickel Decl. ¶¶ 4, 16; Schiff Decl. ¶ 12; Declaration of Marshall Tucker ("Tucker Decl.") ¶ 12 (attached hereto as Appendix L); Covert Decl. ¶ 5.

108.    The June 16, 2023 mid-year meeting was part of the firm's standard cycle for reviewing associate performance, allowing the Practice Groups to follow up on issues identified in the previous year-end reviews, identify any issues that have arisen with respect to their associates, and assess how associates are progressing in their path to partnership. Covert Decl. ¶ 6.

109.    Leading up to the mid-year meeting, on June 13, 2023, Ms. Sulc sent Ms. Covert a list of all associates in the MFH Practice Group with a high-level assessment of each associate's

performance. *Id.*; Declaration of Mary Cabell Sulc ("Sulc Decl.") ¶ 4 (attached hereto as <u>Appendix</u> <u>M</u>).

110.    Plaintiff had been identified by the MFH Practice Group as being on the "Watch List," and in the summary she provided to Ms. Covert on June 13, 2023, Ms. Sulc wrote the following:

> Gita was struggling at the time of the merger, so we moved her onto deals with leg[acy] T[routman S[anders] attorneys and she was doing well. However, it seems she may have plateaued and is no longer progressing in her development. Her hours are good and she's very responsive, but she's not operating at the level we'd expect. She's worked with many different partners in the group (DC and RIC) to find a fit, without success.

Sulc Decl. ¶ 4.

111.    During the mid-year meeting in June 2023, the participants discussed Plaintiff's performance, specifically that she was not performing at the substantive level expected of a rising fifth-year associate and that it was unlikely she would be promoted to partner.  Iwashyna Decl. ¶ 37; Nickel Decl. ¶ 16; Schiff Decl. ¶ 12; Tucker Decl. ¶ 12; Covert Decl. ¶ 6.

112.    While the participants in the June 2023 mid-year meeting considered an option of moving Plaintiff from the partnership track to the newly formed "career path" for associates, they deferred any final decision until they had a chance to consider the upcoming evaluations of Plaintiff's 2023 performance. *Id.*

113.    Following the June 2023 mid-year meeting, Ms. Nickel, along with Ashanté Smith, set up a call with the firm's Director of Career Coaching & Planning, Tiffany Southerland Jordan, to discuss referring Plaintiff to the firm's professional coaching program. Nickel Decl. ¶ 17.

114.    Ms. Nickel also staffed Plaintiff on a deal in the summer of 2023 at Mr. Iwashyna's request.  Iwashyna Decl. ¶ 29; Nickel Decl. ¶¶ 8-9.

115.    After the deal was completed, on June 28, 2023, Ms. Nickel set Plaintiff an email providing detailed feedback on what went well and what needed improvement, specifically a need to slow down, review things more closely, proofread, and rely less on her assistant; and Ms. Nickel forwarded her email to Mr. Iwashyna. Iwashyna Decl. ¶ 29; Nickel Decl. ¶ 10.

116.    In July 2023, Mr. Iwashyna continued to seek out partners to work with Plaintiff, and suggested that Plaintiff contact Jennifer Bojorquez, a MFH partner in the Orange County, CA, office, with whom Plaintiff had done limited work in the past.  Iwashyna Decl. ¶ 31.

117.    Ms. Bojorquez worked with Plaintiff on a few deals in July 2023.  Declaration of Jennifer Bojorquez ("Bojorquez Decl.") ¶ 4 (attached hereto as <u>Appendix N</u>).

118.    On August 2, 2023, Mr. Iwashyna contacted Ms. Bojorquez to hear how things were going with Plaintiff, and Ms. Bojorquez indicated surprise that Plaintiff was a fourth-year associate, as she had assumed Plaintiff was much more junior, and commented that Plaintiff's performance was below what she expected of a mid-level associate. Iwashyna Decl. ¶¶ 32-33; Bojorquez Decl. ¶¶ 8-9.

119.    On August 14, 2023, Mr. Iwashyna discussed Plaintiff's work performance with Sona Spencer, the firm's Chief Legal Talent Officer. Iwashyna Decl. ¶ 38; Declaration of Sona Spencer ("Spencer Decl.") ¶ 6 (attached hereto as <u>Appendix O</u>).

