**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

**GITA F. SANKANO,**

              **Plaintiff,**

       **v.**

**TROUTMAN PEPPER HAMILTON**
**SANDERS LLP AND BRIAN IWASHYNA**

              **Defendants.**

---

**Case No. 1:24-cv-00142-JMC**

**MEMORANDUM IN SUPPORT OF**
**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

## Table of Contents

Page

I.  INTRODUCTION ................................................................................................ 1

II.  STATEMENT OF FACTS ................................................................................. 3

    A.  Plaintiff's Employment at Pepper Hamilton (August 2019–June 2020) .............. 3

    B.  Plaintiff's Employment at Troutman Pepper (July 2020–December 2023) .......... 5

    C.  Plaintiff's Complaint About Matt Bowsher in August 2023 ................................ 7

III.  ARGUMENT ...................................................................................................... 9

    A.  Standard of Review ........................................................................................... 9

    B.  Plaintiff's Race Discrimination Claims Should Be Dismissed .......................... 10

        1.  Summary Judgment Is Warranted On Plaintiff's Claim That Ms.
            Carmody Discriminated Against Her By Giving Her Timekeeping
            Instructions ........................................................................................... 10

            a.  Ms. Carmody had Legitimate, Non-Discriminatory Reasons
                for her Timekeeping Instructions to Plaintiff .............................. 12

            b.  Plaintiff has no Evidence Showing That Ms. Carmody's
                Reasons are a Pretext for Race Discrimination ........................... 13

                (1)  Plaintiff is unable to show that Troutman's
                      legitimate, non-discriminatory reasons for the
                      timekeeping instruction are false. .................................... 13

                (2)  Plaintiff cannot show that Troutman's proffered
                      reasons for the timekeeping instruction is
                      pretextual ......................................................................... 14

            c.  Plaintiff's Claims That Ms. Carmody Discriminated
                 Against her Because of Her Race in Violation of Title VII
                 and the DCHRA are Time-Barred .............................................. 16

        2.  Plaintiff Has Failed To Establish That Matt Bowsher's Four
            Comments Created A Racially Hostile Work Environment .................... 17

            a.  Mr. Bowsher's Comments to Plaintiff Were Not Severe or
                Pervasive and Did Not Create an Intimidating, Hostile, or
                Offensive Work Environment ...................................................... 18

i

b.      Mr. Bowsher's Comments Were Not Based on Plaintiff's
Race ................................................................................ 24

c.      Troutman Pepper Took Prompt Remedial Action When
Plaintiff Complained About Mr. Bowsher ................................ 26

3.      Plaintiff Has Abandoned Her Claim That She Was Terminated
Due to Race .................................................................................... 27

C.      Plaintiff's Retaliation Claims Should Be Dismissed ............................................. 28

1.      Plaintiff's Employment Was Terminated Because Of Her
Performance Problems, Not Her Complaint About Mr. Bowsher .......... 29

a.      Troutman and Mr. Iwashyna had a Legitimate, Non-
Retaliatory Reason for Terminating Plaintiff's Employment ...... 30

b.      Plaintiff Is Unable to Show that the Reason Defendants
Provided for the Termination Decision Was a Pretext for
Retaliation ...................................................................... 31

(i)      Plaintiff Cannot Disprove Defendants' Reason for
the Termination .............................................................. 31

(ii)     Plaintiff Cannot Show that Retaliation Was the Real
Reason for the Termination ............................................... 33

2.      Ms. Carmody Did Not Refuse to Give Plaintiff Work in Retaliation
for Complaining About Her Timekeeping Instruction .......................... 37

a.      Ms. Carmody Was Not Aware of Any Protected Activity
by Plaintiff ...................................................................... 37

b.      Ms. Carmody Had Legitimate, Non-Retaliatory Reasons for
Her Work Assignments in May 2020 .......................................... 38

c.      Any Claim that Ms. Carmody Retaliated Against Plaintiff
in Violation of Title VII or the DCHRA is Time-Barred ............ 38

IV.     CONCLUSION .............................................................................................. 38

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Alfano v. Costello,*
 294 F.3d 365 (2d Cir. 2002) ................................................................................................22

*Ali v. McCarthy,*
 179 F. Supp. 3d 54 (D.D.C. 2016), *aff'd sub nom. Ali v. Pruitt,* 727 F. App'x
 692 (D.C. Cir. 2018) ............................................................................................................14

*Anderson v. Liberty Lobby, Inc.,*
 477 U.S. 242 (1986) ..............................................................................................................9

*Ayissi-Etoh v. Fannie Mae,*
 712 F.3d 572 (D.C. Cir. 2013) .............................................................................................18

*Badibanga v. Howard Univ.,*
 679 F. Supp. 2d 99 (D.D.C. 2010) .......................................................................................23

*Baloch v. Kempthorne,*
 550 F.3d 1191 (D.C. Cir. 2008) ......................................................................................18, 22

*Barbour v. Browner,*
 181 F.3d 1342 (D.C. Cir. 1999) ...........................................................................................23

*Baskerville v. CBS News, Inc.,*
 Civil Action No. 18-2522 (FYP), 2022 U.S. Dist. LEXIS 36931 (D.D.C. Mar.
 2. 2022) .................................................................................................................................31

*Bazemore v. Best Buy,*
 957 F.3d 195 (4th Cir. 2020) ...............................................................................................26

*Bowden v. United States,*
 106 F.3d 433 (D.C. Cir. 1997) .............................................................................................16

*Brady v. Office of Sergeant at Arms,*
 520 F.3d 490 (D.D.C Mar. 28, 2008) ........................................................................11, 12, 13

*Broderick v. Donaldson,*
 437 F.3d 1226 (D.C. Cir. 2006) ...........................................................................................29

*Brooks v. Grundmann,*
 851 F. Supp. 2d 1 (D.D.C. 2012) .........................................................................................23

*Brown v. Sessoms,*
 774 F.3d 1016 (D.C. Cir. 2014) ...........................................................................................11

*Burlington Indus. v. Ellerth*,
  524 U.S. 742 (1998)................................................................................................26

*Carney v. the Am. Univ.*,
  151 F.3d 1090 (D.C. Cir. 1998) ............................................................................11

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986)..................................................................................................9

*Chambers v. City of Lakeland*,
  8:20-cv-2794, 2022 WL 2356816 (M.D. Fla. June 30, 2022) ...............................25

*Clark Cnty. Sch. Dist. v. Breeden*,
  532 U.S. 268 (2001)...........................................................................................18, 36

*Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*,
  140 S. Ct. 1009 (2020)...........................................................................................11

*Cruz v. Kelly*,
  241 F. Supp. 3d 107 (D.D.C. 2017)......................................................................36

*Daniel v. Johns Hopkins Univ.*,
  118 F. Supp. 3d 312 (D.D.C. 2015) .....................................................................34

*Davis v. Coastal Int'l Sec., Inc.*,
  275 F.3d 1119 (D.C. Cir. 2002).............................................................................24

*De Souza v. Planned Parenthood Fed'n of Am.*,
  21 CIV. 5553 (LGS), 2023 WL 2691458 (S.D.N.Y. Mar. 29, 2023) ...................25

*Dist. of Columbia v. Bryant*,
  307 A.3d 443 (D.C. 2024) .....................................................................................29

*Dudley v. Wash. Metro. Area Transit Auth.*,
  924 F. Supp. 2d 141 (D.D.C. 2013) .....................................................................38

*Ey v. Office of the Chief Admin. Officer*,
  967 F. Supp. 2d 337 (D.D.C. 2013) .....................................................................32

*Faragher v. City of Boca Raton*,
  524 U.S. 775 (1998).....................................................................................18, 24, 26

*Felder v. Johanns*,
  595 F. Supp. 2d 46 (D.D.C. 2009) ........................................................................11

*Fischbach v. D.C. Dep't of Corr.*,
  86 F.3d 1180 (D.C. Cir. 1996) ..............................................................................13

*Furline v. Morrison*,
  953 A.2d 344 (D.C. 2008) .........................................................................................11

*Graham v. Holder*,
  657 F. Supp. 2d 210 (D.D.C. 2009) ..........................................................................24

*Gregg v. Hay-Adams Hotel*,
  942 F. Supp. 1 (D.D.C. 1996) ...................................................................................26

*Hamilton v. Geithner*,
  666 F.3d 1344 (D.C. Cir. 2012) ................................................................................34

*Harris v. Trustees of Univ. of D.C.*,
  567 F. Supp. 3d 131 (D.D.C. 2021) ..........................................................................29

*Harris v. Wackenhut Servs., Inc.*,
  419 Fed. Appx. 1 (D.C. Cir. 2011) ............................................................................18

*Hollins v. Fed. Nat'l Mort. Ass'n*,
  760 A.2d 563 (D.C. 2000) .........................................................................................13

*Hutchinson v. Holder*,
  815 F. Supp. 2d 303 (D.D.C. 2011) ..........................................................................34

*Jackson v. Gallaudet Univ.*,
  169 F. Supp. 3d 1 (D.D.C. 2016) ..............................................................................23

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
  475 U.S. 574 (1986) ....................................................................................................9

*Montgomery v. Chao*,
  546 F.3d 703 (D.C. Cir. 2008) ..................................................................................15

*Morgan v. Vilsack*,
  715 F. Supp. 2d 168 (D.D.C. 2010) ..........................................................................12

*Mulkerin v. Bunch*,
  Civil Action 1:19-cv-03850 (CJN), 2021 U.S. Dist. LEXIS 160269 (D.D.C.
  Aug. 25, 2021) ...........................................................................................................15

*Muse v. Wash. Metro. Area Transit Auth.*,
  No. 1:23-cv-00407 (TNM), 2024 U.S. Dist. LEXIS 206661 (D.D.C. Nov. 14,
  2024) ..........................................................................................................................31

*Musick v. Salazar*,
  839 F. Supp. 2d 86 (D.D.C. 2012) ............................................................................34

*Owens v. Nat'l Med. Care, Inc.*,
   337 F. Supp. 2d 131 (D.D.C. 2004) .................................................................9

*Pendleton v. Holder*,
   697 F. Supp. 2d 12 (D.D.C. Mar. 22, 2010) .................................................34

*Pollard v. Quest Diagnostics*,
   610 F. Supp. 2d 1 (D.D.C. 2009) ..................................................................38

*Robertson v. Dodaro*,
   767 F. Supp. 2d 185 (D.D.C. 2011) ..............................................................14

*Royall v. Nat'l Ass'n of Letter Carriers, AFL-CIO*,
   548 F.3d 137 (D.C. Cir. 2008) ................................................................11, 15

*Ryczek v. Guest Services, Inc.*,
   877 F. Supp. 754 (D.D.C. 1995) ...................................................................26

*Schuler v. PricewaterhouseCoopers, LLP*,
   514 F.3d 1365 (D.C. Cir. 2008) ....................................................................16

*Stephens v. Yellen*,
   No .17-cv-125 (DLF), 2021 U.S. Dist. LEXIS 225447 (D.D.C. Nov. 23, 2021)...................31

*Stewart v. Evans*,
   275 F.3d 1126 (D.C. Cir. 2002) ....................................................................18

