**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **GITA F. SANKANO,** | |
| **Plaintiff,** | |
| **v.** | **Case No. 1:24-cv-00142** |
| **TROUTMAN PEPPER HAMILTON SANDERS LLP AND BRIAN IWASHYNA,** | |
| **Defendants.** | |

## STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

# Appendix D

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

GITA F. SANKANO,

          Plaintiff,

          v.

TROUTMAN PEPPER HAMILTON
SANDERS LLP and BRIAN IWASHYNA,

          Defendants.

Case No. 1:24-cv-00142

## DECLARATION OF BLAIR SCHIFF

The undersigned states the following:

1.      My name is Blair Schiff. I am of majority age, and I give this declaration of my own free will based upon my personal knowledge for use in the above-captioned matter.

2.      Prior to July 1, 2020, I was a partner at Pepper Hamilton LLP ("Pepper Hamilton"). On July 1, 2020, Pepper Hamilton combined with Troutman Sanders LLP, which changed its name to Troutman Pepper Hamilton Sanders LLP ("Troutman"), and I became a partner at Troutman. On January 1, 2025, the firm's name changed again to Troutman Pepper Locke LLP.

3.      From July 1, 2020 through December 31, 2024, I was a partner in Troutman's Multifamily Housing Finance ("MFH") practice group, and I am currently a partner in MFH.

4.      From the date of the merger in July 2020 through the present, I have served as one of two Professional Development Partners ("PDPs") for the MFH practice group. Nora Nickel has been the other PDP for MFH throughout this time. From the date of the merger in July 2020 through the present, I have also served on the firm's Associate Development Committee ("ADC"). There is one other partner in the MFH group who has also been on the ADC during this time period – his name is Marshall Tucker. I have never been an Office Managing Partner or a Practice Group Leader, at Pepper Hamilton or at Troutman.

### Assignment of Work to Gita Sankano at Pepper Hamilton

5.      Shortly after Gita Sankano began working at Pepper Hamilton, I assigned her a project. I was very disappointed with her work product. Ms. Sankano did not seem to grasp the issues involved, she did not find much on the issue beyond what I had given her, and she did not do a good job issue-spotting.

6.      I understand that Ms. Sankano contends that she told me that Christine Waldmann Carmody was cutting her time before it was entered because Ms. Sankano did not look like

1

anyone else (i.e., that she was Black). This is untrue. Ms. Sankano never told me anything like that. I certainly never told Ms. Carmody that Ms. Sankano had complained about her, or had complained that she was being treated differently due to her race.

7.     After Ms. Sankano indicated she no longer wanted to work with Ms. Carmody in or around May 2020, I agreed to give her some work. I understand that Ms. Sankano believes that I only began giving her work because George Floyd was murdered and the firm increased its focus on DEI issues. This is not true. I gave her work because I understood that she no longer wished to work with Ms. Carmody, and I knew she would need work.

8.     The types of projects that I assigned to Ms. Sankano were the same types of projects that I would assign any first-year associate and had nothing to do with her race. I understand that Ms. Sankano has testified that I only provided her with the type of work that would typically be given to paralegals or Legal Practice Assistants, but this is not true. I gave Ms. Sankano the same type of work that I would give to other first-year associates. I only assigned Ms. Sankano projects during an approximately two-month period, from May 2020 through July 2020, as Ms. Sankano then began working with MFH attorneys who did agency work after the merger.

**Performance Evaluation Conferences with Ms. Sankano**

9.     Each year, Ms. Nickel, Mr. Tucker, and I review the performance evaluations for the associates in the MFH practice group. After the written performance evaluations are provided to associates, Ms. Nickel and I would generally meet with the more junior associates in the MFH practice group to discuss their evaluations, while Mr. Tucker and I would generally meet with the more senior associates in the MFH practice group. These conferences did not constitute the associate's performance evaluation, but rather were an opportunity for the associates to ask questions and discuss their written performance evaluations with us. Following these conferences, one of us would complete a post-evaluation conference memo to document at a high level what was discussed in the conference.

10.     In 2021, 2022, and 2023, Ms. Nickel and I conducted conferences with Ms. Sankano after she received her written performance evaluations for the preceding year. Our meeting with Ms. Sankano regarding her performance in 2022 was held on February 16, 2023. On May 19, 2023, I completed the post-evaluation conference memo for Ms. Sankano. In that memo, I included the statement "We reviewed Gita's 2022 evaluations which were all positive." That was an error. I was drafting this memo three months after the conference as one of approximately 30 memos that I had to complete, and I made that statement based on my memory of Ms. Sankano's reviews. If I had gone back and looked at the reviews prior to completing the memo, I would have said that Ms. Sankano's reviews were "generally positive," not "all positive." However, Ms. Sankano had previously received and read the reviews herself, so she knew that one partner had rated her as needing improvement in two areas and that several partners had identified skills that she needed to improve on or develop in their comments in the reviews.

