UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| GITA F. SANKANO,<br><br>      Plaintiff,<br><br>v.<br><br>TROUTMAN PEPPER HAMILTON SANDERS LLP AND BRIAN IWASHYNA,<br><br>      Defendants. | Case No. 1:24-cv-00142 |

**STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

# Appendix J

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| GITA F. SANKANO,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>TROUTMAN PEPPER HAMILTON<br>SANDERS LLP and BRIAN IWASHYNA,<br><br>　　　　Defendants. | Case No. 1:24-cv-00142 |

## DECLARATION OF PETER STRUP

The undersigned states the following:

1.　　My name is Peter Strup. I am of majority age, and I give this declaration of my own free will based upon my personal knowledge for use in the above-captioned matter.

2.　　Prior to July 1, 2020, I was a partner at Troutman Sanders LLP. On July 1, 2020, resulting from its combination with Pepper Hamilton LLP ("Pepper Hamilton"), Troutman Sanders changed its name to Troutman Pepper Hamilton Sanders LLP ("Troutman"). On January 1, 2025, the firm's name changed again to Troutman Pepper Locke LLP.

3.　　I was a partner in Troutman's Multifamily Housing Finance ("MFH") practice group throughout the time Gita Sankano was employed by Troutman, and I am currently a partner in MFH.

**Training of Ms. Sankano and Visiting Richmond**

4.　　While working with Ms. Sankano on a deal, whenever a concept arose that I realized she did not understand, I did my best to explain it to her. I also tried to give her a big-picture explanation of how the industry worked and why we were doing things the way we were. My training of Ms. Sankano was informal, but it was similar to what I did and continue to do with other associates.

5.　　On April 28, 2021, I had a call with Ms. Sankano where I suggested that she come to Richmond to meet with the MFH attorneys here, to facilitate her work with them and her training. I received approval from Brian Iwashyna, our Practice Group Leader, to have her come and stay for a week. Ms. Sankano came and worked in our office for a week in May 2021 and appeared to be happy with the opportunity. During and following this visit, I suggested to Ms. Sankano that she come more regularly or even consider moving to Richmond, because I thought that it would aid with her training and development. However, Ms. Sankano made it clear that she was not interested in moving to Richmond and she did not take us up on our offer to come

1

work out of the Richmond office more regularly. We have made similar suggestions to other associates and associates have visited, as there are more MFH attorneys in Richmond than anywhere else. My suggestions to Ms. Sankano had nothing to do with her race.

6.     On a couple of occasions during her employment, Ms. Sankano told me that she did not think she was receiving the training she needed because she worked in the Washington D.C. office. On at least one of these occasions, I told her that she needed to find people in that office to work with, and suggested that she try to work with Dameon Rivers and Lanre Popoola, who were new to the firm and should be good teachers and needed the help. I also told her that she could keep working with people in Richmond, but it was a little tougher because she was not in that office. I also indicated that it was still an option for her to visit or move to Richmond.

**Ms. Sankano's Work Performance**

7.     When I first started working with Ms. Sankano, I was treating her like a first-year associate, as she knew very little about the MFH practice. Initially, I felt like I could delegate first-year work to her and she would do it at the appropriate level. That was my experience with her when we were working on easier deals. As time went on, however, it became apparent that she did not always understand the substance of the deals, but would still often proceed as if she knew what she was doing. In fact, I found out two days before the closing that she pushed forward with an issue she did not understand, and I had to redo her work before a deal closing.

8.     One big issue that I had with Ms. Sankano's work was her failure to update checklists accurately. Another area of concern was her inability to extrapolate from one deal to the next. If she received specific instructions for what to do on a deal, she could generally repeat that scenario in the future. She often struggled, though, if she had to extrapolate from her past experience with an issue and apply it in a new or slightly different way.

9.     Over time, I began working with Ms. Sankano less frequently. When I did work with her, I teamed her with more senior associates, in order to help her learn and help her develop relationships with them to aid her development.

**My Performance Evaluations of Ms. Sankano**

10.    I completed formal written evaluations of Ms. Sankano's work performance in 2020, 2022, and 2023. My written evaluations accurately reflected my opinions about Ms. Sankano's work at the time I completed them. I did not complete a performance evaluation for Ms. Sankano in 2021. I did not complete an evaluation for any of the associates who worked for me that year.

