UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

GITA F. SANKANO,

       Plaintiff,

       v.

TROUTMAN PEPPER HAMILTON
SANDERS LLP AND BRIAN IWASHYNA,

       Defendants.

Case No. 1:24-cv-00142

## STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

# Appendix K

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| GITA F. SANKANO,<br><br>        Plaintiff,<br><br>        v.<br><br>TROUTMAN PEPPER HAMILTON<br>SANDERS LLP and BRIAN IWASHYNA,<br><br>        Defendants. | Case No. 1:24-cv-00142 |

## DECLARATION OF DAMEON RIVERS

The undersigned states the following:

1.  My name is Dameon Rivers. I am of majority age, and I give this declaration of my own free will based upon my personal knowledge for use in the above-captioned matter.

2.  In March 2022, I joined the law firm of Troutman Pepper Hamilton Sanders LLP ("Troutman"). On January 1, 2025, the firm's name changed to Troutman Pepper Locke LLP.

3.  From March 2022 through December 31, 2024, I was a partner in Troutman's Multifamily Housing Finance ("MFH") practice group, and I am currently a partner in MFH.

**Gita Sankano's Work Performance, and Discussions with Other MFH Partners About Her Performance**

4.  Shortly after I came to Troutman, Gita Sankano did a little work on some of my deals, but she was primarily working with a senior associate on my team, Lanre Popoola (a Black male). Mr. Popoola told me on numerous occasions how frustrated he was with the quality of Ms. Sankano's work. In fact, he told me that working with Ms. Sankano made his job harder, not easier, and he did not want to work with her.

5.  I began working directly with Ms. Sankano on deals in the fall of 2022 when one of the junior associates on my team went on leave, and I needed the help. I did a significant amount of work with Ms. Sankano in from late 2022 through early May 2023. According to the firm's records, Ms. Sankano billed over 300 hours on work for my clients and worked on approximately 20 deals for my clients.

6.  When I began working with Ms. Sankano, I was initially impressed with her eagerness, her good attitude, and her speed and responsiveness. However, I quickly realized that she was functioning on deals like a first-year associate. I was very surprised by some of the things she did not know. Her approach to deals was very mechanical – she did what she was told or what

1

she had done on prior deals, without seeming to understand the "why" behind what she was doing. She also made mistakes, like failing to update checklists correctly.

7. When I talked with Ms. Sankano about the mistakes she made, she would frequently respond that Mr. Popoola and I "do things differently." This response frustrated me because my concerns were not stylistic or about the process she was using – they were about the substance of what she was doing. I believed that Ms. Sankano struggled with feedback. When she received feedback, I did not feel like she digested it, as she made the same or similar mistakes on subsequent deals.

8. I had a number of conversations with Brian Iwashyna, the MFH practice group leader, about my negative impressions of Ms. Sankano's work product and Mr. Popoola's frustrations working with her.

9. In April 2023, I decided that I was going to let Ms. Sankano finish out the deals we were working on together, but I would not give her any additional work.

10. In April 2023, I spoke with Peter Strup because I was having issues with Ms. Sankano and wanted to see what his experience had been. I told Mr. Strup about a deal where Ms. Sankano had sent out a checklist and a member of the working group replied that it was not up to date. The next week, she sent out the checklist again, and the same thing was wrong. I told Mr. Strup that I thought Ms. Sankano was not well-suited for our practice, based on my experience working with her, and I was not going to work with her anymore. Mr. Strup told me that he had had problems with Ms. Sankano's checklists, as well.

11. In April 2022, Mr. Iwashyna checked in with me about how Ms. Sankano was doing. I said that I thought Ms. Sankano had a low ceiling and just did not pick up on things, and I did not think she was going to progress. I told him that as a result, I was not going to use her any more, after the deals she was working on were finished. Mr. Iwashyna said "okay" and did not push back on my decision. I had similar conversations with Nora Nickel and Blair Schiff about my impressions of Ms. Sankano's work performance.

