UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| GITA F. SANKANO,<br><br>      Plaintiff,<br><br>      v.<br><br>TROUTMAN PEPPER HAMILTON SANDERS LLP AND BRIAN IWASHYNA,<br><br>      Defendants. | Case No. 1:24-cv-00142 |

**STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

# Appendix O

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| GITA F. SANKANO,<br><br>        Plaintiff,<br><br>v.<br><br>TROUTMAN PEPPER HAMILTON SANDERS LLP and BRIAN IWASHYNA,<br><br>        Defendants. | Case No. 1:24-cv-00142 |

## DECLARATION OF SONA SPENCER

The undersigned states the following:

1. My name is Sona Spencer. I am of majority age, and I give this declaration of my own free will based upon my personal knowledge for use in the above-captioned matter. I identify as Black.

### Legal Talent Department

2. During the time period from July 1, 2021 to December 31, 2024, I was employed by Troutman Pepper Hamilton Sanders LLP ("Troutman") as its Chief Legal Talent Officer. On January 1, 2025, the firm's name changed to Troutman Pepper Locke LLP, and I continued serving as the firm's Chief Legal Talent Officer. In this role, I am ultimately responsible for managing all aspects of the firm's legal talent, including professional development, Diversity, Equity & Inclusion ("DEI"), and career coaching and planning. I oversee several directors in the Legal Talent department.

3. Kalle Covert has been the firm's Director of Professional Development since September 2021. Ms. Covert's department is responsible for coordinating all aspects of the professional development of the firm's associates, including the management of their performance, their compensation, their advancement and promotion, and their termination. In 2021, 2022, and 2023, Ms. Covert and I worked closely with the firm's Associate Development Committee ("ADC") and the leadership of each of the firm's practice groups responsible for associate development (generally, the Practice Group Leader, Professional Development Partners ("PDPs"), and any ADC members).

### Concerns About Gita Sankano's Performance and the Decision to Terminate Her Employment

4. In the late spring of 2023, the firm began asking practice groups to take a hard look at their associates. Firm management wanted to be sure that practice groups were taking steps to

1

manage their associates appropriately – specifically, looking at whether they were likely to make partner, and if they were not, then exiting them from the firm or moving them from the partnership track to the newly-formed career path. Legal Talent and the ADC were charged with working with the practice groups on this initiative.

5. In June, the Legal Talent department and ADC held meetings with each practice group to discuss their associates. Following these meetings, Ms. Covert briefed me on the associates in each practice group who were not performing to the firm's expectations and likely to be exited. For the Multifamily Housing Finance ("MFH") practice group, one of the associates Ms. Covert told me about was Gita Sankano. She told me that the practice group had concerns that Ms. Sankano was not taking her analysis and performance to the next level. The MFH practice group felt that as a mid-level associate, Ms. Sankano was performing closer to the level of a junior associate based on the expectations of their practice group. She said that the MFH practice group had also discussed whether to move Ms. Sankano to the career path and agreed to send Ms. Sankano to professional coaching for remedial purposes.

6. On August 14, 2023, I had an in-depth discussion with the MFH Practice Group Leader, Brian Iwashyna, about Ms. Sankano, in light of the firm's mandate that practice groups take a hard look at their associates. During this discussion, I told Mr. Iwashyna that if the MFH practice group knew Ms. Sankano likely would never become a partner at the firm based on her performance to date, they needed to make the hard decision to terminate Ms. Sankano's employment. I also advised Mr. Iwashyna that delaying the termination could actually disadvantage Ms. Sankano because the more senior associates become, the harder it can be for them to find another job.

7. During our conversation on August 14, 2023, Mr. Iwashyna asked me whether the new career path option might be a good fit for Ms. Sankano. But I explained that Ms. Sankano was not a good fit for the career path, due to her performance problems. I explained that the career path should not be used as a "dumping ground" for poorly performing associates. Rather, the intent in creating this new path was to build a group of high performing attorneys that could handle more routine matters at a lower cost level for the firm. I explained that this meant that associates could be moved from partnership track to the career path if they were good performers, but they did not have a business case to become a partner or needed a smaller commitment to the firm. Ms. Sankano did not fit either of those categories. Mr. Iwashyna indicated that he knew he would have to make a hard decision about Ms. Sankano, and I encouraged him to make the decision, even if it was difficult to do so. I suggested that the practice group wait until the performance evaluations came in for 2023 and review those before taking action.

8. During my August 14, 2023 conversation with Mr. Iwashyna, and in separate call with Blair Schiff, one of the PDPs for the MFH practice group and a member of the ADC, around October 24, 2023, I explained that we were not required to place Ms. Sankano on a performance improvement plan ("PIP") or a corrective action plan ("CAP") prior to terminating her employment. I also explained that a PIP or CAP was not appropriate when the performance problems an associate was exhibiting were substantive performance issues that were not quantifiable and that likely could not be corrected within a 30, 60, or 90-day period.

2

9. On November 2, 2023, I attended a meeting with the members of the MFH leadership team responsible for associate development, Kalle Covert, and the chair of the ADC to discuss the MFH practice group's associates. During that meeting, the practice group informed us that the decision had been made to terminate Ms. Sankano's employment.

**DEI Town Halls**

10. In June 2020, following the murder of George Floyd, and in the midst of the COVID-19 pandemic, Troutman Sanders and Pepper Hamilton decided to hold a DEI Town Hall express the two legacy firm's commitment to diversity and allow firm personnel to express their feelings during this challenging time. The decision to hold a town hall had absolutely nothing to do with Ms. Sankano or issues that she experienced working with Christine Waldmann Carmody.

11. Beginning in July 2023, the firm held a series of town halls in various offices as part of a larger initiative related to the strategic plan rolled out in June 2023. The goal of the town halls was to have a listening tour for reactions from firm employees on the firm's DEI strategic plan and introduce the new Director of DEI who was hired in July 2023. The town hall held in the firm's Washington DC office in August 2023 was being planned before Ms. Sankano filed a complaint about Matt Bowsher on August 3, 2023. The decision to hold the series of town halls in 2023 had nothing to do with Ms. Sankano or the complaint she filed with Human Resources about Matt Bowsher.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

_____
Sona Spencer

1/30/25
Date

3