UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| GITA F. SANKANO,<br><br>      Plaintiff,<br><br>      v.<br><br>TROUTMAN PEPPER HAMILTON SANDERS LLP AND BRIAN IWASHYNA,<br><br>      Defendants. | Case No. 1:24-cv-00142 |

**STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

# Appendix P

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| GITA F. SANKANO,<br><br>    Plaintiff,<br><br>    v.<br><br>TROUTMAN PEPPER HAMILTON SANDERS LLP and BRIAN IWASHYNA,<br><br>    Defendants. | Case No. 1:24-cv-00142 |

## DECLARATION OF LINDSEY CRAWFORD

The undersigned states the following:

1. My name is Lindsey Crawford. I am of majority age, and I give this declaration of my own free will based upon my personal knowledge for use in the above-captioned matter.

2. Prior to July 1, 2020, I was a partner at Troutman Sanders LLP. On July 1, 2020, resulting from its combination with Pepper Hamilton LLP ("Pepper Hamilton"), Troutman Sanders changed its name to Troutman Pepper Hamilton Sanders LLP ("Troutman"). On January 1, 2025, the firm's name changed again to Troutman Pepper Locke LLP.

3. I was a partner in Troutman's Multifamily Housing Finance ("MFH") practice group throughout the time Gita Sankano was employed by Troutman, and I am currently a partner in MFH.

**Ms. Sankano's Work Performance**

4. I worked with Ms. Sankano on a number of deals in 2021, 2022, and 2023.

5. When I first began working with Ms. Sankano in March 2021, I thought she was very good at the purely methodical process of moving a deal along. I did observe that she had some typos in emails and that she sometimes would respond to emails without fully thinking them through, in an effort to be responsive. But all of this was largely what I would have expected from a junior associate.

6. Over time, however, I realized that Ms. Sankano seemed to have difficulty analyzing and absorbing the reasons behind what she was doing. When I told her that something did not make sense for a particular deal, she would often respond by saying that X partner does it this way. I tried to explain to her that it is not helpful to just look at how someone does a particular thing – she needed to understand the reasons for why it was done that way so that she could determine whether it should be done that way in the present deal. As a result, I started using Ms. Sankano

1

less, and bringing other associates in to help with Ms. Sankano's deals. This is because I was handling more complicated deals.

7.  I also thought that Ms. Sankano had difficulty listening to people who were telling her that she was not doing things correctly – she took it as them saying she was stupid, which was not true, as they were just offering constructive criticism to try to help her.

### My Performance Evaluations of Ms. Sankano

8.  I completed formal written evaluations of Ms. Sankano's work performance in 2021, 2022, and 2023. My written evaluations accurately reflected my opinions about Ms. Sankano's work at the time I completed them.

### Feedback I Provided to MFH Practice Group Leadership About Ms. Sankano's Work

9.  From time to time, Brian Iwashyna or Nora Nickel would ask me how things were going with Ms. Sankano. I gave them my opinion of Ms. Sankano's strengths and weaknesses. By 2023, I was telling Mr. Iwashyna that I was still using Ms. Sankano on some matters, but not the more complicated ones.

### Ms. Sankano's Request to Discuss Her Career

10. In the late summer of 2023, Ms. Sankano stopped by my office to have a conversation about her career. She told me that she wanted to make partner at Troutman, and she had met with someone who said if she wanted to make partner, she should let people know that she wanted to make partner. I indicated that I could see her as a partner, but by saying that, I meant that I could see her as a partner someday, not that she was on the verge of making partner or even being on the right track. I told Ms. Sankano that she needed to "absorb and analyze and apply" the substance of and reasons for the things that we do. I also told her that she should not just assume that if one person did something one way, another person would want it the same way, or that the facts in the next deal would be the same. I indicated to her that if she did all these things, she should be able to proceed, and she should focus on that in the coming year.

### Decision to Terminate Ms. Sankano's Employment

11. At the time I met with Ms. Sankano in the late summer of 2023 to discuss the path to partnership and at the time I completed my evaluation of Ms. Sankano's work in October 2023, I was not aware of any discussions that the MFH practice group leadership, Legal Talent, and/or the Associate Development Committee may have been having about Ms. Sankano. I am not in a leadership position in the MFH practice group, so I am not involved in any discussions or decisions about the termination of an associate's employment.

12. Blair Schiff stopped by my office on November 28, 2023 to talk with me about Ms. Sankano. He asked me for examples of some of the things I raised in my performance evaluation of Ms. Sankano. Mr. Schiff did not tell me during our meeting that the practice group leadership had decided to terminate Ms. Sankano's employment.

13.     One situation that I described to Mr. Schiff involved a very complicated transaction known as "930 Broadway." I had asked Ms. Sankano to summarize a ground lease document. Rather than analyzing it, she sent me a synopsis that was already in the original closing binder. I told her that that was not what I had asked for. I felt like Ms. Sankano's analysis had missed the boat, and was below what I would expect from an associate at her level.

14.     I also shared with Mr. Schiff my opinion that Ms. Sankano needed to slow down and absorb and analyze what she was doing and why. Ms. Sankano seemed to take a very regimented approach to her work and did not seem to understand the "why" behind our specific judgment or actions in each unique deal. As a result (and as I told Mr. Schiff), I did not use Ms. Sankano on very complicated transactions. Mr. Schiff and I discussed other more junior associates whom I believe had a better substantive base than Ms. Sankano.

15.     I was not aware that Ms. Sankano's employment was going to be terminated prior to the day of the termination.

**Matt Bowsher's August 3, 2023 Email**

16.     On August 3, 2023, Ms. Sankano forwarded me an email that she had received from Matt Bowsher. She then stopped by my office to discuss the email. Ms. Sankano clearly was upset about the email, and told me how disrespectful and rude she thought Mr. Bowsher was, and how she was fed up with that sort of treatment. I acknowledged that the email was rude. But ultimately, I told her that if she felt that strongly about the email, she should go to Human Resources.

17.     After meeting with Ms. Sankano, I talked with Mr. Bowsher about the August 3 email. I told Mr. Bowsher that I thought his email was inappropriate, and I suggested he exercise the "24-hour rule" – *i.e.,* if he was upset, he should give himself 24 hours to calm down before firing off an email. He agreed with me and said he had apologized to Ms. Sankano.

18.     I thought that the email Mr. Bowsher sent to Ms. Sankano on August 3 was typical of the type of emails Mr. Bowsher often sends, because he was frequently wordy and sometimes condescending in his email communications. But I believe the emails Mr. Bowsher sends are more about how he writes than how he is. I thought that Mr. Bowsher's email was unnecessary, but it did not reference Ms. Sankano's race, and it did not seem to me to be racially motivated. Moreover, I do not recall Ms. Sankano telling me that she believed that Mr. Bowsher sent this email to her because she is Black or treated her differently because of her race.

**Training of Ms. Sankano**

19.     While working with Ms. Sankano on a difficult deal, when a concept arose that I realized she did not understand, I tried to explain it to her, and told her why we were doing what we were doing.

3

**Suggestion that Ms. Sankano Go to Richmond**

20.    In May 2021, I learned that Ms. Sankano was going to be going to our Richmond office to meet and work with the MFH attorneys there. I thought that was a good idea, as I knew Ms. Sankano liked working with some of the attorneys in Richmond. At one point, I discussed with Ms. Sankano the idea of moving to Richmond, which I thought would be a good career move for her. I did not make this suggestion because Ms. Sankano was Black.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

*Lindsey Crawford*      1/30/2025

Lindsey Crawford      Date

4