**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

GITA F. SANKANO,

               **Plaintiff,**

      **v.**

TROUTMAN PEPPER HAMILTON
SANDERS LLP AND BRIAN IWASHYNA,

         **Defendants.**

Case No. 1:24-cv-00142

<u>**STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**</u>

# Appendix R

Page 1

<pre>
 1                UNITED STATES DISTRICT COURT

 2                FOR THE DISTRICT OF COLUMBIA

 3

 4     -------------------------------

                                    :

 5     GITA F. SANKANO,             :

                                    :

 6          Plaintiff,              :   Civil Action No.

                                    :

 7       v.                         :   1:24-cv-00142 (JMC)

                                    :

 8     TROUTMAN PEPPER HAMILTON      :

                                    :

 9     SANDERS, LLP and BRIAN       :

                                    :

10     IWASHYNA,                    :

                                    :

11          Defendants.             :

                                    :

12     -------------------------------

13

14          The video deposition of GITA F. SANKANO, the

15     plaintiff herein, held at Littler Mendelson, P.C.,

16     815 Connecticut Avenue, N.W., Suite 400, Washington,

17     D.C., convened at 10:11 a.m. on Thursday, October 17,

18     2024 and the proceedings being taken down by

19     stenotype and transcribed by Catherine B. Crump, a

20     Notary Public in and for the District of Columbia.

21

22
</pre>

Page 44

1          Q.    Do you still have copy of that email?

2          A.    No, I don't.  I don't think I do.  I

3    think I probably emailed him from my work computer at

4    the time when I was clerking.  So that's probably why

5    I don't have a copy of it.  I think so.

6          Q.    Did you have to interview for the

7    position at Pepper Hamilton?

8          A.    Yes.

9          Q.    Who did you interview with?

10         A.    I interviewed with Christine, then also

11   Scott Fireison.  I also met with -- who else did I

12   meet?

13         Randy and Lauren were both like midlevel to

14   senior associates at the time.  Then after that, I

15   was called back for a lunch interview and then I met

16   with Blair, Judy O'Grady, who was a partner at the

17   time, and Blair's paralegal.  I can't remember her

18   name, but we had a lunch at Founding Farmers here out

19   in D.C.

20         Q.    And what is Christine's race?

21         A.    She's white.

22         Q.    And Scott?

1          A.    I think she's been there her whole time

2     too.  I think so, and the reason why I know more

3     about Randy, because Randy was with -- did HUD work

4     like me.  So him and I spoke a lot.

5          Q.    And what type of work did Lauren do?

6          A.    She did agency, Fannie and Freddie work,

7     with Henry Liu.

8          Q.    How did you end up doing HUD work when

9     you were hired at Pepper Hamilton?

10         A.    Well, i was hired by Christine and

11    that's her practice.  She does FHA loans, which are

12    loans that are insured by HUD, and what I mean by

13    that is that unlike Freddie and Fannie Mae loans

14    where Freddie and Fannie Mae become the new lender,

15    in these type of loans, HUD insured the loan, and

16    that means if the borrow defaults, they will

17    guarantee they'll pay 90 percent of the loan amount.

18         So Christine's practice was primarily FHA and

19    nursing facilities, is what she worked on.

20         Q.    Now, I understand that Christine was

21    primarily HUD and then on the other side were agency

22    deals with Freddie and Fannie Mae.  Other than that

Page 51

1          A.    During my midyear review, when I spoke

2    to Audrey on the phone, I had a great evaluation

3    despite my hours, which was on the only issue.

4    Christine told me herself that I had a great work

5    ethic.

6          So no one really complained about me showing

7    up and working hard.

8          Q.    And this was -- when did you get your

9    midyear review?

10          A.    April of 2020.

11          Q.    And up until April of 2020, were you

12    working in the office?

13          A.    Yes.  Yes.  I was definitely in the

14    office.

15          Q.    And then we all know COVID hit.  Did

16    that change where you were working or were you still

17    coming into the office?

18          A.    Christine still wanted me to come in.

19    So during the height of COVID, I was definitely

20    coming in still.  She told me to take Uber and submit

21    it, and then something -- I think we were forced to

22    work from home, but for the most part, like March

Page 52

1    going into April, I was definitely coming in,

2    although, everything was on lockdown.

3         Q.    So do you recall when you started

4    working from home?

5         A.    It was around that time frame, April,

6    the latter half of April.

7         Q.    And during the time that you were

8    employed at Troutman Pepper, did you return to

9    working in the office?

10        A.    At Troutman Pepper or Pepper Hamilton?

11   I'm sorry.

12        Q.    Troutman Pepper.

13        A.    Yes.

14        Q.    And when did you return to working in

15   the office at Troutman Pepper?

16        A.    So it would have to be -- okay.  So the

17   whole debacle with Christine happened around May of

18   2020.  I started coming in after that, a little bit

19   in July, after July, November, but it wasn't every

20   day.  So I would go in the office towards the latter

21   half of 2020.

22        Q.    Was there ever a time that you did come

1    merger in July of 2020, were Pepper Hamilton

2    attorneys in one building and the original Troutman

3    Sanders attorneys in another building?

4         A.    Yes.  Correct.

5         Q.    And at the time that the merger

6    occurred, what practice group were you in?

7         A.    They -- well, the practice group changed

8    names.  So everyone became Multifamily Housing.  So

9    that just happened by default.

10        Q.    And so at the time of the merger, who

11   were the partners in the multifamily housing group in

12   D.C.?

13        A.    When we merged, you had Henry.  You had

14   Blair.  You had Christine.  You had Scott.

15        When it came to the legacy Troutman side, you

16   had Matt, Lindsey, David McPherson.  That's when the

17   merger happened, at the time of the merger that I

18   could recall.  I don't recall if I'm missing someone

19   else, but yes.

20        Q.    And who were the associates in the

21   office in the multifamily housing group?

22        A.    Okay.  On the legacy Pepper side, there

1    -- and she said, Can I ask you something, is

2    Christine stealing your hours, before she even got

3    into what was said in my review, and at the time, for

4    me, I didn't think she was stealing my hours given

5    the conversations we had.

