**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**
-------------------------------------------------------------------X

GITA F. SANKANO,                            :
                                            :
                          Plaintiff,        :       Civil Action No.: 1:24-cv-00142-JMC
                                            :
            v.                              :
                                            :
TROUTMAN PEPPER HAMILTON SANDERS            :
LLP and BRIAN IWASHYNA,                     :
                                            :
                          Defendants.       :
                                            :
                                            :
-------------------------------------------------------------------X


**PLAINTIFF GITA F. SANKANO'S MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANTS TROUTMAN PEPPER HAMILTON SANDERS LLP AND BRIAN
IWASHYNA'S MOTION FOR SUMMARY JUDGMENT**


**WIGDOR LLP**

Michael J. Willemin
Kassandra Vazquez
Brooke Payton

85 Fifth Avenue
New York, NY 10003
Telephone: (212) 257-6800
Facsimile: (212) 257-6845
mwillemin@wigdorlaw.com
kvazquez@wigdorlaw.com
bpayton@wigdorlaw.com

*Counsel for Plaintiff*

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................ iii

PRELIMINARY STATEMENT ...........................................................................................1

STATEMENT OF FACTS ....................................................................................................3

I.      PLAINTIFF JOINS PEPPER HAMILTON LLP AS THE ONLY BLACK ASSOCIATE
        IN ITS D.C. OFFICE AND GETS HER HOURS STOLEN .............................................3

II.     PLAINTIFF'S OVERWHELMINGLY POSITIVE PERFORMANCE OVER THE
        COURSE OF HER TENURE ..........................................................................................5

III.    PLAINTIFF SUFFERS FURTHER DISCRIMINATION .................................................6

IV.     PLAINTIFF ENGAGES IN PROTECTED ACTIVITY ....................................................8

V.      THE FIRM UNLAWFULLY TERMINATES PLAINTIFF'S EMPLOYMENT MERE
        WEEKS AFTER IT CONCLUDES A PERFUNCTORY INVESTIGATION ...................9

VI.     DEFENDANTS' LONG STANDING PATTERN AND PRACTICE OF
        DISCRIMINATING AGAINST BLACK WOMEN ..........................................................11

ARGUMENT .......................................................................................................................14

I.      STANDARD OF REVIEW .............................................................................................14

II.     PLAINTIFF'S RETALIATION CLAIMS MUST BE RESOLVED BY A JURY ...........14

        A.      The Retaliation Suffered by Plaintiff is Plainly Actionable ..................................14

        B.      There is Ample Record Evidence to Show that Plaintiff Was Terminated in
                Retaliation for Her Complaint Against Mr. Bowsher .............................................16

                i.      Plaintiff Was Terminated Because of Her Protected Activity ...................16

                ii.     Plaintiff's Employment was Terminated in Retaliation for Her Complaints
                        About Mr. Bowsher ..................................................................................19

        C.      Plaintiff Was Earlier Retaliated Against By Ms. Carmody ...................................23

                i.      A Jury Could Determine that Ms. Carmody Was Aware of Plaintiff's
                        Protected Activity ...................................................................................24

                ii.     Ms. Carmody's Explanation for Cutting Plaintiff's Work Hours are

Clearly Pretextual.....................................................................................25

III.    PLAINTIFF'S DISCRIMINATION CLAIMS MUST BE RESOLVED BY A JURY ....27

A.  Ms. Carmody's Discriminatory Conduct is Plainly Actionable ..................................27

i.    There is Ample Record Evidence that Raises Triable Issues of Fact as to Whether Ms. Carmody Discriminated Against Plaintiff..................................27

ii.    The Same-Actor Inference Does Not Absolve Defendants of Liability ..........31

iii.    Plaintiff's Claims That Ms. Carmody Discriminated and Retaliated Against Her in Violation of Section 1981 are not Time-Barred ..................................32

B.  Whether Defendants Created a Hostile Work Environment is a Question of Fact That Should Be Resolved by a Jury ......................................................................................32

i.    The Environment Created, Condoned, and Perpetuated by the MFH Partners was Undoubtedly Hostile and Offensive ..........................................................33

ii.    Defendants' Argument that Mr. Bowsher did not "Explicitly Mention Plaintiff's Race" is a Red Herring ...................................................................42

iii.    Troutman Pepper Took No Remedial Action When Plaintiff Complained About Mr. Bowsher .........................................................................................43

iv.    Plaintiff did Not Abandon Her Claim that She Was Terminated Due to Her Race....................................................................................................................45

CONCLUSION.............................................................................................................................46

## TABLE OF AUTHORITIES

<u>Cases</u> <span style="float:right">Page(s)</span>

*Abdelkarim v. Tomlinson,*
  605 F. Supp. 2d 116 (D.D.C. 2009) ...................................................................................... 40

*Aman v. Cort Furniture Rental Corp.,*
  85 F. 3d 1074 (3d Cir. 1996) .............................................................................................. 42

*Anderson v. Liberty Lobby, Inc.,*
  477 U.S. 242 (1986) ............................................................................................................ 31

*Arthur Young & Co. v. Sutherland,*
  631 A. 2d 354 (D.C. 1993) ................................................................................................. 27

*Ash v. Tyson Foods, Inc.,*
  546 U.S. 454 (2006) ............................................................................................................ 42

*Banks v. D.C.,*
  377 F. Supp.2d 85 (D.D.C. 2005) ...................................................................................... 14

*Beard v. Preston,*
  576 F. Supp. 2d 93 (D.D.C. 2008) ..................................................................................... 22

*Bowdre v. Richardson,*
  131 F. Supp. 2d 179 (D.D.C. 2001) .................................................................................... 42

*Brady v. Off. of Sergeant at Arms,*
  520 F. 3d 490 (D.C. Cir. 2008) ........................................................................ 15, 19, 26, 27

*Brockman v. NAES Corp.,*
  No. 19 Civ. 00006 (JAM), 2021 WL 863471 (D. Conn. Mar. 8, 2021) .................................... 43

*Burlington Indus. v. Ellerth,*
  524 U.S. 742 (1998) ............................................................................................................ 44

*Burrell v. Shepard,*
  321 F. Supp. 3d 1 (D.D.C. 2018) ........................................................................................ 41

*Burton v. Donovan,*
  210 F. Supp. 3d 203 (D.D.C. 2016) .................................................................................... 21

*Carpenter v. Fed. Nat'l Mortg. Ass'n,*
  165 F. 3d 69 (D.C. Cir. 1999) ............................................................................................. 27

*CBOCS West, Inc. v. Humphries*,
   553 U.S. 442 (2008) ................................................................................................ 15

*Clark Cty. School Dist. v. Breeden*,
   532 U.S. 268 (2001) ................................................................................................ 20

*Cobb v. Del Toro*,
   No. 20 Civ. 3015 (TSC), 2023 WL 6215037 (D.D.C. Sept. 25, 2023) ..................................... 32

*Coleman v. Potomac Elec. Power Co.*,
   422 F. Supp. 2d 209 (D.D.C. 2006) ......................................................................... 24

*Craig v. District of Columbia*,
   881 F. Supp. 2d 26 (D.D.C. 2012) ............................................................... 33, 34, 35

*Czekalski v. Peters*,
   475 F. 3d 360 (D.C. Cir. 2007) ............................................................................... 31

*Dist. of Columbia v. Bryant*,
   307 A. 3d 443 (D.C. 2024) ................................................................................. 20, 22

*Dunn v. Infosys Ltd.*,
   No. 12 Civ. 3561 (YGR), 2012 WL 4761901 (N.D. Cal. Oct. 5, 2012) ................................... 33

*Faragher v. City of Boca Raton*,
   524 U.S. 775 (1998) ................................................................................................ 44

*Greene v. Dalton*,
   164 F. 3d 671 (D.C. Cir. 1999) ............................................................................... 14

*Hardin v. Dadlani*,
   161 F. Supp. 3d 103 (D.D.C. 2014) ......................................................................... 46

*Harris v. Forklift Sys., Inc.*,
   510 U.S. 17 (1993) ............................................................................................ 40, 41

*Harris v. Trustees of University of District of Columbia*,
   567 F. Supp. 3d 131 (D.D.C. 2021) ..................................................................... 15, 26

*Hunter v. Ark Restaurants Corp.*,
   3 F. Supp. 2d 9 (D.D.C. 1998) ............................................................................... 32

*Jones v. Bernake*,
   557 F. 3d 670 (D.C. Cir. 2009) ............................................................................... 25

*Kindig v. Whole Foods Mkt. Grp., Inc.*,
930 F. Supp. 2d 48 (D.D.C. 2013) ................................................................................. 29

*Lemmons v. Georgetown Univ. Hosp.*,
431 F. Supp. 2d 76 (D.D.C. 2006) ............................................................................ 24, 27

*Lively v. Flexible Packaging Ass'n*,
830 A. 2d 874 (D.C. 2003) ........................................................................................... 40

*Meritor Sav. Bank, FSB v. Vinson*,
477 U.S. 57 (1986) ....................................................................................................... 41

*Miller v. Saxbe*,
403 F. Supp. 1314 (D.D.C. 1975) ................................................................................. 14

*Mungin v. Katten Muchin & Zavis*,
116 F. 3d 1549 (D.C. Cir. 1997) .................................................................................. 27

*Nuskey v. Hochberg*,
657 F. Supp. 2d 47 (D.D.C. 2009) ............................................................................... 42

*Pantazes v. Jackson*,
366 F. Supp. 2d 57 (D.D.C. 2005) ............................................................................... 41

*Propp v. Counterpart Int'l*,
39 A. 3d 856 (D.C. 2012) ............................................................................................. 15

*Reeves v. Sanderson Plumbing Prods., Inc.*,
530 U.S. 133 (2000) ................................................................................................ 14, 29

*Shipman v. Nat'l R.R. Passenger Corp. (AMTRAK)*,
241 F. Supp. 3d 114 (D.D.C. 2017) ............................................................................. 15

*Sierra v. Hayden*,
No. 16 Civ. 1804 (RC), 2019 WL 3802937 (Aug. 13, 2019) ...................................... 42

*Small v. Office of Congressman Henry Cuellar*,
485 F. Supp. 3d 275 (D.D.C. 2020) ................................................................. 16, 17, 18, 19

*Tech 7 Sys., Inc. v. Vacation Acquisition, LLC*,
594 F. Supp. 2d 76 (D.D.C. 2009) ............................................................................... 31

*United States v. Philip Morris USA, Inc.*,
327 F. Supp. 2d 8 ......................................................................................................... 31

*Univ. of Texas Southwestern Med. Ctr. v. Nassar*,
    570 U.S. 338 (2013) ................................................................................................ 20, 21

*Uzoukwu v. Metro. Washington Council of Governments*,
    27 F. Supp. 3d 62 (D.D.C. 2014) ................................................................................ 32

*Vassar v. Shulkin*,
    280 F. Supp. 3d 9 (D.D.C. 2017) .......................................................................... 16, 26

*Walker v. Johnson*,
    798 F. 3d 1085 (D.C. Cir. 2015) ................................................................................ 16

*William Paterson Coll. of N.J.*,
    260 F. 3d 265 (3d Cir. 2001) ...................................................................................... 43

*Yazzie v. Nat'l Org. for Women*,
    712 F. Supp. 3d 56 (D.D.C. 2024) .......................................................................... 24, 25

## Statutes

28 U.S.C.A. § 1658(a) .................................................................................................. 32

42 U.S.C. 2000e .............................................................................................. 14, 27, 33

42 U.S.C. § 1981 ........................................................................................................... 15

D.C. Code § 2-1402.61 .................................................................................................. 15

## Rules

Fed. R. Civ. P. 56 ..................................................................................................... 1, 14

Plaintiff Gita F. Sankano respectfully submits this memorandum of law in support of her opposition to the Motion for Summary Judgement (the "Motion") pursuant to Rule 56 of the Federal Rules of Civil Procedure filed by Defendants Troutman Pepper Hamilton Sanders LLP ("Troutman Pepper" or the "Firm") and Brian Iwashyna (collectively, "Defendants").

## PRELIMINARY STATEMENT

Plaintiff, a former associate in Troutman Pepper's Multifamily Housing ("MFH") Practice Group, consistently hit her marks year after year during her tenure at the Firm. Indeed, each year she worked at Troutman Pepper, Plaintiff's performance evaluations were overwhelmingly positive, and she was objectively (numerically) rated "above average." Plaintiff's above par performance, however, did not immunize her from the Firm's *modus operandi* of discriminating against Black female attorneys. Indeed, Plaintiff repeatedly found herself on the receiving end of racially discriminatory and hostile treatment from white MFH Partners.