120.    During their August 14, 2023 meeting, Ms. Spencer advised Mr. Iwashyna that if the MFH Practice Group knew Plaintiff would likely never become a partner at the firm, they needed to make the hard decision and terminate Plaintiff's employment. Iwashyna Decl. ¶ 38; Spencer Decl. ¶ 6.

121.    During their August 14, 2023 meeting, Ms. Spencer also advised Mr. Iwashyna that Plaintiff's lack of substantive development was likely not a good fit for a performance

improvement plan ("PIP") or a corrective action plan ("CAP"), as it would be difficult for Plaintiff to show measurable improvement in a 30, 60, or 90- day period. Iwashyna Decl. ¶ 39; Spencer Decl. ¶ 8.

122.    Ms. Spencer also advised Mr. Iwashyna that the new "career path" the firm was rolling out as an alternative to partnership track was not a good fit for Plaintiff, as it was not intended to be an option for poorly performing associates, like Plaintiff. Iwashyna Decl. ¶ 40; Spencer Decl. ¶ 7.

123.    Following Mr. Iwashyna's meeting with Ms. Spencer, Mr. Iwashyna concluded that the firm would need to terminate Plaintiff's employment, but at the suggestion of Ms. Spencer, Mr. Iwashyna opted to review the forthcoming evaluations of Plaintiffs' 2023 performance before taking any action. Iwashyna Decl. ¶ 41; Spencer Decl. ¶ 7.

124.    On October 12, 2023, the firm's Legal Talent department sent Mr. Iwashyna a link to access the 2023 performance evaluations for the associates in the MFH Practice Group. Iwashyna Decl. ¶ 42.

125.    Plaintiff's 2023 performance evaluation is Exhibit 10 to the Iwashyna Declaration (Appendix E) and Exhibit 10 to the Covert Declaration (Appendix I).

126.    For the 2023 performance period, Plaintiff received evaluations from the following MFH partners: Nora Nickel, Ashante Smith, Virginia Stitzer, Marshall Tucker, Jennifer Bojorquez, Lindsey Crawford, Jonathan Lautt, and Peter Strup. Iwashyna Decl. Ex. 10; Covert Decl. Ex. 10.

127.    Plaintiff's 2023 performance evaluations had gotten worse than they had been in previous years, and contained several "needs improvement" ratings, along with more negative comments. Iwashyna Decl. ¶ 42 & Ex.10.

128.    The average of Plaintiff's numerical ratings in her 2023 performance evaluations was 3.63, which was the second lowest of all MFH associates for that year. Covert Decl. ¶ 21.

129.    The only MFH associate with a lower average rating was a second-year associate whose 2023 overall average rating represented an improvement over her average rating the prior year. *Id.*

130.    Plaintiff's average ratings dropped each year from 2021 to 2023, which is the exact opposite of what the firm expects to see from associates as they gain more experience and become more senior. Covert Decl. ¶¶ 21-22.

**F.    Mr. Iwashyna's Decision to Terminate Plaintiff's Employment**

131.    On October 24, 2023, Mr. Iwashyna, Ms. Nickel, Mr. Schiff, Mr. Tucker, Ms. Sulc, and the incoming MFH Practice Group Leader, Ms. Stitzer, met to discuss the MFH associates in light of their 2023 performance evaluations. Iwashyna Decl. ¶ 43; Nickel Decl. ¶ 19; Schiff Decl. ¶ 15; Tucker Decl. ¶ 14; Sulc Decl. ¶ 11.

132.    During the October 24, 2023 meeting, the participants discussed (a) Plaintiff's 2023 performance evaluations, which indicated that Plaintiff was performing poorly and not meeting the firm's expectations for an associate at her level and (b) concerns about Plaintiff's performance that various partners had expressed over the years, which indicated that Plaintiff was not meeting the expectations for an associate at her level of seniority. *Id.*

133.    Mr. Iwashyna determined that Plaintiff's performance problems included a lack of substantive knowledge on deals, sloppiness in her work product, lack of attention to detail, problems with issue spotting, and a failure to apply learnings from one deal to the next. Iwashyna Decl. ¶ 47.