*Trawick v. Hantman*,
   151 F. Supp. 2d 54 (D.D.C. 2001), *aff'd*, No. 01-5309, 2002 WL 449777
   (D.C. Cir. Feb. 21, 2002) .............................................................................36

*Univ. of Tex. Sw. Med. Ctr. v. Nassar*,
   570 U.S. 338 (2013)......................................................................................29

*Weinberg v. William Blair & Co., LLC*,
   12-CV-09846, 2015 WL 5731637 (N.D. Ill. Sept. 30, 2015) .................................25

*Woodruff v. Peters*,
   482 F.3d 521 (D.C. Cir. 2007) ...............................................................33, 34

**Statutes**

42 U.S.C.
   § 1981...........................................................................................................1, 11
   § 2000e–2(m) ...................................................................................................11

§ 2000e-2(a)(1) .....................................................................................................11
   § 2000e-5(e)(1) ................................................................................................16

Civil Rights Act of 1866, 42 U.S.C. § 1981 ................................................................1

Civil Rights Act of 1964 Title VII, 42 U.S.C. §§ 2000e, *et seq* ........................... *passim*

D.C. Code
    § 2-1402.11(a)(1)(A) ...........................................................................11
    § 2-1402.11(c-2)(1) ............................................................................24
    § 2-1402.11(c-2)(3) .......................................................................19, 22
    § 2-1403.16(a) .............................................................................16, 17

District of Columbia Human Rights Act, §§ 2-1401.01, *et seq* ........................... *passim*

**Other Authorities**

Fed. R. Civ P. 56 .....................................................................................9

# I.    INTRODUCTION

Plaintiff Gita Sankano ("Plaintiff" or "Ms. Sankano") worked as an associate attorney at Defendant Troutman Pepper Hamilton Sanders LLP ("Troutman") and its predecessor firm, Pepper Hamilton LLP. Ms. Sankano claims that Troutman discriminated against her because of her race in violation of 42 U.S.C. § 1981 ("Section 1981"), the D.C. Human Rights Act (the "DCHRA"), and Title VII of the Civil Rights Act of 1964 ("Title VII"). Ms. Sankano also contends that Troutman and her former Practice Group Leader, Defendant Brian Iwashyna, retaliated against her in violation of Section 1981, the DCHRA, and Title VII.

Ms. Sankano's claims of race discrimination (Am. Compl. Counts I, III, and V, ECF No. 15) are based on three sets of factual allegations, involving three different sets of actors at three different time periods. First, Ms. Sankano contends that while she worked for Pepper Hamilton in 2019 and 2020, a partner named Christine Carmody discriminated against her because of her race by "stealing her hours." In actuality, the undisputed record evidence shows that Ms. Carmody simply asked Ms. Sankano to send Ms. Carmody her time before it was entered into the timekeeping system, so that Ms. Carmody could review the time and determine how much time should be billed to client matters and how much time should be entered on non-billable "training" matters. Moreover, there is no evidence to support Ms. Sankano's contention that Ms. Carmody gave her these timekeeping instructions because Ms. Sankano is Black.

Second, Ms. Sankano alleges that in 2022 and 2023, a Troutman partner named Matt Bowsher created a racially hostile work environment for her by making four allegedly belittling and condescending comments to her over the phone and in emails. These four comments were made over the course of sixteen months, and are all facially neutral and work-related, and therefore cannot rise to the level of creating a hostile work environment as a matter of law. In addition, there is no evidence that Mr. Bowsher made these comments to Ms. Sankano because she is Black or

that Mr. Bowsher harbored any sort of racial animus against Ms. Sankano. To the contrary, it is undisputed that Mr. Bowsher invited Ms. Sankano to work on his matters, provided Ms. Sankano with individualized, one-on-one training over a period of four months, and frequently sent her long emails on a variety of topics to help her understand issues relating to their practice.

Third, in her Amended Complaint, Ms. Sankano claimed that in late 2023, Troutman terminated her employment because she is Black. However, Ms. Sankano abandoned that claim in her deposition, insisting that she does not believe she was terminated because of her race, but rather because she complained about Mr. Bowsher. Thus, Ms. Sankano's discriminatory termination claim must be summarily dismissed.

Ms. Sankano's claims of retaliation against Troutman and Mr. Iwashyna (Am. Compl. Counts II, IV, and VI) are primarily based on her belief that she was terminated because she had filed a complaint with Troutman's Human Resources department about Mr. Bowsher's comments. Those claims must be dismissed because the evidence shows that Ms. Sankano's employment was terminated once Mr. Iwashyna concluded that she was not performing at the level expected for an associate with her years of experience. It is undisputed that Mr. Iwashyna began considering Ms. Sankano's termination in April 2023—four months before she filed any complaint about Mr. Bowsher—and the documentary evidence supports that timeline. It is similarly undisputed that Mr. Iwashyna made the termination decision based on feedback he received from multiple partners in the practice group and based on Ms. Sankano's written performance evaluations, and that he made the decision in consultation with a diverse team of other partners together with the firm's Chief Legal Talent Officer. Ms. Sankano cannot point to any evidence to support her retaliatory termination claim, other than her personal belief based on the temporal proximity between her complaint in August 2023 and her termination in December 2023. That temporal proximity is not

sufficient for Ms. Sankano to carry her burden of showing that the legitimate, non-retaliatory reason Defendants have provided for her termination was actually a pretext for retaliation.

For all of these reasons (and as explained in more detail below), there is no genuine issue of material fact supporting any of Ms. Sankano's claims, and Defendants are entitled to summary judgment on each of those claims as a matter of law.

## II.    STATEMENT OF FACTS

### A.    Plaintiff's Employment at Pepper Hamilton (August 2019–June 2020)

Ms. Sankano was hired by Pepper Hamilton LLP in August 2019 to support a partner in its Financial Services practice group, Christine Carmody (white). (Defendants' Statement of Undisputed Material Facts ("SUMF") ¶3)[1] Ms. Sankano was an entry-level attorney who did not have any prior experience working at a law firm in this type of law practice, so Ms. Carmody asked Ms. Sankano to send her time entries before entering them into Pepper Hamilton's timekeeping system. Ms. Carmody then would instruct Ms. Sankano how much time should be entered on billable client matters and how much time should be placed on non-billable training numbers. (SUMF ¶¶6-7, 13, 19, 21) Ms. Carmody took this approach because she knew that not all of the time Ms. Sankano spent working on client matters should be billed to the client, and as the sole partner responsible for training Ms. Sankano, Ms. Carmody wanted to teach Ms. Sankano how to recognize the difference between billable work and training. (SUMF ¶¶ 14-17)

In early 2020, the head of Pepper Hamilton's Associates' Committee, Audrey Wisotsky (white) learned how Ms. Carmody was instructing Ms. Sankano to enter her time and talked with Ms. Carmody and Ms. Sankano about it. (SUMF ¶¶23-24) While Ms. Carmody's approach did not violate any firm policy, Ms. Wisotsky told Ms. Carmody that Ms. Sankano should be entering all

---

[1] Defendants' SUMF includes citations to record evidence contained in 17 witness declarations, documents attached as exhibits to the declarations, and Ms. Sankano's deposition testimony.

of her time worked on a client's matter to the billable client number, and then if Ms. Carmody wished to move some of the time to a non-billable training number, she should do that on the back end. (SUMF ¶¶25-26) After initially pushing back on this approach, Ms. Carmody ultimately agreed, and in May 2020, she stopped reviewing Ms. Sankano's time before it was entered. (SUMF ¶¶37-38)

Ms. Carmody's approach to Ms. Sankano's timekeeping did not hurt Ms. Sankano in any way. Ms. Sankano received a positive review from Ms. Carmody in her first interim performance evaluation in April 2020. (SUMF ¶¶32-34) Moreover, Ms. Wisotsky was the head of the Associates' Committee (which oversaw associate performance), was familiar with Ms. Carmody's approach, and did not blame Ms. Sankano in any way for what had happened with her hours. (SUMF ¶35) Finally, the timekeeping issue did not affect Ms. Sankano's compensation, as she received "lockstep" merit increases throughout her employment and would not have qualified for a bonus in 2019 or 2020, regardless of how her hours were categorized. (SUMF ¶¶27, 70-72)

Ms. Sankano was nevertheless upset by what Ms. Carmody had done, and she told management that she wanted to work for other attorneys. (SUMF ¶39) Pepper Hamilton was merging with another firm (Troutman Sanders LLP) in the summer of 2020, and Ms. Sankano requested to work with Troutman Sanders attorneys in the Multifamily Housing Finance ("MFH") practice group after the merger. (SUMF ¶¶44, 46; Am. Compl. ¶95) Until then, Ms. Sankano had worked primarily with Ms. Carmody and to a lesser extent with another attorney at Pepper Hamilton, Blair Schiff (white).[2] (SUMF ¶¶6, 43-44)

---

[2] Ms. Sankano contends that Ms. Carmody "retaliatorily" stopped working with her for approximately one month in May 2020 and that Mr. Schiff only gave her administrative tasks to do because she is Black. However, the record evidence shows that the work Ms. Carmody was able to give Ms. Sankano dropped off for a brief period in the spring of 2020 due to the COVID-pandemic, and Mr. Schiff provided Ms. Sankano with the same type of work he gave to other first-year associates. (SUMF ¶45) Ms. Sankano also contends that another Pepper Hamilton partner, Henry Liu (Asian), refused to give her work during this

**B.**    **Plaintiff's Employment at Troutman Pepper (July 2020–December 2023)**

Shortly after the merger in July 2020, Ms. Sankano began working with legacy Troutman Sanders attorneys in the MFH practice group. (SUMF ¶¶50-51) The MFH Practice Group Leader was Defendant Brian Iwashyna (white). (SUMF ¶48) Mr. Iwashyna went out of his way to welcome and integrate Ms. Sankano into the group—trying to arrange a mentor for her and asking her to send him and one of the practice group's Professional Development Partners, Nora Nickel (Hispanic and Asian), weekly updates of her work assignments and attorneys with whom she was working, so that he could oversee her development. (SUMF ¶¶52-53) Mr. Iwashyna also asked various MFH partners to work with Ms. Sankano. (SUMF ¶¶98, 104, 114, 116)

Over the next three years, Mr. Iwashyna received feedback from more than nine MFH partners about Ms. Sankano's work. Some of this feedback was provided in Ms. Sankano's formal annual performance evaluations or in emails, but much of it was provided to Mr. Iwashyna in meetings and phone calls that he had with those partners. (SUMF ¶¶133-135) Partners reported to Mr. Iwashyna that they were impressed with Ms. Sankano's friendly demeanor, positive attitude, and responsiveness. (SUMF ¶¶66, 69) However, almost immediately, Mr. Iwashyna also began hearing that several MFH partners had concerns about Ms. Sankano's work. (SUMF ¶¶64-66) Many of the concerns related to Ms. Sankano's repeated mistakes, reflecting her lack of attention to detail. (SUMF ¶¶65) Over time, a number of partners also observed that Ms. Sankano did not seem to absorb what she learned on one deal and did not demonstrate an ability to think critically and apply that learning effectively in her work on subsequent deals. (SUMF ¶¶ 71-76) Some also indicated to Mr. Iwashyna that Ms. Sankano did not seem to have the expected level of substantive