## Discussions in the Spring and Summer of 2023 About Ms. Sankano's Performance

11.     In April or May of 2023, Dameon Rivers told me that he was not pleased with Ms. Sankano's work performance.

12.     On June 16, 2023, I participated in a meeting to discuss the associates in the MFH practice group and their path forward at the firm.  In attendance were MFH Practice Group Leader Brian Iwashyna, other members of the MFH leadership team responsible for associate development (Nora Nickel, Marshall Tucker, and me), the MFH Practice Director (Mary Cabell Sulc), representatives of the firm's Legal Talent department, and the Chair of the ADC.  During this meeting, we discussed concerns about Ms. Sankano's performance.  While I do not remember all details of the discussion, the general theme was that Ms. Sankano was not performing at the substantive level expected of a rising fifth-year associate.  We discussed that it was unlikely Ms. Sankano would be promoted to partner, and we considered an option of moving Ms. Sankano from the partnership track to the newly formed career path for associates, but we ultimately deferred any final decisions until we had a chance to consider the upcoming 2023 performance evaluations.  In the interim, we agreed to refer Ms. Sankano to participate in the firm's professional coaching program.

## Decision to Terminate Ms. Sankano's Employment

13.     On October 12, 2023, Legal Talent sent me a link to access the performance evaluations for the associates in the MFH practice group.  I saw that Ms. Sankano's performance evaluations had gotten worse and contained several negative comments and "needs improvement" ratings.

14.     I also noticed that Ms. Sankano had reported in her self-evaluation a positive experience working with a partner in MFH, Jennifer Bojorquez, but Ms. Bojorquez's review of Ms. Sankano was more mixed.  Consequently, I emailed Ms. Bojorquez on October 21, 2023, asking to discuss Ms. Sankano.  In my email, I explained why I was reaching out, saying "Her review says that working with you has been her big success this year, your review seems more mixed.  I'd be more curious to know your thoughts in a less formal setting than the written review."  *See* Exhibit 1.  I spoke with Ms. Bojorquez on October 23, 2023.  In that call, Ms. Bojorquez told me that Ms. Sankano had exhibited a number of performance problems, including not looking at the bigger picture and blindly applying things from one deal to another, even though the facts were not similar.  Ms. Bojorquez also told me that Ms. Sankano had complained to her about not receiving enough training, but Ms. Bojorquez did not agree with that excuse, because they had talked about at least one of these issues on a prior deal.

15.     On October 24, 2023, the MFH Practice Group Leader Brian Iwashyna, other members of the MFH leadership team responsible for associate development (Nora Nickel, Marshall Tucker, and me), the incoming MFH Practice Group Leader (Virginia Stitzer), and the MFH Practice Director (Mary Cabell Sulc) met to discuss the MFH associates, in light of their 2023 performance evaluations.  During that meeting, the group discussed the fact that Ms. Sankano's performance evaluations for 2023 indicated that she was not performing well and was not at the level that she should be, confirming the concerns that we had discussed in the June 2023 meeting.  We also discussed concerns raised by various partners (including but not limited to

3

Peter Strup, Lindsey Crawford, Dameon Rivers, Marshall Tucker, Virginia Stitzer, and Jennifer Bojorquez) about how Ms. Sankano was not taking her analysis to the next level, as expected of a rising fifth-year attorney, and Ms. Stitzer reported that her Second Attorney Reviews ("SARs") were not very good.  During that meeting, we discussed whether Ms. Sankano should be terminated, or whether to give her another year to improve, or whether to put her on a performance improvement plan ("PIP") or corrective action plan ("CAP").  We decided to discuss the options with Legal Talent and the ADC.  At no time during this meeting did we discuss or reference Ms. Sankano's race or the fact that she had filed a complaint with Human Resources about Mr. Bowsher's August 2023 email.

16.     Following the October 24, 2023 meeting, I asked the firm's Chief Legal Talent Officer, Sona Spencer, if Ms. Sankano needed to be placed on a PIP or CAP prior to terminating her employment.  Ms. Spencer told me that Ms. Sankano did not have to be placed on a PIP or CAP prior to termination.  She also explained that a PIP or CAP was not appropriate when the associate's performance problems were substantive issues that were not quantifiable and that likely could not be corrected within a 30, 60, or 90-day period.

17.     Our MFH Practice Group Leader, Brian Iwashyna, made the decision to terminate Ms. Sankano's employment and communicated that decision to me.  I supported and agreed with the decision to terminate Ms. Sankano's employment based on all of the performance problems we had discussed in our June and October meetings, based on feedback provided by the MFH partners in written performance evaluations and conversations throughout Ms. Sankano's employment, and consensus amongst the MFH leadership team responsible for associate development and the Chief Legal Talent Officer that it was the appropriate action.

18.     Neither Ms. Sankano's race nor the complaint that Ms. Sankano filed with Human Resources about Mr. Bowsher's August 3, 2023 email was something I considered in connection with my participation in discussions regarding the decision to terminate Ms. Sankano's employment or my support of that decision.

19.     On November 2, 2023, I met with Mr. Iwashyna, the other members of the MFH leadership team responsible for associate development (Ms. Nickel, Mr. Tucker, and Ms. Stitzer), Legal Talent representatives (Kalle Covert and Sona Spencer), the chair of the ADC (Steve Hewitson), and the MFH Practice Director (Mary Cabell Sulc) to discuss the MFH practice group's associates.  During that meeting, we informed Legal Talent and the ADC of the decision to terminate Ms. Sankano's employment.

20.     During the next few weeks, I communicated with the MFH Practice Director, Mary Cabell Sulc, and Marshall Tucker on several occasions about the timing of Ms. Sankano's termination, her severance, and how long she would receive job-search leave.  Mr. Tucker and I asked Legal Talent if Ms. Sankano could be given a longer severance package than the standard 3 months.  However, we were told that the firm does not make exceptions to that standard amount.  I ultimately agreed with that approach.