**Feedback I Provided to MFH Practice Group Leadership About Ms. Sankano's Performance**

11.    I talked with Brian Iwashyna on a number of occasions about Ms. Sankano's work performance. I shared with Mr. Iwashyna that Ms. Sankano did not seem to understand the substance of deals, and she seemed to be unable to effectively extrapolate from one deal to the

next. If she received specific instructions of what to do on a deal, she could generally do that. But she struggled to apply learnings from her past experience in a new or slightly different way in a subsequent deal. I also told Mr. Iwashyna that Ms. Sankano made mistakes that could have been avoided by paying more attention to details and failed to update checklists accurately. At first, Mr. Iwashyna asked me to keep working with her and training her. But then, sometime in 2021 or 2022, when I again told Mr. Iwashyna that I was not pleased with her performance, he said it would be fine for me to work with other associates instead. After that, I continued to work with Ms. Sankano some, but the amount of my work for her dropped off.

12.     In April 2023, I had a conversation with Dameon Rivers about Ms. Sankano. Mr. Rivers reached out to me and told me that he was having issues with Ms. Sankano. Specifically, he told me of a deal where Ms. Sankano had sent out a checklist, and the client replied that it was wrong. The next week, she sent out the checklist again, and the same thing was wrong. He mentioned that this was not the first time this type of thing had happened. I confirmed to Mr. Rivers that I had also dealt with similar problems with Ms. Sankano's checklists. Mr. Rivers and I also discussed that her work product was not where it should be for someone at her level, and that more junior associates were performing better than she was, and the gap was widening.

13.     Following that conversation with Mr. Rivers in April 2023, I talked with Mr. Iwashyna again about Ms. Sankano. I told him what Mr. Rivers had said about Ms. Sankano's work performance, that I had similar concerns about her work product, and that things just were not working out. Around this time, I also talked with Marshall Tucker and Nora Nickel about Ms. Sankano. With all three of these individuals, I told them that Ms. Sankano was not performing at class level and did not seem to be getting better over time.

**Ms. Sankano's Request to Discuss Her Career**

14.     On August 25, 2023, Ms. Sankano asked to have a conversation about her career. She told me that she wanted to become a partner at Troutman and asked for tips on how to achieve that goal. During this call, Ms. Sankano told me that she thought she was doing a good job at her work, but people were telling her that she was not doing a good job. In response, I told her that if she thought other people had an incorrect view of her value, she needed to prove them wrong. I also told her that perception is reality. I knew that people did not think she was doing a good job, but I wanted to inspire her, not insult her. As a result, I suggested that she go demonstrate that she is the superstar she thought she was and "prove the haters wrong." I did not view this call with Ms. Sankano as an appropriate time to share with Ms. Sankano the concerns I had about her work, and she did not ask me for my feedback on her work. Based on what she told me on that call, she had already heard that people wanted her to improve, and I was hoping to inspire that improvement.

15.     Before my call with Ms. Sankano on August 25, 2023, Mary Cabell Sulc (the MFH Practice Director) had come to my office to discuss her meeting with Ms. Sankano earlier that day. I knew from Ms. Sulc that the purpose of the meeting had been to tell Ms. Sankano that she needed to significantly improve her performance, but when I talked with Ms. Sankano, it was apparent to me that she either did not understand or did not accept that message, because she thought she was doing a great job. Consequently, I tried to take a different tack by suggesting

3

that she pretend that everything people were saying about her performance <u>was</u> true, and try to prove them wrong. I made references to times in my own career where I had felt someone had assessed my work in a way I did not believe to be true, but how I still made changes to the way I practice as a result.

**<u>Decision to Terminate Ms. Sankano's Employment</u>**

16. At the time I met with Ms. Sankano in August 2023 to discuss the path to partnership and at the time I completed my evaluation of Ms. Sankano's work in October 2023, I was not aware of any discussions that the MFH practice group leadership, Legal Talent, and/or the Associate Development Committee may have been having about Ms. Sankano. I was not in a leadership position in the MFH practice group at that time, and was not involved in any discussions or decisions about the termination of an associate's employment. I was not aware that Ms. Sankano's employment was going to be terminated prior to the day of the termination.

17. On November 28, 2023, I had a conversation with Blair Schiff about Ms. Sankano. Mr. Schiff told me that he had read my performance evaluation of Ms. Sankano for 2023 and wanted to get more specific examples of the concerns I described in my evaluation. I provided Mr. Schiff with those specifics. I told him that while Ms. Sankano had a great attitude, she did not update checklists accurately and had trouble extrapolating one concept to other, similar concepts. I also told Mr. Schiff that I had more faith in the work of some first-year associates than I did in Ms. Sankano's work. Mr. Schiff thanked me for the information, but he did not tell me what he planned to do with this information other than to say he would be having a hard conversation with Ms. Sankano.

       Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Signed by:
*Peter D. Strup*
599620A2097C4E4...
Peter Strup

1/30/2025
_____
Date