12. On May 16, 2023, I met with Ms. Sankano and told her that I was not going to work with her any more on the complex deals that I had. She had recently worked on a couple of conventional deals with Mr. Popoola and me, and they had not gone well. I told her that those were the easiest type of work that I get from clients, and I am not going to be getting work that was more straightforward than that. And I told her that us working together was not a good fit.

**No Evaluation of Ms. Sankano's Performance**

13. I was never asked to complete a written evaluation of Ms. Sankano's performance for 2023. I do not know why I was not asked to evaluate her. I was surprised that I was not asked to review Ms. Sankano. I did not try to review her anyway, as I did not want to be seen as going out of my way to "torpedo" her, as I knew my review would be negative.

2

**Decision to Terminate Ms. Sankano's Employment**

14. On November 28, 2023, Mr. Schiff asked to meet with me about Ms. Sankano. He told me that the decision had been made to terminate her employment for performance reasons, and he was going to meet with her the next day to communicate the decision. He reminded me that we had talked previously about Ms. Sankano's performance and said that he just wanted to be sure that he had proper notes on that. I told Mr. Schiff that I thought Ms. Sankano struggled with carrying what she learned from one deal to the next deal. She also was not asking questions and was overconfident. Ms. Sankano's knowledge was not growing and she was not linking the pieces of a deal together to make the whole. As a result, I did not trust her to run deals. I also said that Ms. Sankano has to be directed for every task to ensure that it is done correctly. In conclusion, I thought that this job just was not the right fit for her.

15. I am not in a leadership position in the MFH practice group, so I am not involved in any discussions or decisions about the termination of an associate's employment. I was not aware that Ms. Sankano's employment was going to be terminated prior to the day Mr. Schiff contacted me and informed me of the termination.

16. While I was not aware of the decision to terminate Ms. Sankano's employment before it was made, I agreed with the decision. I do not have any reason to believe that the decision to terminate Ms. Sankano's employment was made because of her race. Like Ms. Sankano, I am Black.

**Training of Ms. Sankano**

17. During the time I was working with Ms. Sankano, Lanre Popoola and I explained to Ms. Sankano what we were doing and why we were doing it. We interacted with her quite often on the deals, and so training on our deals happened every day. This type of training is informal, but it is the way I have always trained the associates with whom I work.

18. Unfortunately, Ms. Sankano did not seem to retain what I taught her and apply it from one deal to the next. Despite my explanations and training, she would make the same mistakes on the next deal. I got the feeling that my training and explanations were going into an abyss, and that with every deal, we were starting anew.

19. When she made mistakes, Ms. Sankano often blamed a lack of training. However, based on my experience with her, I thought that was just an excuse. I know that Mr. Popoola and I had trained her, and she did not seem to retain the information or concepts, so I assumed that it was probably the same with others who had tried to train her while she was working on their deals.

**Comments During a Fannie Mae Panel**

20. I was asked to speak on a panel at the Fannie Mae Legal Issues Forum in May or June 2023. During our panel discussion, I expressed the view that there is sometimes a reluctance to give honest feedback to attorneys in underrepresented groups. I was not talking specifically about Black attorneys, and I was not thinking of Troutman attorneys (or Ms. Sankano) when I

3

made that statement. I made that statement based on my many years of experience in the legal industry – most of which predated my time at Troutman. With respect to Ms. Sankano's work for me, I certainly gave her honest feedback on her performance.

### My Discussions with Ms. Sankano in August 2023

21. On or around August 14, 2023, I happened to be walking past Ms. Sankano's office. She looked sad about something, so I asked her what was wrong out of concern for her wellbeing. She responded asking if I knew what was going on, and when I said no, she asked me to come in and shut the door, and then she told me about an email that Matt Bowsher had sent her.

22. During our conversation, Ms. Sankano told me that she was working on a deal with Mr. Bowsher and Kelly Mufarrige, there was some confusion about who should get credit for the deal, and she received an email from Mr. Bowsher that was upsetting to her. She told me that she thought the email was discriminatory and that she had filed a complaint about it with Human Resources. She did not show me the email, and I asked her not to show it to me.