6           I told her, Well, I email Christine my hours

7    and she tells me what to bill, and Audrey told me,

8    Going forward, I need you to enter in all of your

9    hours, and she is supposed to cut that off on the

10   back end, not on the front end, and I said okay.

11   Then she went ahead with my review and told me that

12   Christine had a lot of positive things to say about

13   me, that it was a very good evaluation, there was

14   nothing negative said about my work at all, and that

15   was the end of the conversation.

16          After that, I was stunned, because that's

17   something at the first year, you know, is she

18   stealing your hours, you're not expecting that.  So I

19   reached -- I think I reached out to Brendan and my

20   cousin Precious, and she said, Well, you have

21   instructions from the firm, so if she's telling you

22   to bill your hours, you have to bill your hours going

Page 68

```
1           Q.    Was Christine reducing the time for
2      other associates who worked with her?
3           A.    No.
4           Q.    How do you know that she was not
5      reducing their time?
6           A.    I asked.  So Randy was one of the
7      associates that I asked.
8           Q.    Was Randy the same year as you?
9           A.    No, but he worked with her when he was a
10     first year as well.  So he never had to deal with
11     that throughout the course of his employment with
12     her.  Well, at the firm and working with her.
13          Q.    You weren't there when Randy was a first
14     year?
15          A.    No, I was not.
16          Q.    Did Randy show you his time entries from
17     when he was a first year?
18          A.    No.
19          Q.    Did you talk to Christine about how she
20     managed Randy's time when he was a first-year
21     associate?
22          A.    No.
```

Page 69

1          Q.    Any other associate who worked with

2    Christine that you believe that she was not reducing

3    their time?

4          A.    It was just Randy.

5          Q.    Was Randy the only other associate who

6    worked with Christine at the time you were at Pepper

7    Hamilton?

8          A.    Yes, that I know of.

9          Q.    And did you work on deals with Randy for

10   Christine?

11         A.    Yes.

12         Q.    And what was his role on deals that you

13   worked on with him for Christine?

14         A.    So he would review my loan documents

15   that I drafted or -- because he was a part of the

16   training that I received and he would give me advice

17   on how to review a survey or a title.  So he was more

18   so the person that would review my work at times, not

19   for all deals, some deals.

20         Q.    And as part of your midyear review, did

21   you get feedback from Randy or was it just Christine?

22         A.    It was just Christine.

Page 90

1     really concerned because it was the time during

2     COVID.  We're on lockdown.  George Floyd is going on,

3     and there was a lot to deal with that I was being

4     treated this way for no reason at all, and she -- I

5     would follow up with her to ask her like what's going

6     on, and she told me that spoke to Henry, but Henry

7     told her he didn't want to be involved, and I was

8     stunned by that.

9          Q.    Did she tell you why Henry didn't want

10    to be involved?

11         A.    No.  She didn't go into specifics, no.

12         Q.    Now, you said that Christine was

13    retaliating against you.

14         A.    Yes.

15         Q.    How was she retaliating against you?

16         A.    So, initially, everything was fine,

17    because we worked -- before she -- the whole hours --

18    before she got called out for her hours by Audrey.

19    Everything was fine until I had that midyear review

20    in April 2020.

21              So after Audrey gave me instructions to bill,

22    I went to Christine and I sent her an email telling

1    her what Audrey told me to do.  She told she still

2    needed to see my hours, and I thought like, Okay,

3    maybe she'll stop cutting them, maybe she just wants

4    to see them.  She still kept cutting my hours.

5         So at that point, I reached out to two black

6    associates in Philadelphia and they suggested that

7    since I was the only black attorney in D.C. that I

8    reach out to the DEI partner, Kassem, and Kassem told

9    me that Christine was only looking out for herself

10   and her realization rate, and he spoke to Audrey.

11        I reached out to Audrey again to tell her that

12   this was still happening, but I was scared, because

13   it was the only person I received work from and I did

14   not want to let -- I didn't want it to be known that

15   I went back to speak to Audrey, and she told me,

16   Don't worry about it, you'll be protected.

17        So I guess she must have went back and said

18   something.  I don't know, but in May, Christine just

19   stopped giving me work.  I think I billed probably

20   not even 30 hours in May of 2020, and I emailed

21   Audrey and I told her like, Hey, now all of a sudden,

22   I'm not getting work, this is not normal.  Given the

1    the close proximity of what's going on, she just

2    stopped giving me work, and she told me to hang on

3    tight.  She's see what's going on.  She told me to

4    hang on tight, and that's how Christine retaliated

5    against me after the whole thing happened with the

6    hours thing happened with Audrey.  She just stopped

7    giving me work in May.

8        Q.    What race is Audrey?

9        A.    Audrey is white.

10       Q.    Who are the Philly associates that you

11   spoke to?

12       A.    Nicki Akande, which is A-K-A-N-D-E, and

13   Sarah Mohammed.

14       Q.    And were they in the same practice group

15   that you were in?

16       A.    No.

17       Q.    So they didn't work with Christine?

18       A.    No, but they knew that associates are

19   supposed to bill their time and get credit for it.

20   So it was very weird.  That's just standard no matter

21   what practice you're in.

22       Q.    And do you know why Christine was

Page 93

1    cutting your time?

2         A.    According to what she told me she was

3    looking out for my realization rate.  So that's what

4    she said, but to be honest with you, I don't really

5    know the real reason why.

6         Q.    And do you know if either Nicki or Sarah

7    had a conversation with Christine about why she was

8    cutting your time?

9         A.    No, but they told me they spoke to

10   Kaseem about it.

11        Q.    And did you talk to Kassem?

12        A.    I did.

13        Q.    And what discussions did you have with

14   Kassem?

15        A.    I told him what was going and he told me

16   that the reason why she was doing this was to look

17   out for her own profitability and her own realization

18   rate and that she was being greedy.

19        Q.    Did he explain to you why she would be

20   looking out for her own profitability?

21        A.    Monetary gain.

22        Q.    What do you mean by "monetary gain"?

Page 94

1          A.    To look more profitable in front of the

2    firm.  He's was like there's an incentive here that's

3    for a partner.