As a first-year associate at Pepper Hamilton LLP ("Pepper Hamilton"), Plaintiff worked with Christine Waldman Carmody, who inappropriately, and in contravention of normal protocol, required Plaintiff to send her (Ms. Carmody) draft time entries of Plaintiff's billable hours before they could be input into the timekeeping system (the "System"). Ms. Carmody would then manipulate the hours, to Plaintiff's detriment, so that the time reflected in the System was not an accurate representation of the time Plaintiff actually worked. Notably, Ms. Carmody did not have the same requirements of the white male first-year associates who previously worked for her. Once Plaintiff stood up for herself and started inputting her time into the System the same as every other non-Black associate, Ms. Carmody retaliated against her and stopped giving her work. Plaintiff complained about the retaliation and was offered no help – she was simply told to wait for the impending merger of Pepper Hamilton and Troutman Sanders LLP ("Troutman Sanders").

1

In July 2020, after the merger took place, Plaintiff optimistically thought that she could start anew and make up for the year that she lost with Ms. Carmody.  Plaintiff's optimism, however, was dismantled by the Firm's Partners.  At Troutman Pepper, Plaintiff's basic competency and aptitude were repeatedly called into question.  Similarly, it was assumed that Plaintiff did not understand basic functions required for her role and when Plaintiff did offer her substantive knowledge on a topic, she was wrongly assumed to be incorrect and would have to defend herself.  Even if someone else made a mistake on one of Plaintiff's deals, she would be the subject of ire.  Plaintiff raised concerns about her treatment and when her concerns were brought to the Practice Group leader, Mr. Iwashyna, not only did he not escalate those concerns to Human Resources ("HR") as is his obligation, but he minimized and "laughed off" the concerns.  There came a point, on August 3, 2023, where Plaintiff had enough of being consistently beaten down and made to defend work product and knowledge.  This time, Matthew Bowsher (Partner), made clear that he was attacking Plaintiff's aptitude as a human being – in his own words, his hostility had "nothing to do," with Plaintiff's "training," or "understanding of multifamily transactional law," but, instead, with the fabric of who she is – a Black woman.

Plaintiff complained about Mr. Bowsher's discriminatory conduct to several Partners, yet, once again, nobody escalated her concerns, and Plaintiff was left to fend for herself and complain to HR.  Within days, the Firm began efforts to push Plaintiff out of the Firm, and once she declared that she would not be pushed out, Defendants actively solicited negative criticisms of Plaintiff – and only Plaintiff – to manufacture performance issues.  While the retaliatory plan to get rid of her was taking shape behind closed doors, Plaintiff was discussing a "gameplan" to become Partner one day with senior attorneys, who lauded her performance and encouraged her.  Within months, however, Plaintiff was terminated for purported performance reasons.

Defendants seek summary judgment dismissing all of Plaintiff's claims. In support of their Motion, Defendants minimize the discriminatory treatment suffered by Plaintiff and argue that Plaintiff deserved to be unlawfully terminated. Try as they may to make it seem as though this is an open-and-shut case of poor performance, Defendants' argument simply does not hold up against the evidentiary record which establishes that despite the discriminatory conditions that plagued Plaintiff's tenure, she continued to put her best foot forward – and Defendants, *according to their own documents and testimony*, viewed her as a valuable attorney with a future at the Firm – until she engaged in protected activity, at which point she was promptly terminated. Plaintiff worked hard to be at the Firm and deserved a workplace that was not hostile to her. Yet, Defendants chose (as they historically have) to stand behind discriminatory and retaliatory conduct at the expense of its Black, female attorneys. Accordingly, Plaintiff respectfully submits that the record is rife with contested issues and questions of fact, intent, credibility such that dismissal of Plaintiff's claims is improper, and Defendants' motion must be denied in its entirety.

## STATEMENT OF FACTS

I. **PLAINTIFF JOINS PEPPER HAMILTON AS THE ONLY BLACK ASSOCIATE IN ITS D.C. OFFICE AND GETS HER HOURS STOLEN**

After graduating from law school, working for a boutique real estate law firm, and completing a year-long appellate clerkship, Plaintiff began her employment at Pepper Hamilton in August 2019. ¶¶ 193-95, 197.[1] She was hired as an associate in the Financial Services Group in the Washington, D.C. office to support Ms. Carmody, a Partner. ¶¶ 197-98. Plaintiff was the only Black associate in the Pepper Hamilton D.C. office. ¶ 199. Ms. Carmody insisted on reviewing

---

[1] Unless otherwise stated, "¶__" citations refer to Plaintiff's Response to Defendants' Rule 56.1 Statement of Undisputed Material Facts and Plaintiff's Statement of Additional Material Facts.

and cutting Plaintiff's time entries *prior to them being entered into the System*.  ¶ 200.  Ms. Carmody never insisted on the same timekeeping and cutting review from her other associates, like Randall Hurlburt and Blair Schiff, both white men.  ¶¶ 201, 310.  Literally every one of Ms. Carmody's peers understood this to be not only incorrect, but a way of "stealing" Plaintiff's hours – to Plaintiff's significant detriment.  ¶¶ 22, 205-208, 212, 217.

At the end of 2019, Plaintiff spoke to Ms. Carmody about the fact that she had "virtually no hours" in the System, even though Plaintiff was "really busy" and "working [her] tail off."  ¶ 202.  But Ms. Carmody told Plaintiff not to worry about her hours.  ¶ 203.  In April 2020, Audrey Wisotsky ("Ms. Wisotsky"), another Partner, called Plaintiff to discuss her mid-year evaluation.  ¶ 204.  During the call, Plaintiff was told that she had a "great evaluation despite [her] hours, which was the only issue[,]" and then Ms. Wisotsky instructed Plaintiff to begin entering her time into the System herself on a daily basis, making sure to record work performed for clients to the client-matter number.  ¶¶ 205-06.  Ms. Wisotsky notified Ms. Carmody of her instruction to Plaintiff.  ¶ 207.  Henry Liu, Managing Partner, expressed that Ms. Carmody "just need[ed] to follow normal protocol" as it pertained to Plaintiff's hours.  ¶ 311.  Further, on April 26, 2020, Plaintiff emailed Ms. Carmody herself and informed her of Ms. Wisotsky's instructions.  ¶ 209.  That same day, Ms. Carmody responded that she *still* needed to see Plaintiff's time before it went into the system.  ¶ 210.  Plaintiff, unsure of how to handle these competing instructions, reached out to Kassem Lucas ("Mr. Lucas"), a Partner, and Ms. Wisotsky for guidance.  ¶¶ 212-13.  Mr. Lucas stated he would speak to Ms. Wisotsky, and Ms. Wisotsky said she would handle the matter.  ¶¶ 212-213.

After Plaintiff complained to Ms. Wisotsky about Ms. Carmody's discriminatory mismanagement of Plaintiff's time entries, Plaintiff's work dried up drastically.  ¶ 214.  In May 2020, Plaintiff further complained to Ms. Wisotsky that "all of a sudden," she was not getting work

4

from Ms. Carmody and that this was "not normal."  ¶ 215.  Ms. Wisotsky responded by telling Plaintiff to "hold tight" for the imminent merger between Pepper Hamilton and Troutman Sanders. ¶ 216.

In July 2020, Pepper Hamilton and Troutman Sanders merged, forming Troutman Pepper. ¶ 218.  Due to her poor experience working with Ms. Carmody, Plaintiff spoke to Blair Schiff ("Mr. Schiff") about opportunities to join the MFH Practice Group now that the firms had merged. ¶ 219.  Mr. Schiff then reached out to Brian Iwashyna, the MFH Practice Group leader, and copied Mr. Liu.  ¶ 220.  Mr. Iwashyna stated that she could begin training to join the Group "ASAP."  ¶ 221.  After the merger, Plaintiff remained the only Black female attorney in the MFH Practice Group in the Washington, D.C. office.  ¶ 223.

## II.   PLAINTIFF'S OVERWHELMINGLY POSITIVE PERFORMANCE OVER THE COURSE OF HER TENURE

Plaintiff's 2020 performance evaluation was overwhelmingly positive.  ¶ 228.  She was rated "exceptional", "strong", and "good" by her evaluators in all categories, and every evaluator said they would work with her again.  Id.  Her evaluators said that she was "a quick learner . . . who exceeded expectations at every turn . . . [with] great enthusiasm for the work."  Id.  Plaintiff was told by Mr. Schiff that "after a rough start to not fault of hers" *i.e.,* the result of Ms. Carmody's discriminatory practices, "she turned the year around and continues to grow as she learns the practice."  ¶ 230.  Plaintiff's 2021 evaluation was also overwhelmingly positive, and she received a discretionary bonus in recognition of her "significant contributions during 2021."  ¶¶ 231-32. Her evaluators said that she was "eager to learn, responsive, an absolute pleasure to work with, and [someone who] exceeds expectations often."  ¶ 231.  Plaintiff's 2022 review was likewise generally positive, and in her evaluation meeting in February 2023, there was no mention of any performance issues.  ¶¶ 233-34.  Plaintiff also received a discretionary bonus for her work in 2022.

¶ 235.  In her 2022 review, she was overwhelmingly rated "stellar", "above-average", and "satisfactory" in all categories.  ¶ 233.  It was noted that Plaintiff was "a super hard worker", "extremely helpful", and a "go to associate."  Id.

### III.    PLAINTIFF SUFFERS FURTHER DISCRMINATION

Plaintiff was singled out repeatedly by Matthew Bowsher (Partner), who discriminated against her by calling her intelligence and competency into question on numerous occasions.  In early 2022, Plaintiff was on a deal with Mr. Bowsher where the client wanted their "signature pages set up in a different manner" than usual, and Plaintiff formatted the pages according to the client's request. ¶ 142.  "Within minutes," Mr. Bowsher called Plaintiff and "started mansplaining . . . thinking [Plaintiff] didn't know what a notary was."  ¶ 143.  Plaintiff respectfully "let him finish" and told him "I know what a notary is, this is just the way the client wants the signature pages." Id.  Mr. Bowsher then hung up the call.  Id.

In spring 2022, Mr. Iwashyna (Partner and Practice Group leader) spoke to Whitney Loughran ("Ms. Loughran") – who worked very closely with Plaintiff – about Plaintiff's performance feedback.  ¶¶ 292-94, 304.  Ms. Loughran assumed that Mr. Iwashyna was speaking about Mr. Bowsher's performance feedback of Plaintiff, and asked Mr. Iwashyna if Mr. Bowsher would have taken the same approach if the associate in question was a white male.  ¶¶ 304-06.  Mr. Iwashyna took no remedial action and immediately replied, "that doesn't mean that Matt [Bowsher] is racist," despite the fact that treating someone different because of their race is, of course, racist.  ¶ 306.

Also in spring 2022, Plaintiff found herself on another deal with Mr. Bowsher.  While working together, Plaintiff sent Mr. Bowsher an email stating that she had no comments on an opinion letter sent by opposing counsel.  ¶ 150.  Mr. Bowsher condescendingly asked her, "out of

the year that you've been closing deals with us, have you ever seen this language before," to which she responded, deferring to the Partner, that she had not.  ¶ 151-52.  When Plaintiff sent comments back to opposing counsel, they informed her that Mr. Bowsher had recently accepted "the exact same language" that he had deemed unacceptable just "a week prior[.]"  Id.  Plaintiff informed Mr. Bowsher and asked how they should proceed.  Id.; Ex. 34.[2]  Mr. Bowsher responded to opposing counsel, blaming the "mistake" on another Black attorney, Ari Ebi.  Id.

Thereafter, on July 31, 2023, Plaintiff sent an email to the MFH New Matters team, instructing them to open a new matter with the matter responsible credit split as: "Kelly Mufarrige (30%) / Matt Bowsher (70%)."  ¶ 240.  The MFH New Matters team incorrectly gave Mr. Bowsher 100% of the matter responsible credit, and Plaintiff had to follow up multiple times to get the credit corrected.  ¶¶ 241-42.  At one point, Mr. Bowsher emailed Plaintiff and told her, "you are confused.  Kelly is not to be the sole 100% matter responsible attorney.  Per your original request, and per the other matters you've previously opened for me and Kelly, it should be 30% Kelly [Mufarrige] and 70% Matt [Bowsher]."  ¶ 243.  Plaintiff responded that she thought she had been clear.  ¶ 244.  Mr. Bowsher replied on August 3, 2023, with an email that was condescending, inappropriate and seething with racial animus.  ¶¶ 245, 251-52.  He insulted Plaintiff's aptitude by saying, *inter alia*, "This is very basic, elementary communication . . . This has nothing to do with training or understanding of multifamily transactional law, this is daily required functioning".  ¶ 245.  Plaintiff was appalled and wrote back, in part, "I worked hard to be here and I deserve to be here like every other associate."  ¶ 246.