134.    These issues had been noted in Plaintiff's performance evaluations for three years; however, the more senior Plaintiff became, the more troubling her performance problems became, as associates are expected to improve in these areas as they gain experience. *Id.*

135.    Mr. Iwashyna concluded that Plaintiff was not progressing in her substantive legal skills, despite years of training and feedback from MFH partners, and, moreover several partners had decided not to work with Plaintiff, or would only work with her on their less complex deals. *Id.*

136.    Mr. Iwashyna had decided to terminate Plaintiff's employment based on his own review of Plaintiff's written performance evaluations and the other feedback that Mr. Iwashyna had received from MFH partners, to include, Mr. Fireison, Mr. Lautt, Mr. Sidarth, Mr. Bowsher, Ms. Crawford, Mr. Stup, Mr. Rivers, Ms. Nickel, Ms. Bojorquez, Mr. Tucker, and Ms. Stitzer, all of which indicated that Plaintiff was not performing at the firm's expectations for an associate at her level – a mid-level associate going into their fifth year. Iwashyna Decl. ¶¶ 45-47.

137.    Mr. Iwashyna made his decision to terminate Plaintiff's employment with input from Ms. Nickel, Mr. Schiff, Mr. Tucker, and Ms. Spencer. Iwashyna Decl. ¶ 45; Nickel Decl. ¶ 20; Schiff Decl. ¶ 17; Tucker Decl. ¶ 15.

**I.    Termination of Plaintiff's Employment**

138.    On November 2, 2023, Mr. Iwashyna, Ms. Nickel, Mr. Schiff, Mr. Tucker, Ms. Stitzer, Ms. Sulc, Ms. Covert, and Ms. Spencer met with the chair of the ADC, Steve Hewitson, to discuss the MFH associates; in that meeting, Mr. Iwashyna communicated his decision to terminate Plaintiff's employment. Iwashyna Decl. ¶ 51; Nickel Decl. ¶ 22; Schiff Decl. ¶ 19; Tucker Decl. ¶ 17; Sulc Decl. ¶ 12; Covert Decl. ¶ 8; Spencer Decl. ¶ 9.

139.    On November 29, 2023, Mr. Schiff, Mr. Tucker, and Ms. Covert met with Plaintiff to communicate the firm's decision to terminate her employment. Schiff Decl. ¶ 27; Tucker Decl. ¶ 20; Covert Decl. ¶ 11.

140.    The firm offered Plaintiff three (3) months of paid, confidential job search leave as severance, but Plaintiff did not return a signed separation agreement by the deadline of December 6, 2023, so the firm terminated her employment on December 7, 2023. Covert Decl. ¶¶ 11, 14.

141.    The timing and process of Plaintiff's termination meeting were consistent with all other associates who were terminated as part of the 2023 evaluation process. Covert Decl. ¶ 11.

**J.    Mr. Bowsher's 2022 Phone Call with Plaintiff Regarding Notary Pages**

142.    In 2022, while working on a deal with Mr. Bowsher (Aspire at Live Oak), Plaintiff sent an email to the client agreeing to split out the notary pages from the signature pages. Bowsher Decl. ¶ 38.

143.    Mr. Bowsher called Plaintiff and asked why the client requested to split out notary pages and signature pages this way. *Id.*

144.    Because Mr. Bowsher was not sure whether Plaintiff was familiar with notaries, he took the opportunity to explain notaries to Plaintiff, just as he had explained similar concepts to Plaintiffs in the past while working on deals together. *Id.*

145.    On the call, Plaintiff explained that the client wanted to split the pages, and another partner, David McPherson, had agreed to do this in the past.  *Id.* at ¶ 39.

146.    Following the call, Plaintiff sent Mr. Bowsher a follow-up email on the matter giving him an example of the client's approach on a prior deal.  Bowsher Decl. ¶ 40 & Ex. 35.

147.    Mr. Bowsher responded "Understood, totally makes sense. Thanks again." Bowsher Decl. ¶ 40 & 35.

148.    Mr. Bowsher did not make any statement about Plaintiff's race during this call. Bowsher Decl. ¶ 39 & 35; Pl. Dep. 186:2-187:2.