---

period because she is Black, but she cannot dispute the evidence that Mr. Liu did not give her work because he had to keep junior associates on his team busy, and Ms. Sankano did not have any experience in his area of MFH work. (SUMF ¶¶42-43)

knowledge of essential MFH concepts. (SUMF ¶¶ 75-76, 79) These types of issues were not particularly problematic when Ms. Sankano was a junior associate, but the law firm expects associates to improve and develop their skills as they get more senior, so it became more problematic in 2023 when Ms. Sankano was a mid-level associate, and the MFH partners continued to observe and report the <u>same</u> problems with Ms. Sankano's work performance. (SUMF ¶¶ 83, 86-87, 93-94, 99, 110, 128, 132-135)

In 2023, based on the feedback he received from MFH partners, Mr. Iwashyna concluded that Ms. Sankano was not performing at the level expected for someone with her years of experience. (SUMF ¶101; 110) The final "tipping point" for Mr. Iwashyna occurred in April 2023 when a relatively new lateral partner, Dameon Rivers (Black), told Mr. Iwashyna that he was not happy with Ms. Sankano's work performance and that he no longer wanted to work with her. (SUMF ¶101) In April 2023, Mr. Iwashyna reached out to two of his partners and told them that he was afraid they would have to make a "hard call" on Ms. Sankano. (SUMF ¶102)

Then in June 2023, Mr. Iwashyna attended a meeting of all the firm's practice group leaders, where firm management instructed them to evaluate all of their associates to determine their likely path forward at the firm. (SUMF ¶105) On June 16, 2023, Mr. Iwashyna and other members of the MFH leadership team with responsibility for associate development met with the firm's Legal Talent Department and the firm's Associate Development Committee ("ADC") to discuss the MFH associates. (SUMF ¶107) During that June 2023 meeting, the group discussed that Ms. Sankano was not performing at the level expected of her and did not have a path to partnership at the firm. (SUMF ¶¶111)

Next, Mr. Iwashyna discussed Ms. Sankano's situation with the firm's Chief Legal Talent Officer, Sona Spencer (Black), during a meeting on August 14, 2023. (SUMF ¶119) Ms. Spencer

told Mr. Iwashyna that (1) Ms. Sankano's performance problems were not the type that could be addressed in a 30/60/90-day performance improvement plan and (2) Ms. Sankano was not a candidate to be moved from her partnership-track associate position to a new career path position, which was not appropriate for poorly performing associates. (SUMF ¶¶121-122) Ms. Spencer also advised Mr. Iwashyna that if he did not think Ms. Sankano was advancing, he should go ahead and make the hard decision to terminate her employment (although he could wait to see her written performance evaluations for 2023, which would be completed within the next two months). (SUMF ¶123)

In October 2023, Mr. Iwashyna reviewed Ms. Sankano's performance evaluations for 2023 and saw that Ms. Sankano's performance had not improved and more MFH partners said she was not meeting expectations. (SUMF ¶¶123-127) Mr. Iwashyna decided to terminate Ms. Sankano's employment based on (1) the 2023 performance evaluations of Ms. Sankano's work, (2) the feedback he had received from various MFH partners over the years, and (3) the input he received from other members of the MFH leadership team with responsibility for associate development (including Ms. Nickel, Mr. Schiff, and Marshall Tucker (Black), who also was a member of the firm's ADC) and Ms. Spencer. Mr. Iwashyna's decision had absolutely nothing to do with Ms. Sankano's race or a complaint that Ms. Sankano had filed in August 2023 about an email she had received from another MFH partner. (SUMF ¶¶133-137, 192-193)

On November 29, 2023, Ms. Sankano was notified of the firm's termination decision, and she was offered three months on the payroll as severance. (SUMF ¶¶139-140) Ms. Sankano declined the offer, and her employment ended on December 7, 2023. (SUMF ¶140)

C.    **Plaintiff's Complaint About Matt Bowsher in August 2023**

On August 10, 2023, Ms. Sankano filed a complaint with the firm's Human Resources Department about an email that MFH partner Matt Bowsher had sent her on August 3, 2023.

(SUMF ¶181) Ms. Sankano and Mr. Bowsher had worked together for almost three years, and Mr. Bowsher had even conducted customized, one-on-one training for Ms. Sankano when she joined the MFH practice group after the merger in 2020. (SUMF ¶¶56-60) Mr. Bowsher often sent long, wordy emails to Ms. Sankano, his partners at the firm (including Mr. Iwashyna), other attorneys, and opposing counsel, explaining particular topics and his views on them. (SUMF 188; Pl. Dep. 187:15-16, 188:12-16; 193:21-194:13; Bowsher Decl. ¶¶10, 18, 32, 36; Iwashyna Decl. ¶60; Tucker Decl. ¶26; Schiff Decl. ¶33; Crawford Decl. ¶18; Nickel Decl. ¶28) Ms. Sankano had seen numerous emails like this that Mr. Bowsher had sent over the years, but she nevertheless was offended and upset by one that he sent on August 3, 2023, criticizing her for a series of unclear and confusing emails she had sent to the MFH New Matters team about matter origination credits on a deal. (SUMF ¶¶163-173, 181) Ms. Sankano believed that Mr. Bowsher was "questioning her intelligence" in his email and that he must be doing this because she is Black (although Mr. Bowsher's email never mentioned race). (SUMF ¶174) After Ms. Sankano reported the issue to Human Resources, Senior Human Resources Manager Denise Johnson (Black) conducted a thorough investigation, interviewing 10 witnesses and reviewing all of the documents provided by Ms. Sankano.[3] (SUMF ¶182-184) Ultimately, Ms. Johnson concluded that while Mr. Bowsher's email was inappropriate, there was no evidence that he sent it to Ms. Sankano because she is Black. (SUMF ¶186) Nevertheless, Mr. Bowsher was counseled about his communication style, and he did not work with or have any interactions with Ms. Sankano after the investigation. (Pl. Dep. 187:15-16, 188:12-16; 193:21-194:13; SUMF ¶¶187-190)

---

[3] Ms. Sankano contends that in the prior year (2022), Mr. Bowsher sent her two emails and had one phone conversation with her that contributed to a racially hostile work environment. However, Ms. Sankano admits that there was no reference to race (Pl. Dep. 223:7-12), and these 2022 interactions were typical of Mr. Bowsher's prior interactions with her and others. (SUMF 188; Pl. Dep. 187:15-16, 188:12-16; 193:21-194:13)

# III.    ARGUMENT

## A.    <u>Standard of Review</u>

Summary judgment is appropriate under Rule 56 of the Federal Rules of Civil Procedure when the evidence in the record shows that there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. Once the moving party has shown that no genuine issue of material fact exists, the non-moving party must go beyond the pleadings and come forth with sufficient proof to establish the elements of the party's case upon which it bears the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986).

In deciding a motion for summary judgment, a court must construe the facts in the light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). However, a plaintiff must do more than demonstrate there is some "metaphysical doubt as to the material facts." *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *see also Anderson*, 477 U.S. at 247-48 ("[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." (emphasis in original); *Owens v. Nat'l Med. Care, Inc.*, 337 F. Supp. 2d 131, 136 (D.D.C. 2004) ("[T]he non-moving party cannot rely on 'mere allegations or denials . . . but must set forth specific facts demonstrating that there are genuine issues for trial.'").

**B.**    **Plaintiff's Race Discrimination Claims Should Be Dismissed**

Ms. Sankano's claims of race discrimination (Counts I, III, and V) are based on three discrete and separate sets of factual allegations. First, Ms. Sankano claims that Ms. Carmody discriminated against her in 2019 and early 2020 because of her race by instructing her to let Ms. Carmody preview her time entries and then instructing her to move some of that time to non-billable numbers. Second, Ms. Sankano claims that Mr. Bowsher created a racially hostile work environment for her in 2022 and 2023 in three emails and one phone conversation in which she believed he was belittling her and questioning her intelligence. Third, Ms. Sankano claims that Mr. Iwashyna decided to terminate her employment because she is Black. However, as discussed below, there is no genuine issue of material fact concerning any of these claims, and thus judgment is required as a matter of law on Counts I, III, and V.[4]

**1.**    **Summary Judgment Is Warranted On Plaintiff's Claim That Ms. Carmody Discriminated Against Her By Giving Her Timekeeping Instructions**

In her Amended Complaint, Ms. Sankano claims that Ms. Carmody discriminated against her because of her race when she asked to review Ms. Sankano's time before it was entered into

---

[4] For the first time during her deposition, Ms. Sankano alleged that Mr. Schiff and Mr. Liu discriminated against her in 2019-2020 by not providing her work or developing her as they did with their own associates prior to the merger. (Pl. Dep. 142:11-20). Specifically, Ms. Sankano alleges the associates reporting to Mr. Schiff and Mr. Liu were given substantive work and "proper training," whereas Mr. Schiff and Mr. Liu had only given her administrative-type work. (Id.). Mr. Liu worked on different types of loans than what Ms. Sankano did for Ms. Carmody, and Ms. Sankano had no training or experience working on those types of loans. (SUMF ¶43) Further, Ms. Sankano was hired to work for Ms. Carmody and Mr. Liu already had a team of associates and did not have capacity to provide Ms. Sankano with enough work to keep her busy. (SUMF ¶¶ 6, 42-43; Pl. Dep. 147:6-148:12) While Mr. Schiff gave Ms. Sankano some work in June 2020 (which she now complains was beneath her), Mr. Schiff did not have the workload to support Ms. Sankano on a full-time basis. (SUMF ¶44) Ms. Sankano does not have any evidence that Mr. Schiff and Mr. Liu did not provide her work or training because of her race, and Ms. Sankano instead cites to only the fact that she is Black, and the associates on their teams were not Black. (Pl. Dep. 144:1-22). This bare assertion is insufficient for a race discrimination claim to survive at the summary judgment stage. Thus, any claims of race discrimination based on the actions of Mr. Schiff and Mr. Liu fail as a matter of law. In addition, any such claims under Title VII or the DCHRA are time-barred (as explained in Section III(B)(1)(c) with respect to Ms. Carmody's actions) and should be dismissed for that reason as well.

the timekeeping system and directed Ms. Sankano to move some of her time to non-billable training numbers. These claims of race discrimination by Ms. Carmody fail as a matter of law because (a) Ms. Carmody has provided legitimate, non-discriminatory reasons for her actions, (b) Ms. Sankano has not produced any evidence that Ms. Carmody's reasons are a pretext for race discrimination, and (c) the claims are untimely under Title VII and the DCHRA.

Section 1981, Title VII, and the DCHRA all prohibit employers from discriminating against employees because of their race. *See* 42 U.S.C. § 1981; 42 U.S.C. § 2000e-2(a)(1); D.C. Code § 2-1402.11(a)(1)(A). However, a plaintiff/employee's burden of proof is different under Section 1981 as compared to Title VII and the DCHRA. To prevail on a Section 1981 disparate treatment claim, the plaintiff must prove that, *but for* race, she would not have suffered the loss of a legally protected right. *Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 140 S. Ct. 1009, 1019 (2020). However, under Title VII and the DCHRA, a plaintiff can prevail by showing that race is a motivating factor in the decision, even though other factors motivated the practice. 42 U.S.C. § 2000e–2(m); *Furline v. Morrison*, 953 A.2d 344, 353 (D.C. 2008).