21.     On November 28, 2023, Ms. Covert (the firm's Director of Professional Development) sent Marshall Tucker and me a draft outline to use for the termination meeting with Ms.

Sankano, and suggested that we provide Ms. Sankano with specific examples of her performance problems. I responded to Ms. Covert's email the same day with an email outlining the reasons the MFH practice group had decided to terminate Ms. Sankano's employment and providing some examples. As I stated in my email, the general theme for why Ms. Sankano was being let go was that she was not operating at the level we expect from a mid-level associate going into their fifth year, and the MFH practice group had identified four categories or "buckets" of performance problems that we had observed with Ms. Sankano's work:

1. **Ms. Sankano was not being diligent in her review.** Specifically, multiple partners had issues with her checklists not being updated and her not staying on top of changes. In addition, her SAR reviews were not up to the standard expected for someone at her level, and the analysis was very superficial.

2. **Ms. Sankano lacked substantive knowledge.** Specifically, things did not seem to be "clicking" in the manner the practice group expects from a rising fifth-year associate and her knowledge base did not seem to be developing at the rate expected. Ms. Sankano seemed to be struggling with linking the pieces together to make the whole and carrying over what she had been taught from one transaction to the next. Finally, the amount of direction she had to be given was greater than what was expected for a mid-level associate.

3. **Ms. Sankano was not taking control of deals.** I explained that the MFH practice group expects mid-level associates to dig into a matter and take ownership of it and not requiring a ton of oversight, but Ms. Sankano had not proven that she was ready to take a deal and own it. In my email to Ms. Covert, I provided an example of a large assumption she had worked on with Jennifer Bojorquez where she failed to review the UCCs to see what collateral was being pledged and did not review the purchase and sales agreement to understand the structure of the deal.

4. **Ms. Sankano was not thinking critically.** Ms. Sankano appeared to be having trouble grasping transactions at the level the practice group expects for an associate at her level. She should know, or at least be asking why, an issue was addressed in a certain manner, rather than simply trying to use the same method to address a similar issue when the fact pattern and reasoning might not apply. When she was asked why she addressed an issue in a certain manner, she would regularly answer that that was how she had seen it handled previously, as opposed to understanding the reasoning behind the solution and being able to apply it to different fact patterns. This had limited her ability to critically think through analysis memos and loan modifications. In my email to Ms. Covert, I then provided two examples of deals where Ms. Sankano did this.

*See* Exhibit 2.

22.    I also spoke with three partners who I knew had worked with and reviewed Ms. Sankano and had reported problems with her performance in order to get specific examples of those

5

problems to share with her. I talked with Lindsey Crawford, Peter Strup, and Dameon Rivers on November 28, 2023. A true and correct copy of my handwritten notes of my calls with Ms. Crawford, Mr. Strup, and Mr. Rivers is attached as <u>Exhibit 3</u>.

23.    During my conversation with Ms. Crawford on November 28, 2023, Ms. Crawford told me the following:

- Ms. Sankano's analysis on the 930 Broadway deal for Key Bank had some misses and was limited to a level below what one would expect from a fourth-year associate.
- Ms. Sankano needed to slow down.
- Ms. Sankano needed to absorb and analyze (something Ms. Crawford had told her ten times).
- Ms. Sankano was "super regimented" and didn't seem to have the understanding behind why things were being done the way they were.
- Ms. Crawford did not use Ms. Sankano on complicated transactions.
- Drolma Gesang (a first-year associate) had a better substantive base than Ms. Sankano did.

*See* <u>Exhibit 3</u>. I did not tell Ms. Crawford during this meeting that the practice group had decided to terminate Ms. Sankano's employment. Ms. Crawford suggested that I talk with Ari Ebi for additional details on two matters, but I did not because I had decided to only talk with partners to gather examples to share with Ms. Sankano in the termination meeting.

24.    During my conversation with Mr. Strup on November 28, 2023, Mr. Strup told me the following:

- Ms. Sankano had a great attitude.
- Ms. Sankano did not update checklists accurately.
- Mr. Strup had more faith in first-year associates than Ms. Sankano.
- Ms. Sankano was not thinking critically at all.

*See* <u>Exhibit 3</u>.

25.    During my conversation with Mr. Rivers on November 28, 2023, Mr. Rivers told me the following:

- Ms. Sankano struggled with carrying what she learned from one deal to the next deal.
- Ms. Sankano was not asking questions and was overconfident.
- Ms. Sankano was not putting the pieces together.
- Ms. Sankano's knowledge was not growing and she was not linking the pieces together to make the whole, so people will not trust her to run deals.
- Ms. Sankano has to be directed for everything.
- This just is not the right fit for her.

*See* <u>Exhibit 3</u>.

26.    To be clear, I was not talking with Ms. Crawford, Mr. Strup, or Mr. Rivers on November 28, 2023, to obtain information about Ms. Sankano's performance in order to decide whether to terminate her employment – that decision had already been made. Rather, I was simply talking with them to gather details supporting the performance concerns that they had already shared with practice group leadership that were considered in making the decision to terminate Ms. Sankano's employment. I selected partners who I knew had worked a significant amount with

Ms. Sankano, but I certainly did not talk with every partner with whom she had worked. I did not consider talking to Whitney Loughran, Ari Ebi, or any other associate to gather information about specific examples of Ms. Sankano's performance problems, as I did not think it was appropriate to involve an associate in discussions about another associate's employment.