23. From what Ms. Sankano told me about the email, it sounded to me like Mr. Bowsher was frustrated with her communication problems. I also was not surprised that Mr. Bowsher indicated that this was not an issue of lack of training, as Ms. Sankano frequently blamed a lack of training when I pointed out mistakes to her. Ultimately, however, I did not think that anything Ms. Sankano told me about Mr. Bowsher's email indicated a hostility to Ms. Sankano because of her race or that he had sent the email to her because she is Black. I know how Mr. Bowsher communicates, and I did not think the email Ms. Sankano described sounded out of the ordinary for him.

24. During our conversation, I told Ms. Sankano that I was glad she had filed the complaint, and I was confident that if the firm found that the complaint has merit, it would be dealt with appropriately.

25. I then told Ms. Sankano that I wanted her to understand that when the investigation is completed, it is likely that she would not hear what the consequences, if any, would be as a result of the findings from the investigation. I also told her that I wanted to ensure that if she walked past Mr. Bowsher in the hallway, she would not be uncomfortable. I did not tell her that "if I were you I would leave the firm" or any words to that effect (as she has alleged in her lawsuit).

26. We also talked about the fact that when we had worked together, I occasionally sent emails that were direct and straight to the point. I said something to the effect that Mr. Bowsher can send tough emails, as well.

27. At one point during the conversation, Ms. Sankano expressed to me that it was hurtful to her that no one in the group had spoken to her about the complaint she had made. So I agreed to make some calls.

4

28. We then went on to talk about a number of other things, including her career and an interaction I had had with another associate, Whitney Loughran. Our entire conversation lasted approximately 45 minutes.

29. During the portion of the conversation about Ms. Sankano's career trajectory, I asked Ms. Sankano if she thought she could be successful here. She said yes, so I said that we needed to find her a sponsor, or someone to take care of her. I knew that Whitney Loughran sent her work, but I did not think Ms. Loughran had enough work to keep Ms. Sankano busy long-term.

30. I asked Ms. Sankano about her place in the group and whether Troutman was the right fit for her. I asked this because I thought what she described about her email communications that led to Mr. Bowsher's emails was further evidence that she had trouble communicating clearly and was very mechanical. I did not think the firm was the right place for her, and it had always bothered me that she did not seem to recognize that she was performing poorly. I thought she was not self-aware, if she thought she was ever going to make partner at Troutman. I asked her to think about her strengths and weaknesses and whether she really had a future in the firm. She indicated that she would think about it.

31. At one point in the conversation, I told Ms. Sankano (as I had on previous occasions) that she needed to show others at the firm that she is receptive to feedback. This part of the conversation had nothing to do with Ms. Sankano's interactions with Mr. Bowsher.

32. My entire conversation with Ms. Sankano about Mr. Bowsher's email was based purely on my own personal beliefs and thoughts, and not based on any knowledge of her particular situation or the firm's investigation. No one in firm management sent me to talk with Ms. Sankano or suggested that I have this conversation, and no one else was aware of what I was planning to discuss with her.

33. After my conversation with Ms. Sankano on or around August 14, I called Mr. Iwashyna and left him a voicemail. When Mr. Iwashyna called me back the next day, I told him that I had talked with Ms. Sankano about Mr. Bowsher's email and conveyed Ms. Sankano's statement that no one in the group had spoken to her about this. He advised me that this was not true. Rather, she had reached out directly to several people in the MFH practice group to discuss it, and that he personally had not called her because he was trying to allow the complaint to run its course.

34. A few days to a week later, Ms. Sankano came to my office and announced that she had thought about what we talked about, and she was not going to let Mr. Bowsher "push her out of the firm." I thought that was an odd statement, but I was busy and I did not question Ms. Sankano about that statement – I just said something to the effect of "Okay, I'm glad," and "the firm is looking into it."

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Signed by: *Dameon Rivers*    1/30/2025

Dameon Rivers    Date

5