4          So her own comp, I guess.  He didn't really

5    get into specific details, but that was the gist that

6    he gave me about like why she was doing this, to look

7    out for her own profitability.

8          Q.    And you said that you only billed about

9    30 hours in May of 2020?

10         A.    I believe so, yes.

11         Q.    Did you start to get more hours after

12   May of 2020?

13         A.    Well, yes, after George Floyd died.

14         Q.    And when did you start getting more

15   hours after May of 2020?

16         A.    After the town hall.  The firm had a

17   town hall about race and everyone was, Oh, my God,

18   you're the only black associate here, let's give you

19   work.

20         So it was literally because of what happened

21   with George Floyd, because prior to that, that whole

22   month, they sidelined me.  They didn't care at all.

Page 95

1    Henry told Audrey that he didn't want to be involved,

2    and after we had the town hall about race, I spoke to

3    Audrey and she told me that Blair would be reaching

4    out and, miraculously, out of nowhere, I started to

5    get work again from Blair.

6         Q.    Do you know if Blair was aware that you

7    weren't getting work from Christine prior to that?

8         A.    Yes.

9         Q.    How do you know?

10        A.    I spoke to him about it.

11        Q.    When did you speak to him?

12        A.    In June of 2020.

13        Q.    At that point in time, do you know if

14   Blair had work that he could give you?

15        A.    Yes.

16        Q.    How do you know he had work?

17        A.    Because he gave me work.

18        Q.    He gave you work in June of 2020 --

19        A.    Yes.

20        Q.    -- when you spoke to him?

21        A.    Yes.

22        Q.    And prior to June of 2020, did Blair

Page 96

1    have an associate that he was working with?

2            A.    Yes.

3            Q.    Who was he working with?

4            A.    Randy.

5            Q.    And did you continue to get work after

6    June of 2020?

7            A.    Yes.  So Blair and I spoke in June of

8    2020, and he tried to make excuses for Christine,

9    because they have like a close relationship, and I

10   told him this is not a gray area, associates are

11   supposed to bill their time and get credit for that.

12   She's supposed to write that off on the back end, not

13   the front end, and he said, Yeah, you're right.

14           He told me to come in the office and he

15   started giving me work.  Once Christine saw that I

16   was working with other partners, that's when she

17   started to try to take me away again and try to start

18   giving me work.

19           So during that time, I did get work.  There

20   was an uptick from that, but it was more so -- the

21   work that Blair was giving me was more so

22   administrative work, putting together closing binders

1    with Scott, and Henry literally stopped my office and

2    looked side to side to make sure she wasn't there.

3    He came to my office like, Hey, I know what's going

4    on.  Virginia from Richmond, Virginia -- she was a

5    senior associate at the time -- is going to reach out

6    to me, do you want to move your office, and I told

7    him why.  He was like, Well, she's going to be really

8    mad.  I'm like, What do you think?  He said, Yeah, I

9    think it's better.

10          So he moved my office to the tenth floor, I

11   believe.  At think at the time, we was on the

12   eleventh.  No.  That's the new building, but the

13   floor -- because we were in K Street.  So no.  It

14   didn't have ten floors.

15          So he wanted to move me to the lower floor,

16   away from Christine, and he told me if I wanted to be

17   the one to tell Christine that I was no longer going

18   to work for her, and I said no.  As a first year, I

19   suffered enough.  You guys didn't do anything.  So

20   you want me to be the one to tell her that?  I was

21   like, No, I think you should tell her, and he said

22   okay.

Page 102

1          Q.    And who was going to be really mad?

2          A.    Christine.  That's what he was saying.

3    He didn't want her to be spicy with me if I was still

4    sitting on the same floor as her.  So he thought it

5    was better -- he suggested that I move to the floor

6    beneath us.

7          Q.    And why would Christine be really mad?

8          A.    I don't know.  He didn't get into

9    specifics as to why he thought that.

10         Q.    And were you involved in any discussions

11   between Henry and Brian about you?

12         A.    No.

13         Q.    Now, did you have more than one

14   conversation with Kassem about Christine?

15         A.    Yes.

16         Q.    What were your conversations with him

17   about Christine?

18         A.    The first one was when I reached out to

19   him to let him know about her manipulating my hours,

20   and he told me that she was looking out for her own

21   realization.  That was the first conversation.

22         He went back to Audrey.  I think we had -- the

Page 125

```
 1              What kind of feedback did she provide?
 2          A.    She gave me feedback in June and told me
 3     that I knew -- that I was on top of things all the
 4     time and I was -- you know, and I knew like the
 5     nuances and how to run a deal and how a deal is
 6     supposed to be ran.  Right?
 7              The criticism that she had, and I think it's
 8     in the email, that, you know, we shouldn't rely on
 9     our LPAs too much and just to slow down.
10          Q.    And that was June of what year?
11          A.    2023 and, of course, she did my
12     evaluation as well the prior year.
13          Q.    So do you remember what year you first
14     got feedback from Nora?
15          A.    Which was an evaluation.  It would have
16     been the 2020 eval or the 2021, one of those.
17          Q.    And do you recall what her feedback was
18     in those evaluations?
19          A.    It was very positive, but I don't know
20     exactly what was said.  She said good things.  My
21     evaluations were pretty decent.
22          Q.    The evaluation that you received for
```

Page 126

1    work in 2021, and I'm focusing on 2021 because it's a

2    complete year after the merger --

3         A.    Okay.

4         Q.    -- how would you describe the

5    performance evaluation that you received in 2021?

6         A.    I thought it was pretty good.  I got a

7    discretionary bonus.  So I'm pretty sure they don't

8    just throw money at you if you're performing

9    terrible, and there was nothing in there that I felt

10   was to the point of me losing my job or my job was in

11   jeopardy.

12        It was just standard feedback.  I didn't think

13   there was anything negative.  No.

14        Q.    And do you know the various components

15   of the performance review process --

16        A.    No.

17        Q.    -- at Troutman Pepper?

18        A.    When you say "components", what do you

19   mean?

20        Q.    Do you know who was involved in

21   completing your performance evaluation?