---

[2]    Unless otherwise stated, "Ex. __" citations refer to Exhibits attached to the Declaration of Michael J. Willemin, dated March 26, 2025 and filed concurrently with this memorandum.

## IV.    PLAINTIFF ENGAGES IN PROTECTED ACTIVITY

Plaintiff promptly forwarded Mr. Bowsher's email to several Partners, including the Practice Group leader Mr. Iwashyna, as well as other attorneys at the Firm, saying that she "had enough" of Mr. Bowsher's discriminatory treatment towards her.  ¶¶ 247, 249-52.  Mr. Iwashyna never responded to Plaintiff's email nor did he ever speak to her about this matter.  ¶ 248.  Lindsey Crawford ("Ms. Crawford") encouraged Plaintiff to go to Human Resources ("HR") and told Plaintiff that the email was "disrespectful", "rude", and that "You don't talk to people like that." ¶ 173.    Mr. Schiff called it "an asshole email[.]"   Id.   Ms. Mufarrige said the email was "inappropriate."  ¶ 174.  Dameon Rivers ("Mr. Rivers") told Plaintiff that "he didn't want to even see the email, because if he saw the email, he was going to get upset."  ¶¶ 173, 256.  Ms. Loughran agreed with Plaintiff that the email was "racist."  ¶ 174.  Plaintiff's Troutman Pepper career coach also said the email "was racist."  Id.

Given the inadequate response to her concerns, days later, on August 10, 2023, Plaintiff filed a formal complaint with Denise Johnson ("Ms. Johnson") in HR regarding Mr. Bowsher's discriminatory treatment.  ¶ 253.  Plaintiff told Ms. Johnson that she knew that Mr. Bowsher did not speak to her colleagues in a similar way and that she (Plaintiff) felt targeted as the only Black woman in the D.C. MFH Practice Group.  ¶ 254.  Shortly thereafter, Mr. Rivers, a Partner in the D.C. office, came to Plaintiff's office and told her that if he were her, he would want to leave the Firm due to Mr. Bowsher's email.  ¶¶ 255-56.  Plaintiff told him that she was not going to let Mr. Bowsher push her out of the Firm, and he responded that "conversations [were] being had," a clear indication that just days after she formally complained, Troutman Pepper began to contemplate exiting Plaintiff from the Firm.  ¶ 257.

8

**V.    THE FIRM UNLAWFULLY TERMINATES PLAINTIFF'S EMPLOYMENT MERE WEEKS AFTER IT CONCLUDES A PERFUNCTORY INVESTIGATION**

Nearly two weeks after Plaintiff complained to HR regarding Mr. Bowsher's discriminatory conduct, on August 23, 2023, Ms. Johnson told Plaintiff that the Firm was going to investigate Plaintiff's complaint.  ¶ 259.  On August 25, 2023, Plaintiff met with Kalle Covert and Mary Cabell Sulc.  ¶ 260.  During this meeting, and for the first time, Ms. Covert and Ms. Sulc mentioned that Plaintiff's 2022 performance evaluation was "mixed[.]"  During this meeting, Plaintiff complained that she was not receiving sufficient training in the D.C. office and, rather than provide Plaintiff with resources or training opportunities in the office where she was hired to work, Ms. Covert responded that Plaintiff should visit the Richmond office – a multi-hour drive one-way – more regularly to receive training.  ¶¶ 260-62.

Also around this time, Plaintiff expressed her desire to become a Partner with multiple Partners and senior attorneys, all of whom encouraged her to do so – below are just a few examples of the praise and encouragement Plaintiff received:

- Plaintiff reached out to Peter Strup ("Mr. Strup") and expressed her interest in becoming a Partner and Mr. Strup gave Plaintiff tips on how to do so. During this conversation, Plaintiff mentioned to Mr. Strup that in her review, Mr. Bowsher said she did not have a formal understanding of the practice – Mr. Strup told Plaintiff to "prove the haters wrong."

- Plaintiff spoke with Jennifer Bojorquez to discuss her desire to make partner.  In response, Ms. Bojorquez mentioned developing a game plan. Ms. Bojorquez did not discuss any purported poor performance of Plaintiff.

- On or around August 28, 2023, Plaintiff spoke to Ms. Crawford regarding her desire to make partner.  In response, Ms. Crawford told Plaintiff that "she could see her as a Partner."

¶¶ 263-65.

In late October 2023 – 77 days after Plaintiff engaged in protected activity – Ms. Johnson (HR) reached out to discuss the Firm's findings based on its purported investigation.  ¶ 266.  In

9

connection with the investigation, the Firm created a Formal Complaint Investigation Report wherein it was concluded that the investigator did not find evidence of discriminatory behavior, actions creating a hostile work environment, or retaliatory actions. ¶ 267. The Report recommended training and coaching for Mr. Bowsher, but the Firm never enforced this recommendation – no one at the Firm even so much as suggested to Mr. Bowsher that he should undergo any training or counseling. ¶¶ 268-69.

Within weeks of the Firm standing behind Mr. Bowsher's discriminatory conduct, on November 29, 2023, Plaintiff received an invitation for a meeting with Ms. Covert, Mr. Schiff, and Mr. Tucker for 1:30 p.m. that same day. ¶ 270. During this meeting, Plaintiff was informed that the Firm was terminating her employment for purported performance reasons. ¶ 271. Before her termination, Plaintiff was not placed on a Corrective Action Plan or a Performance Improvement Plan. ¶ 272. During the meeting Mr. Schiff began reading from prepared notes, and specifically cited to Plaintiff's 2023 performance review. However, the Firm had not even released the 2023 performance evaluation to Plaintiff at that point and, more to the point, when the 2023 performance evaluation was provided it demonstrated that Plaintiff, on average, rated *higher* than "meeting expectations." ¶ 127. Clearly having no legitimate springboard to terminate Plaintiff for performance reasons, the Firm manufactured its basis. To this point, ***after*** Ms. Crawford had already submitted her performance evaluation for 2023, Mr. Schiff reached out to Ms. Crawford and specifically asked her for negative feedback about Plaintiff – Mr. Schiff did not do so for any other associate, just Plaintiff. ¶ 274.

Nevertheless, Plaintiff's termination came as a surprise not only to herself but also to those with whom she worked closely. Ms. Crawford was "blindsided" by Plaintiff's termination and did not observe anything with Plaintiff's performance that warranted Plaintiff's termination. ¶ 319.

10

Similarly, Whitney Loughran, a senior attorney and now-Partner, who staffed Plaintiff on a majority of her deals, did not believe Plaintiff was underperforming such that Plaintiff was at risk for termination. ¶¶ 294-295. Incredibly, even though Ms. Sankano did most of her work for Ms. Loughran, the latter was not even consulted in connection with the termination decision, which is further evidence of the Firm's disregard for Black lawyers. ¶ 275. Nevertheless, after Plaintiff was discriminated against and complained to HR, she was cut loose expeditiously.

The Firm's position at her termination is a marked shift from Plaintiff's performance evaluations in the months that preceded her protected activity, and, as noted, was even inconsistent with the later-provided 2023 review. Indeed, in February 2023, Plaintiff received her 2022 performance evaluation in a meeting with Mr. Schiff and Nora Nickel ("Ms. Nickel"). ¶ 234. In that meeting, "there was no mention of any performance issues." Id. Months later, in June 2023, the MFH Partners attended a meeting to discuss the general performance of MFH Practice Group associates ("the June 2023 Meeting"). ¶ 236. After this meeting, a written memorialization was created and circulated to those who attended. ¶ 237. In the memorialization, Plaintiff was listed as a "[p]otential alternate track candidate" and it was stated that Ms. Nickel should speak to Plaintiff about coaching as an "**initial** step." ¶ 238 (emphasis added). An "alternate track candidate" is someone with the potential to be a "career attorney," at the Firm which is a non-Partner track attorney position for "someone who is performing at their level and performing appropriately." ¶ 239. Other MFH associates were put on a Performance Improvement Plan ("PIP") or referred to and provided coaching. ¶ 237. Prior to her discrimination complaint, Plaintiff, at worst, was in line for a career attorney position, a PIP, or coaching. At best, she remained on a Partner track. Promptly after her complaint, however, Plaintiff was fired.

11

In no uncertain terms, Plaintiff was unceremoniously terminated because she was the victim of discrimination and had the courage to protest the unlawful treatment – terminable offenses at Troutman Pepper.

## VI. DEFENDANTS' LONG STANDING PATTERN AND PRACTICE OF DISCRIMINATING AGAINST BLACK WOMEN

The Court need not take just Plaintiff's word (although that is enough on its own) regarding the Defendant's unlawful conduct toward Black women, as the record contains several instances of discrimination toward Black female attorneys.

First, Brittney Williams ("Ms. Williams") worked as an attorney at Troutman Sanders from September 2018 to December 2019 as an associate in the Firm's MFH Practice Group. ¶ 277. Ms. Williams is a Black woman. ¶ 279. At the same time that Ms. Williams started, so did another associate – Katie Love, a white woman. ¶¶ 278-279. Only a few months later, Austin Sargent, a white man, also joined as an associate. Id. Over the course of her first few months, Ms. Williams's main source of work was second attorney reviews ("SARs"), while Ms. Love and Mr. Sargent were provided more substantive work that gave them opportunities to grow and develop as attorneys. ¶ 280. Ms. Williams confided in Ms. Loughran and Ms. Smith, two Black female senior attorneys, and shared her feelings that it was unfair that her white colleagues received more opportunities and substantive work than she did. ¶ 281. After several months of this, Ms. Williams decided to raise her concerns to Mr. Iwashyna. ¶ 282. She told him that she felt that her race played a role in the limited opportunities she received. ¶ 283. Specifically, she said, "the partners are giving work to people who look like them" and that are "culturally the same as them." Id. Mr. Iwashyna was then on notice that the mostly white group of Partners in his Practice Group were giving work to associates based on race. ¶ 284. Mr. Iwashyna's reaction to this clear complaint of discrimination was abhorrent. Indeed, he did not act to address Ms. Williams's concerns; instead,

he responded to her complaint of race-based disparate treatment by saying, "that's how the real-world works." ¶ 285.  Mr. Iwashyna did not ever escalate her complaint or encourage her to reach out to HR.  ¶ 286.  Ms. Williams felt like she had no choice but to leave the Firm, and within weeks of her conversation with Mr. Iwashyna, she resigned.  ¶ 287.

Second, ███████ worked at the Firm's Atlanta office for two years.  ¶ 307.  She left in August 2023 as part of a "mass exodus of Black associates."  Id. ███████ has stated that Troutman Pepper "has a serious problem with the way they handle their black associates, specifically their black women associates."  ¶ 308.

Third, Whitney Loughran, a Black woman, worked at Troutman Sanders from 2015 through the merger in 2020.  ¶ 288-89.  She continued to work at Troutman Pepper post-merger and, as of January 1, 2024, is currently a Partner in the MFH Practice Group.  ¶ 290.  Ms. Loughran worked closely with Plaintiff from 2020 to 2023, and staffed Plaintiff on the majority of her deals. ¶ 291-93.  By 2023, most of Plaintiff's work came from Ms. Loughran.  ¶ 294.

Ms. Loughran went on maternity leave several times over the course of her tenure at Troutman Pepper – in 2020, 2021 and 2023.  ¶ 298.  In 2021, Mr. Bowsher made reference to Ms. Loughran's pregnancy before asking her about a deal they were working on together.  ¶ 296. Shortly thereafter, Ms. Loughran told Mr. Iwashyna that she no longer wanted to work with Mr. Bowsher anymore.  ¶ 297.  The following year, Ms. Loughran did not receive a bonus for her work in 2021.  ¶ 299.  When she found out that she would receive no bonus that year, Mr. Iwashyna explained to her that bonuses are for people who went "above and beyond," and Ms. Loughran had not gone above and beyond.  ¶ 300.  Ms. Loughran complained to Mr. Iwashyna that she was being punished for being pregnant and having children.  ¶ 301.  She asked Mr. Iwashyna what she could have done differently to receive a bonus, and he replied, "nothing."  ¶ 302.  No one from HR

ever reached out to Ms. Loughran about her complaint to Mr. Iwashyna of disparate treatment due to her pregnancy. ¶ 303. Put simply, it is a rigged and losing game for the Black, female attorneys at the Firm.

## ARGUMENT

### I.     STANDARD OF REVIEW

Under Fed. R. Civ. P. 56(c), summary judgment is appropriate only if "there is no genuine issue as to any material fact." Greene v. Dalton, 164 F.3d 671, 674 (D.C. Cir. 1999). When deciding a motion for summary judgment, the court must "assume the truth of all statements proffered by the party opposing summary judgment" and "construe all evidence in favor of the non-moving party." Banks v. D.C., 377 F.Supp.2d 85, 88 (D.D.C. 2005). Additionally, the court also "may not make credibility determinations or weigh the evidence." Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000).