149.    Plaintiff "did not think anything of [the call]," but thought that it was strange.  Pl. Dep. 187:3-4.

**K.    Mr. Bowsher's 2022 Emails with Plaintiff Regarding Language That Had Previously Been Accepted in a Deal**

150.    In April 2022, while working on a deal with Mr. Bowsher (Estates at Palm Bay), Plaintiff sent Mr. Bowsher an email stating that she had no comments on an opinion letter that opposing counsel (Winstead) had proposed. Bowsher Decl. ¶ 41.

151.    Mr. Bowsher asked Plaintiff if she had ever seen their MFH Practice Group accept that language before, stating:

> Not asking you to push back blindly on the [borrower's] counsel on this, rather I am asking you to give this some thought, consider whether you've ever seen it in the year you've been closing loans with us, and also pull prior Winstead opinions to see if Troutman has accepted it from this firm, then let's circle-back and see if it's appropriate to reject it.

Bowsher Decl. ¶ 41 & Ex. 36.

152.    Plaintiff responded that she had seen that type of language before, but on the wrong type of deal (Fannie Mae rather than Freddie Mac) and noted that she "might have got the opinion languages confused" and then recommended that they push back on the opinion language. Bowsher Decl. ¶ 42 & Ex. 36.

153.    After opposing counsel pointed out that the firm had taken inconsistent positions in this deal and a prior deal, Mr. Bowsher realized that Plaintiff had not done what he asked her to do (*i.e.,* check prior opinions to see if Troutman had accepted the language previous), and only then did Plaintiff confirm to Mr. Bowsher that the language had been accepted by Troutman in a prior Freddie Mac deal, contradicting her prior response. Bowsher Decl. ¶ 43.

154.    While Mr. Bowsher was disappointed in Plaintiff's performance, he did not admonish her but instead just said "Meh, no biggie. I'll respond." Bowsher Decl. ¶ 44 & Ex. 37.

155.    Mr. Bowsher did not make any statement about Plaintiff's race in any of these emails about whether certain language had previously been accepted.  Bowsher Decl. Exs. 36-37.; Pl. Dep. 214:12-20.

## L.    Mr. Bowsher's 2022 Emails with Plaintiff Regarding Local Opinions

156.    In May of 2022, during the course of another deal with Mr. Bowsher (Andorra Point), Plaintiff told opposing counsel that "no enforceability/local opinions are needed because this transaction is a supplemental loan." Bowsher Decl. ¶ 46.

157.    Mr. Bowsher thought that Plaintiff was incorrect and responded "Please issue a correction to your statement below. It is not accurate to say that "no enforceability/local opinions are needed." Bowsher Decl. ¶ 46 & Ex. 38.

158.    Plaintiff responded that local opinions were not required for supplemental loans and referenced a Freddie Mac published opinion and guidance from another MFH partner. Bowsher Decl. ¶ 47 & Ex. 38.

159.    After reviewing the materials Plaintiff sent to him, Mr. Bowsher sent an email acknowledging his error, stating "Oh, wow! Ha!! That's a massive disconnect between the form opinion and the guidelines…Thanks for bringing this to my attention! I'll ping Jeremy and Virginia. Hard to argue with the Guidelines, you're totally right of course…." Bowsher Decl. ¶ 48 & Ex. 38.

160.    Mr. Bowsher did not make any statement in this email exchange indicating that he was commenting about Plaintiff's race.  Bowsher Decl. Ex. 38; Pl. Dep. 223:7-12.

**M.      Mr. Bowsher's August 3, 2023 Email to Plaintiff**

161.    In June 2023, Mr. Bowsher was asked to handle a deal involving two properties called the Falls of Braeswood and the Falls of Dairy Ashford. Bowsher Decl. ¶ 27.

162.    Mr. Bowsher asked Kelly Mufarrige to serve as the senior associate on the deal, and Ms. Mufarriage asked to staff Plaintiff as the junior associate on the deal, to which Mr. Bowsher agreed because he was comfortable with Ms. Mufarrige overseeing Plaintiff's work.  *Id.*

163.    As it was typical for junior associates to take the administrative steps to open new matters, Mr. Bowsher asked Plaintiff to open a new matter for the deal with Mr. Bowsher receiving 70% of the "matter responsible" credit and Ms. Mufarrige receiving 30%. *Id.*

164.    On July 31, 2023, Plaintiff sent an email to the MFH New Matters team, instructing the matter responsible credit splits that Mr. Bowsher had requested. Bowsher Decl. ¶ 27 & Ex. 37.