In cases like this one, where there is no direct evidence of intentional race discrimination, the *McDonnell Douglas* burden-shifting framework applies. *See Brown v. Sessoms*, 774 F.3d 1016, 1022 (D.C. Cir. 2014); *Royall v. Nat'l Ass'n of Letter Carriers, AFL-CIO*, 548 F.3d 137, 144 (D.C. Cir. 2008); *Carney v. the Am. Univ.*, 151 F.3d 1090, 1092-93 (D.C. Cir. 1998) (applying the *McDonnell Douglas* framework to a plaintiff's Section 1981 claim). While the *McDonnell Douglas* framework applies, the D.C. Circuit has held that, for summary judgment purposes, the three-step analysis is really just two where a legitimate, non-discriminatory reason for an adverse employment action has been established. *See Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 492-99 (D.D.C Mar. 28, 2008); *see also Felder v. Johanns*, 595 F. Supp. 2d 46, 63-64 (D.D.C.

2009) (citing *Brady* for the proposition that the *McDonnell Douglas prima facie* factors are "'almost always irrelevant' and are 'largely [an] unnecessary sideshow'").[5]

### a. Ms. Carmody had Legitimate, Non-Discriminatory Reasons for her Timekeeping Instructions to Plaintiff

There were several reasons why Ms. Carmody asked to review Ms. Sankano's time before it was entered and why she instructed Ms. Sankano to move some of her time to non-billable numbers. <u>First</u>, Ms. Carmody knew that Ms. Sankano was a new associate and did not have experience with billing and timekeeping practices, and Ms. Carmody believed it was her responsibility to train Ms. Sankano on how to accurately record and bill her time. (SUMF ¶14) <u>Second</u>, Ms. Carmody was responsible for supervising Ms. Sankano's work, which included reviewing Ms. Sankano's activities and how much time Ms. Sankano spent on assignments, so that Ms. Carmody could provide feedback to Ms. Sankano and balance her workload. (SUMF ¶15) <u>Third</u>, Ms. Carmody knew that as a junior attorney, Ms. Sankano was less efficient and took longer to perform each task than a more experienced attorney would take. (SUMF ¶16) Ms. Carmody did not think that a client should be billed for all of the time that Ms. Sankano worked on a matter, when some of that time was training for a first-year associate and some of the time was greater due to the inherent inefficiency of an inexperienced attorney. (SUMF ¶17) All of these reasons are legitimate and non-discriminatory.

---

[5] In fact, when an employer puts forth a legitimate business reason, the Court's inquiry collapses into a single question: "[h]as the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee on the basis of [the protected category]." *Brady*, 520 F.3d at 494; *Morgan v. Vilsack*, 715 F. Supp. 2d 168, 174 (D.D.C. 2010).

**b.     Plaintiff has no Evidence Showing That Ms. Carmody's Reasons are a Pretext for Race Discrimination**

Because Troutman has produced legitimate non-discriminatory reasons for why Ms. Carmody provided the timekeeping instructions to Ms. Sankano, in order to survive summary judgment, Ms. Sankano must present evidence that creates a genuine dispute of material fact "*both* that the reason [given by Troutman] was false, *and* that discrimination was the real reason." *Hollins v. Fed. Nat'l Mort. Ass'n*, 760 A.2d 563, 571-72 (D.C. 2000); *Brady*, 520 F.3d at 494. "[T]he issue is not 'the correctness or desirability of [the] reasons offered . . . [but] whether the employer honestly believes' [them]." *Fischbach v. D.C. Dep't of Corr.*, 86 F.3d 1180, 1183 (D.C. Cir. 1996). The Court must enter summary judgment on Ms. Sankano's race discrimination claims about Ms. Carmody's timekeeping instructions because (1) Ms. Sankano is unable to demonstrate falsity of Ms. Carmody's explanation, and (2) Ms. Sankano has no evidence showing that the real reason Ms. Carmody gave the timekeeping instructions was because Ms. Sankano is Black.

**(1)     Plaintiff is unable to show that Troutman's legitimate, non-discriminatory reasons for the timekeeping instruction are false.**

Although Ms. Sankano speculated during her deposition about why Ms. Carmody might have wanted to move some of Ms. Sankano's time to non-billable numbers, Ms. Sankano concedes that she does not know why Ms. Carmody reviewed and moved her billable time. (Pl. Dep. 93:22-94:5) Ms. Sankano also cannot point to any policy that Ms. Carmody's instruction violated, and Troutman has submitted evidence that there was no such policy. (SUMF ¶¶25-26) Thus, Ms. Sankano cannot produce any record evidence to rebut the legitimate, non-discriminatory reasons that Ms. Carmody had for issuing the timekeeping instructions.

**(2)    Plaintiff cannot show that Troutman's proffered reasons for the timekeeping instruction is pretextual.**

Not only is Ms. Sankano unable to rebut Ms. Carmody's reasons for the timekeeping instructions she gave Ms. Sankano, but Ms. Sankano is also unable to point to any evidence in the record that would indicate Ms. Carmody's actions were actually because of Ms. Sankano's race.

Ms. Sankano believes Ms. Carmody treated her differently because she is Black solely because Ms. Carmody did not require another associate who was working for her at that time, Randy Hurlburt, to let Ms. Carmody review his hours before they were entered into the timekeeping system. (Pl. Dep. 68:1-69:8) Ms. Sankano is correct that Ms. Carmody did not give the same timekeeping instructions to Mr. Hurlburt, but Mr. Hurlburt was not similarly situated to Ms. Sankano—either at the time they both worked for Ms. Carmody in 2019 and 2020 or earlier when Mr. Hurlburt was a first-year associate working for Ms. Carmody. (SUMF ¶¶10-12)

Ms. Sankano can only create an inference of discriminatory intent by identifying other employees outside of her protected category who were treated more favorably than she was. *See Robertson v. Dodaro*, 767 F. Supp. 2d 185, 195 (D.D.C. 2011). A person is similarly situated to the plaintiff when he or she is "nearly identical" to the plaintiff in all relevant aspects. *Id.* at 196; *Ali v. McCarthy*, 179 F. Supp. 3d 54, 80 (D.D.C. 2016), *aff'd sub nom. Ali v. Pruitt*, 727 F. App'x 692 (D.C. Cir. 2018). Relevant aspects include the employee's job duties, pay level, and area of responsibility. *See Robertson*, 767 F. Supp. 2d at 196.

When Ms. Sankano was working for Ms. Carmody in 2019 and 2020, Ms. Sankano was a new, first-year associate with no prior experience in practicing law in financial services or in timekeeping at Pepper Hamilton. (SUMF ¶9) In contrast, Mr. Hurlburt was a more senior associate than Ms. Sankano was in 2019 and 2020, so he had several years of prior experience with the law practice and timekeeping. (SUMF ¶¶10-12) Moreover, before going to law school, Mr. Hurlburt

14

had worked as a law clerk in Pepper Hamilton's Financial Services Practice Group, so when Mr. Hurlburt was a first-year associate working with Ms. Carmody, he was already familiar with the practice and timekeeping, was more efficient, and did not require the same level of oversight and training on what could or could not be billed to clients. (SUMF ¶12) These differences illustrate that the relevant aspects of Mr. Hurlburt's and Ms. Sankano's employment were not even close to "nearly identical," and Mr. Hurlburt was not "similarly situated" to Ms. Sankano as a matter of law. *See Royall v. Nat'l Ass'n of Letter Carriers*, 548 F.3d 137, 145 (D.C. Cir. 2008) (finding that allegation that other employees were treated more favorably could not establish pretext where plaintiff had not shown "all of the relevant aspects of [their] employment were 'nearly identical'"). Thus, the fact that Ms. Carmody did not issue the same timekeeping instructions to Mr. Hurlburt as she did to Ms. Sankano does not constitute evidence of pretext.[6]

It is also worth noting that Ms. Carmody hired Ms. Sankano knowing Ms. Sankano's race, which strongly suggests that Ms. Carmody did not have a racial animus against Ms. Sankano. (SUMF ¶¶3, 5) While not dispositive, there is a strong presumption against finding discrimination when the discriminating bad actor is the same person who made the decision to hire an individual, as it "becomes difficult to impute to that person an invidious motivation that would be inconsistent with the decision to hire." *See Mulkerin v. Bunch*, Civil Action 1:19-cv-03850 (CJN), 2021 U.S. Dist. LEXIS 160269 at *1 n.5 (D.D.C. Aug. 25, 2021) (quoting *Vatel v. Alliance of Auto. Mfrs.*, 627 F.3d 1245, 1247 (D.C. Cir. 2011)). The rationale behind this "same actor" inference is a

---

[6] During Ms. Sankano's deposition, Ms. Sankano alleged she was treated differently than all "the other associates, who were nonblack"; however, she does not allege that any of the other associates, other than Mr. Hurlburt, worked for Ms. Carmody. (Pl. Dep. 144:1-5) Therefore, none of these other, unnamed associates were similarly situated as proper comparators. Bare assertions of differing treatment, without identifying a proper comparator, are insufficient to create an inference of racial animus. *See Montgomery v. Chao*, 546 F.3d 703, 707 (D.C. Cir. 2008) ("'In the absence of evidence that the comparators were actually similarly situated' to him, an inference of falsity or discrimination is not reasonable." (quoting *Waterhouse v. Dist. of Columbia*, 298 F.3d 989, 991 (D.C. Cir. 2002)).

sensible one: it is entirely illogical that an employer who is aware of an individual's protected class upon making the decision to hire them would then later take an adverse action against them based on that same protected class. This inference is typically applied in the hiring and firing context, but it is also clearly applicable to Ms. Carmody and directly cuts against inferring a discriminatory motive, as Ms. Carmody selected Ms. Sankano to join Pepper Hamilton and to work directly with her. (SUMF ¶3)

For all of these reasons, Ms. Sankano has failed to establish that the reasons Troutman has given for Ms. Carmody's timekeeping instructions to Ms. Sankano are actually a pretext for race discrimination.

### c.    Plaintiff's Claims That Ms. Carmody Discriminated Against her Because of Her Race in Violation of Title VII and the DCHRA are Time-Barred

Under Title VII, before initiating a lawsuit, a plaintiff must exhaust her administrative remedies by first filing a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"). *See Bowden v. United States*, 106 F.3d 433, 437 (D.C. Cir. 1997). A plaintiff generally must file her charge within 180 days of the alleged discriminatory action. 42 U.S.C. § 2000e-5(e)(1). However, because the EEOC has entered into a work-sharing agreement with the District's Office of Human Rights ("DCOHR"), a plaintiff in the District of Columbia has 300 days to file a charge with the EEOC. *See Schuler v. PricewaterhouseCoopers, LLP*, 514 F.3d 1365, 1372 (D.C. Cir. 2008). Ms. Sankano filed her charge with the EEOC on February 28, 2024. (Am. Compl. ¶ 30) Thus, any Title VII claims that Ms. Sankano might have had for adverse employment actions that occurred prior to May 4, 2023 are time-barred under Title VII.