## Communication of the Termination Decision to Ms. Sankano

27.    We conducted Ms. Sankano's termination notification meeting on November 29, 2023, as planned. Ms. Sankano came to my office that morning after receiving the meeting invite from Ms. Covert to ask what the meeting was about and whether she was being fired. I did not think it was appropriate to tell Ms. Sankano about the termination in advance of the formal meeting, so I just told her that we should wait and discuss in the meeting. When we met at the assigned time, I read Ms. Sankano the script I had prepared. Ms. Covert then explained the 3-month severance package that the firm was offering to Ms. Sankano.

## Transfer of Other Associates to Career Path Positions

28.    In 2023, MFH Practice Group Leader Brian Iwashyna and the other members of the MFH leadership team responsible for associate development (Nora Nickel, Marshall Tucker, and I) made the decision to move two associates from partnership track to career path: Iyanna Draper and Randy Hurlburt. Ms. Draper was moved to the career path because she had experienced a number of hardships in her life that meant she was not able to meet the hours requirements for a partnership track associate. Moreover, we determined that she was not likely to have a business case for partnership. Mr. Hurlburt was moved to career path because his work performance was good, but a downturn in the type of work he did meant that he was not able to meet the billable hours requirements for a partnership track associate.

## Matt Bowsher's August 3, 2023 Email

29.    On August 3, 2023, Ms. Sankano sent me an email asking if she could talk with me about an email Matt Bowsher had sent her, stating that Nora Nickel was out. *See* Exhibit 4. I had a call with Ms. Sankano later that afternoon about Mr. Bowsher's email. Ms. Sankano told me that she was upset with the tone of Mr. Bowsher's email and that she felt like she was being insulted by Mr. Bowsher. I told her that I did not think Mr. Bowsher was trying to be insulting toward her, but I could completely understand why she may think that. I recommended that she and Mr. Bowsher speak to each other in person instead of sending emails to each other. In fact, I offered to sit in on that conversation with her or to have Brian Iwashyna come to D.C. to be a part of that conversation, but Ms. Sankano declined. Ms. Sankano did not tell me during that conversation (or at any other time) that she believed that Mr. Bowsher sent this email to her because she is Black.

30.    After my conversation with Ms. Sankano, Ms. Sankano sent an email to Mr. Bowsher. I concluded that she had decided not to take my advice that she talk with Mr. Bowsher in person.

31.    I told our practice group leader, Brian Iwashyna, about my conversation with Ms. Sankano about the August 3 email.

32.    The tone Mr. Bowsher used in his August 3 email to Ms. Sankano was not one that I would have used.  I did not think that Mr. Bowsher's August 3 email to Ms. Sankano was racist, and I did not believe that it referenced her race in any way.  No one has ever told me that they thought Mr. Bowsher had made a racist comment to them or sent them a racist email.

33.    I thought that the email Mr. Bowsher sent to Ms. Sankano on August 3 was typical of the type of emails Mr. Bowsher often sends – very long and sometimes condescending.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

_____
Blair Schiff

_____1/30/25_____
Date

8

| | |
|---|---|
| **From:** | Bojorquez, Jennifer A.[/O=TROUTMANSANDERS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=BOJORQJI] |
| **Sent:** | Mon 10/23/2023 12:19:50 PM (UTC-04:00) |
| **To:** | Schiff, Blair L.[Blair.Schiff@Troutman.com] |
| **Subject:** | RE: Gita |

Oh, I haven't received a voicemail or any missed calls.  I'll give you a call now.

**Jennifer A. Bojorquez**
**Partner**
Direct: 949.622.2727 | Mobile: 949.326.3306 | Internal: 18-2727
jennifer.bojorquez@troutman.com

troutman **pepper**
5 Park Plaza, Suite 1400
Irvine, CA 92614
troutman.com

Troutman Pepper is a Mansfield Certified Plus Firm

**From:** Schiff, Blair L. <Blair.Schiff@Troutman.com>
**Sent:** Monday, October 23, 2023 9:18 AM
**To:** Bojorquez, Jennifer A. <Jennifer.Bojorquez@troutman.com>
**Subject:** RE: Gita

Good morning,

I left you a voicemail, I have calls at 1 and 3 ET but am otherwise mostly around.

Thanks,
Blair

**Blair L. Schiff**
**Partner**
Direct: 202.220.1223
blair.schiff@troutman.com
Pronouns: he, him, his

troutman **pepper**
401 9th Street, NW, Suite 1000
Washington, DC 20004
troutman.com

Troutman Pepper is a Mansfield Certified Plus Firm

**From:** Bojorquez, Jennifer A. <Jennifer.Bojorquez@troutman.com>
**Sent:** Sunday, October 22, 2023 11:02 AM

App.D-Schiff-Ex.1

Troutman_00005831

**To:** Schiff, Blair L. <Blair.Schiff@Troutman.com>
**Subject:** RE: Gita

Sure thing.  I have calls at 10 and 11:30 Pacific tomorrow and can be available after 8:30 Pacific.