22        A.    Yes.

1        I worked for Christine.  Christine

2    intentionally reduced my hours.  She manipulated my

3    hours, and it was because due to my race because she

4    did not do it to Randy, who was the other associate

5    who worked for her.

6        Now, one could say, Well, Randy is not a

7    first-year associate.  Well, to my knowledge, he was

8    there as a first year and she never did it to him

9    while he was as a first year as well, because we

10    spoke about it in great detail.

11        Also, I was discriminated against because --

12    by Blair and Henry to a certain extent when it was

13    time to give me work, which they were supposed to do.

14    They didn't give it to me.  They did not look out for

15    my development as they did with their associates.

16    Case in point, Henry was the head of the practice

17    group.  He made sure that other associates within the

18    practice group, made sure that they got the proper

19    work and the proper development and the proper

20    training.

21        Blair, who was the co-managing partner at the

22    time, he also made the other partners [sic] were

Page 144

1          Also, when I look at the other associates,

2     who were nonblack -- they were all white -- they

3     received proper training.  They received the proper

4     development, and Henry refused to get involved in the

5     situation with Christine until the firm merged.

6          I sat there being treated differently from my

7     counterparts and, as a result, I suffered harm from

8     that.  I lost a whole year dealing with something

9     that had nothing to with her, because a partner took

10    advantage of me being a black woman, the only black

11    attorney there, and she was greedy and she stole from

12    me.  She stole my hours.  She manipulated my hours

13    and I suffered from that.

14         I couldn't -- I was not able to be further

15    developed as a result of it, lost a whole year,

16    wasn't even eligible or given the proper

17    opportunities to even get a bonus.  So I was not

18    given the same equal footing as the rest of my

19    counterparts, and it was due to the fact that I am

20    black.

21         So the only difference between me and anyone

22    else here is the color of my skin.  That was it.

1    assignments given out to associates?

2         A.    So how it worked, it wasn't like after

3    the merger, we would get assignments from every

4    partner.  You were basically designated to one

5    partner.  Right?

6         So I was hired to work primarily, exclusively,

7    with Christine.

8         Q.    And who were the associates that were

9    working with Blair?

10         A.    Primarily, Randy.

11         Q.    What about with Henry?

12         A.    Henry had a whole team.  He had

13    Christian, Lauren, David Bly, Zach.  There was

14    another Zach there.  I can't recall who else, but he

15    had a whole bigger team.

16         Q.    And did Henry have enough work that he

17    needed an additional associates on that team?

18         MR. WILLEMIN:  Objection.

19         THE WITNESS:  That, I wouldn't know, because

20    Henry did agency loans.  He did Freddie Mac and

21    Fannie Mae.  I was hired to do HUD loans.

22         So within the practice group, if you were

Page 148

1    hired to do HUD loans, that all you did.  Right?

2         And a lot of the time, the people who worked

3    for Henry did not do any work for Christine.  Scott

4    was also part of our practice group and he had an

5    associate called Brendan.  His name was Brendan.

6         Q.   And at the time that you were having

7    issues with Christine about your time, did you have

8    any training in doing agency work?

9         A.   No.  When you say "agency work", that's

10   Freddie Mac and Fannie Mae.  Right?

11        Q.   Yes.

12        A.   Yes.  No.

13        Q.   And were you involved in Kristen being

14   hired to work at Pepper Hamilton?

15        A.   When you say "involved", what do you

16   mean?

17        Q.   Did you recruit Kristen to work at

18   Pepper Hamilton?

19        A.   She was there before I started.

20        Q.   And so you don't the terms of her offer

21   to work at Pepper Hamilton?

22        A.   No.

Page 181

1    go-tos?

2          A.    No, I don't.

3          Q.    Anybody else that you worked with at

4    Pepper Hamilton who you felt created a hostile work

5    environment because of your race?

6          A.    Not that I can recall at this current

7    time.

8          Q.    Let's talk about Troutman.  Was there

9    anybody that you worked with at Troutman Pepper that

10   you felt like discriminated against you because of

11   your race?

12         A.    Matt.

13         Q.    Matt who?

14         A.    Bowsher.

15         Q.    Why do you feel that he discriminated

16   against you because of your race?

17         A.    So Matt had a constant theme of

18   questioning my basic competency level, and the reason

19   why I believe that it was due to my race is because

20   he did not speak to anyone else in that manner.  The

21   only other person that had an experience similar to

22   mine was Whitney.  She told me that he weaponized her

Page 182

1    pregnancy against her, because -- and she felt like

2    it was due to her race as well.

3        She told me that -- we knew that he did not

4    speak to Kelly, who was also pregnant at the time,

5    and who was his go-to associate.  So there was a

6    common theme between two black women that he just

7    questioning our basic competency level.

8        Ari, who is black, did not have the same

9    experience with him, but he's a black male; however,

10   he told me it could be due to the fact he was

11   involved in training Matt on how to close deals.

12       Q.    How did Ari train Matt to close deals?

13       A.    So Matt was hired from Freddie Mac

14   because his substantive knowledge.  When you're a

15   Freddie Mac attorney, you're not really a closing

16   attorney, and what I mean by that is you're not

17   involved -- you're not lender's counsel involved with

18   title, closing the deal, getting the deal closed, or

19   anything like that.

20       So Ari was very integral in showing Matt how

21   we did things on the lender side at Troutman.  So

22   they had a very different relationship.

Page 185

 1      things.  Yes, he did.

 2              Q.     What did he teach you?

 3              A.     If there -- initially, I remember when I

 4      first started working there, he would call.  He used

 5      to call and tell me more about the Freddie Mac

 6      program and just the Freddie Mac guide and what

 7      things to look for in a deal.

 8              Q.     Was that helpful to you in working on

 9      deals with him?

10              A.     Yes.

11              Q.     How was it helpful?

12              A.     It gave me introspection on how like --

13      you know, more knowledge on how the Freddie Mac

14      program worked, as a new attorney doing agency deals.

15              Q.     And was Mr. Bowsher the first partner at

16      Troutman Pepper who you worked on Freddie Mac deals

17      with.