Indeed, it is well-settled that when a case "hangs largely on issues of motivation, intent and good faith" the matter is "peculiarly not susceptible to resolution by summary judgment." Miller v. Saxbe, 403 F.Supp. 1314, 1316 (D.D.C. 1975). To this point, affidavits which assert "good faith or the lack thereof," for example, "do not establish the absence of a genuine issue of material fact such that summary judgment would be appropriate" and a "fuller inquiry must be made under adversary conditions, often in the light of numerous facts which may or may not create a pattern from which the jury should be allowed to draw ultimate inferences." Id.

### II.     PLAINTIFF'S RETALIATION CLAIMS MUST BE RESOLVED BY A JURY

#### A.     The Retaliation Suffered by Plaintiff is Plainly Actionable

Title VII of the Civil Rights Act of 1964 ("Title VII") prohibits employers from retaliating against employees who engage in protected activity. 42 U.S.C. 2000e-3(a). Section 1981 of the

14

Civil Rights Act of 1886 ("Section 1981") protects the equal right of all persons to make and enforce contracts without respect to race.  42 U.S.C. § 1981.  In 2008, the United States Supreme Court ruled that Section 1981 encompasses retaliation claims as well.  CBOCS West, Inc. v. Humphries, 553 U.S. 442, 446 (2008).  Likewise, the Washington, D.C. Human Rights Act ("DCHRA") makes it unlawful for an employer to "coerce, threaten retaliate against or interfere with any person in the exercise or enjoyment of" protected activity.  D.C. Code § 2-1402.61.  To make a retaliation claim under all three statutes, Plaintiff must show "(1) that she engaged in protected activity; (2) she suffered an adverse employment action; and (3) there is a causal connection between the two."  Harris v. Trustees of University of District of Columbia, 567 F.Supp.3d 131, 144 (D.D.C. 2021); Shipman v. Nat'l R.R. Passenger Corp. (AMTRAK), 241 F.Supp.3d 114, 121 (D.D.C. 2017).

However, at the summary judgment stage, this Court must proceed "to the ultimate question: whether the employee has produced enough evidence for a reasonably jury to find that the employer's explanation was not the actual basis for its actions and that retaliation was the real reason."  Brady v. Off. of Sergeant at Arms, 520 F.3d 490, 494 (D.C. Cir. 2008).  Nevertheless, courts routinely find that the issue of whether an employer had "such a retaliatory motive is a question of fact for the jury (or the judge in a non-jury trial) and, like other types of claims in which motive or intent is in issue, is not well suited to disposition on a motion for summary judgment."  Propp v. Counterpart Int'l, 39 A.3d 856, 870-71 (D.C. 2012).

In their Motion, Defendants provide plainly pretextual explanations – mostly shirking the blame to Plaintiff – for Defendants' unlawful retaliation.  However, the record evidence overwhelmingly establishes that Defendants' proffered reasons for Plaintiff's termination are

15

pretextual and further demonstrates that once Plaintiff had the courage to complain about discrimination in her workplace she was made to pay a heavy price for it.

**B.**   **There is Ample Record Evidence to Show that Plaintiff Was Terminated in Retaliation for Her Complaint Against Mr. Bowsher**

**i.**   **Plaintiff Was Terminated Because of Her Protected Activity**

Defendants do not dispute that Plaintiff engaged in protected activity in connection with her complaints about Mr. Bowsher's discriminatory behavior. As such, the only issue is whether there is sufficient evidence to demonstrate that Troutman Pepper's purported basis for her termination is a pretext for retaliation.

Troutman Pepper asserts that the reason for Plaintiff's termination was that she "was simply not performing at the level expected for a mid-level associate." ECF 27-2 ("Defs. Brf.") at 30. While it is undisputed that Mr. Iwashyna made the decision to terminate Plaintiff, there is a genuine issue of material fact regarding the intent and motivation behind his decision. Vassar v. Shulkin, 280 F.Supp.3d 9, 25 (D.D.C. 2017) (finding that the motivation of the decision-maker was a material fact issue precluding summary judgment). Despite Defendants' assertion otherwise, it is not just that Plaintiff disagrees with Mr. Iwashyna's assessment of her performance – it is that there is no evidence in the record that Plaintiff was performing poorly enough to be terminated and, consequently, a jury could determine that Troutman Pepper did not believe she was performing poorly enough to be terminated and was actually terminated her for retaliatory reasons. See Walker v. Johnson, 798 F.3d 1085, 1092 (D.C. Cir. 2015) (describing a number of ways an employee can support an inference that the employer's stated reason is pretextual). This is a fact determination that must be made by a jury. Small v. Office of Congressman Henry Cuellar, 485 F.Supp.3d 275, 281 (D.D.C. 2020) ("Was it reasonable for [the decision-maker] to believe that

16

[the employee] was performing poorly . . . ?  That is a matter for a fact-finder, not summary judgment.").

Mr. Iwashyna states that he consulted with multiple other MFH Partners about Plaintiff's performance and reviewed her performance evaluations before deciding to ultimately terminate her.  Defs. Brf. at 30.  However, the memorialization notes from the June 2023 meeting, held just weeks before Plaintiff's complaint, reflect that Troutman Pepper did not believe that Plaintiff's performance warranted termination or a PIP, and there is not a single performance evaluation for Plaintiff that Defendants can point to that at all suggests that Plaintiff's performance was unsatisfactory such that termination was warranted.  ¶¶ 238-39.  Indeed, just two months before Plaintiff complained regarding Mr. Bowsher's discriminatory conduct, in the memorialization of the June 2023 Meeting, Plaintiff was at worst an "alternate track candidate" – i.e, "someone who is performing at their level and performing appropriately" – and it further suggested that, for Plaintiff's continued progression, Ms. Nickel should speak to Plaintiff about "coaching as an **initial** step." Id. (emphasis added).  If Plaintiff had been the terrible performer that Defendants try to paint her as or subject to termination, it would have been noted in the memorialization of the June 2023 Meeting notes.  To be sure, another MFH associate, Sonali Gupta, was listed as "Candidate for a PIP" because she was "[n]ot grasping basic approach to practice skills **even after seeking coaching**." ¶ 237 (emphasis added).  Essentially, Plaintiff was not being considered for termination in June 2023.  ¶ 239.  To the contrary, the record demonstrates that Troutman Pepper saw her as a lawyer that would continue to be employed by, and grow, at the Firm.

Further, even Plaintiff's 2023 evaluation, which Defendants point to in an effort to justify their false narrative, was generally positive.  Plaintiff was rated "stellar", "above-average", and

17

"satisfactory" by the overwhelming majority of her evaluators in all categories.[3] ¶ 127.  Nothing in Plaintiff's 2023 performance evaluation would lead Plaintiff to believe that she was going to be terminated (had she been able to review it before her termination at all).  To this point, Whitney Loughran (now-Partner) staffed Plaintiff on a majority of her deals and worked closely with Plaintiff throughout her tenure at the Firm.  ¶¶ 292-94.  Ms. Loughran did not believe that Plaintiff's performance warranted termination in 2023.  ¶ 295.  Ms. Crawford, a Partner who worked extensively with Plaintiff, testified under oath that she did not observe any performance deficiencies warranting termination.  ¶ 319.

Moreover, three of the Partners with whom Mr. Iwashyna claims to have discussed Plaintiff's poor performance actually discussed with Plaintiff her path to Partnership shortly before she was terminated.  ¶¶ 263-65.  Indeed, in the weeks that followed Plaintiff's HR complaint, she spoke to several Partners at the Firm about her desire to one day become Partner herself.  Id.  She

---

[3]    Ms. Bojorquez stated, "[She] is eager to learn and be mentored. . . . [she] help[s] us stay on top of deals that had shorter than normal timelines. . . . Gita is very responsive and will jump on an assignment when received.  She is very reliable . . . She readily takes ownership of matters and acknowledges when a situation should have been handled differently."  Ex. 17.  Ms. Crawford stated, "Gita has marketed herself across the entire group and started working with other partners and senior associates.  She is always looking for ways to enhance her personal brand and that of the team and the firm. . . . Clients really like Gita as do I.  We would like to see her succeed[.]"  Id.  Ms. Loughran stated, "Gita is very responsive and communicative.  She takes ownership of her tasks and works hard to keep deals moving forward. . . . Gita is working very hard to advance within the practice group.  She is dependable, responsive and eager to learn.  She helps me tremendously in keeping deals on track.  A dedication to client care is very clear with Gita and it is important to her that our clients are taken care of. . . . I enjoy working with Gita."  Id.  Mr. Lucas stated, "Gita played a vital role in the Firm's DEI initiatives and should be recognized for her efforts."  Id.  Ms. Mufarrige stated, "Gita is a team player.  She's always willing to help out on deals.  She also does a good job checking in to see if there are matters she can assist on. . . . Gita is efficient and keeps deals moving forward. . . . I've never received negative feedback from a client on Gita's performance.  Clients enjoy working with Gita."  Id.  Ms. Nickel stated, "Gita is very responsive, proactive and always eager to assist. . . . Gita has a great attitude, and her responsiveness is always appreciated.  She always gets assignments back to me on time or early."  Id.  Ashante Smith stated, "Gita has routinely demonstrated a willingness to pitch in where needed. . . . Gita is extremely responsive and turns work product quickly. . . . She actively pursues work and will reach out anytime she has capacity to take on more.  She is also communicative and proactive on assignments and will offer to assist beyond the scope of the initial assignment – suggesting where she can be of use.  Gita has a thorough understanding of the team's practices and procedures as well as the mechanics of a deal.  Gita also has a collaborative attitude and seems to enjoy working with a number of attorneys across offices. . . . Gita has demonstrated a strong dedication to the team and the firm.  She actively seeks guidance and constructive feedback to learn and grow.  Gita has also demonstrated strong networking skills that are useful for client development."  Id.  Mr. Strup stated, "Gita's attitude and commitment to self-improvement is commendable.  She wants to succeed."  Id.  Mr. Tucker stated, "Gita has been very involved in the practice group and firm activities. . . . Gita is very responsive and on top of deals."  Id.

18

reached out to Peter Strup, who gave her tips and told her to "prove the haters wrong." ¶ 263.  She spoke to Jennifer Bojorquez, who mentioned developing a game plan for her success and notably did not mention any purported poor performance of Plaintiff.  ¶ 264.  She also reached out to Lindsey Crawford, who told Plaintiff that "she could see her as a Partner."  ¶ 265.  Clearly, Plaintiff's purported poor performance was not well-known or universally understood.

At the very least, it is clear that there is a genuine issue of material fact as to whether Plaintiff's performance was poor enough to warrant termination.  Small, 485 F.Supp. at 281 (holding that performance level is a question of fact for a jury).  And if Plaintiff's performance was not poor enough to warrant termination, then the proffered reasoning for her termination being merely "performance" is obviously pretextual.  See Brady, 520 F.3d at 493.  To be clear, this is not a case in which Plaintiff is relying on her own subjective view of her performance in an effort to defeat summary judgment.  Rather, the totality of the objective evidence, including testimony, statements and performance reviews, shows that Troutman Pepper never, at any point in time, believed that Plaintiff's performance warranted termination.  In fact, it is clear that the Firm was fully aware that Plaintiff's performance did not warrant termination given that after its Partners submitted 2023 performance feedback, Mr. Schiff went doubled-back to solicit negative feedback in an effort to justify a retaliatory termination.

### ii.    Plaintiff's Employment was Terminated in Retaliation for Her Complaints About Mr. Bowsher

In June 2023, Plaintiff was being considered for the "[p]otential alternate track[,]" which meant that she was "performing at [her] level and performing appropriately."  ¶¶ 238-39.  By November 2023, she had been terminated.  The only thing that changed in that short time span was that Plaintiff made a protected complaint regarding Mr. Bowsher's discriminatory treatment of

her. ¶ 253. Plaintiff had the courage to escalate her concerns to HR and it derailed her career from that point on until she was unceremoniously terminated.

In order to assert a retaliation claim under Title VII or Section 1981, Plaintiff must show that the desire to retaliate was the "but-for" cause of her termination. Univ. of Texas Southwestern Med. Ctr. v. Nassar, 570 U.S. 338, 339 (2013). Under the DCHRA, Plaintiff does not need to show that retaliation was the only reason for her termination, but rather she must show that her protected activity was a "substantial factor"[4] in her termination. Dist. of Columbia v. Bryant, 307 A.3d 443, 452 (D.C. 2024) (holding that an employee can "prevail in [her] DCHRA claim by proving that [the employer's] actions were motivated in substantial part by retaliatory reasons, even if they were motivated also by legitimate business reasons") (internal quotations omitted). Plaintiff easily meets both of these standards.