165.    When she learned that the MFH New Matters team incorrectly gave Mr. Bowsher 100% of the matter responsible credit, on August 3, 2023, Plaintiff sent Mr. Bowsher an email saying that the MFH New Matters team had messed up and that Ms. Mufarrige did not have any credit. Bowsher Decl. ¶ 28 & Ex. 31.

166.    At Mr. Bowsher's request, Plaintiff then emailed MFH New Matters to try and fix the problem. Instead of fixing the problem, however, Plaintiff created more confusion in the wording of her email to MFH New Matters by stating that "Kelly should be the matter responsible attorney for this one. See below. Please update." Bowsher Decl. ¶¶ 28-29 & Ex. 30.

167.    Confused by Plaintiff's contradictory instructions, MFH New Matters changed the matter assigned credit (a different category), but left the matter responsible credit as it was, incorrectly reflecting Mr. Bowsher as having 100% of that credit. Bowsher Decl. ¶ 30.

168.    In response, Plaintiff sent two emails: (a) in the first email, Plaintiff stated that "Kelly should be the matter responsible. So it should change from Matt to Kelly," and (b) in the next email, Plaintiff indicated that the matter responsible credits should be assigned only to Ms. Mufarrige. Bowsher Decl. ¶ 30 & Ex. 30.

169.    Both of Plaintiff's emails were incorrect, so Mr. Bowsher stepped in and wrote: "It should not be 100% Kelly. It should be as was originally requested, per the thread below. Kelly Mufarrige (30%) / Matt Bowsher (70%)." Bowsher Decl. ¶ 31 & Ex. 30.

170.    Mr. Bowsher followed up with an email only to Plaintiff, stating that she was confused and pointing out the correct splits. Bowsher Decl. ¶ 32 & Ex. 32.

171.    Plaintiff responded to Mr. Bowsher, stating that she thought she had been clear. *Id*.

172.    Plaintiff's response frustrated Mr. Bowsher because not only had Plaintiff created the problem with her unclear and inconsistent communications, but she could not even acknowledge her own poor communication was the root of the confusion. Bowsher Decl. ¶ 32.

173.    In response, Mr. Bowsher sent Plaintiff a lengthy email explaining why Plaintiff's communication was not clear and noting that it was "very basic, elementary communication that had nothing to do with training or understanding of multifamily transactional law." Bowsher Decl. ¶ 32 & Ex. 32.

174.    Mr. Bowsher did not make any statement about Plaintiff's race in any of the emails he exchanged with Plaintiff on August 3, 2023 about her communications with the MFH New Matters team.  Bowsher Decl. Exs. 30-32; Pl. Dep. 262:6-263:5.

175.    Plaintiff sent a response to Mr. Bowsher stating she would not tolerate his condescending tone, her intelligence being questioned, or Mr. Bowsher belittling her. Bowsher Decl. ¶ 36 & Ex. 32.

176.    In his response to Plaintiff, Mr. Bowsher said that was not his intent and noted that he appreciated her constructive criticism of his own constructive criticism. *Id.*

177.    That same day, Plaintiff forwarded Mr. Bowsher's email correspondence to Mr. Iwashyna asking to speak with him. Iwashyna Decl. ¶ 56; Bowsher Decl. ¶ 35.

178.    About an hour later, Plaintiff sent another email to Mr. Iwashyna, Ms. Nickel, Ms. Smith, and Mr. Tucker, stating "I'm sorry I had enough with Matt and how he addresses me." Iwashyna Decl. ¶ 56.

179.    Plaintiff also spoke with Mr. Schiff, Mr. Tucker, Ms. Smith, and Ms. Crawford about Mr. Bowsher's August 3, 2023 email.  Tucker Decl. ¶¶ 23-24; Schiff Decl. ¶ 29; Declaration of Lindsey Crawford ("Crawford Decl.") ¶ 16 (attached hereto as Appendix P).