The DCHRA does not require a plaintiff to exhaust administrative remedies and instead allows a plaintiff to file a complaint with the DCOHR or to sue directly in court. *See* D.C. Code § 2-1403.16(a). Regardless of which option a plaintiff elects, she must file her complaint within

one year of the allegedly discriminatory act. *Id.* Ms. Sankano filed this lawsuit on January 17, 2024. (Am. Compl.) Thus, any DCHRA claims that Ms. Sankano might have had for adverse employment actions that occurred prior to January 17, 2023 are time-barred under the DCHRA.

It is undisputed that all of Ms. Carmody's acts upon which Ms. Sankano bases her race discrimination claims occurred in 2019 and 2020. (SUMF ¶¶13, 28-30; 38, 51) For these acts, Ms. Sankano had until 2021 to file an EEOC charge under Title VII and to file a complaint either with DCOHR or in court under the DCHRA. Ms. Sankano did not meet the deadlines. Because Ms. Sankano did not file her EEOC charge or this lawsuit until 2024, Ms. Sankano's discrimination claims based on Ms. Carmody's alleged 2019-2020 acts are time-barred under Title VII and the DCHRA, and the Court must enter summary judgment for Troutman on those claims.[7]

### 2.    Plaintiff Has Failed To Establish That Matt Bowsher's Four Comments Created A Racially Hostile Work Environment

Ms. Sankano alleges that in 2022 and 2023, Troutman partner Matt Bowsher created a racially hostile work environment by making four belittling and condescending comments to her over the phone and in emails. Ms. Sankano's hostile work environment claims under Title VII, Section 1981, and the DCHRA (Counts I, V, and III, respectively) should be dismissed because (a) Mr. Bowsher's comments were not sufficiently severe or pervasive to change the conditions of her employment or create an abusive work environment under Title VII and Section 1981, and were not frequent or explicit enough to create an intimidating, hostile, or offensive work environment under the DCHRA, regardless of whether they are viewed collectively or in isolation;

---

[7] For this same reason, to the extent that Ms. Sankano asserts claims based on allegations that Mr. Schiff and Mr. Liu discriminated against her in 2019-2020 by not providing work (*see* footnote 4 *supra*), those claims are time-barred under Title VII and the DCHRA.

(b) Mr. Bowsher's comments were not based on race; and (c) Troutman took prompt remedial action to stop the complained-of conduct after Ms. Sankano complained.

  a. **Mr. Bowsher's Comments to Plaintiff Were Not Severe or Pervasive and Did Not Create an Intimidating, Hostile, or Offensive Work Environment**

   In order to state a hostile work environment claim under Title VII or Section 1981, a plaintiff must allege facts showing that she was subject to "discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Baloch v. Kempthorne*, 550 F.3d 1191, 1201 (D.C. Cir. 2008) (citing *Harris v. Forklift Sys. Inc.*, 114 S. Ct. 367 (1993)) (Title VII); *Ayissi-Etoh v. Fannie Mae*, 712 F.3d 572, 577-78 (D.C. Cir. 2013) (Section 1981). To qualify as a hostile work environment, the behaviors must be "both objectively and subjectively offensive," and the work environment must be "one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." *Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998). "To determine whether an environment is sufficiently hostile or abusive," the Court must "'look[] at all the circumstances,' including the 'frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Id.* at 787-88 (quoting *Harris*, 510 U.S. at 23). Generally, "a few isolated incidents of offensive conduct [will] not amount to actionable harassment." *Stewart v. Evans*, 275 F.3d 1126, 1134 (D.C. Cir. 2002) (holding that a plaintiff could not prove *prima facie* case of sexual harassment where "claim amount[ed] to only one isolated incident of alleged sexual harassment"); *see also Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 271 (2001) (finding no actionable harassment in case involving singular statement); *Harris v. Wackenhut Servs., Inc.*, 419 Fed. Appx. 1, 1-2 (D.C. Cir. 2011) (holding that "three

racially motivated comments directed at [the plaintiff] . . . 'do not amount to actionable harassment'" (citation omitted)).

Under the DCHRA (as amended by the Human Rights Enhancement Amendment Act of 2022), fact finders are required to look at the totality of the circumstances to determine whether the plaintiff was subjected to an intimidating, hostile, or offensive work environment. D.C. Code § 2-1402.11(c-2)(3). The factors include (but are not limited to): the frequency of the conduct; the duration of the conduct; the location where the conduct occurred; whether the conduct involves threats, slurs, epithets, stereotypes, or other humiliating or degrading conduct; and whether any party to the conduct held a formal position over authority or relative to another. *See id.*

Ms. Sankano's allegation that Mr. Bowsher subjected her to a hostile work environment is based on four interactions with Mr. Bowsher: one phone call and three emails that occurred over the span of two years. (Pl. Dep. 181:8-182:2, 185:22-187:2, 187:4-188:16, 189:12-191:11, 203:11-17) Whether considered collectively or in isolation, these incidents do not create an abusive working environment based on Ms. Sankano's race under Title VII, Section 1981, or the DCHRA.

First Interaction – Phone Call Explaining Notaries: The first interaction with Mr. Bowsher about which Ms. Sankano complains involved a phone call in 2022 during which Mr. Bowsher explained to Ms. Sankano what a notary was. (Am. Compl. ¶¶ 130-138; Pl. Dep. 185:22-187:2) Mr. Bowsher called Ms. Sankano about this issue after she sent an email agreeing to separate the notary pages from the signature pages on certain loan documents. (SUMF ¶143) Mr. Bowsher had never heard of someone intentionally splitting the notary page from the signature page before, and Mr. Bowsher thought Ms. Sankano might not understand the function of a notary, so he called her to explain it to her. (SUMF ¶144) Ms. Sankano felt like Mr. Bowsher was "mansplaining"[8] notaries

---

[8] Ms. Sankano testified that "mansplaining" means that Mr. Bowsher was "very aggressive, very condescending. Like he came off like I did not know what I was talking about." (Pl. Dep. 193:13-20)

to her, "thinking that [she] didn't know what a notary was." (Pl. Dep. 186:18-22) Ms. Sankano admits that she "did not think anything of [the call], but it was strange." (Pl. Dep. 187:3-4) Following the call, Ms. Sankano emailed Mr. Bowsher an example of how the client preferred to handle notary pages, and Mr. Bowsher responded "Understood, totally makes sense. Thanks again." (SUMF ¶147)

Second Interaction – Question About Whether Plaintiff Had Seen the Firm Accept Certain Language Before: The second interaction with Mr. Bowsher occurred when Ms. Sankano and Mr. Bowsher were working on a deal together in April 2022. After Ms. Sankano told Mr. Bowsher that she had no comments on the opinion letter opposing counsel had sent, Mr. Bowsher sent Ms. Sankano an email containing the following request:

> Not asking you to push back blindly on the [borrower's] counsel on this, rather I'm asking you to give this some thought, consider whether you've ever seen it in the year you've been closing loans with us, and also pull prior Winstead opinions to see if Troutman has accepted it from this firm, then let's circle-back and see if it's appropriate to reject it.

(SUMF ¶151) Ms. Sankano responded that she had seen that type of language before, but on the wrong type of deal and admitted that she "might have got the opinion languages confused." (SUMF ¶152) In her deposition, Ms. Sankano again characterized this interaction as Mr. Bowsher "mansplaining" the issue to her. (Pl. Dep. 209:21-211:20)

Third Interaction – Erroneous Email About Whether Local Opinions Were Needed: The next incident occurred in May 2022, when Ms. Sankano told opposing counsel that "no enforceability/local opinions are needed because this transaction is a supplemental loan." (SUMF ¶156) Mr. Bowsher emailed her and asked "Please issue a correction to your statement below. It is not accurate to say that "no enforceability/local opinions are needed"; Mr. Bowsher then explained why he believed local opinions were required on supplemental loans. (SUMF ¶157) Ms. Sankano responded by email, explaining her understanding that local opinions were not required

on such loans and attaching authority to support her position. (SUMF ¶158) Mr. Bowsher reviewed

the authorities and then responded: "Oh, wow! Ha!! That's a massive disconnect between the form

opinion and the guidelines...Thanks for bringing this to my attention! I'll ping Jeremy and Virginia.

Hard to argue with the Guidelines, you're totally right of course . . . ." (SUMF ¶159) Ms. Sankano

testified in her deposition that Mr. Bowsher's email asking her to issue a correction was another

instance of him "mansplaining" and that she thought this was an instance of a microaggression.

(Pl. Dep. 190:3-7, 191:6-11)

Fourth Interaction: Email About Plaintiff's Confusing and Contradictory Instructions for

Opening New Matter: The fourth interaction Ms. Sankano points to as creating a hostile work

environment occurred in August 2023, when Ms. Sankano was staffed on a deal with Mr. Bowsher

and then senior associate Kelly Mufarrige. Ms. Sankano sent the firm's MFH New Matters team a

series of confusing and contradictory emails about how the "matter responsible" credit on the deal

should be divided between Mr. Bowsher and Ms. Mufarrige. (SUMF ¶¶166-169) Mr. Bowsher

asked Ms. Sankano to correct her statements, and when Ms. Sankano stated that she thought she

had been clear, Mr. Bowsher sent her a lengthy email explaining exactly why her emails were not

clear. In that email, Mr. Bowsher noted that this was "very basic, elementary communication that

had nothing to do with training or understanding of multifamily transactional law." (SUMF ¶¶170-

173) Ms. Sankano claims that Mr. Bowsher's response to her correspondence was a "demeaning

attack" and was just another example of him questioning her intellect. (Am. Compl. ¶ 192; Pl. Dep.

203:11-17)

Not only are these four discrete exchanges not sufficiently severe or pervasive under Title

VII or Section 1981, but they also do not create a hostile work environment based on race when a

factfinder looks at the totality of the circumstances under the DCHRA. The four interactions are

completely isolated incidents that occurred over the period of a year and a half, and in the midst of thousands of other communications between Ms. Sankano and Mr. Bowsher about which she does not complain. Collectively, Mr. Bowsher's four interactions are simply too infrequent to be pervasive under Title VII or Section 1981. *See Baloch*, 550 F.3d at 1201 (holding that employee's four verbal altercations with supervisor, two impositions of leave restrictions, two proposals of suspension, and other clashes over two-year period were too sporadic); *Alfano v. Costello*, 294 F.3d 365, 374 (2d Cir. 2002) ("As a general rule, incidents must be more than 'episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive.'"). Similarly, the infrequency and short duration of Mr. Bowsher's allegedly harassing interactions with Ms. Sankano negate any hostile work environment claim under the DCHRA. D.C. Code § 2-1402.11(c-2)(3)(A, B).

Mr. Bowsher's one phone call and three emails also were not severe and did not create an abusive or offensive environment for Ms. Sankano. None of Mr. Bowsher's email or phone communications contained the "threats, slurs, epithets, stereotypes, or humiliating or degrading conduct" described in the DCHRA. In fact, Ms. Sankano contends that Mr. Bowsher's behavior was "subtle." (Pl. Dep. 202:7-8) Ms. Sankano tries to characterize Mr. Bowsher's comments in the August 3 email as indirectly reflecting "stereotypes about black folk who work in corporate America that we're not – we didn't get these job based on our own merit, that we got here because to fit some quota and he was exhibiting those stereotypes as in questioning my basic competency level." (Pl. Dep. 203:4-13) But Ms. Sankano's characterization is simply her own opinion that Mr. Bowsher's comments in the August 3 email reflected societal stereotypes. Mr. Bowsher's August 3 communication does not actually <u>contain</u> any stereotypes. (SUMF ¶¶173-174) Similarly, Ms. Sankano argues that Mr. Bowsher's explanation of a notary's function, his request that she

consider whether she had ever seen the firm accept certain language before, and his (erroneous) statement that local opinions were required for supplemental deals suggested that he did not think she was smart. But again, none of those three communications contains or refers to any stereotypes about Black people.