**Jennifer A. Bojorquez**
**Partner**
Direct: 949.622.2727 | Mobile: 949.326.3306 | Internal: 18-2727
jennifer.bojorquez@troutman.com

**troutman** pepper
5 Park Plaza, Suite 1400
Irvine, CA 92614
troutman.com

Troutman Pepper is a Mansfield Certified Plus Firm

---

**From:** Schiff, Blair L. <Blair.Schiff@Troutman.com>
**Sent:** Saturday, October 21, 2023 12:03 PM
**To:** Bojorquez, Jennifer A. <Jennifer.Bojorquez@troutman.com>
**Subject:** Gita

Hi Jennifer,

I hope you had an easy trip back from Montreal, I am in the process of reviewing the associate evaluations, do you have some time on Monday to discuss Gita?

Her review says that working with you has been her big success this year, your review seems more mixed. I'd be more curious to know your thoughts in a less formal setting than the written review.

Have a good weekend!

Thanks!
Blair

**Blair L. Schiff**
**Partner**
Direct: 202.220.1223
blair.schiff@troutman.com
Pronouns: he, him, his

**troutman** pepper
401 9th Street, NW, Suite 1000
Washington, DC 20004
troutman.com

Troutman Pepper is a Mansfield Certified Plus Firm

App.D-Schiff-Ex.1

| | |
|---|---|
| **From:** | Schiff, Blair L.[/O=TROUTMANSANDERS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=BLAIR.SCHIFF] |
| **Sent:** | Tue 11/28/2023 12:55:25 PM (UTC-05:00) |
| **To:** | Covert, Kalle R.[Kalle.Covert@troutman.com]; Tucker, Marshall D.[Marshall.Tucker@troutman.com] |
| **Subject:** | RE: Meeting Outline |

Thanks, Kalle.

I have not discussed meeting with Gita tomorrow. Marshall do you think one of us should give her a head's up or just send the invite in the morning? I have mixed feelings on how to handle it.

As Marshall knows, I had a good discussion with Ashely Hager yesterday about how to handle Wednesday's meeting. She suggested ⸤⸤⸤⸤⸤⸤⸤⸤⸤⸤ Defendants' Privilege ⸥⸥⸥⸥⸥⸥⸥⸥⸥⸥
⸤⸤⸤⸤⸤⸤⸤⸤⸤⸤ Defendants' Privilege ⸥⸥⸥⸥⸥⸥⸥⸥⸥⸥ Here are the buckets I came up with based on her reviews and conversations I've had with some of her reviewing partners, feel free to add to this list or change the examples. I can also reach out to a few people to get more concrete examples.

As you noted, the general theme is she is not operating at the level we expect from a mid-level associate going into their 5th year.

1. **Not diligent in your review.** Multiple partners have had issues with checklists not being properly updated and you staying on top of changes. Your SAR reviews have not been up to the standard we expect from a rising 5th year, the analysis is very superficial. (Marshall I think you have a specific deal for this one but I can ask Virginia as well)

2. **Lack of substantive knowledge** – Things do not seem to be clicking in the manner we expect from a rising 5th year, and your knowledge base does not seem to be developing at the rate we would expect. You seem to struggle with linking the pieces together to make the whole and carrying over what you were taught from one transaction to the next transaction. The amount of direction you have to be given is greater than what is expected for a mid-level associate.

3. **Taking control of a deal** -  Worked on a large assumption with Jennifer (Nineteen01 – CONA) and in taking first review said it all was fine but did not review the UCCs to see what collateral was being pledged and did not review the purchase and sale agreement to understand the structure of the deal. We expect mid-level associates to really dig deep into the matter, take ownership of the matter and not require a ton of partner oversight. You have not proven that you are ready to take on a deal and own it.

4. **Not thinking critically** – You appear to have trouble grasping transactions at a level we expect from a 5th year associate. You should know, or at least be asking why, an issue was addressed in a certain manner as opposed to trying to use that same method to address a similar issue even when the fact pattern and reasoning might not apply. When asked why you addressed an issue in a certain manner, the answer is constantly because that is how you have seen it handled previously, as opposed to understanding the reasoning behind the solution and being able to apply it to different fact patterns. This has limited your ability to critically think through analysis memos and loan modifications.  Your recent Ground Lease Analysis for 930 Broadway included some misses and was limited at a level below what we expect from a 4th year associate.  Another deal you are currently working on, Sherwood Manor, you performed a regulatory agreement analysis and quoted the regulatory agreement rider as part of your analysis but missed in the rider that the time period of the restrictions was extended.

Ashley's advice was
<div style="border:1px dashed">

**Defendants' Privilege**

**Defendants' Privilege**
</div>

Thanks,
Blair

**Blair L. Schiff**
**Partner**
Direct: 202.220.1223
blair.schiff@troutman.com
Pronouns: he, him, his

**troutman pepper**
401 9th Street, NW, Suite 1000
Washington, DC 20004
troutman.com

Troutman Pepper is a Mansfield Certified Plus Firm

**From:** Covert, Kalle R. <Kalle.Covert@troutman.com>
**Sent:** Tuesday, November 28, 2023 12:19 PM
**To:** Schiff, Blair L. <Blair.Schiff@Troutman.com>; Tucker, Marshall D. <Marshall.Tucker@troutman.com>
**Subject:** Meeting Outline

Hi there –

See attached for a meeting outline for tomorrow. Does Gita know that we are planning to speak to her? If not, I will plan to send the calendar invite tomorrow morning. I have also given a heads up to Denise in the DC office so she can plan to be nearby in case there is any issue. I wasn't sure which of you wanted to take the lead on discussing the reasons, or if you both plan to speak during that part. Feel free to provide specific examples. I will help keep things on point if she brings up things outside the scope of this conversation. Let me know if you'd like to discuss anything before the meeting.