18              A.     It was mainly someone up in Richmond.  I

19      can't remember who the first one was, but it was not

20      from the D.C. Office.  It was mainly the folks up in

21      Richmond.

22              Q.     How did Mr. Bowsher question your

Page 186

1       competency level?

2              A.    Okay.  So the first interaction was back

3       -- we had a deal back in, I would say, May of 2022

4       and we had a client that he asked me to join the deal

5       with him.  It was David McPherson's deal.  David

6       McPherson had a health scare and he was going out on

7       retirement, and he asked if I could assist him with

8       the deal and I said sure.

9              The client wanted their signature pages set up

10      in a certain way.  So, typically, we have certain

11      loan documents that are recorded with title and those

12      loan documents are notarized, but for this particular

13      client, she wanted -- and I knew who she was.  Her

14      name was Natalie.  She wanted her signature pages set

15      up in a different manner, and I told my assistant at

16      the time to break up the signature block according to

17      the way the client wanted.

18             Within minutes, Matt called and he started

19      mansplaining to me, thinking that I didn't know what

20      a notary was, and I let him finish and I told him

21      like, Hey, Matt, I know what a notary is, this is

22      just the way the client wants the signature pages set

1    up, and he hung up the phone, and that was the first

2    instance.

3         I didn't think anything of it, but it was

4    strange.  Then around April, going into May, I

5    received, I believe, an email from Kelly.  I think

6    Kelly was going out on maternity leave, and she

7    wanted me to cover some deals with her, and I did,

8    and Matt happened to be on those deals.

9         The first deal that we were on, I came in

10   between the deal.  Like I didn't start the deal off.

11   It was something that Kelly worked on.  I reviewed an

12   opinion for him for the first deal, and before I even

13   sent my comments out, I always run it through the

14   partner on a deal before I send my comments out to

15   opposing counsel, and he -- because Matt tends to

16   write these long emails.  Right?

17        So he sent back his comments to me and asked

18   me, you know, out of the year you've been closing

19   deals with us, have you ever seen this language

20   before, and I said no, and that was that and I

21   incorporated his comments and I sent it along to

22   borrower's counsel.  Borrower's counsel comes back

1      and says, Hey, you know, we just closed a deal with

2      you guys and we used the same exact language that you

3      guys are saying is unacceptable, and I asked her do

4      you know what deal it was, do you know when the deal

5      closed.

6            She gave me the information.  I went in the

7      system and I saw that this deal was just closed like

8      a week prior with the same exact language that Matt

9      was mansplaining to me about and the person who

10     closed the deal was Matt, himself.  So I told him,

11     Hey, you know, it looks you closed this deal, and he

12     said no biggie.  He sent a long email to the client,

13     throwing Ari underneath the bus, not taking

14     accountability over the fact that he was the partner

15     on the deal that accepted that same exact same

16     language.

17            I remember showing that email to Ari and Ari

18     Ari was like, yeah, that strange.

19            It around this time that I then got a call

20     from Whitney telling me that Brian went into her

21     office stating that there's been concerns about my

22     work.  Now, she told me that Brian didn't tell her

1    who it was, but her and I knew exactly who it was.

2    Right?

3          Because prior to that, I've never gotten

4    complaints, and she told Brian the complaints that

5    you're receiving, they're consistent with one of a

6    junior associate, and if this was Austin, who was a

7    white male in the group, would they even come to you

8    about it and why are they going to you instead of

9    coming directly to Gita.

10         And I can't remember exactly what he said in

11   response to her.  That was that particular instance.

12         The second one was with another opinion.  This

13   deal was a supplemental loan.  Now, typically, on

14   opinions on a regular deal, you have an opinion.  You

15   ask borrower's counsel to draft an opinion, and if

16   the borrowing entity is formed in Delaware and the

17   property is out in Florida, we will ask for the

18   opinion to opine to the formation jurisdiction, which

19   would be, obviously, Delaware and where the property

20   is located, which would be Florida; but on

21   supplemental deals, you just need formation opinions.

22         So I told the borrower, borrower's counsel,

1    that, Hey, we just need formation opinions.  Matt

2    then emails me.  In these two instances, the opinions

3    literally happened around the same time frame.  Matt

4    emailed me mansplaining again, not asking me like,

5    Hey, Gita, why would you say that or anything like

6    that and said like you need to, basically, retract

7    the statement, that's incorrect.

8         So I emailed -- I forwarded the email to

9    Whitney, and Whitney said he's wrong, hold on.  So

10   Whitney went ahead and drafted an email for me and

11   she texted me and said if he's going to go complain

12   and say that you don't what you're doing, meanwhile,

13   you're correcting him, he can't have it both ways and

14   the group has a history of pushing black woman out of

15   the group.

16        She told me that she forwarded the email to

17   Brian and Nora and Ashante and that how Brian rushed

18   into her office and said I just want to say that Matt

19   is not a racist, and she told Brian no one is calling

20   him one.  Matt, in the meantime, when I sent him the

21   email that Whitney drafted, he responded and he just

22   said, Oh, I'm sorry, and then it wasn't enough for

Page 191

1    him.  He went and he emailed Sidarth and Jeremy and

2    Virginia, who were like the internal review committee

3    when it came to opinions and just to confirm, and he

4    said I can't believe I'm getting this wrong and Gita

5    was right, something along those lines.

6            And I remember speaking to Ashante about this

7    and I told Ashante these are microaggressions.

8    Right?

9            Like he has this preconceived notion for some

10   reason that I don't know what the hell I'm doing.

11   Right?

12           And she told me she spoke to Brian about it

13   and Brian kept saying like, Well, Gita should feel

14   good about herself because she was right, and she

15   told Brian it's not about her being right.  It's the

16   fact that he's questioning -- he's making her

17   question her work.

18           So that happened and things went silent for a

19   little bit, and then I think in the fall, we worked

20   together a little bit in 2022, and then after that, I

21   got my 2022 evaluation in February.  I'm sorry this

22   is all a little longwinded, but I got my 2022

1    stopped speaking to me.  So every morning, Matt would

2    pass my office and say good morning.  So after that

3    conversation in February 2023, he just started to

4    ignore me.  So I made it my business to say good

5    morning to him every day, and was not put on any

6    deals with him all throughout 2023.  It wasn't until

7    I reached out to Kelly, because interest rates were

8    very low, and I got put on a deal with Kelly and I

9    didn't know Matt was going to be on that deal.