After Plaintiff engaged in protected action by filing her complaint against Mr. Bowsher, the retaliatory actions swiftly followed. Clark Cty. School Dist. v. Breeden, 532 U.S. 268, 273 (2001) (holding that temporal proximity can be used as evidence of causality to establish retaliation). On August 14, 2023, only four days after making her formal complaint, Plaintiff was visited by Mr. Rivers. ¶ 255. Mr. Rivers point-blank told Plaintiff that if he were her, he would want to leave the Firm. ¶¶ 255-56. Plaintiff responded that she was not going to let Mr. Bowsher push her out of the Firm, and Mr. Rivers responded that "conversations are being had." ¶ 257. Clearly, Mr. Rivers's urging Plaintiff to leave the Firm was a result of her complaint about Mr. Bowsher's discriminatory conduct, and his references to "conversations" a foreshadowing of the

---

[4]    Defendants misstate the standard in their Motion, arguing that Bryant requires a showing that the protected activity was a "motivating factor" for the adverse action. Defs. Brf. at 29. However, Bryant actually explains the small distinction between "motivating reason" and "substantial factor" and adopts the latter standard. Bryant, 307 A.3d at 454. Regardless, either standard is lesser than the "but-for" standard articulated in Nassar, and Plaintiff easily meets any standard applied in this case. Id. at 450-51.

20

retaliatory termination.  See Burton v. Donovan, 210 F.Supp.3d 203, (D.D.C. 2016) (denying summary judgment and holding that encouraging an employee to resign supports inference of retaliation).

In late October 2023, the Formal Complaint Investigation Report was completed and suggested training and coaching for Mr. Bowsher, although the Firm never even bothered to follow through on the recommendation.  ¶ 268-269.  Mere weeks later, Plaintiff was unceremoniously terminated with no prior warning or PIP.  ¶¶ 270-72.

For her Title VII and § 1981 claims, Plaintiff has shown that "but for" her protected complaint, she would not have been terminated.  See Nassar, 570 U.S. at 339.  This is shown because there is no evidence in the record that anyone "believed" that Plaintiff should be terminated for performance reasons until after August 10, 2023 when she filed her complaint against Mr. Bowsher.  To the contrary, at all times Plaintiff's reviews were objectively above meeting expectations and multiple Partners suggested that she was on a Partnership track.  At worst, she was meeting expectations and on the pathway to be a career attorney.  Plaintiff heard for the first time on August 23, 2023 that her 2022 performance evaluation was "mixed," even though her February 2023 meeting about that evaluation revealed no performance problems.  ¶¶ 234, 259.  When Plaintiff complained that there were no training opportunities for her, she was not provided any additional training but, instead, was instructed to make a multi-hour drive to the Richmond office to receive training.  ¶¶ 261-62.  Clearly, the Firm was desperately trying to get Plaintiff to leave on her own volition.  When she did not, she was terminated.

Defendants argue that Plaintiff cannot rely entirely on temporal proximity to establish her retaliation claims.  However, as described in great detail herein, Plaintiff does not rely entirely on temporal proximity.  Combined with the other evidence of pretext, the temporal proximity of just

21

four months between Plaintiff's complaint and her termination (plus the even closer proximity of just a single month between the completion of the Formal Complaint Investigation Report and her termination is strong evidence that there was a retaliatory motive behind Plaintiff's termination. Beard v. Preston, 576 F.Supp.2d 93, 105-06 (D.D.C. 2008) (denying summary judgment where there was a close temporal relationship between protected activity and retaliation, among other evidence).

As further evidence that Plaintiff's performance evaluation and comments from Partners were not enough to terminate her, Ms. Crawford testified that she was approached by Mr. Schiff after she had already submitted her performance evaluation for 2023 but before Plaintiff was terminated. ¶ 273. Mr. Schiff asked Ms. Crawford to identify concerns and negative feedback about Plaintiff's performance. ¶ 274. Mr. Schiff did not ask her for negative feedback about any other associate – just Plaintiff. Id. This supports the inference that in 2023 there was not enough negative feedback about Plaintiff to warrant her termination and that the Partners knew they had to manufacture performance issues to justify Plaintiff's unlawful termination. Without question, Plaintiff was terminated because she engaged in protected activity and Mr. Iwashyna's motivation in terminating Plaintiff was retaliatory.

It is obvious that, because Plaintiff meets the higher standard under Title VII and § 1981, she necessarily meets the lower "substantial factor" standard for her DCHRA claim. Bryant, 307 A.3d at 454. Even so, Plaintiff has shown that that the Firm's actions in terminating her were motivated in substantial part by retaliatory reasons. First, as discussed above, the Firm tried to push Plaintiff out, and when that did not work, they had no choice but to fire her in retaliation for making a protected complaint against a white Partner. It is clear from the record that a jury could reasonably determine that a substantial part of why Plaintiff was terminated was because of the

22

protected complaint she made against Mr. Bowsher. In short, Plaintiff's retaliatory termination claim must proceed to trial.

### C.    Plaintiff Was Earlier Retaliated Against By Ms. Carmody

In 2019 and the beginning of 2020 (pre-merger), Plaintiff was the only Black associate reporting to Ms. Carmody and the only Black attorney in Pepper Hamilton's entire Washington, D.C. office. ¶¶ 197-99. Ms. Carmody required Plaintiff to send Ms. Carmody draft time entries so that she (Ms. Carmody) could cut them down on the front end before they went into the System. This was not proper protocol at the Firm, nor did Ms. Carmody make any of the white first-year associates who worked for her in the past send her draft time entries before they were input in the System – her conduct was unique to Plaintiff. ¶ 206. Ms. Carmody was expressly told that her "approach" could have detrimental effects and "hurt" Plaintiff. ¶ 8. Ms. Wisotsky (Partner) instructed Plaintiff to enter her time directly into the System on a daily basis, and stated that if she performed work for a client, Plaintiff should record her time into the client-matter number. ¶ 206. Plaintiff attempted to do so but was blocked by Ms. Carmody. ¶¶ 37, 210; (Ms. Carmody emailing Plaintiff "do not finalize your time until I have reviewed it!!! T[h]ere is no point in my reviewing your time if you just enter what you first sent to me??? You need to wait for my comments, then enter that."). Plaintiff complained to Ms. Wisotsky again that the issue still had not been resolved, and Ms. Wisotsky told Plaintiff that she would "handle the matter." ¶ 213.

Immediately after, in late April to May 2020, after Plaintiff rang the alarm that Ms. Carmody would still not let her input her hours in the System, the work that Plaintiff received from Ms. Carmody completely dried up. ¶¶ 214-15; see also ¶ 28 ("[I]n May, [Ms. Carmody] just stopped giving me work. … and I emailed Audrey [Wisotsky] and told her like, Hey now all of a

sudden, I'm not getting work, this is not normal."). Clearly, Ms. Carmody wanted to punish Plaintiff for speaking out against her discriminatory conduct.

        **i.**        **A Jury Could Determine that Ms. Carmody Was Aware of Plaintiff's Protected Activity**

Plaintiff complained to Mr. Schiff and Ms. Wisotsky to complain about Ms. Carmody stealing her hours and blocking her from inputting her hours into the System because – in Plaintiff's view – she was a Black female associate. ¶¶ 322; see also ¶ 322 ("I did tell [Ms. Wisotsky] that I was being treated differently because I didn't look like anyone else at the office."); ¶ 18 ("So the only difference . . . is that number one, I'm a woman and I'm Black."); Id. ("I lost a whole year dealing with [Ms. Carmody about] something that had nothing to [do] with me, the only Black attorney there, and she was greedy and she stole [my hours] from me."); Id. ("She treated a Black associate differently from a white associate and knowing that that was setting me up for failure and it was definitely due to my race. It was definitely due to the fact – it was definitely discriminatory. She didn't do it to another associate at all."). These complaints were protected activity. "[A]ctivity is 'protected' for the purposes of a retaliation claim 'if it involves opposing alleged discriminatory treatment by the employer.'" Lemmons v. Georgetown Univ. Hosp., 431 F.Supp.2d 76, 91 (D.D.C. 2006) (quoting Coleman v. Potomac Elec. Power Co., 422 F.Supp.2d 209, 212-13 (D.D.C. 2006)); see also Yazzie v. Nat'l Org. for Women, 712 F.Supp.3d 56, 90 (D.D.C. 2024) (finding that complaints of racial discrimination are protected activity for the purposes of a § 1981 retaliation claim). Plaintiff alleges that Ms. Carmody treated her differently than her white colleagues and manipulated her hours based on a discriminatory animus, and she unambiguously reported this treatment to both Ms. Wisotsky and Mr. Schiff, and Mr.

Lucas, the Diversity Partner.[5]  Mr. Lucas told Plaintiff that he would speak to Ms. Wisotsky.  ¶ 212.

After receiving the complaint from both Plaintiff and from the Diversity Partner, Ms. Wisotsky was on notice that Plaintiff had clearly engaged in protected activity, and Ms. Wisotsky told Plaintiff that she would "handle the matter." ¶ 213.  Further, she promised Plaintiff, "Don't worry about it, you'll be protected." ¶ 28.  Defendants argue that Ms. Carmody was unaware that Plaintiff believed that her hours were being manipulated because of her race.  But this material fact is disputed – Ms. Carmody was aware that Plaintiff had raised "concerns" and the individuals who informed her about these concerns were well aware that it was related to Plaintiff's race.  ¶ 323.  Despite Ms. Wisotsky's assertion to the contrary in her declaration, Plaintiff testified that she told Ms. Wisotsky and Mr. Schiff that she was being treated differently because she was Black.  ¶ 322.  This in and of itself raises a genuine issue of material fact as to whether the Firm was on notice of the protected nature of Plaintiff's complaints, and such an issue can only be resolved by a jury.  Jones v. Bernake, 557 F.3d 670, 680 (D.C. Cir. 2009) (holding that a genuine issue of material fact as to whether the decision-maker had knowledge of the employee's protected activity when it took adverse action against him, precluding summary judgment on the retaliation claim).

**ii.**      **Ms. Carmody's Explanation for Cutting Plaintiff's Work Hours are Clearly Pretextual**

In Defendants' Motion, they devote a single sentence to Ms. Carmody's supposedly "legitimate, non-retaliatory reason" for cutting Plaintiff's work assignments so suddenly and drastically.  They argue that both the nature and workload level of Ms. Carmody's work changed

---

[5]      Plaintiff texted a friend on April 29, 2020: "I spoke to the diversity partner in confidence about my issue [with Ms. Carmody]. He was like hell nah you can't keep living like this." ¶ 324.  She texted another friend on April 30, 2020: "She's still cutting my hours after I told her I was instructed to enter them properly.  I had to reach out to the diversity partner he said this is not right . . . Also he said I can't continue to live like this because I'm 44% behind my yearly target goal." Id.

substantially due to the COVID-19 pandemic.  Defendants claim that there was less work all around (and particularly less remote work), and therefore less work for Plaintiff to do.  Yet, the record evidence negates this argument.  ¶ 325; see also ¶ 28 ("[D]uring COVID, the interest rates were really low [and] the real estate market was booming[.]"  As a result, Ms. Carmody's Practice Group was "extremely busy.").  Further, Plaintiff's text messages show that she frequently came into the office during COVID-19 to complete assignments for Ms. Carmody.  ¶ 326.

On May 15, 2020, Plaintiff reported that her workload had "completely changed" which was "strange because I am typically busy."  ¶ 325.  Only weeks earlier, Plaintiff had reached out yet again to Ms. Wisotsky and, for the first time, to Mr. Lucas to complain that Ms. Carmody was still manipulating Plaintiff's hours.  This temporal proximity between Plaintiff's protected activity and her workload drying up "drastically" shows that Ms. Carmody engaged in retaliation under Section 1981.  Harris, 567 F.Supp.3d at 149 (stating that while there is no "bright-line" rule for a temporal proximity inference, courts generally allow such an inference if the interval is less than three months).  While COVID-19 is a convenient excuse for Defendants, it is clearly pretextual.  There is ample record evidence that supports Plaintiff's argument that Ms. Carmody stopped giving Plaintiff work in retaliation for making protected complaints about racial discrimination.  See Harris, 567 F.Supp.3d at 144-45 (holding that "the employee [must have] produced enough evidence for a reasonable jury to find that the employer's explanation was not the actual basis for its actions and that retaliation was the real reason) (citing Brady, 520 F.3d at 493).  At the very least, there is a genuine issue of material fact as to Ms. Carmody's intent when she stopped giving Plaintiff work, and intent determinations must be made by a jury.  Vassar, 280 F.Supp.3d at 25 (finding that the motivation of the decision-maker was a material fact issue precluding summary judgment).