180.    Mr. Schiff, Mr. Tucker, Ms. Smith, and Ms. Crawford all communicated to Mr. Iwashyna that they had spoken to Plaintiff about the incident, so Mr. Iwashyna (who was also very busy and traveling for work) did not speak with Plaintiff about the email.  Iwashyna Decl. ¶¶ 57, 59; Tucker Decl. ¶ 25; Schiff Decl. ¶ 31.

**N.    Plaintiff's Internal Complaint Concerning Matt Bowsher**

181.    On or about August 10, 2023, Plaintiff made a verbal complaint to Denise Johnson, Senior Human Resource Manager, alleging that in an email dated August 3, 2023, Mr. Bowsher had spoken to her in a condescending tone and questioned her intelligence, and she felt that Mr. Bowsher had sent her the August 3 email because of her darker skin tone and because she wore braids. Declaration of Denise Johnson ("Johnson Decl.") ¶ 3 (attached hereto as Appendix Q); Pl. Dep. 253:14-16; 254:1.

182.    Ms. Johnson initiated a formal investigation into Plaintiff's complaint, with guidance and supervision provided by her manager, Elizabeth Mark, Director of Human Resources. Johnson Decl. ¶¶ 4-5.

183.    As part of the investigation, Ms. Johnson reviewed a number of emails between Plaintiff and Mr. Bowsher that Plaintiff had provided to her. *Id*. at ¶ 5.

184.    Ms. Johnson also interviewed Plaintiff, as well as the following witnesses: Sona Spencer, Tiffany Southerland Jordan, Jennifer Jana, Ashanté Smith, Nora Nickel, Blair Schiff, Whitney Loughran, Kelly Mufarrige, and Ari Ebi—all people who Plaintiff had identified as having relevant information or with whom Plaintiff spoke about Mr. Bowsher's email. *Id*. at ¶ 6.

185.    Consistent with Troutman's practice at the time, a member of the firm's Office of General Counsel interviewed Mr. Bowsher because he was a partner and subject of the complaint. *Id*.

186.    Ms. Johnson did not find any evidence of discriminatory behavior in violation of any of the firm's policies, any evidence that Mr. Bowsher's actions created a hostile work environment based on race, or any evidence that Mr. Bowsher had retaliated against Plaintiff. *Id*. at ¶ 7.

187.    At the conclusion of the investigation, a member of the firm's Office of General Counsel informed Mr. Iwashyna of the findings of the investigation; then, Mr. Iwashyna contacted Mr. Bowsher and counseled him about the need to improve his communication style. Iwashyna Decl. ¶ 62; Bowsher Decl. ¶ 37.

188.    Prior to August 2023, Mr. Iwashyna had also received communication from Mr. Bowsher that was wordy, harsh, and condescending. Iwashyna Decl. ¶ 60.

189.    Since Mr. Iwashyna counseled Mr. Bowsher about his communication style, Mr. Bowsher has made a conscious effort to communicate in a more appropriate tone and manner in emails. Bowsher Decl. ¶ 37.

190.    Following the HR investigation, Mr. Bowsher did not have any interactions with Ms. Sankano: he did not staff her on any deals, exchange emails with her, or complete an evaluation of her performance and he was not involved in the decision to terminate her employment. *Id*.

191.    Plaintiff's internal complaint was not a factor in Mr. Iwashyna's decision to terminate her employment. Iwashyna Decl. ¶ 48.

192.    Plaintiff's race also was not a factor in Mr. Iwashyna's decision to terminate her employment. Iwashyna Decl. ¶ 48; Pl. Dep. 251:22-252:5.

Dated: January 31, 2025                              */s/ Alison N. Davis*
                                                     Alison N. Davis, Bar No. 429700
                                                     andavis@littler.com
                                                     Paul Kennedy, Bar No. 428623
                                                     pkennedy@littler.com
                                                     Morgan Kinney, Bar No. 8888325169
                                                     mkinney@littler.com
                                                     LITTLER MENDELSON, P.C.
                                                     815 Connecticut Avenue NW
                                                     Suite 400
                                                     Washington, DC  20006.4046
                                                     Telephone:    202.842.3400
                                                     Facsimile:    202.842.0011
                                                     Attorneys for Defendants