Finally, Mr. Bowsher's comments did not create a hostile work environment under Title VII, Section 1981, or the DCHRA because there is no record evidence that they affected the terms of Ms. Sankano's employment. (*See* Pl. Dep. 187:3-4; 188:17-18)

For these reasons, Mr. Bowsher's conduct simply did not rise to the level sufficient to sustain a hostile work environment claim. *Barbour v. Browner*, 181 F.3d 1342, 1348 (D.C. Cir. 1999) (finding that an employee who had co-workers turn their backs on her in meetings, give deliberately slow response to the employee's requests, and request confirmation of the employee's instructions failed to sustain a hostile work environment claim); *Jackson v. Gallaudet Univ.*, 169 F. Supp. 3d 1, 5 (D.D.C. 2016) (finding that allegations that supervisor made derogatory comments on "multiple occasions" over a two-year time span, made one comment pertaining to a traditional Jamaican dish, and posed one question to children on a school bus interpreted by plaintiff as "insulting and humiliating to her Jamaican national origin," along with a vague assertion that the supervisor repeatedly humiliated her do not meet the objective severity of harassment); *Brooks v. Grundmann*, 851 F. Supp. 2d 1, 4-7 (D.D.C. 2012) (holding that negative performance appraisals, being subjected to yelling in meetings, and reassignment to a "Team of One" did not sustain a hostile work environment claim); *Badibanga v. Howard Univ.*, 679 F. Supp. 2d 99, 104 (D.D.C. 2010) (finding no hostile work environment where plaintiff was placed on administrative leave due to a false accusation, his accent was criticized, and he was told he was easy to replace with an American and that his supervisor would not hire other Africans). The fact that Ms. Sankano

subjectively did not like the way Mr. Bowsher spoke to her, or merely the fact that he questioned some of Ms. Sankano's work, is simply not enough to create a hostile work environment, as a matter of law, given the Supreme Court's instruction in *Faragher* that the complained-of conduct be both subjectively <u>and</u> objectively offensive. 524 U.S. at 787. The antidiscrimination laws do not outlaw everything that makes an employee unhappy. *Graham v. Holder*, 657 F. Supp. 2d 210, 216 (D.D.C. 2009).

### b.    Mr. Bowsher's Comments Were Not Based on Plaintiff's Race

Ms. Sankano's hostile work environment claims also fail because there is no evidence in the record that any of Mr. Bowsher's comments to Ms. Sankano were based on her race. It is axiomatic that a plaintiff asserting a hostile work environment claim must prove that the conduct about which she complains was based on the plaintiff's protected status—in this case, her race. *See Davis v. Coastal Int'l Sec., Inc.*, 275 F.3d 1119, 1122-23 (D.C. Cir. 2002) (requiring proof for hostile work environment claims that the harassment complained of was based upon the plaintiff's protected status); *see also* D.C. Code § 2-1402.11(c-2)(1) (prohibiting only "harassment based on one or more protected characteristics").

Here, Ms. Sankano does not contend that Mr. Bowsher explicitly mentioned her race in <u>any</u> of the four interactions she claims created a hostile work environment. (Pl. Dep. 186:2-187:2, 214:12-20, 223:7-12, 262:6-263:5) Moreover, there is no record evidence that Mr. Bowsher ever made a racial slur or an otherwise derogatory comment about Ms. Sankano's race.

Despite this lack of any reference to race in Mr. Bowsher's communications, Ms. Sankano contends that when Mr. Bowsher's emails and phone call are viewed in context, his communications are racist. (Pl. Dep. 214:12-20, 262:6-263:5) Specifically, Ms. Sankano contends that Mr. Bowsher was belittling and questioning her cognitive ability and that behavior constituted microaggressions based on preconceived notions about Black people. (Pl. Dep. 191:6-8, 203:14-

17) Troutman disputes this characterization of Mr. Bowsher's interactions, but even if those interactions were "microaggressions," as Ms. Sankano believes, they are insufficient to state a claim. While this Circuit has not yet opined on whether a hostile work environment can be predicated on microaggressions, other jurisdictions have found that "microaggressions" are more similar to "mere offensive utterances" rather than "physically threatening or humiliating" statements that could form the basis of a hostile work environment claim. *De Souza v. Planned Parenthood Fed'n of Am.*, 21 CIV. 5553 (LGS), 2023 WL 2691458, at *5 (S.D.N.Y. Mar. 29, 2023); *Chambers v. City of Lakeland*, 8:20-cv-2794, 2022 WL 2356816, at *8 (M.D. Fla. June 30, 2022); *Weinberg v. William Blair & Co., LLC*, 12-CV-09846, 2015 WL 5731637, at *6 (N.D. Ill. Sept. 30, 2015). Thus, as a matter of law, Ms. Sankano's opinion that Mr. Bowsher's call and emails constituted racial microaggressions cannot support a claim for hostile work environment based on race.

In addition, there is no record evidence from which a reasonable factfinder can conclude that Mr. Bowsher harbored any kind of racial animus towards Ms. Sankano. As just one example of Mr. Bowsher's lack of racial animus, Mr. Bowsher reached out to Ms. Sankano when she first joined Troutman after the merger and voluntarily offered to take time to train her on MFH concepts, and then proceeded to have weekly training sessions with her for several months. (SUMF ¶¶56-59) The undisputed evidence in this case also shows that Mr. Bowsher sent long, wordy, and sometimes condescending emails to other individuals, not just Ms. Sankano—a fact to which Ms. Sankano testified during her deposition. (P1. Dep. 187:15-16)[9] Mr. Bowsher's communication style was not directed at Ms. Sankano (or anyone else) on account of race. Thus, Ms. Sankano has

---

[9] Mr. Iwashyna corroborates this evidence. Mr. Iwashyna, a white male and the MFH Practice Group Leader, was not immune to Mr. Bowsher's verbiage and tone which Ms. Sankano found to be offensive. Mr. Iwashyna also has received similar communication from Mr. Bowsher. (SUMF ¶ 188)

failed to establish that her four interactions with Mr. Bowsher created a hostile work environment based on race.

### c. Troutman Pepper Took Prompt Remedial Action When Plaintiff Complained About Mr. Bowsher

Even if Ms. Sankano were able to satisfy her burden of proving Mr. Bowsher created a hostile work environment based on race (which she cannot), Ms. Sankano's Title VII, DCHRA, and Section 1981 claims are ripe for summary judgment because Troutman took prompt remedial action in response to Ms. Sankano's complaint.

Under the *Faragher/Ellerth* affirmative defense, when a plaintiff argues that a supervisor has created a hostile work environment and no tangible employment action is taken, the employer will be shielded from hostile-work-environment liability if it establishes that: (1) it "exercised reasonable care to prevent and correct" any harassing behavior, and (2) the employee "unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Burlington Indus. v. Ellerth*, 524 U.S. 742, 765 (1998); *Faragher*, 524 U.S. at 807. Moreover, the employer is only required to take steps that are "reasonably likely to stop the harassment." *Gregg v. Hay-Adams Hotel*, 942 F. Supp. 1, 7 (D.D.C. 1996) (quoting *Saxton v. Am. Tel. & Tel.*, 10 F.3d 526, 535-36 (7th Cir. 1993)). "[A]n employer . . . does not have to necessarily discipline or terminate the offending employee"; what matters is whether the employer's actions are "reasonably likely to prevent the offending conduct from recurring." *Ryczek v. Guest Services, Inc.*, 877 F. Supp. 754, 760 (D.D.C. 1995) (quoting *Saxton*, 10 F.3d at 535, and *Talanda v. KFC Nat'l Mgmt. Co.*, 863 F. Supp. 664, 668 (N.D. Ill. 1994)); *accord Bazemore v. Best Buy*, 957 F.3d 195, 201 (4th Cir. 2020) ("A remedial action that effectively stops the harassment will be deemed adequate as a matter of law.") (quoting *EEOC v. Xerxes Corp.*, 639 F.3d 658, 670 (4th Cir. 2011)).

Here, when Ms. Sankano brought her concerns about Mr. Bowsher to Human Resources, Troutman took the allegations seriously and promptly initiated an investigation. (SUMF ¶¶181-185) The investigation was conducted by a Senior Human Resources Manager (who happened to be Black) in consultation with the firm's Director of Human Resources and a member of the firm's Office of General Counsel. (SUMF ¶182) The investigator interviewed multiple witnesses, all of whom Ms. Sankano had either identified when she reported her concerns or had spoken to about her concerns, and the investigator reviewed numerous documents that Ms. Sankano provided. (SUMF ¶184) After a lengthy and thorough investigation, the Human Resources investigator did not find that Mr. Bowsher's conduct was discriminatory.

Following the conclusion of the investigation, although there was no finding of discrimination, Mr. Iwashyna spoke to Mr. Bowsher about his communication style and counseled him to be more mindful of his communications going forward. (SUMF ¶187) Since then, Mr. Bowsher has made a conscious effort to communicate in a more appropriate tone and manner in his emails. (SUMF ¶189) Moreover, after the investigation closed, Ms. Sankano did not interact with Mr. Bowsher, did not receive a performance evaluation from Mr. Bowsher, and did not work with Mr. Bowsher on any of his deals. (SUMF ¶190) Finally, Mr. Bowsher was not involved in the decision to terminate Ms. Sankano's employment. (SUMF ¶190) Thus, it is clear that the remedial actions Troutman took to address Ms. Sankano's complaint about Mr. Bowsher were effective at stopping any allegedly harassing behaviors. As a result, the Court must enter summary judgment on Ms. Sankano's Title VII, DCHRA, and Section 1981 claims.

### 3.    Plaintiff Has Abandoned Her Claim That She Was Terminated Due to Race

In her Amended Complaint, Ms. Sankano indicates Troutman discriminated against her because of her race in violation of Section 1981, Title VII, and the DCHRA when it terminated

her employment. (Am. Compl. ¶¶ 297, 319)[10] But when Ms. Sankano was asked in her deposition why she believed her termination was because of her race, Ms. Sankano responded "I was terminated as retaliation for filing an HR complaint, not because of discrimination." (Pl. Dep. 251:22-252:5) Thus, Ms. Sankano has explicitly rejected and abandoned her discriminatory termination claims, and Troutman should be granted summary judgment on all of those claims (Counts I, III, and V).

Even if Ms. Sankano had not abandoned her discriminatory termination claims, those claims are subject to judgment as a matter of law. As explained below in Section III(C)(1)(a), it is undisputed that Mr. Iwashyna made the decision to terminate Ms. Sankano's employment and had legitimate, non-discriminatory reasons for making that decision. Ms. Sankano has no evidence that Mr. Iwashyna harbored any racial animus towards her (and Ms. Sankano implicitly concedes as much by not asserting a claim of race discrimination against him individually). For all of these reasons, this Court must enter judgment in Troutman's favor on Ms. Sankano's claims that her employment was terminated because of her race.