Thanks,

**Kalle R. Covert**
**Director of Professional Development**
Direct: 804.697.1489 | Mobile: 804.564.6975 | Internal: 15-1489
kalle.covert@troutman.com
Pronouns: she, her, hers

**troutman pepper**
1001 Haxall Point, Suite 1500
Richmond, VA 23219
troutman.com

Troutman Pepper is a Mansfield Certified Plus Firm

App.D-Schiff-Ex.2

Discussion w/ Lindsay

• Ground Lease checklist    930 Broadway – Key Bank
  – The analysis had a ~~good number of~~ some misses and was
    limited but a level below one would expect from
    a 4th year associate

  – Need to slow down
  – Need to absorb and analyze – told her 10 times
  – Super regimental, doesn't have support or reasoning behind
    why things are being done

Ari: 930 Broadway, Astor Apts

  – Don't use her on complicated transactions
  – Drolma has a better substantive base

Discussion w/ Peter
  – Great attitude
  – Doesn't update checklists accurately (discuss w/ Drolma)
  – Has more faith in 1st year associates
  – Isn't thinking critically at all

App.D-Schiff-Ex.3

Discussion w/ Damon

- Gita struggles w/ carrying what she learned from one deal to the next deal
- She isn't asking questions and is overconfident
- She isn't putting the pieces together
- Knowledge isn't growing and aren't linking the pieces to make the whole - so people won't trust her to run deals
- She has to be directed for everything
- This just isn't the right fit

App.D-Schiff-Ex.3

Troutman_00001026

**From:**       Sankano, Gita F. [/o=TroutmanSanders/ou=Exchange Administrative Group
                 (FYDIBOHF23SPDLT)/cn=Recipients/cn=Gita.Sankano]
on behalf of   Sankano, Gita F.
**Sent:**        8/3/2023 1:11:57 PM
**To:**          Schiff, Blair L. [/o=TroutmanSanders/ou=Exchange Administrative Group
                 (FYDIBOHF23SPDLT)/cn=Recipients/cn=Blair.Schiff]; Nickel, Nora Garcia [/o=TroutmanSanders/ou=First
                 Administrative Group/cn=Recipients/cn=garciamn]
**Subject:**     RE: Falls of Braeswood and Falls of Dairy Ashford - NEW MATTER

Okay!

## Gita F. Sankano
**Associate**
troutman **pepper**
Direct: 202.220.1251 | Internal: 803-1251
gita.sankano@troutman.com

---

**From:** Schiff, Blair L. <Blair.Schiff@Troutman.com>
**Sent:** Thursday, August 3, 2023 1:12 PM
**To:** Sankano, Gita F. <Gita.Sankano@troutman.com>; Nickel, Nora Garcia <nora.nickel@troutman.com>
**Subject:** RE: Falls of Braeswood and Falls of Dairy Ashford - NEW MATTER

Sure, I am hoping on a call and then I'll give you a call.

Thanks,
Blair

## Blair L. Schiff
**Partner**
Direct: 202.220.1223
blair.schiff@troutman.com
Pronouns: he, him, his

---

troutman **pepper**
401 9th Street, NW, Suite 1000
Washington, DC 20004
troutman.com

Troutman Pepper is a Mansfield Certified Plus Firm

---

**From:** Sankano, Gita F. <Gita.Sankano@troutman.com>
**Sent:** Thursday, August 3, 2023 1:05 PM
**To:** Nickel, Nora Garcia <nora.nickel@troutman.com>; Schiff, Blair L. <Blair.Schiff@Troutman.com>
**Subject:** FW: Falls of Braeswood and Falls of Dairy Ashford - NEW MATTER

Hi Blair – can I call you about this? Nora is out

## Gita F. Sankano
**Associate**

App.D-Schiff-Ex.4

troutman **pepper**
Direct: 202.220.1251 ┆ Internal: 803-1251
gita.sankano@troutman.com

---

**From:** Bowsher, Matthew R. <Matthew.Bowsher@troutman.com>
**Sent:** Thursday, August 3, 2023 12:44 PM
**To:** Sankano, Gita F. <Gita.Sankano@troutman.com>
**Subject:** RE: Falls of Braeswood and Falls of Dairy Ashford - NEW MATTER

I'm concerned that you thought you were "clear". In fact, you were the opposite of clear. And the fact that you still don't see this upon further reflection, even after I've taken the time to point it out, is what worries me.

In your first email below (from 11:09am this morning), you stated "**Kelly should be the matter responsible**". Anyone reading that sentence would reasonably interpret that as a request to make Kelly the matter responsible attorney, i.e. to switch it from 100% Matt to 100% Kelly. There is no other way to interpret that sentence. If you meant to ask for them to change it from Matt being 100% responsible to Matt only being 70% responsible, that is not what that sentence conveyed. You added a sentence which said "See below", and then you added a clip of the originally-requested 70/30 split at the end, but that clip with the correct split contradicted your initial sentence which requested that Kelly be 100% matter responsible; that contradiction is what made your communication anything but clear. Then, adding to the confusion, in your subsequent email, you doubled-down on your initial request, by again saying "**Kelly should be the matter responsible. So it should change from Matt to Kelly.**" Again, I'm not sure how anyone could read that sentence to mean anything other than what it very clearly says, which is that you're asking to make Kelly "the" matter responsible attorney, i.e. the 100% matter responsible, the only matter responsible attorney, not a 70/30 split with Matt.