10         He happened to be on the deal and that's when

11   I received that August 3rd email.

12   BY MS. DAVIS:

13        Q.   Now, you've used the term "mansplaining"

14   numerous times when describing Mr. Bowsher.  What do

15   you mean by mansplaining?

16        A.   Like it was more -- like what I mean by

17   that is that it was very aggressive, very

18   condescending.  Like he came off like I did not know

19   what I was speaking about.  That's what I mean by

20   mansplaining.

21        Q.   And I think you said that Mr. Bowsher

22   was in the habit of sending lengthy emails.

Page 194

1          A.    Yes.

2          Q.    Had you seen him send lengthy emails to

3    other associates?

4          A.    Well, no, I did not; however, when I

5    asked -- I showed my Ari emails to Ari and he told me

6    that he did not speak to him like that.

7          Q.    But you said that he sent lengthy emails

8    to other people.  So who else did get some?

9          A.    Well, Bowsher used to send emails to the

10   whole group as a whole and they were long to the

11   point that people had jokes about them.  So like

12   that's what he was known for, just sending long

13   emails.

14         Q.    Did you talk to other attorneys in the

15   group as to whether or not they got lengthy emails

16   from him?

17         A.    No.

18         Q.    You mentioned in talking about the

19   conversation that Whitney shared with you about the

20   discussion she had with Brian -- and you're assuming

21   that the discussion was about Mr. Bowsher?

22         MR. WILLEMIN:  Objection.

1           A.    I know that I wasn't -- I can't answer

2     that question, because when I got there, Whitney was

3     running her own deals.  So I'm not sure.

4           Q.    And when you say she was running her own

5     deals, were they deals that originated with her own

6     clients?

7           A.    Yes.  Yes.  Well, yes, to my

8     understanding, her own sponsors that she dealt with.

9           Q.    So to your knowledge, the only work that

10    she was doing were with her sponsor?

11          A.    Yes, but she was also working on other

12    deals with like Kevin or Lindsey at the time as well.

13          Q.    And do you know how she came to be

14    working with Kevin?

15          A.    I'm not sure.

16          Q.    What's Kevin last name?

17          A.    Dexter.

18          Q.    Did you do any work with Kevin Dexter?

19          A.    Yes, I did.

20          Q.    Did you get any feedback from him about

21    your work?

22          A.    Yes.

Page 202

1          A.    Yes.

2          Q.    And correct me if I'm wrong, but during

3     this conversation, you mentioned to her that Matt was

4     engaged in microaggressions?

5          A.    Yes.

6          Q.    What's a microaggression?

7          A.    So a microaggression is things that are

8     subtle.  Right?

9          Like let's just say I tell someone of color

10    like you that you sound so articulate.  Right?

11         That's because there's a preconceived notion

12    out there that people who look like us are not

13    articulate.  Right?

14         These are like little subtle micro aggressions

15    that show up because people think in order for

16    someone to be racist, they may have to show up with a

17    KKK hoodie on and that's what it's going to take, but

18    that's not how discrimination works now, especially

19    in the workplace.

20         Q.    So how do you differentiate between one

21    who is making a comment that they would make to a

22    white person from one that they would not make to a

Page 203

1    white person?

2              A.    With certain stereotypes that out there.

3    Right?

4              Like one is the fact that he was questioning

5    my intellect level.  There are certain stereotypes

6    about black folk who work in corporate America that

7    we're not -- we didn't get these job based on our own

8    merit, that we got here because to fit some quota,

9    and he was exhibiting those stereotypes as in

10   questioning my basic competency level.  Right?

11             You know, the email, he said -- what did he

12   say in the August 3rd email?  That this is elementary

13   and basic communication.  Right?

14             So he questioned my intellect level many

15   times, and that August 3rd email, he let it loose.

16   So that's what a microaggression is.  It's based over

17   stereotypes that are about marginalized groups.

18             Q.    So if Matt had sent an email to Kelly

19   commenting that something was elementary, that would

20   not be racist?

21             MR. WILLEMIN:  Objection.

22             THE WITNESS:  It would be discriminatory.  It

Page 209

1    confused.  Sorry about that.

2         Q.    So my question was about Ari.

3         A.    No.  I mean I answered it incorrect, but

4    you re-clarified.

5         Q.    So do we have the correct answer on the

6    record to my question?

7         A.    Yes.  We do.  We do.

8         MR. WILLEMIN:  It's a double negative,

9    actually.

10        THE WITNESS:  I know.  I'm tired.  I'm

11    starting to get a little tired.

12        MS. DAVIS:  Why don't we take a quick break.

13        VIDEOGRAPHER:  Going off the record.  The

14    time is 15:57 p.m.

15        [Recess.]

16        VIDEOGRAPHER:  Going back on the record.  The

17    time is 16:21 p.m.

18                              [Sankano Exhibit No. 2 was

19                               marked for identification.]

20    BY MS. DAVIS:

21        Q.    Ms. Sankano, you've been shown what has

22    been marked as Exhibit No. 2 and it's marked

Page 210

1      Troutman_0002720.  Do you recognize that document?

2              A.    Yes.

3              Q.    What is it?

4              A.    This is a document, correspondence

5      between Matt and I and borrower 's counsel.

6              Q.    And is there in this email chain a

7      segment that you would describe as Matt mansplaining?

8              A.    Yes.

9              Q.    Where?

10             A.    So if you look at -- so this is an email

11     thread when I sent him my comment to a Delaware

12     opinion, and when he says I'm not sure I'm okay with

13     the following mod circled in red, have you ever seen

14     us accept this before, seems to me that we already

15     allow borrowers to counsel, that whole paragraph of

16     paragraph 2.

17             Q.    All of paragraph 2 is an example of Matt

18     mansplaining or just the sentence that you read?

19             A.    The whole thing.

20             Q.    How is that mansplaining?

21             A.    Well, I wouldn't say it was him -- in

22     this context alone, no, but everything that I said in

Page 211

1    totality of what led up to this event.  Right?