### III.   <u>PLAINTIFF'S DISCRIMINATION CLAIMS MUST BE RESOLVED BY A JURY</u>

#### A.   <u>Ms. Carmody's Discriminatory Conduct is Plainly Actionable</u>

Under Title VII, it is unlawful for an employer to "discriminate against any individual with respect to his . . . employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). For Plaintiff's discrimination claims pursuant to Title VII, § 1981, and the DCHRA,[6] in considering the Firm's motion for summary judgment, this Court need only "resolve one central question: Has the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee on the basis of race, color, religion, sex, or national origin?" <u>Brady</u>, 520 F.3d 490 at 494. As discussed further below, the evidence is sufficient such that a jury could find that the reasons proffered by Defendants to try to minimize Ms. Carmody's discriminatory conduct are pretextual.

#### i.   **There is Ample Record Evidence that Raises Triable Issues of Fact as to Whether Ms. Carmody Discriminated Against Plaintiff**

Defendants submit that because: (1) Plaintiff "was a new associate" who "did not have experience with billing and timekeeping practices"; (2) Ms. Carmody was responsible for "supervising Plaintiff's work"; and (3) because, again, Plaintiff was a "junior attorney," and thus "took longer to perform each task" that Plaintiff somehow deserved to have her hours stolen by

---

[6]   See <u>Carpenter v. Fed. Nat'l Mortg. Ass'n</u>, 165 F.3d 69, 72 (D.C. Cir. 1999) ("In interpreting [the DCHRA] the District of Columbia also follows [the Title VII] formula . . . ." (citing <u>Arthur Young & Co. v. Sutherland</u>, 631 A.2d 354, 361 (D.C. 1993))); <u>see also</u> <u>Lemmons v. Georgetown Univ. Hosp.</u>, 431 F.Supp.2d 76, 86 (D.D.C. 2006) ("[D]iscrimination claims under *both* the DCHRA and Section 1981 are evaluated using the same framework as claims arising under Title VII ....") (citing <u>Mungin v. Katten Muchin & Zavis</u>, 116 F.3d 1549, 1553 (D.C. Cir. 1997)) (emphasis added).

Ms. Carmody. Defs. Brf. at 13. However, as set forth below, each purported reason set forth by Defendants is easily disposed of.

First, Defendants repeated assertion that Plaintiff had no prior experience before joining the firm is flat-out false. Defendants are well aware that before joining Pepper Hamilton, Plaintiff worked at The Law Offices of Anthony Onwuanibe, a boutique law firm that primarily handles real estate transactions. ¶ 194. Surely, a small firm such as the one Plaintiff previously worked for also billed its clients for attorney time and kept records of that time – even if Plaintiff was not a practicing attorney at the time, she was certainly exposed to "billing and timekeeping practices." Ex. 59 at ¶ 3.

More importantly, Randall Hurlburt ("Mr. Hurlburt"), a white male who also worked for Ms. Carmody as a first-year associate, also was not a practicing attorney before joining Pepper Hamilton and yet he was not required to submit his billing to Ms. Carmody before it was entered in the System. ¶¶ 12, 201. Similarly, when Blair Schiff, a white male, worked for Ms. Carmody as a first-year associate, he was not required to send his time for her review before it was entered into the System. ¶ 310.

To somehow support the defunct (and offensive) proposition that Mr. Hurlburt was somehow more advanced in timekeeping than Plaintiff during their respective first years as practicing attorneys, Defendants rely on the self-serving declaration of Ms. Carmody to support Mr. Hurlburt's knowledge, aptitude, and experience. Dkt. No. 27-4. Her declaration does not even say how she learned about Mr. Hurlburt's purported familiarity with timekeeping and attorney billing. Indeed, Ms. Carmody makes a conclusory assertion regarding Mr. Hurlburt's prior experience and knowledge to try and excuse her discriminatory conduct and asks this Court to accept it as an undisputed fact. At best, Ms. Carmody's self-serving testimony would require an

impermissible credibility determination.  See Reeves, 530 U.S. at 150-51 (2000) (explaining that courts must avoid making "credibility determinations or weigh[ing] the evidence," since "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.") (internal quotations omitted).

Second, Defendants claim that Ms. Carmody contravening Pepper Hamilton's standard time keeping policies is somehow justified because Ms. Carmody claims that she was responsible for "supervising" Plaintiff.  As a preliminary matter, whether Ms. Carmody actually supervised Plaintiff is a question of fact and cannot be decided as a matter of law.  See Kindig v. Whole Foods Mkt. Grp., Inc., 930 F.Supp.2d 48, 54 (D.D.C. 2013) (noting that "questions of material fact that cannot be resolved at the summary judgment phase.").  And even if Ms. Carmody was Plaintiff's supervisor (she was not), that does not give her carte blanche regarding Plaintiff's employment.

While it is true that Plaintiff performed a bulk of her work in her first year for Ms. Carmody, Henry Liu – not Ms. Carmody – was the managing partner at Pepper Hamilton during the relevant timeframe.  ¶ 1.  It was also Mr. Liu who point-blank stated that Ms. Carmody "just need[ed] to follow normal protocol" at it pertained to Plaintiff.  ¶ 311.  Another Partner at Pepper Hamilton, Ms. Wisotsky, told Ms. Carmody "if [Plaintiff] is doing work on a client matter it should be billed to the client matter.  If you have to write off time then that is fine but it is not fair to [Plaintiff] to not have her bill client work."  ¶ 14.  These are just two examples of the numerous warnings Ms. Carmody received regarding her practices when it came to entering Plaintiff's time.  Whether or not Ms. Carmody was "supervising Plaintiff's work" as she claims in self-serving fashion, which is a question of fact, the record evidence expressly shows that Ms. Carmody uniquely deviated from "normal protocol" when it came to Plaintiff, the only Black attorney in the D.C. office, and

29

did not do so when "supervising" white associates. ¶ 311.  Literally none of Ms. Carmody's peers believed that what she was doing was appropriate or proper.

Third, Defendants' argument that Plaintiff was a "junior attorney," and thus "took longer to perform each task" is similarly unavailing.  As discussed above, Ms. Carmody's practice as it pertained to Plaintiff's timekeeping was a deviation from "normal protocol," regardless of whether Plaintiff was a first-year associate or not.  It simply cannot be overstated that Ms. Carmody never held the white male associates who worked for her to the same exacting standard as Plaintiff. Defendants did not submit an iota of record evidence which demonstrates how or why Mr. Hurlburt's experience as a law clerk made him more familiar with timekeeping than Plaintiff. Similarly, Defendants did not – because they cannot – point to a single reason as to why Mr. Schiff was allowed to submit his time without first sending it to Ms. Carmody to review and cut down. Defendants cannot escape the fact that Plaintiff, Mr. Hurlburt and Mr. Schiff all did work for Ms. Carmody as first-year associates, and it was only Plaintiff who had her time stolen to her detriment.

Fourth, notably absent from Defendants' expansive arguments regarding the pretextual explanations for Ms. Carmody's discriminatory conduct is **<u>any</u>** explanation as to how or why **<u>timekeeping</u>** and **<u>billing</u>**, of all things, was of such complexity or difficulty that Plaintiff was unable to enter her time the same as every other non-Black associate.  During her time working under Ms. Carmody, Plaintiff drafted "disbursement agreements," "use agreements" and "loan documents," for deals and closings, but was – according to Defendants – unable to enter her time because she was a junior associate.  ¶ 312.  Defendants' self-serving contentions regarding Plaintiff's timekeeping abilities simply do not add up against the record.  Frankly, Defendants have not asserted a single undisputed or credible reason that Plaintiff was treated unlike everyone else.

30

Where, as here, a determination needs to be made regarding Ms. Carmody's intent and motivation for subjecting Plaintiff to disparate treatment, "weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . on a motion for summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). Accordingly, Plaintiff's discrimination disparate-treatment claim should proceed to a jury.

### ii.    The Same-Actor Inference Does Not Absolve Defendants of Liability

Defendants also attempt to skirt liability by claiming that because Ms. Carmody knew Plaintiff's race when Plaintiff was hired that it "directly cuts against inferring a discriminatory motive." Defs. Brf. at 14-15. Again, Defendants improperly ask this Court to decide Ms. Carmody's "motive" as a matter of law. See Tech 7 Sys., Inc. v. Vacation Acquisition, LLC, 594 F.Supp.2d 76, 85 (D.D.C. 2009) ("It is well-established that it is inappropriate to resolve issues of credibility, motive, and intent on motions for summary judgment.") (internal quotations omitted); see also United States v. Philip Morris USA, Inc., 327 F.Supp.2d 8, 12 n. 5 (D.D.C. 2004) ("questions of credibility, motive, and intent . . . are ill-suited for summary judgment.").

It is well-settled that the "same-actor inference," is just that, an inference, which "cannot immunize [defendants] from liability for subsequent discrimination," and is not "alone sufficient to keep [a] case from the jury." Czekalski v. Peters, 475 F.3d 360, 369 (D.C. Cir. 2007). Accordingly, as Plaintiff has presented record evidence which disputes Ms. Carmody's purported reasons for discriminating against plaintiff, Defendants cannot purely rely on the "same-actor" inference in an effort to avoid liability.

Finally, Defendants concede that the "same-actor" inference, "is typically applied in the hiring and firing context" but nevertheless – without citing a single case in support – claim that it "clearly" applies to Ms. Carmody. Defs. Brf. at 16. However, the "same-actor" inference does

31

not preclude a finding of discrimination as a matter of law and the removal of the fact-finding function from the purview of the jury should not be made lightly.  Put simply, the "same-actor" inference does not apply here and is nothing but a red herring – Defendants have not provided record evidence nor case law to the contrary.

### iii.    Plaintiff's Claims That Ms. Carmody Discriminated and Retaliated Against Her in Violation of Section 1981 are not Time-Barred

Here, Plaintiff's claims alleging violations of Section 1981 is subject to a four-year statute of limitations.  See 28 U.S.C.A. § 1658(a); see also Uzoukwu v. Metro. Washington Council of Governments, 27 F.Supp.3d 62 (D.D.C. 2014) (finding that four-year federal default statute of limitations applied to employee's § 1981 claims).  Plaintiff filed the instant action on January 17, 2024, and, thus, every single instance of discriminatory or retaliatory conduct by Ms. Carmody that occurred in 2020 fall within the purview of Section 1981.  Defendants do not argue that Plaintiff's Section 1981 claim is time-barred and, therefore, summary judgment cannot be granted as to these claims.  Nevertheless, Plaintiff concedes that her disparate treatment and retaliation claims pursuant to Title VII and the DCHRA regarding Ms. Carmody are time-barred.

### B.    Whether Defendants Created a Hostile Work Environment is a Question of Fact That Should Be Resolved by a Jury

Defendants seek to subdivide Plaintiff's discrimination claims, however, hostile work environment claims are assessed on the basis of a "totality of circumstances," not piecemeal.[7] Cobb v. Del Toro, No. 20 Civ. 3015 (TSC), 2023 WL 6215037, at *8 (D.D.C. Sept. 25, 2023); see

---

[7]    "This Circuit has recognized that the same standards apply in evaluating a hostile environment claim under both Title VII and § 1981."  Hunter v. Ark Restaurants Corp., 3 F. Supp. 2d 9, 14 (D.D.C. 1998).  Similarly, "the District of Columbia Court of Appeals usually looks to Title VII as a source for interpreting the DCHRA."  Id.

32

also Dunn v. Infosys Ltd., No. 12 Civ. 3561 (YGR), 2012 WL 4761901, at *4 (N.D. Cal. Oct. 5, 2012) ("Whether the conduct was severe or pervasive enough to create a hostile or abusive working environment depends on the totality of the circumstances, and is ordinarily a question of fact."). Hostile work environment claims are "usually characterized by a series of events that cumulatively give rise to a claim, although each individual component might not be actionable on its own." Craig v. District of Columbia, 881 F.Supp.2d 26, 32 (D.D.C. 2012).  Indeed, a hostile work environment claim is composed of a series of separate acts that collectively constitute one "unlawful employment practice." 42 U.S.C. § 2000e-5(e)(1).

Here, Plaintiff is not alleging a hostile work environment solely on the basis of Mr. Bowsher's discriminatory conduct, but upon the full extent of the work environment she was subjected to for years.  Despite Defendants effort to minimize the hostile work environment Plaintiff endured at the hands of MFH Partners, the record is rife with contested issues and questions of fact, intent, and credibility that preclude summary judgment as to Plaintiff's hostile work environment claim.