C.     **Plaintiff's Retaliation Claims Should Be Dismissed**

Ms. Sankano's Amended Complaint clearly states in Counts II, IV, and VI that Ms. Sankano was retaliated against for engaging in protected activity. It is also clear from the Amended Complaint and Ms. Sankano's deposition that Ms. Sankano is basing her retaliation claims primarily on the termination of her employment. (Am. Compl. ¶¶ 303, 325; Pl. Dep. 251:22-252:5) But in her deposition, Ms. Sankano also testified that she believed Ms. Carmody retaliated against

---

[10] Counts I and V explicitly state that Ms. Sankano is pursuing a race discrimination claim under Section 1981 and Title VII based on the termination of her employment. (Am. Compl. ¶¶ 297, 319) Count III does not explicitly state that Ms. Sankano's race discrimination claim under the DCHRA is based on her termination, but its reference to "the actions described above" (Am. Compl. ¶ 308) presumably incudes the act of terminating Ms. Sankano's employment.

her by reducing her workload in May 2020. (Pl. Dep. 90:12-92:7) It is not clear whether Ms. Sankano was merely speaking colloquially when she referred to Ms. Carmody as "retaliating" against her—particularly when she only named Troutman and Mr. Iwashyna as defendants in her retaliation claims. But out of an abundance of caution, the following sections explain why Defendants are entitled to summary judgment on both (1) Ms. Sankano's retaliatory termination claims and (2) any retaliation claims Ms. Sankano may assert involving Ms. Carmody.

### 1.    Plaintiff's Employment Was Terminated Because Of Her Performance Problems, Not Her Complaint About Mr. Bowsher

Ms. Sankano alleges that Troutman and Mr. Iwashyna terminated her employment in retaliation for engaging in protected activity by complaining about Mr. Bowsher's emails. (Am. Compl. ¶¶ 280, 303, 314, 325) To prove retaliation, Ms. Sankano must establish: "[F]irst, that she engaged in protected activity; second, that she was subjected to adverse action by the employer; and third, that there existed a causal link between the adverse action and the protected activity." *Broderick v. Donaldson,* 437 F.3d 1226, 1231-32 (D.C. Cir. 2006) (citation omitted). "The standard for retaliation under [Title VII] is identical" to that under Section 1981. *Harris v. Trustees of Univ. of D.C.*, 567 F. Supp. 3d 131, 144 (D.D.C. 2021). Ultimately, to assert a retaliation claim under Title VII or Section 1981, Ms. Sankano must prove that the desire to retaliate was the "but-for cause" of her termination. *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338 (2013). In contrast, to assert a claim of retaliation under the DCHRA, Ms. Sankano must prove that her protected activity was "a motivating factor" for the termination decision. *Dist. of Columbia v. Bryant*, 307 A.3d 443 (D.C. 2024).

Both Troutman and Mr. Iwashyna are entitled to judgment as a matter of law pertaining to Ms. Sankano's claim that she was terminated in retaliation for complaining about Mr. Bowsher. The record shows that Mr. Iwashyna (and by extension, Troutman) had a legitimate, non-

retaliatory reason for terminating Ms. Sankano's employment—that she was simply not performing at the level expected for a mid-level associate. (SUMF ¶¶132-136) Ms. Sankano has no evidence to show that her complaint about Mr. Bowsher was the real reason for Troutman's and Mr. Iwashyna's decision to terminate her employment. Consequently, Ms. Sankano's retaliatory termination claims in Counts II, IV, and VI must be dismissed as a matter of law.

### a.  Troutman and Mr. Iwashyna had a Legitimate, Non-Retaliatory Reason for Terminating Plaintiff's Employment

It is undisputed that Mr. Iwashyna made the decision to terminate Ms. Sankano's employment, in consultation with other MFH partners in leadership positions responsible for associate development (Mr. Schiff, Mr. Tucker, and Ms. Nickel) and with Ms. Spencer, the firm's Chief Legal Talent Officer. (SUMF ¶137) There is also no genuine dispute of material fact about why Mr. Iwashyna made that decision. Mr. Iwashyna had concluded that Ms. Sankano was not performing at the MFH partners' expectation for an associate at her level. (SUMF ¶132) Mr. Iwashyna further noted that Ms. Sankano's performance problems included a lack of substantive knowledge on deals, sloppiness in her work product and lack of attention to detail, problems issue-spotting, and a failure apply learnings from one deal to the next. (SUMF ¶133) Mr. Iwashyna reached this conclusion based on Ms. Sankano's written performance evaluations and the feedback he had received about her performance from multiple MFH partners.[11] (SUMF ¶136) Mr. Iwashyna has testified that Ms. Sankano's complaint about Mr. Bowsher had nothing to do with his decision. (SUMF ¶192) Mr. Iwashyna's explanations are consistent with discussions that he

---

[11] Mr. Iwashyna considered feedback about Ms. Sankano's performance from the following partners in the MFH Practice Group: Scott Fireison; Jonathan Lautt; S.R. Sidarth, Matt Bowsher, Lindsey Crawford, Peter Strup, Dameon Rivers, Nora Nickel, Jennifer Bojorquez, Marshall Tucker, and Virginia Stitzer. (SUMF ¶136) This feedback was provided from 2020 through 2023, with each partner independently expressing concerns about Ms. Sankano's work. (SUMF ¶¶64, 65-66, 75, 76, 78, 79, 89, 99-100, 107, 111, 115, 118, 131, 132, 136-137)

had with the diverse group of individuals who provided input into the decision. (SUMF ¶¶64, 65-66, 75-76, 78, 79, 89, 99-100, 107, 111, 115, 118, 131, 132, 136-137) Accordingly, Mr. Iwashyna's reason for terminating Ms. Sankano's employment is legitimate and non-retaliatory, as a matter of law. *See Baskerville v. CBS News, Inc.*, Civil Action No. 18-2522 (FYP), 2022 U.S. Dist. LEXIS 36931, at *27 (D.D.C. Mar. 2. 2022)("Among the many legitimate reasons an employer might give for terminating an employee, the simplest one is: [they were] a poor employee."); *Stephens v. Yellen*, No .17-cv-125 (DLF), 2021 U.S. Dist. LEXIS 225447, at *18 (D.D.C. Nov. 23, 2021)(concluding employer met its burden in proffering a legitimate, non-discriminatory reason where employer presented admissible evidence in the form of testimony and exhibits outlining plaintiff's performance issues, which included "specific examples").

>   **b.    Plaintiff Is Unable to Show that the Reason Defendants Provided for the Termination Decision Was a Pretext for Retaliation**

Because Defendants have produced a legitimate, non-retaliatory reason for the termination decision, the burden-shifting framework largely falls away and the key question for the Court becomes "whether the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted non-retaliatory reason was not the actual reason and that the employer intentionally retaliated against the employee." *Muse v. Wash. Metro. Area Transit Auth.*, No. 1:23-cv-00407 (TNM), 2024 U.S. Dist. LEXIS 206661, at *39 (D.D.C. Nov. 14, 2024). Ms. Sankano cannot produce sufficient evidence to disprove Defendants' reason for her termination, and she cannot show that unlawful retaliation was the true reason for her termination.

>   **(i)    Plaintiff Cannot Disprove Defendants' Reason for the Termination**

Ms. Sankano cannot disprove Defendants' reasons for her termination because those reasons are rooted in Mr. Iwashyna's opinion that she was not performing at the level expected for a mid-level associate—a conclusion Mr. Iwashyna reached based on feedback he received from a

number of other partners in the MFH practice group who had worked with Ms. Sankano over many years. (SUMF ¶136) That feedback is established by testimony from Mr. Iwashyna and from those partners, written performance evaluations of Ms. Sankano that Mr. Iwashyna reviewed, and a number of contemporaneous emails. (SUMF ¶136) Ms. Sankano cannot contest that Mr. Iwashyna received this feedback or that he formed his conclusions and opinions based on that feedback.

Ms. Sankano, of course, disagrees with Mr. Iwashyna's assessment that she was performing poorly. (Am. Compl. ¶¶41, 118-119, 120, 162, 164, 174, 179, 234; Pl. Dep. 126:6-11, 125:19-21; 252:13-253:16) But it is well settled that a plaintiff's disagreement with an employer's assessment of her performance does not demonstrate pretext. *See Ey v. Office of the Chief Admin. Officer*, 967 F. Supp. 2d 337, 343-44 (D.D.C. 2013).

Ms. Sankano tries to disprove Defendants' assessment of her performance by contending that she only received positive comments in her performance evaluations and other feedback from partners. (Am. Compl. ¶¶ 120, 164, 261; Pl's Dep. 252:12-257:19) Ms. Sankano's contentions are contrary to the undisputed evidence in this case and are legally irrelevant.

Ms. Sankano's statements that her performance evaluations for 2021 and 2022 showed that she was doing "exceptional" and "outstanding" work are not supported by the evaluations themselves. In her Amended Complaint, Ms. Sankano cherry-picks a few positive comments from those evaluations to support her case, but completely ignores the criticisms she received in those evaluations. Contrary to Ms. Sankano's statements, the comments made by various MFH partners in Ms. Sankano's performance evaluations for 2021-2022 reflect consistent themes of sloppiness and lack of attention to detail, lack of substantive knowledge, and failure to apply learnings from one deal to the next. (SUMF ¶¶82-83; 92-95) Indeed, Ms. Sankano received several ratings of 2 (needs improvement / does not meet expectations) in her evaluations in 2021 and 2022. *Id*.

Moreover, the undisputed evidence shows that Ms. Sankano's performance evaluations for 2023 reflected a significant drop in her performance that year, which is the year in which the termination decision was made. A number of MFH partners (including Mr. Strup, Ms. Bojorquez, Mr. Lautt, and Ms. Crawford) gave Ms. Sankano ratings of 2 in their evaluations in 2023. (SUMF ¶125) Virtually every partner who reviewed Ms. Sankano's work commented on her performance problems, discussing her gaps in substantive knowledge and her need to work on "developing her pragmatic thinking skills," understanding the "why" behind the documents being used and advice being given, improving her thoroughness and the quality of her work product, and/or being more diligent in her review. (SUMF ¶125) Mr. Iwashyna testified that he waited to make the final decision until he saw those written performance evaluations for 2023, and that his termination decision was based in part on those evaluations, because while some of Ms. Sankano's mistakes might be understandable for a more junior associate, as Ms. Sankano became more senior, her continued performance problems became more concerning. (SUMF ¶134) Thus, the undisputed evidence shows that Ms. Sankano's performance evaluations support Mr. Iwashyna's decision to terminate Ms. Sankano's employment.