This is very basic, elementary communication. This has nothing to do with training, or understanding of multifamily transactional law, this is daily required functioning. You expressed interest in receiving my input/feedback in real time as to your performance, so I am taking 20 minutes out of my morning right now to explain to you, in very clear objective detailed analysis, that when I see something like this, where it is so undeniably evident that you've made an obvious and surprising error, and you're saying you still don't see the error even after I've taken the time to point it out to you, and you're still saying you've done nothing wrong… I really just don't know what more I can say here. If you don't even see the problem, I'm not sure how you'll fix it, but it's definitely something you need to fix, because if you had this same type of miscommunication with a client or borrower's counsel rather than with our internal administrative team, I would have to drop everything and get on the phone immediately to do serious damage control, reassuring them that the deal is actually in capable hands. Bottom line: this is not something I would expect from a fourth-year associate.

I am in the office 4 days a week, every week, available to discuss this further in person any time you wish. Just so we are 100% clear, I have no intention of proactively contacting you to discuss this any further, as I've already given you my full and candid thoughts on the matter, nor am I necessarily implying that any further discussion need be had, rather I am merely clarifying that I leave it to your own initiative as to whether you wish to discuss it further.

Matt

**Matthew R. Bowsher**
**Partner**
troutman **pepper**
Office: 202.274.1939 ┆ Mobile: 301.512.0423
matthew.bowsher@troutman.com

---

**From:** Sankano, Gita F. <Gita.Sankano@troutman.com>
**Sent:** Thursday, August 3, 2023 11:31 AM

App.D-Schiff-Ex.4

**To:** Bowsher, Matthew R. <Matthew.Bowsher@troutman.com>
**Subject:** RE: Falls of Braeswood and Falls of Dairy Ashford - NEW MATTER

Thank you, Matt.

I thought I was clear with the first email I sent today as it relates to the percentage distribution (see attached).

## Gita F. Sankano
**Associate**
troutman pepper
Direct: 202.220.1251 ⦙ Internal: 803-1251
gita.sankano@troutman.com

---

**From:** Bowsher, Matthew R. <Matthew.Bowsher@troutman.com>
**Sent:** Thursday, August 3, 2023 11:28 AM
**To:** Sankano, Gita F. <Gita.Sankano@troutman.com>
**Subject:** RE: Falls of Braeswood and Falls of Dairy Ashford - NEW MATTER

You are confused.  Kelly is not to be the sole 100% matter responsible attorney.   Per your original request, and per the other matters you've previously opened for me and Kelly, it should be 30% Kelly and 70% Matt.

## Matthew R. Bowsher
**Partner**
troutman pepper
Office: 202.274.1939 ⦙ Mobile: 301.512.0423
matthew.bowsher@troutman.com

**From:** Sankano, Gita F. <Gita.Sankano@troutman.com>
**Sent:** Thursday, August 3, 2023 11:17 AM
**To:** Mauriello, Lisa M. <Lisa.Mauriello@troutman.com>; MFH New Matters <MFHNewMatters@troutman.com>
**Cc:** Mufarrige, Kelly A. <Kelly.Mufarrige@troutman.com>; Bowsher, Matthew R. <Matthew.Bowsher@troutman.com>; Staub, Julie Lynn <Julie.Staub@troutman.com>; Jackson, Tia L. <Tia.Jackson@troutman.com>; Morant, Michelle <Michelle.Morant@Troutman.com>; Stratton, Katherine E <Katie.Stratton@troutman.com>
**Subject:** RE: Falls of Braeswood and Falls of Dairy Ashford - NEW MATTER

I just got a request to change the matter assigned from to Kelly?

Kelly should be the matter responsible. So it should change from Matt to Kelly.

I hope that that makes sense!

## Gita F. Sankano
**Associate**
troutman pepper
Direct: 202.220.1251 ⦙ Internal: 803-1251
gita.sankano@troutman.com

---

**From:** Mauriello, Lisa M. <Lisa.Mauriello@troutman.com>
**Sent:** Thursday, August 3, 2023 11:14 AM

App.D-Schiff-Ex.4

Troutman_00003353

**To:** Sankano, Gita F. <Gita.Sankano@troutman.com>; MFH New Matters <MFHNewMatters@troutman.com>
**Cc:** Mufarrige, Kelly A. <Kelly.Mufarrige@troutman.com>; Bowsher, Matthew R. <Matthew.Bowsher@troutman.com>; Staub, Julie Lynn <Julie.Staub@troutman.com>; Jackson, Tia L. <Tia.Jackson@troutman.com>; Morant, Michelle <Michelle.Morant@Troutman.com>; Stratton, Katherine E <Katie.Stratton@troutman.com>
**Subject:** RE: Falls of Braeswood and Falls of Dairy Ashford - NEW MATTER

Good Morning,
The change request was entered.
Thanks

**Lisa Mauriello**
**Firm Intelligence Coordinator**
troutman pepper
Direct: 757.687.7521 ⁞ Internal: 17-7521
lisa.mauriello@troutman.com