2         So him coming to me and telling me have I ever

3    seen this language before and things about like for

4    the past year, have you ever seen this before or the

5    past year -- what did he say here?  Not asking you to

6    push back blindly on borrower's counsel; rather, I'm

7    asking you to give you this -- some thought, consider

8    whether you've ever seen it in the year that you've

9    been closing loans with us.

10        Come to find out, he accepted the same very

11   language in not one, but other deals as well.  Right?

12        And during the time period, he was

13   complaining, stating that I didn't know what I was

14   doing.  Right?

15        And you're over here telling me to do this,

16   but at the same time, you've been accepting the same

17   exact language.

18        So you have to take everything in totality.  I

19   wouldn't just say just looking at this one paragraph

20   and that's it.  It was everything that transpired.

21        Q.   And for deals that Mr. Bowsher did, were

22   they -- I'll use the term "cookie cutter", and if you

Page 214

```
 1      typically, in these conventional deals that I worked
 2      on, you have a loan.  You know, you have to get your
 3      borrower's opinion and whatnot.  A complex deal would
 4      entail something like more of a affordable deal,
 5      deals that have ground leases, deals that have master
 6      leases, because it doesn't typically routinely pop up
 7      in the deals that we work on, because we do
 8      conventional deals, depending on the sponsor you're
 9      working with.
10          So those would be more so of a complex nature
11      of those.
12          Q.   And is there anything in this email
13      trail with Mr. Bowsher that you would describe as
14      racist?
15          A.   Racist on its face in the email, no, but
16      what I said, again, you have to take everything in
17      totality what I told you.  So I wouldn't say there's
18      anything that he's written here that would look like
19      it's racist on its face until you take everything
20      into context, is what I just explained.
21          MS. DAVIS:  This will be No. 3.
22                          [Sankano Exhibit No. 3 was
```

Page 223

1          Q.    So if she, as an associate, was not

2     follow instructions at the firm, would you think that

3     there would be some type of consequence for her?

4          MR. WILLEMIN:  Objection.

5          THE WITNESS:  Naturally, yes.

6     BY MS. DAVIS:

7          Q.    And going back to Exhibit No. 3, is

8     there anything in this email trail between you and

9     Mr. Bowsher that indicates he's commenting about your

10    race?

11         MR. WILLEMIN:  Objection.

12         THE WITNESS:  No.

13    BY MS. DAVIS:

14         Q.    Did you talk to Dameon Rivers about

15    working with Mr. Bowsher?

16         A.    Yes, I did.

17         Q.    When did you speak to him?

18         A.    I remember back in -- so Dameon does

19    affordable work.  So this was back in the latter half

20    of '22, going on '23, and I told him that he was

21    saying things -- it was either him or Lanre.  I can't

22    remember, but I did tell him that things were not --

Page 251

1    BY MS. DAVIS:

2          Q.    Who made the decision to terminate your

3    employment?

4          A.    Well, I found out after.  From my

5    knowledge, from what the firm said, it was Brian.  He

6    made the ultimate decision.  A part of that decision

7    was Marshall and Blair.

8          Q.    What input did Marshall have into the

9    decision to terminate your employment?

10          MR. WILLEMIN:  Objection.

11          THE WITNESS:  I have no idea.

12    BY MS. DAVIS:

13          Q.    What input did Blair have into the

14    decision to terminate your employment?

15          MR. WILLEMIN:  Objection.

16          THE WITNESS:  I have no idea.

17    BY MS. DAVIS:

18          Q.    Do you know if, other than Brian, there

19    were other partners who he consulted with before

20    making a decision to terminate your employment?

21          A.    I don't know.  I have no idea.

22          Q.    Why do you believe that Brian terminated

Page 252

1    your employment because of your race?

2         A.    So the claim is it wasn't -- because it

3    was retaliation, because I was terminated as

4    retaliation for filing an HR complaint, not because

5    of discrimination.

6         Q.    And why do you believe that it was

7    retaliation for --

8         A.    Because -- oh, I'm sorry.  Go ahead.

9    Sorry.

10        Q.    Why do you believe that your termination

11   was retaliation for filing an HR complaint?

12        A.    The timing.  It's a huge indicator.

13        In February of 2023, I receive my 2022

14   performance evaluation.  I had a committee meeting

15   with Blair, Nora.  At the meeting, there was no

16   mention of any performance issues.  If anything, they

17   made fun of Matt at that meeting.

18        I got an almost $60,000 discretionary bonus.

19   Brian came down to the office in February of '23 and

20   he even asked me if I was happy with my comp and

21   bonus, which he typically does do.

22        In June of '23, we went to a Fannie Mae

Page 253

1    conference.  Brian is an individual who always came

2    out his way to let me know how great I was and how I

3    was never given a fair shot.  He said that a quite a

4    few times, and in June of '23, I believe at the

5    Fannie Mae conference, he walked up to me and told me

6    that he wanted to see me move up to the next level.

7         On June 28, 2023, I received feedback from

8    Nora, and it was -- of course, you know, no one is

9    perfect in the practice of law.  It was relatively

10   good feedback.

11        In July, Brian asked me how my July was

12   looking, because he always routinely checked in, and

13   I told him it was looking good.  Then August rolls

14   around.  I get the August 3rd email.  I file my HR

15   complaint on August 10th.  Prior to that, on August

16   8th -- let me rewind back.

17        August 3rd, I get the email.  I forward the

18   email to leadership.  I get ignored.  August 8th, I

19   had a meeting with my coach and she read the email

20   and just said it was racist and even didn't know how

21   to help me and suggested I go to HR.  Lindsey did

22   too.  I sat on the email for a week, and after not

1    hearing from leadership, I went to HR on August 10th.

2         When I initially went to HR and spoke to

3    Denise, she told me it was an easy fix.  She didn't

4    take it seriously at first.

5         The next day, I spoke to Sonia on August 11th

6    and told her everything, and then all of a sudden,

7    the review I received in '22 became mixed over night.