> **i.      The Environment Created, Condoned, and Perpetuated by the MFH Partners was Undoubtedly Hostile and Offensive**

When Plaintiff began working with Mr. Bowsher, it was clear that Mr. Bowsher had a "preconceived notion that [Plaintiff] didn't know what [she] was doing" and it clearly showed in the way he spoke to and about her.  ¶ 159.

First, in early 2022, while working on a deal with Mr. Bowhser, Plaintiff instructed her assistant to split signature pages according to the client's preference.  "Within minutes" of Plaintiff's email, Mr. Bowsher called and assumed that Plaintiff "didn't know what a notary was," and began to explain to her the function of a notary.  ¶ 143.  Plaintiff respectfully "let him finish," his explanation, then she informed Mr. Bowsher that she knew what a notary was and that "this is

just the way the client wants the signature pages set up." Id.  Mr. Bowsher then ended the call and hung up on Plaintiff.  Id.  This fact is notably absent from Mr. Bowsher's declaration.  See Dkt. No. 27-9.  Plaintiff complained regarding Mr. Bowsher's condescending and offensive manner of speaking to her to Ms. Loughran.  Obviously alluding to Mr. Bowsher speaking to her in a degrading manner due to her race, Plaintiff told Ms. Loughran "it makes me wonder [Mr. Bowsher's] personal views" to which Ms. Loughran, a Black female herself, told Plaintiff "you know what it boils down to."  ¶ 313.  Plainly, it was apparent to the Black female attorneys in the MFH Practice Group that Mr. Bowsher treated Black attorneys with hostility and condescension.

Second, in Spring of 2022, Mr. Iwashyna (Partner and Practice Group Leader) spoke to Ms. Loughran – who staffed Plaintiff on a majority of her deals – regarding Plaintiff's performance and complaints that he had purportedly received.  ¶¶ 297, 308.  During this conversation, Ms. Loughran assumed that he was speaking about Mr. Bowsher and asked Mr. Iwashyna whether the person complaining had gone directly to Plaintiff with their feedback, which Ms. Loughran thought was more appropriate rather than going directly to Mr. Iwashyna.  ¶ 308.  Ms. Loughran felt as though if it was someone other than Plaintiff, i.e., a non-Black attorney, the procedure would have been different.  ¶ 309.  To illustrate this point, Ms. Loughran asked the question that if it was Austin Padgett, a white male, would Mr. Bowsher or another partner have gone directly to him versus going directly to the Practice Group leader.  Id.  With her illustration, Ms. Loughran "was alluding to the fact that Austin is a White male so he would have been afforded the opportunity to have the conversation directly versus having a discussion about him with a Practice Group leader."  ¶ 310.  Clearly understanding that Ms. Loughran was alluding to Plaintiff's race being a factor in Mr. Bowsher's conduct, Mr. Iwashyna responded, "that doesn't mean that Matt [Bowsher's] racist."  Id.

34

Third, around April or May of 2022, while working on a deal with Mr. Bowsher, Plaintiff sent an email to Mr. Bowsher stating that she had no comments on an opinion letter that opposing counsel had sent. ¶ 150. Mr. Bowsher responded to Plaintiff and condescendingly asked her, "out of the year that you've been closing deals with us, have you ever seen this language before," to which she responded "no." ¶¶ 151, 153. Plaintiff deferred to Mr. Bowsher – who has been a practicing attorney many more years than Plaintiff and was her superior on this deal – and incorporated his suggested comments and sent it to the opposing counsel. Id. In response, opposing counsel informed Plaintiff and Mr. Bowsher that they (opposing counsel) recently closed on another loan with the Firm and "used the exact same language" that Mr. Bowsher said was "unacceptable." ¶ 153; Dkt. No. 27-9, Ex. 36. Plaintiff then looked into it and saw that a "deal was closed like a week prior with the exact same language" that Mr. Bowsher instructed Plaintiff was unacceptable and "the person who closed that deal was Matt [Bowsher] himself" and Plaintiff informed him of that and asked how they should proceed. Id.; ¶ 153. Only when it was clear the fault was his, did Mr. Bowsher say it was "no biggie." Dkt. No. 27-9, Ex. 37. Nevertheless, when responding to opposing counsel, Mr. Bowsher blamed the "mistake" on another Black attorney, Ari Ebi. ¶ 153.

Plaintiff forwarded Mr. Bowsher's communication, wherein he blamed another Black attorney for his own oversight, to Ms. Smith (Partner). ¶ 314. Ms. Smith told Plaintiff that "this situation has been frustrating for you" and acknowledged that Plaintiff was "likely still processing a myriad of emotions," but that the Firm was "monitoring the situation," although she could not "promise" that Plaintiff would see "changes overnight." Id. Plaintiff rang the alarm regarding Mr. Bowsher's tone and manner of speaking to her, but his conduct was left unabated.

35

<u>Fourth</u>, in May 2022, while working on a deal with Mr. Bowsher, Ms. Sankano correctly told opposing counsel that "no enforceability/local opinions are needed because this transaction is a supplemental loan." ¶ 156. Without any conversation with Plaintiff and clearly without looking into it on his own, Mr. Bowsher assumed that Plaintiff was incorrect and told her to "issue a correction" to her statement to opposing counsel and that it was "not accurate" for Plaintiff to say that "no enforceability/local opinions are needed." ¶ 158.

Plaintiff forwarded Mr. Bowsher's communication to a senior Black female attorney, Whitney Loughran, and inquired whether Mr. Bowsher was correct. Ms. Loughran told Plaintiff that Mr. Bowsher was "not correct" and helped her craft a response to Mr. Bowsher "to try to tactfully tell him that he was wrong and that she didn't need to issue a correction statement." ¶ 158. Only after Plaintiff sent Mr. Bowsher the "Freddie Mac published opinion guidelines" which show that "no enforceability opinion or local law opinions" were required for supplemental loans, did Mr. Bowsher admit that he was incorrect in the first instance. Dkt. No. 27-9, Ex. 38. Of course, Mr. Bowsher could have done his own due diligence before telling Plaintiff she was wrong and making Plaintiff question her work.

Plaintiff spoke to Ashante Smith, a Black female Partner in the MFH Practice Group, and told Ms. Smith that Mr. Bowsher's chosen language toward her were "microaggressions," and that Mr. Bowsher had a "preconceived notion" that Plaintiff did not know what she was doing. ¶ 160. Plaintiff explained at her deposition that "[t]here are certain stereotypes" about Black professionals "who work in corporate America," including Plaintiff, that "we didn't get these jobs based on our own merit," and were instead there to "fit some quota," and that Mr. Bowsher's conduct "was exhibiting those stereotypes" and questioning her "basic competency." ¶ 320. Ms. Smith spoke to Mr. Iwashyna, the Practice Group leader, regarding Mr. Bowsher's conduct but was brushed off

36

– Mr. Iwashyna told Ms. Smith that Plaintiff "should feel good about herself because she was right," but Ms. Smith explained it was more about Mr. Bowsher "making [Plaintiff] question her work," than it was about who was right. ¶ 158.

Ms. Loughran was also concerned by Mr. Bowsher's communication to Plaintiff and forwarded it to Mr. Iwashyna, Nora Nickel (Partner), and Ms. Smith. ¶ 315. Ms. Loughran spoke to all three regarding Mr. Bowsher's conduct. Ms. Loughran spoke to Ms. Smith because she thought "it was problematic that Matt was making comments about Gita's work but then was also wrong" about a "pretty basic . . . knowledge point about the Freddie Mac program." ¶ 316. Similarly, Ms. Loughran told Ms. Nickel her perspective "of how frustrating" it was for Plaintiff "when her work is being criticized, yet in the same breath, Matt [Bowsher] was also very wrong," and Ms. Nickel simply "laughed at how wrong" Mr. Bowsher was but did not offer "any sort of advice or action points." ¶ 317. Ms. Loughran's conversation with Mr. Iwashyna "was the same," and he was "just laughing about how wrong that was." ¶ 318. Clearly, Mr. Bowsher's repeated mistreatment of Plaintiff was a laughing matter to the Firm's non-Black Partners.

Fifth, in June 2023, Plaintiff was staffed on a deal with Mr. Bowsher. ¶ 162. Mr. Bowsher asked Plaintiff to open a new matter for the deal with Mr. Bowsher receiving 70% of the "matter responsible" credit and Ms. Mufarrige receiving 30%. ¶ 163. Plaintiff did **<u>exactly</u>** as Mr. Bowsher instructed and, on July 31, 2023, sent an email to the MFH New Matters team, expressly instructing that the matter responsible credit split should be as follows: "Kelly Mufarrige (30%) / Matt Bowsher (70%)." ¶ 244. When Plaintiff learned that the MFH New Matters team incorrectly gave Mr. Bowsher 100% of the matter responsible credit, Plaintiff wrote to the MFH New Matters team, and asked them to correct the matter responsible credit split and included the below demonstrative which was also included in her initial July 31, 2023 email:

| Matter Responsible Atty: | Kelly Mufarrige (30%) / Matt Bowsher (70%) |
|---|---|

¶ 245. The MFH New Matters team failed to correct its mistake, and Plaintiff followed up once more to request that the matter responsible credit split be corrected and that credit be taken from Mr. Bowsher and apportioned to Ms. Mufarrige as Plaintiff had requested twice before. ¶ 246.

At this point, Mr. Bowsher emailed Plaintiff and called her "confused," and that Ms. Mufarrige was "not to be the sole 100% matter responsible attorney." ¶ 247. Plaintiff responded to Mr. Bowsher that she thought she had been clear in her first communication with the MFH New Matters team as it relates to the percentage distribution. ¶ 248. In response, Mr. Bowsher "let it loose." ¶ 174. Indeed, on August 3, 2023, Mr. Bowsher told Plaintiff she was "the opposite of clear," and "the fact" that she didn't see it, "even after he took the time to point it out," is what "worrie[d] him." ¶ 249. Mr. Bowsher did not stop there – he continued his racially discriminatory onslaught toward Plaintiff and told her, "[t]his is very basic, elementary communication," and "[t]his has nothing to do with training, or understanding of multifamily transactional law, this is daily required functioning." Id. In his own words Mr. Bowsher made clear his hostile and offensive feedback had nothing to do with her training or knowledge and everything to do with who she is as a person – a Black woman.

Plaintiff responded to Mr. Bowsher's derogatory email and told him that she "worked hard" and "deserved" to be at the Firm "like every other associate." ¶ 250. Plaintiff also forwarded the email thread between her and Mr. Bowsher to several of the Firm's attorneys, Mr. Iwashyna, Ms. Nickel, Ms. Crawford and Mr. Tucker and wrote that she "had enough" of the way Mr. Bowsher "addresses" her. ¶ 251. Mr. Iwashyna, the Practice Group leader, did not respond to Plaintiff's email, nor did he speak to Plaintiff regarding this correspondence with Mr. Bowsher. ¶ 252.

38

Without question, Plaintiff found Mr. Bowsher's communication to be racist – she was "very upset" that Mr. Bowsher "was calling her intelligence into question." ¶ 174. Unequivocally, Plaintiff expressed to Ms. Loughran that it "was indicative of Matt [Bowsher] being a racist." Id. Plaintiff was not the only one who found Mr. Bowsher's communication to be racist. Her collegue at the Firm, Jennifer Jana, told Plaintiff that Mr. Bowsher's email to Plaintiff was racist and suggested that Plaintiff go to HR. ¶ 255. Plaintiff also spoke to Judge Michael W. Reed, for whom she clerked, about the August 3, 2023 correspondence with Mr. Bowsher. ¶ 256. Judge Reed felt as though Mr. Bowsher's communication to Plaintiff was racist "because of the stereotype that's out there about people who look like us in these spaces, that we did not get these positions based off our own true merit, [but] that we are here because we're affirmative action cases." Id.

Sixth, the MFH Practice Group leader, Mr. Iwashyna, has a history of condoning and perpetuating discrimination against Black, female attorneys. For instance, Brittney Williams, a Black female, worked with Mr. Iwashyna as an associate at Troutman Sanders. ¶¶ 271, 282. Ms. Williams was hired at approximately the same time as two other white associates. ¶ 282. For months, Ms. Williams' white colleagues were provided with more opportunities for development and more substantive work than she was such that she felt the need to raise her concerns to Mr. Iwashyna, the head of the MFH Practice Group. ¶¶ 285-286. Thus, in or around November 2019, Ms. Williams told Mr. Iwashyna that she felt as though her race played a role in the limited opportunities that she was being provided. Specifically, she told Mr. Iwashyna, "the partners are giving work to people who look like them" and that are "culturally the same as them." Mr. Iwashyna responded to Ms. Williams' complaint of race-based disparate treatment by telling her, "That's how the real-world works." ¶ 289. Mr. Iwashyna is the same man who "laughed off" and "shrugged off" concerns regarding Mr. Bowsher's treatment of Plaintiff.