### (ii)    Plaintiff Cannot Show that Retaliation Was the Real Reason for the Termination

Ms. Sankano also cannot establish that unlawful retaliation was the true reason she was terminated. When asked in her deposition why she believed her termination was retaliatory, Ms. Sankano testified "the timing. It's a huge indicator." (Pl's Dep. 252:12) However, to prove retaliation under both the "but-for" test for her Section 1981 and Title VII claims and the "motivating" factor test for her DCHRA, Ms. Sankano cannot rely solely on temporal proximity. While "[t]emporal proximity can indeed support an inference of causation . . . where the two events are 'very close' in time,' *Woodruff v. Peters*, 482 F.3d 521, 529 (D.C. Cir. 2007)(quoting *Clark*

*County School Dist. v. Breeden*, 532 U.S. 268, 273-74 (2001)), this Court has held that "positive evidence beyond mere proximity is required to defeat the presumption that [an employer's] proffered explanations are genuine." *Hutchinson v. Holder*, 815 F. Supp. 2d 303, 318-19 (D.D.C. 2011) (Section 1981); *Musick v. Salazar*, 839 F. Supp. 2d 86, 96 (D.D.C. 2012) (Title VII) ("[T]emporal proximity . . . standing alone . . . is insufficient to discredit defendant's proffered explanation[.]")(quoting *Kranz v. Gray*, 2012 WL 271308, at * 9 (D.D.C. Jan. 31, 2012)(citing *Sewell v. Chao*, 532 F. Supp. 2d 126, 139 (D.D.C. 2008) ); *see Pendleton v. Holder*, 697 F. Supp. 2d 12, 23 (D.D.C. Mar. 22, 2010) ("Temporal proximity alone . . . is insufficient to rebut" an employer's proffered explanation for its adverse action); *Daniel v. Johns Hopkins Univ.*, 118 F. Supp. 3d 312, 319 (D.D.C. 2015) (Title VII, Section 1981, and DCHRA) ("Temporal proximity alone fails to defeat the presumption that a proffered explanation is genuine.").

As the D.C. Court of Appeals has stated: "'[P]ositive evidence *beyond mere proximity* is required to defeat the presumption that the proffered explanations are genuine.'" *Hamilton v. Geithner*, 666 F.3d 1344, 1359 (D.C. Cir. 2012) (quoting *Woodruff*, 482 F.3d 521, 530 (emphasis added)). Indeed, "[i]f temporal proximity sufficed to rebut a legitimate proffer, then protected activities would effectively grant employees a period of immunity, during which no act, however egregious, would support summary judgment for the employer in a subsequent retaliation claim." *Woodruff*, 482 F.3d at 530.[12]

In addition, the timing of the events leading up to the decision to terminate Ms. Sankano's employment actually supports Defendants' proffered reasons for the termination. Mr. Iwashyna

---

[12] While *Woodruff* addressed a retaliation claim brought under the Americans with Disabilities Act, this sentiment has consistently been applied and is the same standard for Title VII, DCHRA and Section 1981 cases. *See e.g., Daniel v. Johns Hopkins Univ.*, 118 F. Supp. 3d 312, 319 (D.D.C. 2015) (applying *Woodruff* to Title VII, DCHRA, and Section 1981 claims).

did not suddenly identify Ms. Sankano's performance problems for the first time after she filed a complaint with Human Resources about Mr. Bowsher on August 10, 2023. Rather, the undisputed evidence shows that Mr. Iwashyna had been receiving concerns about Ms. Sankano's performance for many years, and in April 2023, he began thinking about termination. (SUMF ¶101) Mr. Iwashyna testified that his conversation with Dameon Rivers in April 2023 was a "tipping point" for him, as by that time, a number of MFH partners (including most of the MFH partners in Ms. Sankano's Washington, D.C. office) had decided they would no longer work with Ms. Sankano on their deals. (SUMF ¶101) In light of this, Mr. Iwashyna had hoped that Mr. Rivers, as a new lateral partner, would be a lifeline for Ms. Sankano. (SUMF ¶101) When Mr. Rivers said that he would not work with Ms. Sankano, Mr. Iwashyna began to consider separating Ms. Sankano from the firm. (SUMF ¶101) This testimony is buttressed by emails that Mr. Iwashyna sent to Ms. Nickel and Mr. Tucker on April 19, 2023, that he thought they were going to have to "make a hard call" on Ms. Sankano. (SUMF ¶102)

From that point on, the decision to terminate Ms. Sankano's employment followed the firm's usual performance management process for associates. In June 2023, Mr. Iwashyna participated in a mid-year meeting with Legal Talent and the ADC to discuss the MFH practice group's associates, and there was discussion during that meeting that Ms. Sankano was not performing at her expected level and it was unlikely that she would ever be promoted to partner. (SUMF ¶111) In an August 2023 conversation, the firm's Chief Legal Talent Officer advised Mr. Iwashyna to make the hard decision to terminate Ms. Sankano's employment, if he knew that she would likely never become a partner.[13] (SUMF ¶120) Ms. Spencer also suggested that Mr.

---

[13] The June 2023 meeting followed a meeting that Mr. Iwashyna had in May 2023, where all Practice Group Leaders were instructed by firm management to "take a hard look" at their mid-level and senior associates to determine their likely future path at the firm (SUMF ¶¶105-107)

Iwashyna could wait to review Ms. Sankano's 2023 performance evaluations before taking any action. (SUMF ¶123) On October 12, 2023, Mr. Iwashyna was given access to those evaluations and saw that Ms. Sankano's evaluations had actually gotten worse with multiple individuals rating her performance as "needs improvement" (SUMF ¶¶124-125, 127) Then when Mr. Iwashyna and the rest of the MFH leadership team responsible for associate development met to discuss the associates' performance evaluations on October 24 and November 2, 2023, the group discussed the fact that Ms. Sankano was performing poorly and was not meeting the expectations for an associate at her level of seniority. (SUMF ¶¶131-138) As a result, Mr. Iwashyna made the final decision to terminate Ms. Sankano's employment. (SUMF ¶137)

This sequence of events shows that Mr. Iwashyna's decision to terminate Ms. Sankano's employment started in April 2023, developed over the next five months as Troutman followed its usual processes, and culminated in the termination of Ms. Sankano's employment in December 2023. Troutman was not required to halt these processes simply because Ms. Sankano happened to engage in protected activity on August 10, 2023. *See Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 272 (2001) (finding that temporal proximity was immaterial in light of the fact that the employer was contemplating the employee's transfer before it learned of the protected activity); *Trawick v. Hantman*, 151 F. Supp. 2d 54, 63 (D.D.C. 2001) ("Because the termination process had already been initiated, following on the heels of repeated warnings . . . , no reasonable juror could conclude that the termination had been caused by the [protected] activity."), *aff'd*, No. 01-5309, 2002 WL 449777 (D.C. Cir. Feb. 21, 2002); *Cruz v. Kelly*, 241 F. Supp. 3d 107, 114 (D.D.C. 2017) (finding no causation when the plaintiff's EEO activity did not change the course that was already in motion).

As Ms. Sankano cannot present any evidence to show that the reason Troutman and Mr. Iwashyna have provided for the decision to terminate her employment is pretext, Ms. Sankano's retaliatory termination claims in Counts II, IV, and VI fail as a matter of law.

### 2.      Ms. Carmody Did Not Refuse to Give Plaintiff Work in Retaliation for Complaining About Her Timekeeping Instruction

Ms. Sankano alleges that Ms. Carmody "retaliatorily stopped giving her work" in late April or early May 2020, and then started giving her work again in June 2020. (Am. Compl. ¶ 83) It is not clear from the Amended Complaint whether Ms. Sankano bases her retaliation claims against Troutman and Mr. Iwashyna under Section 1981, Title VII, and the DCHRA on this allegation concerning Ms. Carmody, or only on the allegation that she was retaliatorily terminated for complaining about Mr. Bowsher. However, if any of Ms. Sankano's retaliation claims are based on Ms. Carmody's conduct, Mr. Iwashyna is entitled to summary judgment because he was not involved in such conduct,[14] and Troutman is entitled to summary judgment because (a) Ms. Carmody was not aware of any protected activity by Ms. Sankano; (b) Ms. Carmody had legitimate, non-retaliatory reasons for her work allocation at that time; and (c) such a claim is time-barred under Title VII and the DCHRA.

### a.      Ms. Carmody Was Not Aware of Any Protected Activity by Plaintiff

Any retaliation claim that Ms. Sankano is seeking to bring against Troutman on the basis of Ms. Carmody's alleged failure to send Ms. Sankano work in April or May 2020 fails for the simple reason that there is no evidence in the record that Ms. Carmody was aware of Ms. Sankano engaging in protected activity. (SUMF ¶46) Without knowledge of protected activity, Ms.

---

[14] It is undisputed that Mr. Iwashyna was not involved in Ms. Carmody's decisions about whether to send Ms. Sankano work in April or May 2020. (SUMF ¶¶28-30) In fact, Ms. Carmody's alleged conduct occurred prior to the firm's merger, while Ms. Carmody and Ms. Sankano worked for Pepper Hamilton and Mr. Iwashyna worked for Troutman Sanders. (SUMF ¶47)

Carmody could not have engaged in retaliatory behavior. *See Dudley v. Wash. Metro. Area Transit Auth.*, 924 F. Supp. 2d 141, 182 (D.D.C. 2013) ("It is hard to argue that the employer punished plaintiff *because of* plaintiff's protected activity, if the employer was completely *unaware* of plaintiff's protected activity." (emphasis in original)); *Pollard v. Quest Diagnostics*, 610 F. Supp. 2d 1 (D.D.C. 2009) (stating that a plaintiff cannot satisfy the causation element of a retaliation claim where the plaintiff does not show that the decisionmaker knew of the complaint at the time of the adverse action).

### b.  Ms. Carmody Had Legitimate, Non-Retaliatory Reasons for Her Work Assignments in May 2020

Ms. Sankano's retaliation claim against Troutman also fails because there is no evidence that Ms. Carmody stopped giving Ms. Sankano work in April or May 2020 for any reason other than legitimate ones. Instead, the record shows that the amount of work Ms. Carmody could give Ms. Sankano slowed down for a short period of time during the COVID-19 pandemic, in part because Ms. Sankano was working remotely and the work Ms. Carmody had for her to do was more hands-on. (SUMF ¶¶28-30) Ms. Sankano therefore cannot create a genuine dispute regarding the reason Ms. Carmody stopped giving her work in April and May 2020, as Ms. Sankano alleges.

### c.  Any Claim that Ms. Carmody Retaliated Against Plaintiff in Violation of Title VII or the DCHRA is Time-Barred

Ms. Sankano alleges that Ms. Carmody stopped giving her work in April or May 2020. (Am. Compl. ¶ 83) However, as explained above in Section III(B)(1)(c), any claims that Ms. Sankano asserts under Title VII or the DCHRA concerning Ms. Carmody's actions in 2020 are time-barred.

## IV.    CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court grant summary judgment in their favor on all Counts in Ms. Sankano's Amended Complaint.

Dated: January 31, 2025

*/s/ Alison N. Davis*

Alison N. Davis, Bar No. 429700
andavis@littler.com
Paul Kennedy, Bar No. 428623
pkennedy@littler.com
Morgan Kinney, Bar No. 8888325169
mkinney@littler.com
LITTLER MENDELSON, P.C.
815 Connecticut Avenue NW
Suite 400
Washington, DC 20006.4046
Telephone:    202.842.3400
Facsimile:     202.842.0011

*Attorneys for Defendants*