---

**From:** Sankano, Gita F. <Gita.Sankano@troutman.com>
**Sent:** Thursday, August 3, 2023 11:09 AM
**To:** Mauriello, Lisa M. <Lisa.Mauriello@troutman.com>; MFH New Matters <MFHNewMatters@troutman.com>
**Cc:** Mufarrige, Kelly A. <Kelly.Mufarrige@troutman.com>; Bowsher, Matthew R. <Matthew.Bowsher@troutman.com>; Staub, Julie Lynn <Julie.Staub@troutman.com>; Jackson, Tia L. <Tia.Jackson@troutman.com>; Morant, Michelle <Michelle.Morant@Troutman.com>; Stratton, Katherine E <Katie.Stratton@troutman.com>
**Subject:** RE: Falls of Braeswood and Falls of Dairy Ashford - NEW MATTER

Hi Lisa,

Kelly should be the matter responsible attorney for this one. See below. Please update.

Thanks!!

| Matter Responsible Atty: | Kelly Mufarrige (30%) / Matt Bowsher (70%) |
| --- | --- |

**Gita F. Sankano**
**Associate**
troutman pepper
Direct: 202.220.1251 ⁞ Internal: 803-1251
gita.sankano@troutman.com

---

**From:** Mauriello, Lisa M. <Lisa.Mauriello@troutman.com>
**Sent:** Wednesday, August 2, 2023 11:31 AM
**To:** Sankano, Gita F. <Gita.Sankano@troutman.com>; MFH New Matters <MFHNewMatters@troutman.com>
**Cc:** Mufarrige, Kelly A. <Kelly.Mufarrige@troutman.com>; Bowsher, Matthew R. <Matthew.Bowsher@troutman.com>; Staub, Julie Lynn <Julie.Staub@troutman.com>; Jackson, Tia L. <Tia.Jackson@troutman.com>; Morant, Michelle

App.D-Schiff-Ex.4

<Michelle.Morant@Troutman.com>; Stratton, Katherine E <Katie.Stratton@troutman.com>
**Subject:** RE: Falls of Braeswood and Falls of Dairy Ashford - NEW MATTER

Good Morning,
We combined the two properties into one matter, **018413.000867**
Thanks!


**Lisa Mauriello**
**Firm Intelligence Coordinator**
troutman **pepper**
Direct: 757.687.7521 ¦ Internal: 17-7521
lisa.mauriello@troutman.com


**From:** Sankano, Gita F. <Gita.Sankano@troutman.com>
**Sent:** Monday, July 31, 2023 2:10 PM
**To:** MFH New Matters <MFHNewMatters@troutman.com>
**Cc:** Mufarrige, Kelly A. <Kelly.Mufarrige@troutman.com>; Bowsher, Matthew R. <Matthew.Bowsher@troutman.com>;
Staub, Julie Lynn <Julie.Staub@troutman.com>; Jackson, Tia L. <Tia.Jackson@troutman.com>; Morant, Michelle
<Michelle.Morant@Troutman.com>; Stratton, Katherine E <Katie.Stratton@troutman.com>
**Subject:** Falls of Braeswood and Falls of Dairy Ashford - NEW MATTER

Good afternoon,

Please open the two deals below. We will only need **one client matter number** for these two.

Thanks,

| Client: | JLL |
|---|---|
| Deal Type: | **Freddie Mac** |
| Property Name & Location: | **Falls of Dairy Ashford**<br>**12707 Bellaire Boulevard**<br>**Houston, TX 77072** |
| Matter Opening Atty: | **Matt Bowsher** |
| Matter Responsible Atty: | **Kelly Mufarrige (30%) / Matt Bowsher (70%)** |
| Matter Assigned Atty: | **Gita Sankano** |
| Closing Date: | **08/30/2023** |
| Loan Amount: | **$17,400,000** |
| Borrower(s): | **Falls of Dairy Ashford LP** |
| Guarantor(s) / Key Principals(s): | **Rao J. Polavarapu** |
| Originator: | **Luke Rogers** |
| Closer: | **Patrick McCarren** |

| Client: | JLL |
|---|---|

App.D-Schiff-Ex.4

| | |
|---|---|
| **Deal Type:** | **Freddie Mac** |
| **Property Name & Location:** | **Falls of Braeswood**<br>**8801 South Braeswood Boulevard**<br>**Houston, TX 77031** |
| **Matter Opening Atty:** | **Matt Bowsher** |
| **Matter Responsible Atty:** | **Kelly Mufarrige (30%) / Matt Bowsher (70%)** |
| **Matter Assigned Atty:** | **Gita Sankano** |
| **Closing Date:** | **08/30/2023** |
| **Loan Amount:** | **$16,781,000** |
| **Borrower(s):** | **Falls of Braeswood LP** |
| **Guarantor(s) /**<br>**Key Principals(s):** | **Rao J. Polavarapu** |
| **Originator:** | **Luke Rogers** |
| **Closer:** | **Patrick McCarren** |

**Gita F. Sankano**
**Associate**
Direct: 202.220.1251 ⦙ Internal: 803-1251
gita.sankano@troutman.com

troutman **pepper**
401 9th Street, NW, Suite 1000
Washington, DC 20004
troutman.com

Troutman Pepper is a Mansfield Certified Plus Firm

App.D-Schiff-Ex.4