8    That's when the retaliation started, after I filed

9    the complaint.  She told me the review was mixed and

10   she told me that Matt did not represent the firm and

11   that she -- it was even problematic that she even

12   didn't know who he was; however, she couldn't help me

13   with the HR complaint because she was a legal talent

14   officer and that she could help with this, meaning

15   performance.  So all of a sudden, it became a

16   performance thing.

17        Then she went ahead and scheduled a meeting

18   with Mary Cabell and Kalle to talk about my continued

19   growth within the firm.  That was August 11th.

20   August 14th, you have Dameon -- and I told you what

21   he said -- come into my office randomly and telling

22   me I should leave and all, trying to get me to

Page 255

1      resign.

2            Then you have after that -- that was August

3      14th.  What was next in the timeline?

4            Around August 20 -- I believe.  I'll let you

5      know.

6            August 25th -- no.  August 23rd, that's when

7      HR finally reached out to me and took my statement,

8      because, initially, she told me it was an easy fix

9      and that's when she took my official statement, was

10     August 23, and I told her everything that transpired.

11           August 25th, I had a meeting with Kalle and

12     Mary Cabell.  Kalle starts the meeting off saying

13     that my hours are through the roof and how people

14     would kill for my hours.  Mary Cabell comes on and

15     she's the practice director and she says to me that

16     they're not seeing the level of depth and nuance in

17     my work and that when I started, I was a rock star.

18           To me, that meeting with Mary Cabell, what she

19     said to me was definitely retaliatory.  Right?

20           Because at the end of the day, I like Mary

21     Cabell, but she's not a partner within our group and

22     that's feedback that I've never received before ever,

Page 256

1    and they started saying that the '22 evaluation, the

2    one I had meeting for in February, was mixed, which

3    if it was truly mixed, it would have been brought up

4    prior to me filing this HR complaint.

5           After that, Mary Cabell suggested that I reach

6    out to partners that I work with and let them know

7    what I want to do with my future at Troutman.  I

8    said, Okay, cool.  As soon as I got off the phone, I

9    called Whitney and I told her about the meeting and I

10   asked her did Mary Cabell reach to you so we can have

11   this discussion, because if this is supposed to be a

12   meeting about my progress within the firm, you'd

13   think they would reach out to the main person I work

14   with.  She said no.  So I don't know where she got

15   that information from.

16          I then reached out to Peter, Jennifer, and

17   Lindsey.  Neither one of them said, Gita, we have

18   concerns about your -- about you not meeting your

19   performance goals, we have concerns about we're not

20   see your development, nothing, no red flag at all.

21   The conversation was pretty okay.  So that was August

22   25th to August 28th.

Page 257

1          Everything goes radio silent.  I was told by

2     HR that they were going to wrap up the investigation

3     by Labor Day weekend.  In October, it wasn't until my

4     boyfriend telling me like, Hey, whatever happened to

5     that investigation.  I went and I followed up with

6     HR, like what's going on with the investigation.

7     That was like the beginning of October.

8          At this time period, no one still had reached

9     out to me, not Brian.  No one reached out to me

10    within the group.  She then tells me like they're

11    about to wrap it up.  I said okay.

12         I get the findings on October 28th.  It took

13    the firm 77 days to do an investigation, although,

14    the people that -- although, HR sits on the same

15    floor as me.  The month after, I got fired for

16    performance.

17         So when you look at the timeline in itself, it

18    speaks for itself.  Yeah.  The timeline in itself

19    speaks, is a strong indicator of retaliation.

20         Q.    Prior to your complaint in August of

21    2023, had you been involved in an HR investigation?

22         A.    No, not that I can recall.

1          A.    It was around the same time frame of

2     when I got that racist email.

3          Q.    And the email that you're describing as

4     racist is the August 3rd email?

5          A.    Correct.

6          Q.    And what was racist in that email?

7          A.    "This is very basic elementary

8     communication."

9          Q.    And what are you looking at?

10          A.    I'm looking at this.  It's on page 24 of

11     the complaint.

12          Q.    Are you looking at Exhibit 1?

13          A.    Exhibit 1.

14          Q.    And what page?

15          A.    Twenty-four of the complaint, of Exhibit

16     1.

17          Q.    Okay.  So what is racist in that email?

18          A.    The whole email in totality, if you ask

19     me, is racist given what transpired prior to that --

20     right -- everything that I told you about my history

21     with this man, but if you read it on its face, I

22     guess the average -- for me, the whole thing is

```
 1    racist because of my experience with him, but if

 2    someone probably doesn't know the background, they

 3    might be like, Oh, I don't know until they hear the

 4    whole thing in totality.

 5         So for me, the whole thing is racist.

 6         Q.    And the whole thing that you're

 7    describing is your experience working with Mr.

 8    Bowsher?

 9         A.    My experience coupled with the email,

10    when you take everything in totality.

11         Q.    But it all related to Mr. Bowsher?

12         A.    Correct.

13         Q.    And you said that it impacted you

14    mentally?

15         A.    Yes.

16         Q.    How so?

17         A.    I felt like I -- I was distraught.  I

18    cried so much just coming to work.  You know, the

19    thing is that people think that people have to come

20    in -- it's just hard to deal with -- right -- the

21    gaslighting of it all, the fact that it would have

22    taken for Matt to call me the "N" word for them to
```

Page 320

1                CERTIFICATE OF NOTARY PUBLIC

2          I, CATHERINE B. CRUMP, the officer before

3    whom the foregoing deposition was taken, do hereby

4    testify that the witness whose testimony appears in

5    the foregoing deposition was duly sworn by me; that

6    the testimony of said witness was taken by me

7    stenographically and thereafter reduced to

8    typewriting under my direction; that said deposition

9    is a true record of the testimony given by said

10   witness; that I am neither counsel for, related to,

11   nor employed by any of the parties to the action in

12   which this deposition was taken; and further, that I

13   am not a relative or employee of any attorney or

14   counsel employed by the parties hereto nor

15   financially or otherwise interested in the outcome of

16   the action.

17                    CATHERINE B. CRUMP

18                    CATHERINE B. CRUMP

19                    Notary Public in and for the

20                    District of Columbia

21

22   My Commission Expires:  October 31, 2027