39

Defendants' efforts to reduce Plaintiff's experience to a mere four "interactions," with Mr. Bowsher could not be further from the truth.  Frankly, it only further perpetuates the Firm's *modus operandi* of allowing racism to permeate unabated at the expense of its Black, female attorneys. The MFH Practice Group was a closed universe within the Firm and Plaintiff had internally rang the alarm regarding Mr. Bowsher's outward bias toward her and the way he demeaned her – yet, the MFH Partners did nothing.  ¶¶ 158, 247-251, 317-318.  To make matters worse, when any Black female attorney raised concerns regarding Mr. Bowsher's treatment of Plaintiff the concerns were not taken seriously, and sometimes "laughed off."  Id.  In that environment, there was no reprieve for Plaintiff – she was forced to endure her basic competency and work product repeatedly questioned by Mr. Bowsher and nobody was going to do anything about it; no one (outside of two other Black female attorneys) was even going to try.  Plaintiff had nowhere to go –she just had to live in the reality that she had to report to someone who she (and others) believed to be racist.

Here, the record evidence raises a question of fact as to whether Plaintiff was subjected to a working environment that was "severe or pervasive enough to create an objectively hostile or abusive work environment."  Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993); see also Abdelkarim v. Tomlinson*, 605 F.Supp.2d 116, 122 (D.D.C. 2009) (denying summary judgment on a hostile work environment claim because the plaintiffs' allegations that their supervisor routinely made derisive comments related to their national origin and background constituted an on-going pattern of hostility); Lively v. Flexible Packaging Ass'n*, 830 A.2d 874, 894-96 (D.C. 2003) (concluding that allegations that the plaintiff was subjected to "offensive, insulting language about women," "actions with sexual overtones that humiliated women," low performance evaluations and criticism directed at women, implying that their communication skills were less developed,

40

was sufficient to support a jury determination that the plaintiff was subjected to a hostile work environment).

In one sentence, without citing a single case, Defendants assert that Plaintiff's hostile work environment claims fail because the terms and conditions did not affect the "terms" of Plaintiff's employment. Defs. Brf. at 23. However, the Supreme Court has determined that "[t]he phrase 'terms, conditions, or privileges of employment' evinces a congressional intent to strike at the entire spectrum of disparate treatment of men and women in employment, which includes requiring people to work in a discriminatorily hostile or abusive environment." Harris v. Forklift Sys., 510 U.S. 17, 21 (1993) (quoting Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 64 (1986)).

To this point, the Court "is obliged to consider the whole picture, not just particular pixels, in assessing whether a host of incidents amount to a pervasive pattern of hostility and ridicule." Burrell v. Shepard, 321 F.Supp.3d 1, 12 (D.D.C. 2018). In the instant matter, Plaintiff was repeatedly subjected to blatant discriminatory animus by Mr. Bowsher all while Mr. Iwashyna (and others) allowed Mr. Bowsher's discriminatory conduct to continue unabated such that he only grew more volatile toward Plaintiff. Without question, on August 3, 2023, after months of demeaning and degrading Plaintiff, Mr. Bowsher insulted and ridiculed the very fabric of who Plaintiff is as a Black woman. Surely, a reasonable jury could conclude that the discriminatory acts suffered by Plaintiff were committed, and allowed to permeate, because of Plaintiff's race. See Pantazes v. Jackson, 366 F.Supp.2d 57, 71 (D.D.C. 2005) (denying summary judgment on a hostile work environment claim because a jury could reasonably find the acts alleged to be sufficient "to alter the conditions of [plaintiff's] employment, thereby creating an abusive working environment").

41

### ii. Defendants' Argument that Mr. Bowsher did not "Explicitly Mention Plaintiff's Race" is a Red Herring

Defendants argue that Plaintiff's hostile work environment claims must fail because "there is no record evidence that Mr. Bowsher ever made a racial slur or an otherwise derogatory comment" about Plaintiff's race. Defs. Brf. at 24. However, there is no such requirement in order for the Court to find she was subjected to a hostile work environment. In fact, discriminatory conduct "need not be racial in content to create a racially hostile work environment." Bowdre v. Richardson, 131 F.Supp.2d 179, 187 (D.D.C. 2001). Moreover, stereotypical criticisms can support a hostile environment claim. See Aman v. Cort Furniture Rental Corp., 85 F.3d 1074, 1078-84 (3d Cir. 1996) (summary judgment on hostile environment reversed where two Black employees subjected to coded racial remarks, were forced to do menial tasks not in their job descriptions and made their jobs more difficult; harassment based on race may not be overtly racial in nature); Sierra v. Hayden, No. 16-1804 (RC), 2019 WL 3802937, at *16 (Aug. 13, 2019) ("discrimination can exist even where there is not a 'direct connection' between disparaging comments and the alleged discrimination"); Nuskey v. Hochberg, 657 F.Supp.2d 47, 58 (D.D.C. 2009) (calling plaintiff an "aggressive woman" and "strong woman" created issue of material fact regarding gender stereotypes in termination decision).

While Defendants are correct that this Court has "not yet opined on whether a hostile work environment claim can be predicated on microaggressions," they are incorrect in their implication that the overwhelming majority of other circuits deem microaggressions akin to "mere offensive utterances." Defs. Brf. at 25. To this point, the Supreme Court has explained that certain words standing alone might be facially non-discriminatory or appear to be benign but nonetheless may be understood as racist code words, which may in part depend on the speaker's inflection, tone of voice, local custom, and historical usage. See Ash v. Tyson Foods, Inc., 546 U.S. 454, 456 (2006)

(*per curiam*) (discussing supervisor's use of term "boy" to refer to African American employees); see also Brockman v. NAES Corp., No. 19 Civ. 00006 (JAM), 2021 WL 863471, at *4 (D. Conn. Mar. 8, 2021) ("A jury could reasonably (and easily) conclude" that a supervisor's comments using coded language "was race-related"); Abrasam v. William Paterson Coll. of N.J., 260 F.3d 265, 278 (3d Cir. 2001) (same).  Put simply, it is a question of fact and issue of intent whether Mr. Bowsher's repeated assumptions that Plaintiff was incorrect or "confused," or his criticisms of her basic aptitude and abilities to function were coded and laden with discriminatory animus.

Finally, Defendants also argue that because Mr. Bowsher stated in his declaration that he had weekly training sessions with Plaintiff "for several months," and because Mr. Iwashyna, in his own declaration, stated that he had also received communication from Mr. Bowsher that was "wordy, harsh, and condescending," that Mr. Bowsher could not have harbored racial animus toward Plaintiff.  Again, this is an issue of intent, which should not be decided at the summary judgment stage.  Despite that, Mr. Iwashyna is not Black, and it is outright offensive to minimize Plaintiff's experience as a Black woman and the stereotypes she faces on a daily basis as something that could be equally felt or understood by anyone.  Moreover, Defendants have not proffered an iota of record evidence to support that Mr. Bowsher actually trained Plaintiff weekly for "several months" because that simply did not happen.  Ex. 59 at ¶¶ 15-16.  Instead, the point to a single email wherein Mr. Bowsher offers to speak to Plaintiff about the Freddie Mac processes and procedures.  This single email is not sufficient to find as a matter of law that Mr. Bowser did not harbor discriminatory animus toward Plaintiff.

> **iii.    Troutman Pepper Took No Remedial Action When Plaintiff Complained About Mr. Bowsher**

Defendants concede that under the Faragher/Ellerth affirmative defense the employer must establish that "(1) it 'exercised reasonable care to prevent and correct' any harassing behavior, **and**

43

(2) the employee 'unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise.'" Defs. Brf. at 26 (quoting Burlington Indus. v. Ellerth, 524 U.S. 742, 765 (1998)) (emphasis added). Indeed, "[b]oth elements must be satisfied for the defendant-employer to avoid liability, and the defendant bears the burden of proof on both elements." Faragher v. City of Boca Raton, 524 U.S. 775, 118 (1998). Nowhere in Defendants expansive motion do they argue or even suggest that Plaintiff "failed to take advantage" of any preventative or corrective opportunities. Thus, by Defendants' own admission, their attempt at asserting a Faragher/Ellerth defense fails.

Nevertheless, Defendants argue that Troutman Pepper took "prompt remedial action," in response to Plaintiff's complaint about Mr. Bowsher's discriminatory conduct. Defs. Brf. at 26. However, the record evidence establishes that the investigation into Plaintiff's complaint was nowhere near "prompt," and that Troutman Pepper took **no** remedial action against Mr. Bowsher. As a preliminary matter, multiple Black attorneys raised concerns to Mr. Iwashyna about Mr. Bowsher's treatment of Plaintiff months before she filed a complaint with HR – he did nothing. ¶¶ 158, 317-318. In fact, he defended Mr. Bowsher and "laughed off" his discriminatory conduct. Id. Mr. Bowsher was left completely unchecked and was allowed to repeatedly insult Plaintiff's ability to function and basic aptitude. Then, on August 3, 2023, when Mr. Bowsher told Plaintiff that she is inept because of who she is as a person, Plaintiff forwarded that communication to Mr. Iwashyna (and other attorneys including several Partners) and told them that she "had enough." ¶¶ 251-252. Despite the fact that Partners have an "obligation" to report a complaint of discrimination, not a single Partner to whom Plaintiff forwarded the email reported it to HR. In fact, Mr. Iwashyna completely ignored Plaintiff's email and Plaintiff entirely thereafter.

44

After no affirmative action by the Firm, Plaintiff had no choice but to file a complaint herself on August 10, 2023.  It took nearly two weeks for Ms. Johnson (HR) to even tell Plaintiff that the Firm would investigate her complaint.  ¶ 263.  Then, it took months to investigate her complaint, and only after Plaintiff followed up with HR, did she receive findings in connection with the purported investigation.  ¶¶ 270-271.  The investigator did not find evidence of discriminatory behavior, actions creating a hostile work environment or retaliatory actions.  ¶ 272.  Nevertheless, the Firm recommended that the Firm consider training and/or coaching for Mr. Bowsher.  ¶ 273.  But Mr. Bowsher was not required to undergo any training – Mr. Bowsher admitted, under oath, that no one at the Firm even suggested to him that he undergo any counseling or training in relation to Plaintiff's complaint.  ¶ 274.

The fact that Plaintiff did not "interact with Mr. Bowsher, did not receive a performance evaluation from Mr. Bowsher, and did not work with Mr. Bowsher on any of his deals," Defs. Brf. at 27, after the investigation is of no moment – Plaintiff was terminated weeks after the investigation concluded.  Despite Defendants attempt to style it as such, Plaintiff's unlawful termination was not a favor or benefit to her.  A reasonable jury could conclude from this record that the Firm did not take any, let alone prompt, remedial action to resolve Mr. Bowsher's discriminatory conduct toward Plaintiff.

   iv.  **Plaintiff did Not Abandon Her Claim that She Was Terminated Due to Her Race**

Without citing a single case in support, Defendants argue that one sentence of Plaintiff's deposition testimony qualifies as an abandonment of her claim that she was terminated due to her race.  However, at her deposition, Plaintiff also testified that she reviewed the Amended Complaint, wherein she alleges that the Firm discriminated against her due to her race by, *inter alia*, terminating her employment, before it was filed and that its contents are accurate.  ¶ 321.

Nevertheless, Plaintiff did not expressly "abandon" her claim and Defendants cannot ask the Court to rule on Plaintiff's intention as a matter of law.  Moreover, the reasons set forth by Defendants in connection with Plaintiff's termination are plainly pretextual and, as set forth above, Defendants perpetuated and condoned discriminatory animus toward Plaintiff.  Accordingly, Troutman Pepper should not be granted summary judgment on Plaintiff's discriminatory termination claims.  See Hardin v. Dadlani, 161 F.Supp.3d 103 (D.D.C. 2014) (finding that genuine issues of material fact existed as to whether an African American former employee was terminated from her job based on her race, precluding summary judgment.).

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court deny Defendants' motion for summary judgment in its entirety.

Dated: March 26, 2025
       New York, New York                    **WIGDOR LLP**

                                             By: _____
                                                    Michael J. Willemin
                                                    Kassandra Vazquez
                                                    Brooke Payton

                                             85 Fifth Avenue
                                             New York, NY 10003
                                             Telephone: (212) 257-6800
                                             Facsimile: (212) 257-6845
                                             mwillemin@wigdorlaw.com
                                             kvazquez@wigdorlaw.com
                                             bpayton@wigdorlaw.com

                                             *Counsel for Plaintiff*

46