**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**
------------------------------------------------------------------------X

GITA F. SANKANO,                                          :
                                                         :
                                    Plaintiff,           :      Civil Action No.: 1:24-cv-00142-JMC
                                                         :
            v.                                           :
                                                         :
TROUTMAN PEPPER HAMILTON SANDERS          :
LLP and BRIAN IWASHYNA,                                  :
                                                         :
                                    Defendants.          :
------------------------------------------------------------------------X

## PLAINTIFF'S RESPONSE TO THE STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Pursuant to Rule 56 of the Federal Rules of Civil Procedure and Rule 7(h) of the Local

Rules of this Court, Plaintiff, by and through counsel, submits her Response to Defendants'

Statement of Undisputed Material Facts in Support of their Motion for Summary Judgment.

### A.    Plaintiff's Hiring at Pepper Hamilton

1.      In the summer of 2019, Plaintiff contacted Henry Liu, the managing partner of the Washington, D.C. office of Pepper Hamilton LLP, and expressed interest in working at the firm. Declaration of Henry Liu ("Liu Decl.") ¶ 4 (attached hereto as <u>Appendix A</u>).

**Response to Paragraph 1:**

Admit.

2.      Mr. Liu did not need a new associate, so he referred Plaintiff to Christine Waldmann Carmody, another partner at Pepper Hamilton who had indicated to Mr. Liu a potential need for a new associate to support her practice. Liu Decl. ¶ 4

**Response to Paragraph 2:**

Admit.

3.      Ms. Carmody made the decision to hire Plaintiff in 2019 as an associate to provide support for her practice. Declaration of Christine Waldmann Carmody ("Carmody Decl.") ¶ 5 (attached hereto as <u>Appendix B</u>); Gita Sankano Deposition Transcript ("Pl. Dep.") 47:10 (attached hereto as <u>Appendix R</u>).

1

**Response to Paragraph 3:**

Admit.

4.    Ms. Carmody was a partner in Pepper Hamilton's Financial Services Practice Group, and she represents lenders in connection with loans insured by the Federal Housing Administration ("FHA"), which is part of Housing and Urban Development ("HUD"). Carmody Decl. ¶ 4; Pl. Dep. 47:10-12.

**Response to Paragraph 4:**

Admit.

5.    Ms. Carmody interviewed Plaintiff, so Ms. Carmody was aware of Plaintiff's race when she decided to hire Plaintiff as an associate. Carmody Decl. ¶ 6; Pl. Dep. 44:10-12.

**Response to Paragraph 5:**

Admit.

6.    In late August 2019, Plaintiff began as an entry-level associate, commonly referred to as a "first-year associate," at Pepper Hamilton in its Washington, D.C. office, exclusively working for Ms. Carmody on FHA/HUD loans. Carmody Decl. ¶¶ 5, 7; Pl. Dep. 47:10-10.

**Response to Paragraph 6:**

Admit.

7.    Ms. Carmody understood that Plaintiff had graduated law school in 2018, but had spent the year after graduation clerking for a judge, and thus believed that Plaintiff did not have any experience working on FHA/HUD loans, or any other type of multifamily housing finance matters when Plaintiff began her employment at Pepper Hamilton. Carmody Decl. ¶ 6.

**Response to Paragraph 7:**

Dispute.  Prior to joining Pepper Hamilton, Ms. Sankano worked for a "boutique law firm" that "worked on real estate transactions." Ex. 9, Gita Sankano Deposition Transcript ("Pl. Dep.") 35:2-10; see also Pl. Dep. 42:20-43:1 ("I saw that [Pepper Hamilton] had a financial services practice group and I knew that I had experience already.").

8.    During the time Plaintiff worked at Pepper Hamilton, the firm did not have a minimum number of hours that associates were required to bill, but it did have an annual billable

target of 1940 billable hours for associates. Declaration of Audrey Wisotsky ("Wisotsky Decl.") ¶ 9 (attached hereto as Appendix C).

**Response to Paragraph 8:**

Dispute.  Ms. Wisotsky expressly warned Ms. Carmody in 2019 that Plaintiff "basically has no billable hours" for November and that "it will hurt [Plaintiff] if [her] time doesn't get in." Ex. 28.  See also Ex. 3, Kalle Covert Deposition Transcript ("Covert Dep.") 15:16-23 (confirming that an attorney could be subject to discipline if their "hours were significantly below that threshold").  Further, yearly bonuses at Pepper Hamilton were based, at least in part, on hours billed.  Ex. 10, Blair Schiff Deposition Transcript ("Schiff Dep.") 62:4-12 (explaining that, when determining associate bonuses, "there's a rubric of numbers that are put together based off of hours, performance metrics, quantity and other things that are combined to look and to determine an appropriate bonus for associates").  Aside from the tangible impact on yearly bonuses, an associate's billable hours sent a signal to the rest of the Firm about an associate's performance and capabilities.  See Pl. Dep. 74:18-75:13 (after discussing the impact of billable hours on yearly bonuses, "[n]ot only that, it's the perception of growth.  Right?  Because it measures your productivity within the firm.  So anybody looking at my [low] hours would think that I was just sitting just looking at my nails all day and not working.  So the perception of my productivity was impacted.").

**B.    Plaintiff's Work with Christine Carmody in 2019 and Early 2020**

9.    Plaintiff was the first, and only, first-year associate who was hired to work with Ms. Carmody who had no relevant prior experience in the practice.  Ms. Carmody was solely responsible for supervising Plaintiff, training Plaintiff, and assigning sufficient work to keep Plaintiff busy. Carmody Decl. ¶ 5.

**Response to Paragraph 9:**

Admit that Plaintiff solely worked for Ms. Carmody in 2019. Dispute as to Plaintiff's

purported lack of prior experience. See Response to Paragraph 7.

10.  Randy Hurlburt worked for Ms. Carmody as a first year and occasionally did
work for Ms. Carmody in 2019 and early 2020. *Id.* at ¶ 20.

**Response to Paragraph 10:**

Admit.

11.  Mr. Hurlburt was not a first-year associate in 2019 or early 2020. *Id.* at ¶ 20.

**Response to Paragraph 11:**

Admit.

12.  Mr. Hurlburt had prior experience as a law clerk in the Financial Services Practice
Group prior to going to law school, so he was familiar with financial services and MFH work,
and he was also familiar with timekeeping and what should be billed to a client. *Id.* at ¶ 20.

**Response to Paragraph 12:**

Admit that Mr. Hurlburt had worked in the Financial Services Practice Group as a law

clerk. Dispute any implication that because Mr. Hurlburt previously clerked that he was familiar

with financial services and MFH work or that he was familiar with timekeeping and proper client

billing.

13.  For a period of time until April or May 2020, Ms. Carmody asked Plaintiff to
send draft time entries to Ms. Carmody before that time was inputted into the Pepper Hamilton
timekeeping system. *Id*. at ¶ 7.

**Response to Paragraph 13:**

Dispute. It was not simply "a period of time," that Ms. Carmody required Plaintiff to send

draft time entries to Ms. Carmody – it was **the entire time** she worked exclusively for Ms.

Carmody. Ex. 2, Christine Waldmann Carmody Deposition Transcript ("Carmody Dep.") 27:2-

10 ("I asked for her [Plaintiff] hours before they went in, **all of them**.") (emphasis added).

4

14.     Ms. Carmody asked to review Plaintiff's time before it was entered in part because Ms. Carmody knew that Plaintiff was a new associate and did not have experience with timekeeping or billing practices, and Ms. Carmody believed it was her responsibility to train Plaintiff on how to accurately record and bill her time. *Id*. at ¶ 7.

**Response to Paragraph 14:**

Dispute.  Ms. Carmody testified that she required Plaintiff to send draft time entries to Ms. Carmody, in part, because she "wanted to see how [Plaintiff] was spending her time."  Carmody Dep. 27:21-25.  Plaintiff further disputes any implication that Ms. Carmody's requirement that Plaintiff send draft time entries to her was proper or common practice at Troutman Pepper; in fact, the record evidence shows the opposite – that Ms. Carmody's practice was improper and out of the ordinary.  See e.g. Pl. Dep. 61:19-21 (explaining that after Plaintiff told Brendan [O'Regan] about Ms. Carmody's practice, "[h]e couldn't believe it was happening"); Pl. Dep. 67:19-21 ("[Brendan O'Regan] told me . . . it was insane that Christine was being allowed to do this and it's a huge problem."); Pl. Dep. 96:7-13 (While speaking to Mr. Schiff in June 2020, Plaintiff told him "this is not a gray area, associates are supposed to bill their time and get credit for that.  She's supposed to write that off on the back end, not the front end, and he said, Yeah, you're right."); Schiff Dep. 84:20-85:5 (When speaking to Audrey Wisotsky about Plaintiff's billable hours, Ms. Wisotsky said she told Ms. Carmody "to stop" making Plaintiff submit her hours to Ms. Carmody for review.); see also Ex. 41 (Ms. Carmody was expressly told she should not review and cut Plaintiff's draft time entries before Plaintiff submits her billable hours: "If [Plaintiff] is doing work on a client matter it should be billed to the client matter.  If you have to write off time then that is fine but it is not fair to [Plaintiff] to not have her bill client work.").

15.     Ms. Carmody asked to review Plaintiff's time before it was entered in part because Ms. Carmody believed it was her responsibility to supervise Plaintiff's work, which included reviewing Plaintiff's activities and how much time Plaintiff spent on assignments, so Ms. Carmody could provide feedback to Plaintiff and balance her workload. *Id*. at ¶ 7.

**Response to Paragraph 15:**

Dispute.  Ms. Carmody testified that she required Plaintiff to send draft time entries to her because "it was her job to supervise" Plaintiff and "train" Plaintiff on "how to bill".  Carmody Dep. 27:21-25.  Ms. Carmody further testified that she "wanted to see how [Plaintiff] was spending her time."  Id.  Plaintiff further disputes any implication that Ms. Carmody's requirement that Plaintiff send draft time entries to her was proper or common practice at Troutman Pepper.  See Response to Paragraph 14.

16.     As a new attorney, Plaintiff was less efficient and took longer to perform each task than a more experienced attorney would take—this was expected for all first-year associates, especially those with no prior experience in a specific practice area. *Id*. at ¶ 8.

**Response to Paragraph 16:**

Dispute.  See Responses to Paragraphs 7, 14-15.

17.     Ms. Carmody asked to review Plaintiff's time before it was entered in part because Ms. Carmody did not think that a client should be billed for all the time that Plaintiff worked on a matter, when some of that time was training for a first-year associate and some of the time was due to the inherent inefficiency of an inexperienced attorney. *Id*.

**Response to Paragraph 17:**

Dispute.  See Responses to Paragraphs 7, 14-15.

18.     Plaintiff does not know the real reason why Ms. Carmody asked her to move it to a non-billable training number or other non-billable firm code.  Pl. Dep. 92:22-93:5.

**Response to Paragraph 18:**

Dispute.  Plaintiff believed that Ms. Carmody asking her to move her hours worked to a non-billable firm code was due, at least in part, to Plaintiff's race.  Plaintiff sought the counsel of "two Black associates" to discuss Ms. Carmody cutting her hours.  Pl. Dep. 90:16-91:16.  Then, "since [she] was the only Black attorney" in Troutman Pepper's Washington, D.C. office, Plaintiff also reached out to the "DEI partner," Kassem Lucas, to discuss Ms. Carmody cutting her hours.

Pl. Dep. 91:5-10; <u>see</u> <u>also</u> Response to Paragraph 14.  Further, Plaintiff testified at length during

her deposition that she believed that Ms. Carmody manipulated her hours due to her race.  <u>See</u> <u>e.g.</u>

Pl. Dep. 143:18-22 ("So the only difference . . . is that number one, I'm a woman and I'm Black.");

Pl. Dep. 144:8-13 ("I lost a whole year dealing with [Ms. Carmody about] something that had

nothing to [do] with me, the only Black attorney there, and she was greedy and she stole [my

hours] from me."); Pl. Dep. 155:2-7 ("She treated a Black associate differently from a white

associate and knowing that that was setting me up for failure and it was definitely due to my race.

It was definitely due to the fact – it was definitely discriminatory.  She didn't do it to another

associate at all.").

19.    During the period of time when Ms. Carmody was reviewing Plaintiff's time
entries, Ms. Carmody would direct Plaintiff to move some of her time to a non-billable training
number or other non-billable firm code, instead of a billable client number because Ms. Carmody
did not think that a client should be billed for all the time that Plaintiff worked on a matter, when
some of that time was training for a first-year associate and some of the time was due to the
inherent inefficiency of an inexperienced attorney. Carmody Decl. ¶ 8.

**<u>Response to Paragraph 19:</u>**

Dispute.  <u>See</u> Response to Paragraph 14.

20.    Although many of Ms. Carmody's deals were paid on a flat-fee basis, it was still
important that the time billed is accurate, should the client ask to see an itemized bill of the hours
worked, which occasionally occurred. *Id*.

**<u>Response to Paragraph 20:</u>**

Admit that the Decl. of Ms. Carmody so states.  Dispute any implication that Ms.

Carmody's requirement that Plaintiff send draft time entries to her was proper or common practice

at Troutman Pepper.  <u>See</u> Responses to Paragraphs 14, 19.

21.    Ms. Carmody asked to review Plaintiff's time before it was entered in the
timekeeping system and moved some of Plaintiff's time to a non-billable training number or
other non-billable firm code.  Carmody Decl. ¶ 11.

**Response to Paragraph 21:**

Admit.

22.    Ms. Carmody did not benefit, financially or otherwise, by adjusting Plaintiff's hours on the front end, prior to the time being entered into the system, versus allowing her to enter unreviewed time and have it cut (or written off) on the back end. *Id.*

**Response to Paragraph 22:**

Dispute.  Plaintiff testified that Troutman Pepper's DEI partner, Kassem Lucas, told her that by adjusting Plaintiff's hours on the front end there was a "monetary gain" for Ms. Carmody and that Ms. Carmody "would look more profitable," which is "an incentive" at the firm "for a partner."  Pl. Dep. 93:13-94:7.  See Response to Paragraph 14.

23.    Towards the end of 2019, the head of the Associates' Committee at Pepper Hamilton, Audrey Wisotsky, reached out to Ms. Carmody after learning that Plaintiff had very few billable hours entered into the timekeeping system. Carmody Decl. ¶ 12; Wisotsky Decl. ¶ 4.

**Response to Paragraph 23:**

Admit.

24.    Ms. Carmody explained to Ms. Wisotsky that Plaintiff had been working, but Ms. Carmody had asked to review Plaintiff's time entries before they were entered into the timekeeping system. Wisotsky Decl. ¶ 4.

**Response to Paragraph 24:**

Admit.

25.    Although acknowledging that the ultimate decision on what and how much to bill to clients is generally made by the responsible partner, Ms. Wisotsky thought that Ms. Carmody's approach for previewing Plaintiff's time entries was less appropriate than the usual approach at Pepper Hamilton, which was for associates to enter their time into the timekeeping system under a billable client/matter number, and then the responsible partner could write off the time (or move the time to a non-billable number) before sending an invoice to the client. Wisotsky Decl. ¶ 6.

**Response to Paragraph 25:**

Admit with the clarification that Ms. Carmody's "approach" was more than "less appropriate than the usual approach," and Ms. Wisotsky expressly told Ms. Carmody that her "approach" would have detrimental effects and "hurt" Plaintiff. Ex. 60. See Response to Paragraph 14.

26.    There was no policy at Pepper Hamilton prohibiting a partner from moving an associate's time from a billable number to a non-billable number, either before or after it was entered in the firm's timekeeping system. *Id*. at ¶ 7.

**Response to Paragraph 26:**

Dispute.  Plaintiff testified that she saw a policy while she was employed at Pepper Hamilton regarding recording time and that the policy stated that "associates shall enter" their "billable time."  Pl. Dep. 65:16-66:3.

27.    Neither Plaintiff nor any other entry-level associate at Pepper Hamilton received a bonus for their work in 2019.  *Id*. at ¶ 12.

**Response to Paragraph 27:**

Admit.

28.    In March 2020, when the COVID-19 pandemic began, the nature of Ms. Carmody's work changed substantially in two ways: (a) at first, clients asked Ms. Carmody to process more administrative paperwork associated with loan applications, as Pepper Hamilton attorneys were still largely going into the office, whereas clients' personnel were working remotely, and (b) subsequently, the workload decreased, as everyone struggled to navigate the pandemic. Carmody Decl. ¶ 17.

**Response to Paragraph 28:**

Dispute.  Plaintiff testified that Ms. Carmody "retaliated against [her]" and "[her] work dried up drastically around late April to May" – immediately after she complained about Ms. Carmody cutting her hours.  Pl. Dep. 89:15-22; see also Pl. Dep. 90:16-20 ("So initially, everything was fine . . .  before she got called out for her hours by Audrey.  Everything was fine until I had

that midyear review back in April 2020."); Pl. Dep. 91:18-22 ("[I]n May, Christine just stopped

giving me work.  I think I billed probably not even 30 hours in May of 2020, and I emailed Audrey

and I told her like, Hey now all of a sudden, I'm not getting work, this is not normal."); Pl. Dep.

91:11-16 (Ms. Wisotsky told Plaintiff "Don't worry about it, you'll be protected.").  Plaintiff also

testified that "during COVID, the interest rates were really low" and "[t]he real estate market was

booming," and, as a result, the practice group was "extremely busy."  Pl. Dep. 200:13-18.

29.    Plaintiff began working remotely in or around the end of April or early May 2020, and because Ms. Carmody had less work that could be completed remotely, there was less for Plaintiff to do, and Plaintiff's hours dropped as a result. *Id*. at ¶ 18; Pl. Dep. 52:3-6.

**Response to Paragraph 29:**

Dispute.  <u>See</u> Response to Paragraph 28.

30.    Ms. Carmody did not replace Plaintiff or otherwise work with a different associate during the time period from the end of April through early May 2020. Carmody Decl. ¶ 19.

**Response to Paragraph 30:**

Admit.

**C.    Plaintiff's 2020 Interim Performance Review**

31.    At Pepper Hamilton, entry-level associates who begin in the fall generally received an interim evaluation in March or April of the following year. Wisotsky Decl. ¶ 10.

**Response to Paragraph 31:**

Admit.

32.    In March 2020, Ms. Carmody completed a performance evaluation for Plaintiff. Carmody Decl. ¶ 13.

**Response to Paragraph 32:**

Admit.

33.    In her March 2020 performance evaluation, Ms. Carmody praised Plaintiff's attitude and work ethic and stated that Plaintiff was "making good progress in developing proficiency in the many areas she needs to learn."  *Id.*

**Response to Paragraph 33:**

Admit that Ms. Carmody provided positive feedback to Plaintiff.  Ms. Carmody testified that in her interim performance evaluation for Plaintiff, she said that Plaintiff "was a hard worker." Carmody Dep. 20:13-14.  See also Pl. Dep. 51:1-5 ("During my midyear review, when I spoke to Audrey on the phone, I had a great evaluation despite my hours, which was the only issue. Christine told me herself that I had a great work ethic.").

34.    Ms. Carmody also commented that Plaintiff "needs to remember to re-read instructions and address comments exactly as requested while she is in the learning phase, and focus on getting each piece perfect and to use everything she knows for each task." *Id*.

**Response to Paragraph 34:**

Admit that the quote contained in Paragraph 34 is an accurate representation of one comment made by Ms. Carmody in Plaintiff's 2020 performance review.  Dispute that the comment included in Paragraph 34 is complete or representative of all the comments or feedback Plaintiff received from Ms. Carmody in her 2020 performance review.  See Dkt. No. 27-4 ("Carmody Decl."), Ex. 2.  Ms. Carmody also wrote that Plaintiff "is careful and thoughtful" and that Plaintiff's "focus is good – the perfection will come."  Id.

35.    On April 21, 2020, Ms. Wisotsky met with Plaintiff to discuss her interim evaluation, and during that meeting, Ms. Wisotsky told Plaintiff that going forward, she should not wait for Ms. Carmody to review her time before it was entered into the firm's timekeeping system. Wisotsky Decl. ¶ 11; Pl. Dep. 63:8-10.

**Response to Paragraph 35:**

Admit with the clarification that during this meeting Ms. Wisotsky told Plaintiff that Ms. Carmody was "supposed to cut [Plaintiff's hours] on the back end, not on the front end" as Ms. Carmody had been doing.  Pl. Dep. 63:6-15.  Further, during this meeting Ms. Wisotsky asked if Ms. Carmody was "stealing" Plaintiff's hours.  Pl. Dep. 63:1-2.

36.    As Ms. Wisotsky was aware of Ms. Carmody's prior instructions concerning Plaintiff's timekeeping, Ms. Wisotsky did not hold Plaintiff responsible for her billable hours and ensured that Plaintiff did not suffer any adverse effects as far as her performance evaluation went, due to Ms. Carmody's actions. Wisotsky Decl. ¶ 11; Pl. Dep. 51:1-3, 63:6-15.

**Response to Paragraph 36:**

Admit.

37.    After Plaintiff's interim evaluation meeting, Plaintiff contacted Ms. Carmody and informed her of Ms. Wisotsky's instruction to begin entering her time directly into the firm's timekeeping system. Carmody Decl. ¶14.

**Response to Paragraph 37:**

Dispute.  In May 2020, Ms. Carmody expressly told Plaintiff "do not finalize your time until I have reviewed it!!! T[h]ere is no point in my reviewing your time if you just enter what you first sent to me??? You need to wait for my comments, then enter that."  Ex. 21.  Ms. Carmody continued to review Plaintiff's hours before Plaintiff input them into the firm's timekeeping system throughout the month of May.  See Ex. 20.

38.    In May 2020, Plaintiff stopped sending Ms. Carmody her time to review before it was entered in the timekeeping system. Carmody Decl. ¶¶ 14-15.

**Response to Paragraph 38:**

Dispute.  See Response to Paragraph 37.

39.    Plaintiff told Ms. Wisotsky that she no longer wished to work with Ms. Carmody. Wisotsky Decl. ¶ 11.

**Response to Paragraph 39:**

Admit.

40.    Ms. Wisotsky informed Mr. Liu that Plaintiff no longer wanted to work with Ms. Carmody and that Plaintiff wanted to move her office away from Ms. Carmody. *Id.*; Liu Decl. ¶ 6.

12

**Response to Paragraph 40:**

Admit that Plaintiff requested to no longer work with Ms. Carmody. Dispute that Plaintiff requested to move her office; rather, in July 2020, Henry Liu (Partner) "came to [her] office," and asked Plaintiff, "do you want to move your office," to which she responded, "What do you think?" and Mr. Liu replied, "Yeah I think it's better." Pl. Dep. 100:17-101:9.

41.    Mr. Liu approved Plaintiff moving to a different floor away from Ms. Carmody. Liu Decl. ¶ 8; Pl. Dep. 101:15-102:6.

**Response to Paragraph 41:**

Admit.

42.    After Plaintiff asked to stop working with Ms. Carmody, Mr. Liu was unable to provide Plaintiff with much work, as he already had associates working on his deals and that he was responsible for keeping busy. Liu Decl. ¶ 8; Pl. Dep. 147:12-15.

**Response to Paragraph 42:**

Dispute. The cited deposition testimony does not support the stated proposition. In the cited testimony, Plaintiff testified regarding what associates she knew worked with Mr. Liu, not that Mr. Liu did not have the ability to provide her work. In fact, Plaintiff testified that she "wouldn't know" whether Mr. Liu had enough work such that he needed an additional associate on his team. Pl. Dep. 147:16-21.

43.    Plaintiff had primarily worked with Ms. Carmody on FHA/HUD loans, whereas Mr. Liu handled Fannie Mae or Freddie Mac loans, which would have made it difficult for Plaintiff to transition quickly into Mr. Liu's deals. Liu Decl. ¶ 8; Pl. Dep. 147:16-148:12.

**Response to Paragraph 43:**

Admit that Plaintiff testified that she "was hired to do HUD loans" but dispute that the cited testimony supports the proposition that it would have been difficult for Plaintiff to transition into Mr. Liu's deals.

44.    After Plaintiff informed him that she no longer wanted to work with Ms. Carmody, Blair Schiff, another partner at Pepper Hamilton who worked on FHA/HUD loans, gave Plaintiff a few projects in or around May and June 2020. Declaration of Blair Schiff ("Schiff Decl.") ¶ 7 (attached hereto as Appendix D); Pl. Dep. 95:18-96:19.

**Response to Paragraph 44:**

Admit that Plaintiff testified Mr. Schiff gave her "administrative work" that was "nothing substantive" in or around June 2020.  Pl. Dep. 96:19-97:1.  Further, Plaintiff testified that she believed that she was given work in June 2020 because she was the only Black associate in her office.  Pl. Dep. 94:11-95:5 ("The firm had a town fall about race and everyone was, oh my God, you're the only Black associate here, let's give you work.  So it was literally because of what happened with George Floyd, because prior to that, that whole month, they sidelined me.  They didn't care at all.").

45.    The projects that Mr. Schiff gave Plaintiff in May and June 2020 were the same type of projects that he typically assigned to first-year associates.  Schiff Decl. ¶ 8.

**Response to Paragraph 45:**

Dispute.  Plaintiff testified that Mr. Schiff did the same type of work as Ms. Carmody, such that Plaintiff could have done the same work for Mr. Schiff as she had done for Ms. Carmody. While working for Ms. Carmody, Plaintiff testified that she "was doing all the legwork."  Pl. Dep. 49:10-11.  However, Plaintiff testified that she was not receiving substantive assignments from Mr. Schiff, only administrative tasks.  See Response to Paragraph 44.

46.    No one told Ms. Carmody that Plaintiff believed Ms. Carmody was reviewing and reassigning her time because of her race. Carmody Decl. ¶ 16; Wisotsky Decl. ¶ 8.

**Response to Paragraph 46:**

Admit.

14

**D.      Merger of Troutman Sanders and Pepper Hamilton on July 1, 2020, and Plaintiff's Transition to Agency Work**

47.      On July 1, 2020, Troutman Sanders LLP combined with Pepper Hamilton LLP, becoming Troutman Pepper Hamilton Sanders LLP ("Troutman" or the "Firm").  Declaration of Brian Iwashyna ("Iwashyna Decl.") ¶ 2 (attached hereto as Appendix E).

**Response to Paragraph 47:**

Admit.

48.      Brian Iwashyna served as the Practice Group Leader of Troutman's Multifamily Housing Finance ("MFH") Practice Group. *Id*. at ¶ 4.

**Response to Paragraph 48:**

Admit.

49.      Prior to the merger, Ms. Wisotsky and Mr. Liu asked Mr. Iwashyna if the MFH attorneys that worked on Fannie Mae and Freddie Mac loan transactions (i.e., the "Agency team") could provide work to Plaintiff, and Mr. Iwashyna began efforts to integrate Plaintiff into the Agency team after the merger. *Id*. at ¶¶ 6-7.

**Response to Paragraph 49:**

Admit that Plaintiff began to work with the Agency team after the merger.  Dispute any implication that Plaintiff began to work with the Agency team due to the affirmative action of Ms. Wisotsky or Mr. Liu.  In fact, Plaintiff made the request to work with the Agency team and proactively followed up on that request "a few times[.]"  Ex. 18, see also Ex. 42.  Additionally, Plaintiff testified that she "came to [leadership] with a list of demands and what [she] wanted after the merger."  Pl. Dep. 98:4-5.  Before she took this action, "[t]hey were going to let me drown. They didn't care. . . . Because they didn't have no real plan to get me back up to speed."  Pl. Dep. 98:5-22.

50.      On July 1, 2020, the effective date of the merger, all attorneys from Pepper Hamilton's Financial Services Practice Group who practiced in the area of multifamily housing finance, including Plaintiff, were assigned to Troutman's MFH Practice Group. *Id*. at ¶ 5; Pl. Dep. 54:5-9.

**Response to Paragraph 50:**

    Admit.

51.    In July 2020, after the merger, Mr. Liu notified Plaintiff that she would begin working with the Agency team when she returned from her planned vacation in early August 2020. Liu Decl. ¶ 7.

**Response to Paragraph 51:**

    Admit.

52.    To assist Plaintiff's transition to the Agency team, and to ensure Plaintiff was getting enough work and exposure to different types of projects and attorneys, Mr. Iwashyna asked Plaintiff to send him and Nora Nickel, one of the Professional Development Partners for the MFH Practice Group, also based in Richmond, an email every week describing her work assignments and hours.  Iwashyna Decl. ¶ 8.

**Response to Paragraph 52:**

    Dispute.  The record evidence cited in Paragraph 8 of Mr. Iwashyna's Decl. does not state

any request to Plaintiff that she submit her hours to him and Ms. Nickel and instead only asks for

"a very basic description of the stuff you work on each week."  See Dkt. No. 27-7 ("Iwashyna

Decl."), Ex. 2.

53.    Plaintiff provided Mr. Iwashyna and Ms. Nickel her weekly reports from September 2020 through December 2021. *Id*.; Declaration of Nora Nickel ("Nickel Decl.") ¶ 5 (attached hereto as Appendix F).

**Response to Paragraph 53:**

    Admit.

54.    During Plaintiff's first year in the MFH Practice Group, Mr. Iwashyna and Ms. Nickel periodically checked in with Plaintiff to make sure she had enough work, and Plaintiff consistently assured Ms. Nickel and Mr. Iwashyna that she was doing well and getting helpful feedback. Iwashyna Decl. ¶ 10; Nickel Decl. ¶ 6.

**Response to Paragraph 54:**

    Admit.

55.    One MFH partner who gave Plaintiff training and feedback early in her transition working with the Agency team was Matthew Bowsher, a partner in the Washington, D.C. office. Declaration of Matthew Bowsher ("Bowsher Decl.") ¶¶ 2-3 (attached hereto as Appendix G).

**Response to Paragraph 55:**

Dispute.   The Paragraphs of Mr. Bowsher's Decl. cited do not support the stated proposition.  In fact, these Paragraphs do not state anywhere that Mr. Bowsher provided training or feedback to Plaintiff.

56.    In November 2020, Mr. Bowsher contacted Plaintiff and asked her if she was interested in working with him. *Id*. at ¶ 4.

**Response to Paragraph 56:**

Admit.

57.    To find Plaintiff's contact information, Mr. Bowsher searched the firm's directory on the intranet, which includes photographs, so Mr. Bowsher was aware that Plaintiff was Black prior to speaking with her and asking her to work with him on deals. *Id*.

**Response to Paragraph 57:**

Admit.  Plaintiff disputes, however, any implication that because Mr. Bowsher purportedly knew that Plaintiff is Black that he did not discriminate or retaliate against Plaintiff.

58.    Mr. Bowsher primarily worked on Freddie Mac loans and understood that Plaintiff did not have any experience working on those types of loans, so he offered to provide her with weekly one-on-one training to get her up to speed and answer any questions she may have about the deals. *Id*. at ¶ 6.

**Response to Paragraph 58:**

Admit that Mr. Bowsher offered to set-up a weekly call for 30 minutes to "touch base on Freddie Stuff."  Dkt. No. 27-9 ("Bowsher Decl."), Ex. 1.  Dispute that the cited record evidence supports the proposition that Plaintiff did not have any experience working on Freddie Mac loans. In fact, Mr. Bowsher acknowledged that at the time he reached out to Plaintiff she had "several" deals that were "Freddie."  Id.

59.    Mr. Bowsher conducted weekly, one-on-one training sessions for Plaintiff from November 2020 through February 2021. *Id*. at ¶ 7.

**Response to Paragraph 59:**

Dispute.  Mr. Bowsher and Plaintiff had brief and sporadic phone calls which lasted less than two months during which Mr. Bowsher spent most of the time discussing another partner, Jonathan Lautt.  See Declaration of Gita F. Sankano ("Pl. Decl.") at ¶¶ 15-16.

60.    Plaintiff began working on one of Mr. Bowsher's deals in December 2020 and continued to work on deals with Mr. Bowsher off and on into 2022. *Id*. at ¶ 9.

**Response to Paragraph 60:**

Admit that Plaintiff worked on one deal with Mr. Bowsher in 2020, "two deals" in 2021 during which she primarily interacted with another senior attorney who was staffed on those deals and "didn't really deal with [Mr. Bowsher] as much."  Pl. Dep. 289:13-290:7.

61.    Mr. Iwashyna worked on a few deals with Plaintiff in late 2020 and thought she did a good job as the junior associate on those deals, but after 2020, Mr. Iwashyna did not work on any deals with Plaintiff. Iwashyna Decl. ¶ 11.

**Response to Paragraph 61:**

Admit that Plaintiff testified that she worked "on quite a few" deals with Mr. Iwashyna and another senior attorney "in the latter half of 2020."  Pl. Dep. 179:17-180:7.

62.    As the Practice Group Leader, Mr. Iwashyna was responsible for monitoring the performance of the associates, so he regularly solicited and received feedback from MFH partners about associates' performance. *Id*. at ¶¶ 12, 22.

**Response to Paragraph 62:**

Admit.

63.    All of Mr. Iwashyna's impressions about Plaintiff's work product from 2021 through 2023 were based on both (a) feedback that he received from several MFH partners in emails and conversations and (b) what he read in Plaintiff's written performance evaluations. *Id*. at ¶ 11.

**Response to Paragraph 63:**

Dispute. Mr. Iwashyna admitted to having "multiple" conversations with Whitney Loughran, who was an Associate throughout Plaintiff's tenure, during which Ms. Loughran expressed that Plaintiff "was making mistakes consistent with her level." Ex. 5, Brian Iwashyna Deposition Transcript ("Iwashyna Dep.") 91:6-10. See also Pl. Dep. 189:4-9 (describing how Ms. Loughran told Mr. Iwashyna that "the complaints you're receiving [about Plaintiff], they're consistent with one of a junior associate"). Ms. Loughran was not a Partner at the Firm until January 2024 – after Plaintiff's termination. Ex. 7, Whitney Loughran Deposition Transcript ("Loughran Dep. Day 1") 70:20-23. Further, Mr. Iwashyna testified that he had a discussion "regarding performance and promotions of associates in the Multifamily Housing Practice Group in and around June of 2023" with many individuals, including "Kalle Covert [and] Mary Cabell[.]" Iwashyna Dep. 32:5-18. Notably, Ms. Covert and Ms. Cabell are not attorneys at the Firm. Ms. Covert works in Professional Development. Kalle Covert Deposition Transcript ("Covert Dep.") 9:20-10:4; Iwashyna Dep. 33:6-17. Ms. Cabell works in Practice Management. Covert Dep. 23:21-22; Iwashyna Dep. 34:4-23.

**E.      Evaluations of Plaintiff's 2020 Performance**

64.    In September 2020, Scott Fireison, a partner in the MFH Practice Group in the Washington D.C. office, informed Mr. Iwashyna that he had previously worked with Plaintiff and "did not find her ability acceptable (cost me more time than it saved me)." *Id*. at ¶ 13.

**Response to Paragraph 64:**

Admit.

65.    In October 2020, Jonathan Lautt, another MFH partner in the Richmond office, communicated to Mr. Iwashyna that working with Plaintiff had been "a little rough" explaining that Plaintiff had a number of major "misses" due to failure to proofread and not paying attention, citing examples where Plaintiff had left in phrases and paragraphs from prior deals that were inapplicable to the current deals. *Id*. at ¶ 14; Declaration of Jonathan Lautt ("Lautt Decl.") ¶ 9 (attached hereto as Appendix H).

**Response to Paragraph 65:**

Admit with clarification that in his October 2020 email, Mr. Lautt also told Mr. Iwashyna

"I like working with her [Plaintiff,]" "she has a great attitude[,]" and that he was "happy to give"

Plaintiff more servicing work.  See Dkt. No. 27-10, Ex. 1.

66.    While Mr. Lautt was initially optimistic about Plaintiff's potential due to her
positive attitude, in 2021, Mr. Lautt communicated to Mr. Iwashyna that he no longer intended to
work with Plaintiff on his deals going forward. Iwashyna Decl. ¶ 15; Lautt Decl. ¶¶ 7, 10.

**Response to Paragraph 66:**

Dispute.  Mr. Lautt and Plaintiff worked on different types of deals and, as such, would not

have had the opportunity nor occasion to work together regularly.  See Pl. Decl. at ¶ 17.

67.    Plaintiff's 2020 performance evaluation is Exhibit 7 to the Iwashyna Declaration
(Appendix E) and Exhibit 7 to the Declaration of Kalle Covert ("Covert Decl.") (attached hereto
as Appendix I).

**Response to Paragraph 67:**

Admit with clarification that this is not a "material fact" for purposes of a Rule 56 motion

in this action.

68.    For the 2020 performance review period, Plaintiff received written evaluations
from the following partners: Andrew Rogoff, Peter Strup, Anthony Vale, David Wormser, Henry
Liu, and Nora Nickel.  Iwashyna Decl. Ex. 7; Covert Decl. Ex. 7.

**Response to Paragraph 68:**

Admit.

69.    Plaintiff's overall evaluation for 2020 was generally positive, with partners
complimenting her eagerness to learn and good work ethic; however, several MFH partners
noted that Plaintiff needed to improve in her lack of attention to detail.  Iwashyna Decl. Ex. 7;
Covert Decl. Ex. 7.

**Response to Paragraph 69:**

Admit that Plaintiff's overall evaluation in 2020 was generally positive. She was rated "exceptional", "strong" and "good" by her evaluators in all categories, and every evaluator said they would work with her again. Dkt. No. 27-7, Ex. 7. Dispute that "several MFH partners" stated that Plaintiff needed to improve her attention to detail – only Mr. Liu and Ms. Nickel noted Plaintiff's "attention to detail" as a skill she could improve. Id. However, Mr. Liu noted that this was "not atypical for someone of her year/experience[,]" and Ms. Nickel stated it was "getting better." Id.

70.    For her work in 2020, Plaintiff received the same lockstep salary increase as other associates at her class level. Covert Decl. ¶ 38.

**Response to Paragraph 70:**

Admit.

71.    Associates at Troutman were eligible for a bonus for 2020 only if they achieved 2100 hours through a combination of both billable hours and non-billable "Total Contribution Hours" or had very high levels of performance. Wisotsky Decl. ¶ 13.

**Response to Paragraph 71:**

Admit.

72.    Plaintiff did not receive a bonus for 2020 because she did not qualify for one; Plaintiff's billable hours plus her Total Contribution Hours did not exceed 2100 hours. Id. at ¶ 14.

**Response to Paragraph 72:**

Admit.

**F.    Evaluations of Plaintiff's 2021 Performance**

73.    In 2021, MFH partners continued to express concerns about Plaintiff's performance, and those concerns were communicated to Mr. Iwashyna. Iwashyna Decl. ¶ 12.

**Response to Paragraph 73:**

Admit that the Declaration of Brian Iwashyna so states.  <u>See</u> Response to Paragraph 63.

Dispute the implication that all performance feedback and comments relayed to Mr. Iwashyna in

2021 by MFH partners were negative.  In fact, her 2021 evaluation was generally positive.

PSAMF ¶ 231.

74.    In early 2021, Mr. Bowsher voiced concerns about Plaintiff's performance to S.R.
Sidarth, another MFH partner in the Washington, D.C. office, stating that while Plaintiff was
proactive and had good attitude, she was particularly "raw" and asked some concerning
questions, which demonstrated a lack of basic understanding of closing deals. Bowsher Decl. ¶
12.

**Response to Paragraph 74:**

Admit that the quote contained in Paragraph 74 is an accurate representation of a single

comment made by Mr. Bowsher.  Plaintiff disputes that the comment including in Paragraph 74 is

complete or representative of all the comments made by Mr. Bowsher in the referenced

communication.  Mr. Bowsher also stated that Plaintiff "was very responsive, very conscientious,

proactive with communications between the various parties, and most importantly she's good

about asking questions, so don't get me wrong, she has a bright future . . . She'll climb the curve

quickly, I'm sure."  Dkt. No. 27-9, Ex. 11.

75.    In June 2021, Mr. Bowsher emailed Ms. Nickel about problems he saw with
Plaintiff's performance, including her lack of substantive knowledge or progression since
starting in MFH, and Ms. Nickel forwarded that email to Mr. Iwashyna. *Id*. at ¶ 14; Iwashyna
Decl. ¶ 19.

**Response to Paragraph 75:**

Admit with clarification that in his communication to Ms. Nickel regarding Plaintiff Mr.

Bowsher also wrote, "maybe I just have unrealistic expectations".  Ex. 32.

76.    By August 2021, Mr. Bowsher had started to lose confidence in Plaintiff's ability
to succeed in the MFH Practice Group after not seeing much improvement since she started

working with the Agency team the year prior, and Mr. Bowsher told Mr. Iwashyna that he was "not bullish on her trajectory." Bowsher Decl. ¶ 15.

**Response to Paragraph 76:**

Admit that Mr. Bowsher wrote to Mr. Iwashyna that he was "not bullish" on Plaintiff's

trajectory.

77.    In November 2021, Mr. Bowsher told Mr. Sidarth that he did not think that Plaintiff was even at the level of another associate who was two years her junior, in terms of ability to handle a deal independently. *Id*.

**Response to Paragraph 77:**

Admit.

78.    In late 2021, Mr. Iwashyna also learned that Mr. Sidarth no longer wanted to work with Plaintiff, unless a senior associate was also involved, based on Mr. Sidarth's concerns with Plaintiff's performance. Iwashyna Decl. ¶ 17.

**Response to Paragraph 78:**

Dispute.  In 2021, Plaintiff informed Mr. Iwashyna of her request to not work with Mr.

Sidarth.  See Pl. Decl. at ¶ 18.

79.    Also in 2021, Peter Strup, a MFH Partner in the Richmond office, communicated to Mr. Iwashyna that Plaintiff did not seem to understand the substance of deals and she was unable to apply learnings from one deal to the next. *Id*. at ¶ 25; Declaration of Peter Strup ("Strup Decl.") ¶ 11 (attached hereto as Appendix J).

**Response to Paragraph 79:**

Dispute.  Plaintiff selected Mr. Strup as an evaluator in connection with her 2021

performance evaluation.  Mr. Strup, however, did not complete a performance evaluation for

Plaintiff in 2021.  See Dkt. No. 27-7, Ex. 8.  Additionally, in 2021, Plaintiff discussed her

performance with Mr. Strup and he told her to keep doing what she was doing.  See Pl. Decl. at ¶

19.

80.    Plaintiff's 2021 performance evaluation is Exhibit 8 to the Iwashyna Declaration (Appendix E) and Exhibit 8 to the Covert Declaration (Appendix I).

**Response to Paragraph 80:**

Admit.

81.    For the 2021 performance review period, Plaintiff received evaluations from the following MFH partners: Lindsey Crawford, Kevin Dexter, Nora Nickel, S.R. Sidarth, Marshall Tucker, and a partner in another practice group, Kasseem Lucas, who commented on Plaintiff's non-billable contributions. Iwashyna Decl. Ex. 8; Covert Decl. Ex. 8.

**Response to Paragraph 81:**

Admit.

82.    As with Plaintiff's 2020 evaluation, Plaintiff's 2021 evaluation included significant praise about her attitude, willingness to learn, and responsiveness. *Id.*

**Response to Paragraph 82:**

Admit.  <u>See</u> Response to Paragraph 73.

83.    Plaintiff's 2021 performance evaluation noted several areas that needed improvement, such as slowing down "so that she can better absorb the substance behind the matters"; "taking concepts/experience learned in deals and applying it to future transactions"; "increase[ing] her substantive knowledge of Freddie and Fannie"; "focus on higher level issues that arise on deals"; and "developing knowledge of the practice and her skill set." Iwashyna Decl. Ex. 8.

**Response to Paragraph 83:**

Admit that the quotes contained in Paragraph 83 are accurate representations of some of

the comments on Plaintiff's 2021 performance evaluation.  Dispute that the comments included

in Paragraph 83 are complete or representative of all the comments or feedback Plaintiff received

in her 2021 performance evaluation.  <u>See</u> Response to Paragraph 73; PSAMF ¶ 231.

84.    Plaintiff received a copy of her 2021 performance evaluation.  Covert Decl. ¶ 4.

**Response to Paragraph 84:**

Admit (although ¶ 4 of the Covert Decl. does not actually support this claim).

85.    Plaintiff received a lockstep salary increase and bonus commensurate with her hours and class year for her work in 2021.  *Id.* at ¶ 38.

**Response to Paragraph 85:**

Admit.

### G. Evaluations of Plaintiff's 2022 Performance

86.     Mr. Bowsher worked with Plaintiff on a number of deals in 2022, and while he praised Plaintiff when she did a good job, Mr. Bowsher observed that Plaintiff made many substantive mistakes and careless errors, which he recorded contemporaneously through direct written feedback to Plaintiff and in his own notes. Bowsher Decl. ¶¶ 16-19.

**Response to Paragraph 86:**

Admit that the Declaration of Matthew Bowsher so states.  Dispute the implication that

Plaintiff worked with Mr. Bowsher closely or frequently during her tenure at the Firm.

87.     Throughout 2022, Mr. Bowsher continued to express to Mr. Iwashyna his concerns about Plaintiff's performance, including her lack of substantive knowledge, despite receiving significant feedback and training, and sloppiness in her work product. Iwashyna Decl. ¶ 20, Bowsher Decl. ¶ 21.

**Response to Paragraph 87:**

Dispute.  Mr. Bowsher's 2022 evaluation of Plaintiff was generally positive.  See Response

to Paragraph 92; see Dkt. No. 27-7, Ex. 9.

88.     Throughout 2022, Mr. Bowsher continued to express to Mr. Iwashyna his concerns about Plaintiff's performance, including her lack of substantive knowledge, despite receiving significant feedback and training, and sloppiness in her work product. Iwashyna Decl. ¶ 20, Bowsher Decl. ¶ 21.

**Response to Paragraph 88:**

See Response to Paragraph 87.

89.     By late 2022, Mr. Bowsher had completely lost confidence in Plaintiff's work and decided that he no longer wanted to work with Plaintiff, which he communicated to Mr. Iwashyna. Bowsher Decl. ¶¶ 20-21; Iwashyna Decl. ¶ 20.

**Response to Paragraph 89:**

Admit that the Declaration of Matthew Bowsher so states.  Further, Mr. Bowsher's 2022

evaluation of Plaintiff was generally positive.  See Response to Paragraph 92; see also Dkt. No.

27-7, Ex. 9.

90.    Plaintiff's 2022 performance evaluation is Exhibit 9 to the Iwashyna Declaration
(Appendix E) and Exhibit 9 to the Covert Declaration (Appendix I).

**Response to Paragraph 90:**

Admit.

91.    For the 2022 performance period, Plaintiff received evaluations from the
following MFH partners: Nora Nickel, Jennifer Bojorquez, Matthew Bowsher, Lindsey
Crawford, Peter Strup, and S.R. Sidarth.  Iwashyna Decl. Ex. 9; Covert Decl. Ex. 9.

**Response to Paragraph 91:**

Admit.

92.    As with Plaintiff's 2020 and 2021 evaluations, Plaintiff's 2022 evaluations
included praise for her responsiveness, eagerness to work, and great attitude.  Id.

**Response to Paragraph 92:**

Admit that Plaintiff's overall evaluation in 2022 was generally positive.  She was

overwhelmingly rated "stellar", "above-average" and "satisfactory" in all categories.  Dkt. No. 27-

7, Ex. 9; PSAMF ¶ 233.

93.    Plaintiff's 2022 performance evaluations continued to note several areas that
needed improvement, such as "work on communication and making sure that the partner/senior
associate has signed off on work product"; "greater depth of substance and the reasons behind
why certain documentation is acceptable while other documentation is not"; "become more
familiar with complex deal types and issues"; need to see "her problem solving skill[s] develop
and for her to develop more of a process to answer questions she may have on her own";
"general knowledge of the multifamily housing space"; "slow down a little in order to better
understand the big picture"; "needs to become more thorough and more efficient"; "ask
questions early and often when handling a transaction." Id.

**Response to Paragraph 93:**

Admit that the quotes contained in Paragraph 93 are accurate representations of some of the comments on Plaintiff's 2022 performance evaluation. Dispute that the comments included in Paragraph 93 are complete or representative of all the comments or feedback Plaintiff received in her 2022 performance evaluation. See Response to Paragraph 92.

94.    Mr. Bowsher's 2022 review of Plaintiff's performance praised Plaintiff for her responsiveness and follow up, but provided specific examples of mistakes Plaintiff made in his deals that illustrated what he noted as needed areas of improvement, which included "more attention to detail, more independent analysis, and demonstration of a deeper level of understanding of the underlying issues, rather than merely moving the checklist forward at lightspeed." *Id.*

**Response to Paragraph 94:**

Admit.

95.    Mr. Sidarth's numerical ratings were the lowest of all reviewers in 2022, even noting her as a "2 – Needs Improvement" in several areas. *Id.*

**Response to Paragraph 95:**

Admit with clarification that Mr. Sidarth rated Plaintiff as a "3 – Satisfactory Performance" in seven areas, as a "4 – Above Average" in three areas, as a "5 – Stellar Performance" in five areas and as "Not Applicable" in one area.

96.    Plaintiff received a copy of her 2022 performance evaluation. Covert Decl. ¶ 4.

**Response to Paragraph 96:**

Admit (although Paragraph 4 of Ms. Covert's Declaration does not support the stated proposition).

97.    Plaintiff received a lockstep salary increase and bonus commensurate with her hours and class year for her work in 2022. Covert Decl. ¶ 38.

**Response to Paragraph 97:**

Admit.

### H.    Evaluations of Plaintiff's 2023 Performance

98.    In late 2022, Mr. Iwashyna encouraged Dameon Rivers, a new partner who had joined the MFH Practice Group in the fall of 2022 in the Washington, D.C. office, to work with Plaintiff, and Mr. Rivers agreed.  Iwashyna Decl. ¶ 27.

**Response to Paragraph 98:**

Dispute.  After Mr. Rivers joined the MFH Practice Group, Plaintiff reached out to Mr.

Rivers to work with him.  See Pl. Decl. at ¶ 19.

99.    In April 2023, when Mr. Iwashyna checked in with Mr. Rivers on how things were going with Plaintiff, Mr. Rivers told Mr. Iwashyna that he thought Plaintiff had a "low ceiling" and was not picking up on substantive skills and knowledge, despite training and feedback that Mr. Rivers and his senior associate, Lanre Popoola, had provided to Plaintiff. Iwashyna Decl. ¶ 28; Declaration of Dameon Rivers ("Rivers Decl.") ¶ 11 (attached hereto as Appendix K).

**Response to Paragraph 99:**

Admit.

100.    Mr. Rivers communicated to Mr. Iwashyna in April 2023 that because he had not seen any improvement in Plaintiff's performance, he would no longer staff Plaintiff on his deals. Iwashyna Decl. ¶ 28; Rivers Decl. ¶ 11.

**Response to Paragraph 100:**

Admit.

101.    Mr. Rivers feedback was a "tipping point" for Mr. Iwashyna since several MFH partners, including most of the MFH partners in Plaintiff's Washington, D.C. office, had decided to no longer work with Ms. Sankano, and Mr. Iwashyna had hoped Mr. Rivers would be a lifeline for Ms. Sanako; however, after he received the negative feedback on Plaintiff's performance from Mr. Rivers in the spring of 2023, Mr. Iwashyna began to consider separating Plaintiff from employment with the firm. Iwashyna Decl. ¶ 34.

**Response to Paragraph 101:**

Admit.

102.    On April 19, 2023, Mr. Iwashyna emailed Mr. Tucker and Ms. Nickel, both MFH partners, informing them that he thought they were "going to have to make a hard call on [Plaintiff] at some point."  Id.

**Response to Paragraph 102:**

Admit that the quote contained in Paragraph 102 is an accurate representation of part of Mr. Iwashyna's email to Mr. Tucker and Ms. Nickel. Dispute that the quote included in Paragraph 102 is complete or representative of the entire communication.

103.    Around the same time, in the spring of 2023, Mr. Strup spoke with Mr. Iwashyna about his continued concerns with Plaintiff, reporting that her performance had not improved, and things were not working out with her. Iwashyna Decl. ¶ 26; Strup Decl. ¶ 13.

**Response to Paragraph 103:**

Admit with the clarification that Mr. Strup only worked with Plaintiff on one deal in 2023.

See Pl. Decl. at ¶ 20.

104.    In yet another attempt to find a partner with whom Plaintiff could work satisfactorily, in May 2023, Mr. Iwashyna reached out to Mr. Lautt to ask that he try working with Plaintiff again, which Mr. Lautt agreed to do. Iwashyna Decl. ¶ 16; Lautt Decl. ¶ 11.

**Response to Paragraph 104:**

Dispute that the document cited in Paragraph 16 of Mr. Iwashyna's declaration supports the proposition cited. In fact, the document shows that in May 2023, Plaintiff reached out to Mr. Lautt to work together and Mr. Iwashyna stated that Plaintiff "has an amazing attitude and willingness to work." Iwashyna Decl., Ex. 12.

105.    Also in May 2023, Mr. Iwashyna attended a meeting of the Firm's Practice Group Leaders, where firm management asked them to "take a hard look" at their associates to determine their likely future path at the firm. Iwashyna Decl. ¶ 36.

**Response to Paragraph 105:**

Admit.

106.    After the Practice Group Leader meeting in May 2023, Mr. Iwashyna emailed the MFH Practice Director, Mary Cabell Sulc, asking her for information about the MFH associates, the new "Career Track" option that the Firm planned to offer, and certain MFH associates who Mr. Iwashyna characterized as "problem people," which included Plaintiff. *Id.*

**Response to Paragraph 106:**

Dispute.  Paragraph 106 is a mischaracterization of record evidence.  In his email to Ms.

Sulc, Mr. Iwashyna asked about the "career track / alternate path option" and further asked "what

year" is Plaintiff.  See Iwahyna Decl., Ex. 19.

107.    On June 16, 2023, Mr. Iwashyna, as the MFH Practice Group Leader, participated
in a meeting to discuss the associates in the MFH Practice Group and their path forward at the
Firm; in attendance at that meeting were (a) the Chair of the Firm's Associate Development
Committee ("ADC"), (b) representatives of the firm's Legal Talent department, including Kalle
Covert, Director of Professional Development, (c) the MFH Practice Director, Ms. Sulc, and (d)
the MFH partners responsible for MFH associate development—Ms. Nickel (who was one of the
Professional Development Partners for the MFH Practice Group), Mr. Tucker (a member of the
firm's ADC), and Mr. Schiff (who was the other MFH Professional Development Partner and a
member of the firm's ADC). Iwashyna Decl. ¶ 37; Nickel Decl. ¶¶ 4, 16; Schiff Decl. ¶ 12;
Declaration of Marshall Tucker ("Tucker Decl.") ¶ 12 (attached hereto as Appendix L); Covert
Decl. ¶ 5.

**Response to Paragraph 107:**

Admit.

108.    The June 16, 2023 mid-year meeting was part of the firm's standard cycle for
reviewing associate performance, allowing the Practice Groups to follow up on issues identified
in the previous year-end reviews, identify any issues that have arisen with respect to their
associates, and assess how associates are progressing in their path to partnership. Covert Decl. ¶
6.

**Response to Paragraph 108:**

Dispute.  Paragraph 6 of Ms. Covert's Declaration states that the "purpose of this meeting

was to discuss the associates in the MFH practice group and their path forward."  Covert Decl. ¶

6.

109.    Leading up to the mid-year meeting, on June 13, 2023, Ms. Sulc sent Ms. Covert
a list of all associates in the MFH Practice Group with a high-level assessment of each
associate's performance. *Id*.; Declaration of Mary Cabell Sulc ("Sulc Decl.") ¶ 4 (attached hereto
as Appendix M).

**Response to Paragraph 109:**

Admit.

110.    Plaintiff had been identified by the MFH Practice Group as being on the "Watch List," and in the summary she provided to Ms. Covert on June 13, 2023, Ms. Sulc wrote the following:

> Gita was struggling at the time of the merger, so we moved her onto deals with leg[acy] T[routman S[anders] attorneys and she was doing well. However, it seems she may have plateaued and is no longer progressing in her development. Her hours are good and she's very responsive, but she's not operating at the level we'd expect. She's worked with many different partners in the group (DC and RIC) to find a fit, without success.

Sulc Decl. ¶ 4.

**Response to Paragraph 110:**

Admit.

111.    During the mid-year meeting in June 2023, the participants discussed Plaintiff's performance, specifically that she was not performing at the substantive level expected of a rising fifth-year associate and that it was unlikely she would be promoted to partner.  Iwashyna Decl. ¶ 37; Nickel Decl. ¶ 16; Schiff Decl. ¶ 12; Tucker Decl. ¶ 12; Covert Decl. ¶ 6.

**Response to Paragraph 111:**

Dispute.  In their Declarations, Mr. Iwashyna, Ms. Nickel, Mr. Schiff and Mr. Tucker all

admit that they do not remember the details of the discussion.

112.    While the participants in the June 2023 mid-year meeting considered an option of moving Plaintiff from the partnership track to the newly formed "career path" for associates, they deferred any final decision until they had a chance to consider the upcoming evaluations of Plaintiff's 2023 performance. *Id*.

**Response to Paragraph 112:**

See Response to Paragraph 111.

113.    Following the June 2023 mid-year meeting, Ms. Nickel, along with Ashanté Smith, set up a call with the firm's Director of Career Coaching & Planning, Tiffany Southerland Jordan, to discuss referring Plaintiff to the firm's professional coaching program. Nickel Decl. ¶ 17.

**Response to Paragraph 113:**

Admit.

114.    Ms. Nickel also staffed Plaintiff on a deal in the summer of 2023 at Mr. Iwashyna's request.  Iwashyna Decl. ¶ 29; Nickel Decl. ¶¶ 8-9.

**Response to Paragraph 114:**

Admit that the Declarations of Mr. Iwashyna and Ms. Nickel so state.

115.    After the deal was completed, on June 28, 2023, Ms. Nickel set Plaintiff an email providing detailed feedback on what went well and what needed improvement, specifically a need to slow down, review things more closely, proofread, and rely less on her assistant; and Ms. Nickel forwarded her email to Mr. Iwashyna. Iwashyna Decl. ¶ 29; Nickel Decl. ¶ 10.

**Response to Paragraph 115:**

Admit.

116.    In July 2023, Mr. Iwashyna continued to seek out partners to work with Plaintiff, and suggested that Plaintiff contact Jennifer Bojorquez, a MFH partner in the Orange County, CA, office, with whom Plaintiff had done limited work in the past.  Iwashyna Decl. ¶ 31.

**Response to Paragraph 116:**

Admit.

117.    Ms. Bojorquez worked with Plaintiff on a few deals in July 2023.  Declaration of Jennifer Bojorquez ("Bojorquez Decl.") ¶ 4 (attached hereto as Appendix N).

**Response to Paragraph 117:**

Admit.

118.    On August 2, 2023, Mr. Iwashyna contacted Ms. Bojorquez to hear how things were going with Plaintiff, and Ms. Bojorquez indicated surprise that Plaintiff was a fourth-year associate, as she had assumed Plaintiff was much more junior, and commented that Plaintiff's performance was below what she expected of a mid-level associate. Iwashyna Decl. ¶¶ 32-33; Bojorquez Decl. ¶¶ 8-9.

**Response to Paragraph 118:**

Dispute.  On August 2, 2023 Ms. Bojorquez stated that "overall" working with Plaintiff

"had been a positive experience."  Dkt. No. 27-7, Ex. 17.

119.    On August 14, 2023, Mr. Iwashyna discussed Plaintiff's work performance with Sona Spencer, the firm's Chief Legal Talent Officer. Iwashyna Decl. ¶ 38; Declaration of Sona Spencer ("Spencer Decl.") ¶ 6 (attached hereto as Appendix O).

**Response to Paragraph 119:**

Admit.

120.    During their August 14, 2023 meeting, Ms. Spencer advised Mr. Iwashyna that if the MFH Practice Group knew Plaintiff would likely never become a partner at the firm, they needed to make the hard decision and terminate Plaintiff's employment. Iwashyna Decl. ¶ 38; Spencer Decl. ¶ 6.

**Response to Paragraph 120:**

Dispute.  There were non-partnership tracks at the Firm for which Plaintiff was a candidate – indeed, Mr. Schiff testified at length regarding non-partnership tracks at the Firm.  PSAMF ¶ 239.

121.    During their August 14, 2023 meeting, Ms. Spencer also advised Mr. Iwashyna that Plaintiff's lack of substantive development was likely not a good fit for a performance improvement plan ("PIP") or a corrective action plan ("CAP"), as it would be difficult for Plaintiff to show measurable improvement in a 30, 60, or 90- day period. Iwashyna Decl. ¶ 39; Spencer Decl. ¶ 8.

**Response to Paragraph 121:**

Admit.

122.    Ms. Spencer also advised Mr. Iwashyna that the new "career path" the firm was rolling out as an alternative to partnership track was not a good fit for Plaintiff, as it was not intended to be an option for poorly performing associates, like Plaintiff. Iwashyna Decl. ¶ 40; Spencer Decl. ¶ 7.

**Response to Paragraph 122:**

Dispute.  In June 2023, before she made a protected complaint of discrimination and retaliation, Plaintiff was "potential for alternate track."  PSAMF ¶ 238.

123.    Following Mr. Iwashyna's meeting with Ms. Spencer, Mr. Iwashyna concluded that the firm would need to terminate Plaintiff's employment, but at the suggestion of Ms.

Spencer, Mr. Iwashyna opted to review the forthcoming evaluations of Plaintiffs' 2023 performance before taking any action. Iwashyna Decl. ¶ 41; Spencer Decl. ¶ 7.

**Response to Paragraph 123:**

Admit.

124.    On October 12, 2023, the firm's Legal Talent department sent Mr. Iwashyna a link to access the 2023 performance evaluations for the associates in the MFH Practice Group. Iwashyna Decl. ¶ 42.

**Response to Paragraph 124:**

Admit.

125.    Plaintiff's 2023 performance evaluation is Exhibit 10 to the Iwashyna Declaration (Appendix E) and Exhibit 10 to the Covert Declaration (Appendix I).

**Response to Paragraph 125:**

Admit with clarification that this is not a "material fact" for purposes of a Rule 56 motion

in this action.

126.    For the 2023 performance period, Plaintiff received evaluations from the following MFH partners: Nora Nickel, Ashante Smith, Virginia Stitzer, Marshall Tucker, Jennifer Bojorquez, Lindsey Crawford, Jonathan Lautt, and Peter Strup. Iwashyna Decl. Ex. 10; Covert Decl. Ex. 10.

**Response to Paragraph 126:**

Admit.

127.    Plaintiff's 2023 performance evaluations had gotten worse than they had been in previous years, and contained several "needs improvement" ratings, along with more negative comments. Iwashyna Decl. ¶ 42 & Ex.10.

**Response to Paragraph 127:**

Dispute that Plaintiff's overall evaluation in 2023 was generally negative.  She was rated

"stellar", "above-average" and "satisfactory" by the overwhelming majority of her evaluators in

all categories.  Ex. 17.  For example, Ms. Bojorquez stated, "[She] is eager to learn and be

mentored. . . . [she] help[s] us stay on top of deals that had shorter than normal timelines. . . . Gita

is very responsive and will jump on an assignment when received.  She is very reliable . . . She readily takes ownership of matters and acknowledges when a situation should have been handled differently."  Id.  Ms. Crawford stated, "Gita has marketed herself across the entire group and started working with other partners and senior associates.  She is always looking for ways to enhance her personal brand and that of the team and the firm. . . . Clients really like Gita as do I. We would like to see her succeed[.]"  Id.  Ms. Loughran stated, "Gita is very responsive and communicative.  She takes ownership of her tasks and works hard to keep deals moving forward. . . . Gita is working very hard to advance within the practice group.  She is dependable, responsive and eager to learn.  She helps me tremendously in keeping deals on track.  A dedication to client care is very clear with Gita and it is important to her that our clients are taken care of. . . . I enjoy working with Gita."  Id.  Mr. Lucas stated, "Gita played a vital role in the Firm's DEI initiatives and should be recognized for her efforts."  Id.  Ms. Mufarrige stated, "Gita is a team player.  She's always willing to help out on deals.  She also does a good job checking in to see if there are matters she can assist on. . . . Gita is efficient and keeps deals moving forward. . . . I've never received negative feedback from a client on Gita's performance.  Clients enjoy working with Gita."  Id. Ms. Nickel stated, "Gita is very responsive, proactive and always eager to assist. . . . Gita has a great attitude, and her responsiveness is always appreciated.  She always gets assignments back to me on time or early."  Id.  Ashante Smith stated, "Gita has routinely demonstrated a willingness to pitch in where needed. . . . Gita is extremely responsive and turns work product quickly. . . . She actively pursues work and will reach out anytime she has capacity to take on more.  She is also communicative and proactive on assignments and will offer to assist beyond the scope of the initial assignment – suggesting where she can be of use.  Gita has a thorough understanding of the team's practices and procedures as well as the mechanics of a deal.  Gita also has a collaborative attitude

and seems to enjoy working with a number of attorneys across offices. . . . Gita has demonstrated

a strong dedication to the team and the firm. She actively seeks guidance and constructive

feedback to learn and grow. Gita has also demonstrated strong networking skills that are useful

for client development." Id. Mr. Strup stated, "Gita's attitude and commitment to self-

improvement is commendable. She wants to succeed." Id. Mr. Tucker stated, "Gita has been

very involved in the practice group and firm activities. . . . Gita is very responsive and on top of

deals." Id.

128.    The average of Plaintiff's numerical ratings in her 2023 performance evaluations
was 3.63, which was the second lowest of all MFH associates for that year. Covert Decl. ¶ 21.

**Response to Paragraph 128:**

Admit that the average of Plaintiff's numerical ratings in her 2023 performance evaluations

was 3.63.

129.    The only MFH associate with a lower average rating was a second-year associate
whose 2023 overall average rating represented an improvement over her average rating the prior
year. *Id*.

**Response to Paragraph 129:**

Admit that the declaration of Kalle Covert so states.

130.    Plaintiff's average ratings dropped each year from 2021 to 2023, which is the
exact opposite of what the firm expects to see from associates as they gain more experience and
become more senior. Covert Decl. ¶¶ 21-22.

**Response to Paragraph 130:**

Admit that the Declaration of Kalle Covert so states. Dispute that the average of Plaintiff's

numerical ratings in her performance evaluations was ever less than satisfactory. In fact, a "3" on

the rating scale represents "satisfactory performance that meets expectations for as associate of

that class year." Iwashyna Decl., Ex. 10.

### F.    Mr. Iwashyna's Decision to Terminate Plaintiff's Employment

131.    On October 24, 2023, Mr. Iwashyna, Ms. Nickel, Mr. Schiff, Mr. Tucker, Ms. Sulc, and the incoming MFH Practice Group Leader, Ms. Stitzer, met to discuss the MFH associates in light of their 2023 performance evaluations. Iwashyna Decl. ¶ 43; Nickel Decl. ¶ 19; Schiff Decl. ¶ 15; Tucker Decl. ¶ 14; Sulc Decl. ¶ 11.

**Response to Paragraph 131:**

Admit.

132.    During the October 24, 2023 meeting, the participants discussed (a) Plaintiff's 2023 performance evaluations, which indicated that Plaintiff was performing poorly and not meeting the firm's expectations for an associate at her level and (b) concerns about Plaintiff's performance that various partners had expressed over the years, which indicated that Plaintiff was not meeting the expectations for an associate at her level of seniority. *Id.*

**Response to Paragraph 132:**

Dispute that Plaintiff was performing poorly and not meeting the Firm's expectations.  See Response to Paragraph 130.

133.    Mr. Iwashyna determined that Plaintiff's performance problems included a lack of substantive knowledge on deals, sloppiness in her work product, lack of attention to detail, problems with issue spotting, and a failure to apply learnings from one deal to the next. Iwashyna Decl. ¶ 47.

**Response to Paragraph 133:**

Admit that the Declaration of Brian Iwashyna so states.

134.    These issues had been noted in Plaintiff's performance evaluations for three years; however, the more senior Plaintiff became, the more troubling her performance problems became, as associates are expected to improve in these areas as they gain experience. *Id.*

**Response to Paragraph 134:**

Dispute.  The average of Plaintiff's numerical ratings in her performance evaluations was never below a 3.63, which reflects satisfactory performance.  See Response to Paragraph 130.

135.    Mr. Iwashyna concluded that Plaintiff was not progressing in her substantive legal skills, despite years of training and feedback from MFH partners, and, moreover several partners

had decided not to work with Plaintiff, or would only work with her on their less complex deals. *Id*.

**Response to Paragraph 135:**

Dispute.  Plaintiff complained about the complete lack of training she received at the D.C. office and was provided no guidance on how to receive additional training other than travelling hours away to Richmond, Virginia.  PSAMF ¶¶ 261-62.

136.    Mr. Iwashyna had decided to terminate Plaintiff's employment based on his own review of Plaintiff's written performance evaluations and the other feedback that Mr. Iwashyna had received from MFH partners, to include, Mr. Fireison, Mr. Lautt, Mr. Sidarth, Mr. Bowsher, Ms. Crawford, Mr. Stup, Mr. Rivers, Ms. Nickel, Ms. Bojorquez, Mr. Tucker, and Ms. Stitzer, all of which indicated that Plaintiff was not performing at the firm's expectations for an associate at her level – a mid-level associate going into their fifth year. Iwashyna Decl. ¶¶ 45-47.

**Response to Paragraph 136:**

Dispute.  <u>See</u> Response to Paragraph 127.

137.    Mr. Iwashyna made his decision to terminate Plaintiff's employment with input from Ms. Nickel, Mr. Schiff, Mr. Tucker, and Ms. Spencer. Iwashyna Decl. ¶ 45; Nickel Decl. ¶ 20; Schiff Decl. ¶ 17; Tucker Decl. ¶ 15.

**Response to Paragraph 137:**

Admit.

**I.    Termination of Plaintiff's Employment**

138.    On November 2, 2023, Mr. Iwashyna, Ms. Nickel, Mr. Schiff, Mr. Tucker, Ms. Stitzer, Ms. Sulc, Ms. Covert, and Ms. Spencer met with the chair of the ADC, Steve Hewitson, to discuss the MFH associates; in that meeting, Mr. Iwashyna communicated his decision to terminate Plaintiff's employment. Iwashyna Decl. ¶ 51; Nickel Decl. ¶ 22; Schiff Decl. ¶ 19; Tucker Decl. ¶ 17; Sulc Decl. ¶ 12; Covert Decl. ¶ 8; Spencer Decl. ¶ 9.

**Response to Paragraph 138:**

Admit that the cited Declarations so state.  .

139.    On November 29, 2023, Mr. Schiff, Mr. Tucker, and Ms. Covert met with Plaintiff to communicate the firm's decision to terminate her employment. Schiff Decl. ¶ 27; Tucker Decl. ¶ 20; Covert Decl. ¶ 11.

**Response to Paragraph 139:**

Admit.

140.    The firm offered Plaintiff three (3) months of paid, confidential job search leave as severance, but Plaintiff did not return a signed separation agreement by the deadline of December 6, 2023, so the firm terminated her employment on December 7, 2023. Covert Decl. ¶¶ 11, 14.

**Response to Paragraph 140:**

Admit with clarification that the separation agreement and, consequently, the severance was conditioned on Plaintiff releasing all claims against the Firm and its Partners.

141.    The timing and process of Plaintiff's termination meeting were consistent with all other associates who were terminated as part of the 2023 evaluation process. Covert Decl. ¶ 11.

**Response to Paragraph 141:**

Dispute.   Other associates were put on a Performance Improvement Plan, Corrective Action Plan, or referred to and provided coaching before termination.  Ex. 14.

**J.    Mr. Bowsher's 2022 Phone Call with Plaintiff Regarding Notary Pages**

142.    In 2022, while working on a deal with Mr. Bowsher (Aspire at Live Oak), Plaintiff sent an email to the client agreeing to split out the notary pages from the signature pages. Bowsher Decl. ¶ 38.

**Response to Paragraph 142:**

Admit.

143.    Mr. Bowsher called Plaintiff and asked why the client requested to split out notary pages and signature pages this way. *Id*.

**Response to Paragraph 143:**

Dispute.   Plaintiff testified, "Within minutes, Matt [Bowsher] called me, and he started mansplaining to me, thinking that I didn't know what a notary was, and I let him finish and I told him like, Hey Matt, I know what a notary is, this is just the way the client wants the signature pages set up, and he hung up the phone, and that was the first instance."  Pl. Dep. 186:18-187:20.

144.    Because Mr. Bowsher was not sure whether Plaintiff was familiar with notaries, he took the opportunity to explain notaries to Plaintiff, just as he had explained similar concepts to Plaintiffs in the past while working on deals together. *Id.*

**Response to Paragraph 144:**

Admit with clarification.  See Response to Paragraph 143.

145.    On the call, Plaintiff explained that the client wanted to split the pages, and another partner, David McPherson, had agreed to do this in the past.  *Id.* at ¶ 39.

**Response to Paragraph 145:**

Dispute.  See Response to Paragraph 143.

146.    Following the call, Plaintiff sent Mr. Bowsher a follow-up email on the matter giving him an example of the client's approach on a prior deal.  Bowsher Decl. ¶ 40 & Ex. 35.

**Response to Paragraph 146:**

Admit.

147.    Mr. Bowsher responded "Understood, totally makes sense. Thanks again." Bowsher Decl. ¶ 40 & 35.

**Response to Paragraph 147:**

Admit.

148.    Mr. Bowsher did not make any statement about Plaintiff's race during this call. Bowsher Decl. ¶ 39 & 35; Pl. Dep. 186:2-187:2.

**Response to Paragraph 148:**

Admit.

149.    Plaintiff "did not think anything of [the call]," but thought that it was strange.  Pl. Dep. 187:3-4.

**Response to Paragraph 149:**

Admit that, at that point in time, Plaintiff "did not think anything of the call," but thought that it was strange.  Pl. Dep. 187:3-4.

**K.    Mr. Bowsher's 2022 Emails with Plaintiff Regarding Language That Had Previously Been Accepted in a Deal**

150.    In April 2022, while working on a deal with Mr. Bowsher (Estates at Palm Bay), Plaintiff sent Mr. Bowsher an email stating that she had no comments on an opinion letter that opposing counsel (Winstead) had proposed. Bowsher Decl. ¶ 41.

**Response to Paragraph 150:**

Admit.

151.    Mr. Bowsher asked Plaintiff if she had ever seen their MFH Practice Group accept that language before, stating:

> Not asking you to push back blindly on the [borrower's] counsel on this, rather I am asking you to give this some thought, consider whether you've ever seen it in the year you've been closing loans with us, and also pull prior Winstead opinions to see if Troutman has accepted it from this firm, then let's circle-back and see if it's appropriate to reject it.

Bowsher Decl. ¶ 41 & Ex. 36.

**Response to Paragraph 151:**

Admit.

152.    Plaintiff responded that she had seen that type of language before, but on the wrong type of deal (Fannie Mae rather than Freddie Mac) and noted that she "might have got the opinion languages confused" and then recommended that they push back on the opinion language.  Bowsher Decl. ¶ 42 & Ex. 36.

**Response to Paragraph 152:**

Admit.

153.    After opposing counsel pointed out that the firm had taken inconsistent positions in this deal and a prior deal, Mr. Bowsher realized that Plaintiff had not done what he asked her to do (i.e., check prior opinions to see if Troutman had accepted the language previous), and only then did Plaintiff confirm to Mr. Bowsher that the language had been accepted by Troutman in a prior Freddie Mac deal, contradicting her prior response. Bowsher Decl. ¶ 43.

**Response to Paragraph 153:**

Dispute. Plaintiff testified, "I went in the system and I saw that this deal was just closed like a week prior with the same exact language that Matt was mansplaining to me about and the person who closed the deal was Matt, himself. So I told him." Pl. Dep. 187:17-188:10; see also Ex. 34. Plaintiff further testified that Mr. Bowsher blamed the "mix up" on another Black associate, Ari Ebi. Pl. Dep. 188:12-16.

154.    While Mr. Bowsher was disappointed in Plaintiff's performance, he did not admonish her but instead just said "Meh, no biggie. I'll respond." Bowsher Decl. ¶ 44 & Ex. 37.

**Response to Paragraph 154:**

Admit.

155.    Mr. Bowsher did not make any statement about Plaintiff's race in any of these emails about whether certain language had previously been accepted. Bowsher Decl. Exs. 36-37.; Pl. Dep. 214:12-20.

**Response to Paragraph 155:**

Admit that Mr. Bowsher did not make any statement about Plaintiff's race in the cited emails.

**L.     Mr. Bowsher's 2022 Emails with Plaintiff Regarding Local Opinions**

156.    In May of 2022, during the course of another deal with Mr. Bowsher (Andorra Point), Plaintiff told opposing counsel that "no enforceability/local opinions are needed because this transaction is a supplemental loan." Bowsher Decl. ¶ 46.

**Response to Paragraph 156:**

Admit.

157.    Mr. Bowsher thought that Plaintiff was incorrect and responded "Please issue a correction to your statement below. It is not accurate to say that "no enforceability/local opinions are needed." Bowsher Decl. ¶ 46 & Ex. 38.

**Response to Paragraph 157:**

Admit that Mr. Bowsher said, "Please issue a correction to your statement below. It is not accurate to say that "no enforceability/local opinions are needed."  Dispute that Plaintiff's email to opposing counsel was incorrect.

158.    Plaintiff responded that local opinions were not required for supplemental loans and referenced a Freddie Mac published opinion and guidance from another MFH partner. Bowsher Decl. ¶ 47 & Ex. 38.

**Response to Paragraph 158:**

Admit.  Plaintiff testified, "Matt emails me mansplaining again, not asking me like "Hey Gita, why would you say that or anything like that and said like you need to, basically, retract the statement, that's incorrect.  So I emailed - I forwarded the email to Whitney, and Whitney said he's wrong, hold on.  So Whitney went ahead and drafted an email for me and she texted me and said if he's going to go complain and say that you don't know what you're doing, meanwhile, you're correcting him."  Pl. Dep. 190:3-13.  Ms. Loughran testified, "Gita sent me an email -- she had forwarded me the email that Matt sent to her telling her she needed to issue -- or she needed to correct her statement regarding the requirement of a local opinion for a supplemental loan. She asked me if this was right and I said no in an email and I think I told her to hang on. And then we got on the phone after that if I'm not mistaken. We talked on the phone. I told her Matt is not correct. Don't use local opinions for supplemental. I would help her craft a response to Matt to try to tactfully tell him that he was wrong and she didn't need to issue a correction statement." Loughran Dep. Day 1 79:4-80:5; see also Ex. 26.  Ms. Loughran also testified that she spoke to Ms. Smith, Mr. Iwashyna and Ms. Nickel about this incident.  Loughran Dep. Day 1 80:8-15. Similarly, Ashante Smith (Partner)  spoke to Mr. Iwashyna about this incident but was brushed off.  Pl. Dep. 191:12-17.

159.     After reviewing the materials Plaintiff sent to him, Mr. Bowsher sent an email acknowledging his error, stating "Oh, wow! Ha!! That's a massive disconnect between the form opinion and the guidelines…Thanks for bringing this to my attention! I'll ping Jeremy and Virginia. Hard to argue with the Guidelines, you're totally right of course…." Bowsher Decl. ¶ 48 & Ex. 38.

**Response to Paragraph 159:**

Admit with clarification.  Plaintiff testified, "Matt at that time had this preconceived notion that I didn't know what I was doing.  So when he wrote all of this, he was loud and wrong in this email thread."  Pl. Dep. 216:1-4.  She further testified, "He was definitely mansplaining in the whole paragraph, and he was actually wrong. So that's what happened."  Pl. Dep. 216:8-10.  She also testified, "[Matt's communications were] very aggressive, very condescending.  Like he came off like I did not know what I was speaking about.  That's what I mean by mansplaining."  Pl. Dep. 193:16-20.  She further explained, "I showed my [] emails [from Mr. Bowsher] to Ari and he told me that [Mr. Bowsher] did not speak to him like that."  Pl. Dep.194:5-6.

160.     Mr. Bowsher did not make any statement in this email exchange indicating that he was commenting about Plaintiff's race.  Bowsher Decl. Ex. 38; Pl. Dep. 223:7-12.

**Response to Paragraph 160:**

Admit that Mr. Bowsher did not make any statement about Plaintiff's race in the email exchange.  Dispute any implication that Mr. Bowsher did not discriminate or retaliate against Plaintiff.  In fact, Plaintiff testified that, at the time, Ms. Loughran told her, "the [MFH] group has a history of pushing Black women out of the group."  Pl. Dep. 190:14-15.  Plaintiff further testified, "She [Whitney] told me that she forwarded the email to Brian and Nora and Ashante and that how Brian rushed into her office and said I just want to say that Matt is not a racist, and she told Brian no one is calling him one."  Pl. Dep. 190:16-20.  Plaintiff testified, "And I remember speaking to Ashante about this and I told Ashante these are microaggressions."  Pl. Dep. 191:6-11.  Plaintiff explained, "These are like little subtle micro aggressions that show up because people think in

order for someone to be racist, they may have to show up with a KKK hoodie on and that's what

it's going to take, but that's not how discrimination works now, especially in the workplace."  Pl.

Dep. 202:7-19.

**M.     Mr. Bowsher's August 3, 2023 Email to Plaintiff**

161.    In June 2023, Mr. Bowsher was asked to handle a deal involving two properties
called the Falls of Braeswood and the Falls of Dairy Ashford. Bowsher Decl. ¶ 27.

**Response to Paragraph 161:**

Admit.

162.    Mr. Bowsher asked Kelly Mufarrige to serve as the senior associate on the deal,
and Ms. Mufarriage asked to staff Plaintiff as the junior associate on the deal, to which Mr.
Bowsher agreed because he was comfortable with Ms. Mufarrige overseeing Plaintiff's work.
*Id*.

**Response to Paragraph 162:**

Admit that Mr. Bowsher asked Ms. Mufarrige to be the senior associate on the deal.

Dispute the proposition that Mr. Bowsher agreed for Plaintiff to be on the deal because he was

comfortable with Ms. Mufarrige overseeing Plaintiff's work, as that is not included in the

Declaration of Matthew Bowsher.  Further, Plaintiff testified that when Ms. Mufarrige put her on

the deal, she did not know that Mr. Bowsher was on the deal as well.  <u>See</u> Pl. Dep. 193:6-11.

163.    As it was typical for junior associates to take the administrative steps to open new
matters, Mr. Bowsher asked Plaintiff to open a new matter for the deal with Mr. Bowsher
receiving 70% of the "matter responsible" credit and Ms. Mufarrige receiving 30%. *Id*.

**Response to Paragraph 163:**

Admit.

164.    On July 31, 2023, Plaintiff sent an email to the MFH New Matters team,
instructing the matter responsible credit splits that Mr. Bowsher had requested. Bowsher Decl. ¶
27 & Ex. 37.

**Response to Paragraph 164:**

Admit.

165.    When she learned that the MFH New Matters team incorrectly gave Mr. Bowsher 100% of the matter responsible credit, on August 3, 2023, Plaintiff sent Mr. Bowsher an email saying that the MFH New Matters team had messed up and that Ms. Mufarrige did not have any credit. Bowsher Decl. ¶ 28 & Ex. 31.

**Response to Paragraph 165:**

Admit.

166.    At Mr. Bowsher's request, Plaintiff then emailed MFH New Matters to try and fix the problem. Instead of fixing the problem, however, Plaintiff created more confusion in the wording of her email to MFH New Matters by stating that "Kelly should be the matter responsible attorney for this one. See below. Please update." Bowsher Decl. ¶¶ 28-29 & Ex. 30.

**Response to Paragraph 166:**

Admit that Plaintiff sent an email to MFH New Matters to correct their mistake. Dispute

the proposition that Plaintiff "created more confusion" with her language.  Ms. Loughran testified,

"The administration department had got it wrong.  She [Plaintiff] had sent the split correctly the

first time."  Loughran Dep. Day 1 85:15-17.

167.    Confused by Plaintiff's contradictory instructions, MFH New Matters changed the matter assigned credit (a different category), but left the matter responsible credit as it was, incorrectly reflecting Mr. Bowsher as having 100% of that credit. Bowsher Decl. ¶ 30.

**Response to Paragraph 167:**

Admit that MFH New Matters changed the matter assigned credit and did not change the

matter responsible credit.  Dispute the proposition that this error was the fault of Plaintiff.  See

Response to Paragraph 166.

168.    In response, Plaintiff sent two emails: (a) in the first email, Plaintiff stated that "Kelly should be the matter responsible. So it should change from Matt to Kelly," and (b) in the next email, Plaintiff indicated that the matter responsible credits should be assigned only to Ms. Mufarrige. Bowsher Decl. ¶ 30 & Ex. 30.

**Response to Paragraph 168:**

Admit with clarification.  PSAMF ¶¶ 241-42.

169.    Both of Plaintiff's emails were incorrect, so Mr. Bowsher stepped in and wrote: "It should not be 100% Kelly. It should be as was originally requested, per the thread below. Kelly Mufarrige (30%) / Matt Bowsher (70%)." Bowsher Decl. ¶ 31 & Ex. 30.

**Response to Paragraph 169:**

Admit.  Dispute any implication that Plaintiff instructed MFH New Matters to give Ms.

Mufarrige 100% of the matter responsible credit.  PSAMF ¶¶ 241-42.

170.    Mr. Bowsher followed up with an email only to Plaintiff, stating that she was confused and pointing out the correct splits. Bowsher Decl. ¶ 32 & Ex. 32.

**Response to Paragraph 170:**

Admit that Mr. Bowsher told Plaintiff, "you're confused."  Dispute any implication that

Plaintiff did not understand the correct splits or gave incorrect instruction to MFH New Matters.

PSAFM ¶ 243.

171.    Plaintiff responded to Mr. Bowsher, stating that she thought she had been clear. *Id.*

**Response to Paragraph 171:**

Admit with clarification that Plaintiff's email stated in full: "Thank you Matt.  I thought I

was clear with the first email I sent today as it relates to the percentage distribution."  Dkt. No. 27-

9, Ex. 32.

172.    Plaintiff's response frustrated Mr. Bowsher because not only had Plaintiff created the problem with her unclear and inconsistent communications, but she could not even acknowledge her own poor communication was the root of the confusion. Bowsher Decl. ¶ 3.

**Response to Paragraph 172:**

Dispute.  Paragraph 3 of the Declaration Matthew Bowsher makes no mention of Plaintiff

or the August 3, 2023 email exchange.  Thus, the proposition asserted in Paragraph 172 is wholly

unsupported.

173.    In response, Mr. Bowsher sent Plaintiff a lengthy email explaining why Plaintiff's communication was not clear and noting that it was "very basic, elementary communication that

had nothing to do with training or understanding of multifamily transactional law." Bowsher Decl. ¶ 32 & Ex. 32.

**Response to Paragraph 173:**

Admit with clarification that numerous people at Troutman Pepper who saw the email said it was rude, condescending, inappropriate and racist. Plaintiff testified that she told Ms. Smith, Ms. Crawford, Mr. Iwashyna, Mr. Tucker, Mr. Schiff, Ms. Nickel, Ms. Loughran and Jennifer Jana about the email. See Pl. Dep. 293:10-11. Ms. Crawford testified, "I remember [saying the email was] disrespectful, rude. You don't talk to people like that . . . Well, I think I told her that you shouldn't talk to people like that." Ex. 4, Lindsey Crawford Deposition Transcript ("Crawford Dep.") 63:1-7; see also Crawford Dep. 63:19-25 (confirming that she told Plaintiff "that it was an inappropriate way to, for Mr. Bowsher to have communicated"); Crawford Dep. 64:1-4 (telling Plaintiff to go to Human Resources about the email). Plaintiff testified that Mr. Schiff said, "it's an asshole email[.]" Pl. Dep. 293:20-294:1. Mr. Iwashyna testified that the August 3, 2023 email was "condescending." Iwashyna Dep. 105:16-17. Plaintiff testified that she spoke to Dameon Rivers about the email on August 14, 2023. See Pl. Dep. 224:17-225:1 ("I told him about the August 3, 2023 email, and he told me that he didn't want to even see the email, because if he saw the email, he was going to get upset."). See Response to Paragraph 174; see also PSAMF ¶¶ 247-57.

174.    Mr. Bowsher did not make any statement about Plaintiff's race in any of the emails he exchanged with Plaintiff on August 3, 2023 about her communications with the MFH New Matters team. Bowsher Decl. Exs. 30-32; Pl. Dep. 262:6-263:5.

**Response to Paragraph 174:**

Admit that Mr. Bowsher did not expressly make any statement about Plaintiff's race in this email. Dispute any implication that Mr. Bowsher's email was not discriminatory. In fact, Plaintiff testified, "So he [Matt] questioned my intellect level many times, and that August 3rd email, he

let it loose." Pl. Dep. 203:14-15.  She further testified that she immediately told Ms. Mufarrige

about Mr. Bowsher's email, and Ms. Mufarrige told her that "[Matt] didn't speak to her like that,

and she saw the email that he sent me and told me it was inappropriate."  Pl. Dep. 206:21-207:1.

Additionally, Ms. Loughran testified that Plaintiff was "very upset[,]" said that Mr.

Bowsher was "calling her intelligence into question" and that "this was indicative of Matt being a

racist."  Loughran Dep. Day 1 85:6-13; <u>see also</u> Loughran Dep. Day 1 85:13-14 ("[Mr. Bowsher]

would have never sent this email to anybody else."); Loughran Dep. Day 1 86:3-9.  Plaintiff

testified, "Whitney and I both agreed that he had - he was racist and it was a common theme of

what he would do.  He would constantly question my intellect level, and there were many instances

of that."  Pl. Dep. 183:1-4.  Plaintiff further testified, "So Matt had a constant theme of questioning

my basic competency level, and the reason why I believe that it was due to my race is because he

did not speak to anyone else in that manner.  The only other person that had an experience similar

to mine was Whitney.  She told me that he weaponized her pregnancy against her, because - and

she felt like it was due to her race as well."  Pl. Dep. 181:17-182:7.

Further, Plaintiff testified that when she showed the email to her Troutman career coach,

Jennifer Jana, Ms. Jana called the email "racist[.]"  Pl. Dep. 260:7-9; <u>see</u> <u>also</u> Loughran Dep. Day

1 86:14-19 (describing that Plaintiff told her about her meeting with Ms. Jana wherein Ms. Jana

stated that Mr. Bowsher's August 3, 2023 email "was racist").

175.    Plaintiff sent a response to Mr. Bowsher stating she would not tolerate his
condescending tone, her intelligence being questioned, or Mr. Bowsher belittling her. Bowsher
Decl. ¶ 36 & Ex. 32.

**Response to Paragraph 175:**

Admit with clarification that, in her response to Mr. Bowsher, Plaintiff also wrote, *inter alia*, "I worked hard to be here and I deserve to be here like every other associate." Dkt. No. 27-9, Ex. 32.

176.    In his response to Plaintiff, Mr. Bowsher said that was not his intent and noted that he appreciated her constructive criticism of his own constructive criticism. *Id.*

**Response to Paragraph 176:**

Admit with clarification that Mr. Bowsher's email stated in full: "That was obviously not the reaction I intended.  Thank you for your constructive criticism of my constructive criticism.  I will keep that in mind next time I offer you my feedback on your performance.  Sounds like we could both benefit from continued growth and improvement regarding our communications.  Of course, that can't happen until we fully acknowledge and accept how our communications are actually perceived by others, regardless of our own intentions and subjective perceptions thereof.  Here's hoping we can both get past that difficult first stage, and unlock the growth which alludes (sic) us." Dkt. No. 27-9, Ex. 32.

177.    That same day, Plaintiff forwarded Mr. Bowsher's email correspondence to Mr. Iwashyna asking to speak with him. Iwashyna Decl. ¶ 56; Bowsher Decl. ¶ 35.

**Response to Paragraph 177:**

Admit.  Mr. Bowsher testified that he forwarded the email to Mr. Iwashyna and said, "Brian, I think you need to know what's going on.  Something along those lines." Ex. 1, Matthew Bowsher Deposition Transcript ("Bowsher Dep.") 8:6-15.

178.    About an hour later, Plaintiff sent another email to Mr. Iwashyna, Ms. Nickel, Ms. Smith, and Mr. Tucker, stating "I'm sorry I had enough with Matt and how he addresses me." Iwashyna Decl. ¶ 56.

**Response to Paragraph 178:**

Admit with clarification that Plaintiff included in this email a forwarding of Mr. Bowsher's original email and Plaintiff's response to him.

179.    Plaintiff also spoke with Mr. Schiff, Mr. Tucker, Ms. Smith, and Ms. Crawford about Mr. Bowsher's August 3, 2023 email.  Tucker Decl. ¶¶ 23-24; Schiff Decl. ¶ 29; Declaration of Lindsey Crawford ("Crawford Decl.") ¶ 16 (attached hereto as Appendix P).

**Response to Paragraph 179:**

Admit.  See Response to Paragraph 173.

180.    Mr. Schiff, Mr. Tucker, Ms. Smith, and Ms. Crawford all communicated to Mr. Iwashyna that they had spoken to Plaintiff about the incident, so Mr. Iwashyna (who was also very busy and traveling for work) did not speak with Plaintiff about the email.  Iwashyna Decl. ¶¶ 57, 59; Tucker Decl. ¶ 25; Schiff Decl. ¶ 31.

**Response to Paragraph 180:**

Admit that Mr. Iwashyna did not respond to Plaintiff's email nor speak with Plaintiff in connection with Mr. Bowsher's August 3, 2023 email.  PSAMF ¶ 248.  Dispute that Mr. Iwashyna was traveling for work at the time that Plaintiff reached out to him about the August 3, 2023 email from Mr. Bowsher.  On August 3, 2023, Ms. Smith immediately went to Mr. Iwashyna's office after speaking to Plaintiff about the email and spoke to Mr. Iwashyna at length about the email. See Ex. 37 ("After her conversation with Gita [on August 3, 2023], Ashante went to Brian Iwashyna . . . Brian wanted [] Ashante to forward the email to him but before Ashante could leave Brian's office, Matt had forwarded him the message.")  Dispute any implication that Mr. Iwashyna was too busy to ever respond to Plaintiff's complaint regarding Mr. Bowsher's treatment of her.

**N.    Plaintiff's Internal Complaint Concerning Matt Bowsher**

181.    On or about August 10, 2023, Plaintiff made a verbal complaint to Denise Johnson, Senior Human Resource Manager, alleging that in an email dated August 3, 2023, Mr. Bowsher had spoken to her in a condescending tone and questioned her intelligence, and she felt that Mr. Bowsher had sent her the August 3 email because of her darker skin tone and because

she wore braids. Declaration of Denise Johnson ("Johnson Decl.") ¶ 3 (attached hereto as Appendix Q); Pl. Dep. 253:14-16; 254:1.

**Response to Paragraph 181:**

Admit that Plaintiff complained to HR about the August 3, 2023 email on August 10, 2023.

See Pl. Dep 253:14-16; Pl. Dep 254:1; Ex. 6, Denise Johnson Deposition Transcript ("Johnson Dep.") 10:9-13.

182.    Ms. Johnson initiated a formal investigation into Plaintiff's complaint, with guidance and supervision provided by her manager, Elizabeth Mark, Director of Human Resources. Johnson Decl. ¶¶ 4-5.

**Response to Paragraph 182:**

Admit.

183.    As part of the investigation, Ms. Johnson reviewed a number of emails between Plaintiff and Mr. Bowsher that Plaintiff had provided to her. *Id.* at ¶ 5.

**Response to Paragraph 183:**

Admit.

184.    Ms. Johnson also interviewed Plaintiff, as well as the following witnesses: Sona Spencer, Tiffany Southerland Jordan, Jennifer Jana, Ashanté Smith, Nora Nickel, Blair Schiff, Whitney Loughran, Kelly Mufarrige, and Ari Ebi—all people who Plaintiff had identified as having relevant information or with whom Plaintiff spoke about Mr. Bowsher's email. *Id.* at ¶ 6.

**Response to Paragraph 184:**

Admit.

185.    Consistent with Troutman's practice at the time, a member of the firm's Office of General Counsel interviewed Mr. Bowsher because he was a partner and subject of the complaint. *Id.*

**Response to Paragraph 185:**

Admit with clarification that, as a result, the contents of Mr. Bowsher's interview were

protected by attorney-client privilege and, thus, not produced in discovery.

186. Ms. Johnson did not find any evidence of discriminatory behavior in violation of any of the firm's policies, any evidence that Mr. Bowsher's actions created a hostile work environment based on race, or any evidence that Mr. Bowsher had retaliated against Plaintiff. *Id*. at ¶ 7.

**Response to Paragraph 186:**

Admit with the clarification that the Formal Complaint Investigation Report recommended

that the Firm consider training and/or coaching for Mr. Bowsher. PSAMF ¶ 268.

187. At the conclusion of the investigation, a member of the firm's Office of General Counsel informed Mr. Iwashyna of the findings of the investigation; then, Mr. Iwashyna contacted Mr. Bowsher and counseled him about the need to improve his communication style. Iwashyna Decl. ¶ 62; Bowsher Decl. ¶ 37.

**Response to Paragraph 187:**

Admit with the clarification that Mr. Bowsher was never required nor recommended to

undergo any counseling or training in relation to Plaintiff's complaint against him. PSAMF ¶ 269.

188. Prior to August 2023, Mr. Iwashyna had also received communication from Mr. Bowsher that was wordy, harsh, and condescending. Iwashyna Decl. ¶ 60.

**Response to Paragraph 188:**

Admit.

189. Since Mr. Iwashyna counseled Mr. Bowsher about his communication style, Mr. Bowsher has made a conscious effort to communicate in a more appropriate tone and manner in emails. Bowsher Decl. ¶ 37.

**Response to Paragraph 189:**

Dispute. Mr. Bowsher testified that he did not receive any training or counseling in

connection with Plaintiff's complaint. PSAMF ¶ 269.

190.    Following the HR investigation, Mr. Bowsher did not have any interactions with Ms. Sankano: he did not staff her on any deals, exchange emails with her, or complete an evaluation of her performance and he was not involved in the decision to terminate her employment.  *Id*.

**Response to Paragraph 190:**

Dispute.  Mr. Iwashyna testified that he relied on the feedback of Mr. Bowsher when making the decision to terminate Plaintiff's employment.  See Iwashyna Dep. 128:9-17.

191.    Following the HR investigation, Mr. Bowsher did not have any interactions with Ms. Sankano: he did not staff her on any deals, exchange emails with her, or complete an evaluation of her performance and he was not involved in the decision to terminate her employment.  *Id*.

**Response to Paragraph 191:**

Dispute.  See Response to Paragraph 190.

192.    Plaintiff's race also was not a factor in Mr. Iwashyna's decision to terminate her employment. Iwashyna Decl. ¶ 48; Pl. Dep. 251:22-252:5.

**Response to Paragraph 192:**

Dispute.  The cited testimony supports the proposition that Mr. Iwashyna's decision to terminate her employment was based on Plaintiff's race, i.e., as it was based on Plaintiff making a race-based discrimination complaint.  See Pl. Dep. 251:22-252:5.

## PLAINTIFF'S STATEMENT OF ADDITIONAL MATERIAL FACTS

## I.    PLAINTIFF'S PRIOR EXPERIENCE AND TENURE AT PEPPER HAMILTON

193.    Plaintiff graduated *cum laude* and received her Juris Doctor degree from the University of Maryland Francis King Carey School of Law in 2018.  Ex. 35.

194.    While she was in law school, Plaintiff worked at The Law Offices of Anthony Onwuanibe, a boutique law firm that primarily handles real estate transactions.  Pl. Dep. 34:21-35:10.

195.    After graduating from law school, Plaintiff applied and was accepted for a prestigious, one-year appellate clerkship to clerk for The Honorable Michael W. Reed, Court of Special Appeals.  Id. at 37:3-38:7, Ex. 35.

196.    Judge Reed is a Black male.  Pl. Dep. 40:11-12.

197.    Following her clerkship, Plaintiff commenced her employment at Pepper Hamilton on August 31, 2019, as an associate in the Financial Services Group in the Washington, D.C. office.  See Dkt. No. 18, Answer to the Amended Complaint by Troutman Pepper Hamilton Sanders LLP ("Troutman Answer") at ¶ 39.

198.    Plaintiff was hired by Pepper Hamilton to support Christine Waldmann Carmody, a partner in the Washington, D.C. office.  Id. at ¶ 43.

199.    Plaintiff was the only Black associate reporting to Ms. Carmody and the only Black attorney in Pepper Hamilton's Washington, D.C. office.   Id. at ¶ 49.

200.    Ms. Carmody instructed Plaintiff to allow Ms. Carmody to review Plaintiff's time entries prior to them being entered into the firm's timekeeping system (the "System").  Id. at ¶ 47.

201.    Randall Hurlburt, a white male Associate, who was also working with Ms. Carmody, was not required to email his hours to Ms. Carmody for approval and could enter his hours directly into the System.  Id. at ¶ 54.

202.    In or around November or December 2019, Plaintiff spoke to Ms. Carmody about her having "virtually no hours," input into the System despite the fact that Plaintiff was "really busy" and "working [her] tail off."   Pl. Dep. 70:18-71:20.

203.    In response to Plaintiff's complaint, Ms. Carmody told Plaintiff "don't worry about it."  Id.

204.    In April 2020, Ms. Wisotsky reached out to Ms. Sankano to discuss her midterm evaluation.  Troutman Answer at ¶ 68.

205.    During Plaintiff's mid-year evaluation call with Ms. Wisotsky, Plaintiff had a "great evaluation despite [her] hours, which was the only issue."  Pl. Dep. 51:1-5.

206.    Ms. Wisotsky then instructed Ms. Sankano to begin entering her time into the Pepper Hamilton's System on a daily basis and that if Ms. Sankano performed work for a client, she should record her time to the client-matter number.  Troutman Answer at ¶ 71.

207.    Ms. Wisotsky notified Ms. Carmody of her instruction to Plaintiff.  Id.

208.    Ms. Wisotsky told Mr. Schiff that she had spoken to Ms. Carmody regarding Plaintiff's billable hours "issue" and told Ms. Carmody "to stop" making Ms. Sankano submit her hours to Ms. Carmody for review.  See Schiff Dep. 84:20-85:5.

209.    On April 26, 2020, Plaintiff emailed Ms. Carmody informing her that Ms. Wisotsky had instructed Plaintiff to enter all her time in the firm's System.  Troutman Answer at ¶ 72.

210.    That same day, Ms. Carmody emailed Plaintiff stating that she "still need[ed] to see [her] time before it goes in…"  Id. at ¶ 73.

211.    Plaintiff's assistant, Detra McRae, also told Plaintiff that she was instructed by Blair Schiff, a Partner in the D.C. office, to not enter Ms. Sankano's time until it was reviewed by Ms. Carmody.  Id. at ¶ 76.

212.    Plaintiff contacted Kassem Lucas, Diversity Partner in Pepper Hamilton's Philadelphia office, to discuss how to proceed with Ms. Carmody's and Ms. Wisotsky's instructions.  Mr. Lucas told Plaintiff that he would speak to Ms. Wisotsky. Id. at ¶¶ 80-81.

213.    Ms. Sankano also reached out to Ms. Wisotsky about her time entries and Ms. Wisotsky communicated to Ms. Sankano that she would handle the matter.  Id. at ¶ 82.

214.    After Ms. Carmody was called out by Ms. Wisotsky regarding Plaintiff's time entries, Plaintiff's work dried up drastically.  Pl. Dep. 89:15-22, 90:16-20.

215.    In May 2020, Plaintiff complained to Ms. Wisotsky that she "all of a sudden," was not getting work from Ms. Carmody and that it was "not normal."  Pl. Dep. 91:18-22.

216.    At this time, Ms. Wisotsky told Plaintiff to "hold tight" and that Pepper Hamilton was merging with Troutman Sanders.  Troutman Answer at ¶¶ 89, 91.

217.    On May 27, 2020, Ms. Wisotsky emailed Hope Comisky, a Partner and General Counsel, with Mr. Lui copied therein and stated that she figured out that Plaintiff "was not billing all of her time to client matters as she was being directed to move time as non-billable," and that "[u]nfortunately, the situation has not resolved itself."  Ms. Wisotsky explained that "Henry [Liu] and I believe that the 3 of us need to get on a call with Christine [Carmody] to make sure that doesn't occur and that [Plaintiff] is getting work from Christine [Carmody]."  Ex. 30.

218.    In July 2020, Pepper Hamilton and Troutman Sander merged, forming Troutman Pepper Sanders Hamilton LLP ("Troutman Pepper" or the "Firm").  Troutman Answer at ¶ 109, Iwashyna Dep. 74:8-11.

219.    On July 13, 2020, Plaintiff emailed Mr. Schiff to inquire whether there had been any development with her joining the MFH practice group.  Ex. 42.

220.    On July 28, 2020, Mr. Schiff emailed Mr. Iwashyna, with Mr. Liu copied, stating that Plaintiff had "reached out a few times to see if there has been any progress" with her working with the MFH group.  Ex. 29.

221.    Mr. Iwashyna responded that Plaintiff could start training to do Second Attorney Reviews ("SARs") "ASAP."  Mr. Liu then wrote that he and Mr. Schiff "should discuss how to break the news to Christine [Carmody]."  Id.

222.    Mr. Liu further wrote that Ms. Carmody "will not take things well," and that he didn't think there was "any point" in having Ms. Carmody speak to Plaintiff.  Id.

223.    After the merger, Plaintiff remained the only Black female attorney in the MFH group in the Washington, D.C. office.  Troutman Answer at ¶ 111.

## II.    TROUTMAN PEPPER POLICIES AND AUTOMATIC REPORTING

224.    The Firm adopted an Associate Bonus Policy wherein it details the Firm's "Discretionary Bonus Policy," which explains, *inter alia*, that the "Firm recognizes high-performing associates with a discretionary bonus program."  See Ex. 19.

225.    The Firm also adopted an Equal Employment Opportunity and Harassment Policy which states, *inter alia*, that the "Firm will listen to all complaints of harassment or discrimination, promptly investigate such complaints, and quickly apply appropriate sanctions that will end any offensive behavior."  See Ex. 25.

226.    The Firm's Equal Employment Opportunity and Harassment Policy also states, *inter alia*, that the "Firm will not retaliate against any employee because of complaints of harassment or discrimination or because of cooperation with any investigation."  Id.

227.    At the Firm, it is a Partner's "obligation" to report a complaint of discrimination. Schiff Dep. 16:16-23.

## III.    PLAINTIFF'S POSITIVE PERFORMANCE EVALUATIONS AT TROUTMAN PEPPER

228.    In 2020, Plaintiff's performance evaluation contained the following comments from attorneys with whom she worked during the evaluation cycle:

- Our client in this asylum case is from Mauritania and, although he speaks French, he is more comfortable and precise in his first language, Soninke. As we were about to invest in an interpreter, we decided to take a one-in-a-million chance of sending a firm-wide email to locate someone who might know someone who could translate for us. [Plaintiff], volunteered in an instant. Since that time, she has done more than translate – although she has done an excellent job of that from the start. [Plaintiff] gained the confidence of our client instantly, and it is clear that he trusts and relies on her. As we navigate the matter through the immigration court, [Plaintiff] gets called on to assist and to counsel the client concerning issues ranging from his release on bond to such everyday issues (for US citizens) that turn out to be much more complicated for immigrants, such as obtaining identification documents. I expect that her involvement in the case will deepen as time goes on. She has taken on each of the many unrelated (and novel, to her) issues with relish and passion for our client's cause. – Andrew Rogoff.

- [Plaintiff] has been a pleasure to work with! She's a quick learner, eager to take on more work and responsibilities. I'm excited to have her on the team and look forward to working with her more! – Virginia Stitzer.

- [Plaintiff] has exceeded expectations at every turn for an early associate. I have been able to delegate tasks and feel confident that they will be completed on time and she has requested autonomy and run with it. If she continues on this path, then I have great expectations for her future with the group. – Peter Strup.

- [Plaintiff] has shown great enthusiasm for the work. – David Wormser.

Ex. 16.

229.    Despite being selected as an evaluator, Ms. Carmody did not complete an evaluation of Plaintiff's performance for 2020.  Id.

230.    During her performance evaluation with Ms. Nickel and Mr. Schiff, Mr. Schiff told Plaintiff "that after a rough start to no fault of hers, that she turned the year around and

continues to grow as she learns the practice."   Mr. Schiff further "acknowledged the challenges

of 2020 and the impact on hours."  Ex. 36.

231.    In 2021, Plaintiff's performance evaluation contained the following comments

from attorneys with whom she worked during the evaluation cycle:

- [Plaintiff] is eager to learn and stay[s] on top of assignments and is responsive to feedback. – Kevin Dexter.

- [Plaintiff] has been great to work with and has come a long way over the past year.  Her positive can-do attitude really makes her shine and an absolute pleasure to work with.  We are invested in her growth and success with the MFH team and we look forward to continuing to work with her. – Nora Nickel.

- [Plaintiff] is able to handle matters with minimal supervision. She has a good understanding of the subject matter and works with clients directly. – Kelly Muffarige.

- Exceeds expectations often. – Whitney Loughran.

- [Plaintiff] is very on task and on deadline.  You will not get late work product from her.  Checklists go out weekly like clockwork. – S.R. Sidarth.

Ex. 13.

232.    Plaintiff received a discretionary bonus in recognition of her "significant

contributions during 2021."  Ex. 12.

233.    In 2022, Plaintiff's performance evaluation contained the following comments

from attorneys with whom she worked during the evaluation cycle:

- [Plaintiff] is a super hard worker, she is very organized and stays on top of all tasks. Clients give her rave reviews.  – Lindsey Crawford.

- [Plaintiff] is my go to associate for the majority of my matters.  She is always responsive and quick to get projects done.  She is communicative with me in the event her assignments will be delayed and doesn't leave me wondering where she is.  We've also had the opportunity to meet several of our clients this year and she is warm,

inviting and personable.  She also has found time for participation
in pro bono matters.  – Whitney Loughran.

- [Plaintiff] has always been extremely helpful and enjoyable to work
  with.  She's responsive and clients like her. – Kelly Muffarige.

- [Plaintiff's] attitude is great.  She's always eager to help and learn.
  I've enjoyed working with her on a couple hairy deals with her. They
  definitely tested patience and [Plaintiff] has a lot of it! – Nora
  Nickels.

Ex. 11.

234.    In February 2023, Plaintiff had her performance evaluation with Mr. Schiff and

Ms. Nickel, during which "there was no mention of any performance issues."  Pl. Dep. 252:12-

17.

235.    For her work in 2022, Plaintiff received a nearly $60,000 discretionary bonus.  Pl.

Dep. 252:18.

236.    In June 2023, there was a meeting held during which the performance of

associates within the MFH practice group were discussed (the "June 2023 Meeting").  Schiff

Dep. 40:15-21; Ex. 15.

237.    After the June 2023 Meeting, a written memorialization was created and a

summary of the discussion capturing decisions and follow-up items was circulated to all those

who attended.  Ex. 15.

238.    The summary of the discussions at the June 2023 Meeting stated that Plaintiff was

a "[p]otential alternate track candidate" and that Ms. Nickel should speak to Plaintiff about

coaching as an "initial step."  Id.

239.    An "alternate track candidate" would be a "career attorney," which is "someone

who is performing at their level and performing appropriately".  Schiff Dep. 56:4-24, 57:10-12;

Id.

## IV.    **PLAINTIFF SUFFERS FURTHER DISCRIMINATION**

240.    On July 31, 2023 Plaintiff sent an email to the MFH New Matters team, expressly instructing that the matter responsible credit split should be as follows: "Kelly Muffarige (30%) / Matt Bowsher (70%)."  Ex. 38.

241.    When Plaintiff learned that the MFH New Matters team incorrectly gave Mr. Bowsher 100% of the matter responsible credit, Plaintiff wrote to the MFH New Matters team, and asked them to correct the matter responsible credit split and included the below demonstrative which was also included in her initial July 31, 2023 email:

| Matter Responsible Atty: | Kelly Mufarrige (30%) / Matt Bowsher (70%) |
| --- | --- |

Id.

242.    The MFH New Matters team failed to correct its mistake, and Plaintiff followed up once more to request that the matter responsible credit split be corrected and that credit be taken from Mr. Bowsher and apportioned to Ms. Muffarige as Plaintiff had requested twice before.  Id.

243.    At this point, Mr. Bowsher emailed Plaintiff and told her, "you are confused. Kelly is not to be the sole 100% matter responsible attorney.  Per your original request, and per the other matters you've previously opened for me and Kelly, it should be 30% Kelly [Muffarige] and 70% Matt [Bowsher]."  Id.

244.    Plaintiff responded to Mr. Bowsher that she thought she had been clear in her first communication with the MFH New Matters team as it relates to the percentage distribution.  Id.

245.    Mr. Bowsher responded,

I'm concerned that you thought you were "clear". In fact, you were the opposite of clear. And the fact that you still don't see this upon further reflection, even after I've taken the time to point it out, is what worries me.

In your first email below (from 11:09am this morning), you stated "Kelly should be the matter responsible". Anyone reading that sentence would reasonably interpret that as a request to make Kelly the matter responsible attorney, i.e. to switch it from 100% Matt to 100% Kelly. There is no other way to interpret that sentence. If you meant to ask for them to change it from Matt being 100% responsible to Matt only being 70% responsible, that is not what that sentence conveyed. You added a sentence which said "See below', and then you added a clip of the originally-requested 70/30 split at the end, but that clip with the correct split contradicted your initial sentence which requested that Kelly be 100% matter responsible; that contradiction is what made your communication anything but clear. Then, adding to the confusion, in your subsequent email, you doubled-down on your initial request, by again saying "Kelly should be the matter responsible. So it should change from Matt to Kelly." Again, I'm not sure how anyone could read that sentence to mean anything other than what it very clearly says, which is that you're asking to make Kelly "the" matter responsible attorney, i.e. the 100% matter responsible, the only matter responsible attorney, not a 70/30 split with Matt.

This is very basic, elementary communication. This has nothing to do with training, or understanding of multifamily transactional law, this is daily required functioning. You expressed interest in receiving my input/feedback in real time as to your performance, so I am taking 20 minutes out of my morning right now to explain to you, in very clear objective detailed analysis, that when I see something like this, where it is so undeniably evident that you've made an obvious and surprising error, and you're saying you still don't see the error even after I've taken the time to point it out to you, and you're still saying you've done nothing wrong... I really just don't know what more I can say here. 'If you don't even see the problem, I'm not sure how you'll fix it, but it's definitely something you need to fix, because if you had this same type of miscommunication with a client or borrower's counsel rather than with our internal administrative team, I would have to drop everything and get on the phone immediately to do serious damage control, reassuring them that the deal is actually in capable hands. Bottom line: this is not something I would expect from a fourth-year associate.

I am in the office 4 days a week, every week, available to discuss this further in person any time you wish. Just so we are 100% clear, I have no intention of proactively contacting you to discuss this any further, as I've already given you my full and candid thoughts on the matter, nor am I necessarily implying that any further discussion need be had, rather I am merely clarifying that I leave it to your own initiative as to whether you wish to discuss it further.

Id.

246.    In response to Mr. Bowsher, Plaintiff wrote, *inter alia*, that she "worked hard to be here and I deserve to be here like every other associate." Id.

247.    Almost immediately thereafter, Plaintiff forwarded the email thread between her and Mr. Bowsher to several of the Firm's attorneys, Mr. Iwashyna, Ms. Nickel, Ms. Crawford and Mr. Tucker and wrote that she "had enough" of the way Mr. Bowsher "addresses" her. Id.

248.    Mr. Iwashyna did not respond to Plaintiff's email, nor did he speak to Plaintiff regarding the August 3, 2023 email correspondence with Mr. Bowsher. Iwashyna Dep. 100:14-19.

249.    Plaintiff spoke with Ms. Crawford regarding the August 3, 2023 email correspondence with Mr. Bowsher and Ms. Crawford suggested that Plaintiff reach out to Human Resources ("HR"). Troutman Answer ¶¶ 199-200.

250.    Plaintiff also spoke with Mr. Tucker, who was a Partner in the Richmond office, and communicated that she did not feel comfortable having Mr. Bowsher evaluate her work as she believed it would result in a bad performance review. Id. at ¶ 201.

251.    Plaintiff also spoke with her Career Coaching and Planning Manager regarding the August 3, 2023 email correspondence with Mr. Bowsher. Ms. Jana told Plaintiff that Mr. Bowsher's email to Plaintiff was racist and suggested that Plaintiff go to HR. Pl. Dep. 253:18-21, 260:7-9.

252.    Plaintiff also spoke to Judge Reed, for whom she clerked, about the August 3, 2023 email correspondence with Mr. Bowsher.  Judge Reed felt as though Mr. Bowsher's communication to Plaintiff was racist "because of the stereotype that's out there about people who look like us in these spaces, that we did not get these positions based off our own true merit, [but] that we are here because we're affirmative action cases."  Pl. Dep. 40:22-41:19.

253.    Plaintiff filed a formal complaint with Denise Johnson (HR) regarding Mr. Bowsher's discriminatory treatment on August 10, 2023.  Troutman Answer at ¶ 214.

254.    Plaintiff told Ms. Johnson that she knew that Mr. Bowsher did not speak to her colleagues in a similar way and that she (Plaintiff) felt targeted as the only Black woman in the D.C. multifamily housing group.  Id. at ¶ 215.

255.    Shortly thereafter, Plaintiff spoke to Dameon Rivers, a Partner in the D.C. office, about the August 3, 2023 email correspondence with Mr. Bowsher when Mr. Rivers stopped by Plaintiff's office.  Id. at ¶ 221; Pl. Dep. 224:10-16.

256.    During this conversation, Mr. Rivers told Plaintiff that he did not want to see Mr. Bowsher's email to her because it would upset him.  Mr. Rivers further expressed to Plaintiff that if he were her, he would want to leave the firm.  Pl. Dep. 224:10-225:1.

257.    Plaintiff communicated to Mr. Rivers that she was not going to let Mr. Bowsher push her out of the Firm and he responded, "okay, conversations are being had."  Troutman Answer at ¶¶ 227-228.

258.    On August 17, 2023, an invitation was sent to all the Washington, D.C. attorneys and staff members for a "DEI Town Hall" scheduled for August 22, 2023.  Id. at ¶ 229.

259.    The very next day after the scheduled "DEI Town Hall," on August 23, 2023, Ms. Johnson (HR) communicated to Plaintiff that the Firm was investigating the allegations raised in Plaintiff's complaint about Mr. Bowsher's communications.  Id. at ¶ 231.

260.    On August 25, 2023, Ms. Sankano met with Ms. Covert and Ms. Sulc.  During this conversation, Ms. Covert and Ms. Sulc mentioned concerns about Plaintiff's performance stating that Plaintiff's 2022 performance evaluation was "mixed."  Pl. Dep. 255:11-14, 256:1-4.

261.    During this conversation, Plaintiff expressed to Ms. Covert that it was hard for her to get training in the D.C. office to which Ms. Covert responded by telling Plaintiff to visit the Richmond office more regularly.  Covert Dep. 38:7-12, 38:17-21.

262.    Ms. Covert testified that to get from Washington D.C. to Richmond, Virginia would take "hours on a good day, but probably four hours in a car."  Id. at 38:4-10.

263.    Shortly thereafter, Plaintiff reached out to Mr. Strup and expressed her interest in becoming a Partner and Mr. Strup gave Plaintiff tips on how to do so.  During this conversation, Plaintiff mentioned to Mr. Strup that in her review, Mr. Bowsher said she did not have a formal understanding of the practice.  In response, Mr. Strup told Plaintiff to "prove the haters wrong." Troutman Answer at ¶ 235.

264.    Also in August 2023, Plaintiff spoke with Jennifer Bojorquez to discuss her desire to make partner.  In response, Ms. Bojorquez mentioned developing a game plan.  Ms. Bojorquez did not discuss any purported poor performance of Plaintiff.  Id.

265.    On or around August 28, 2023, Plaintiff spoke to Ms. Crawford regarding her desire to make partner.  In response, Ms. Crawford told Plaintiff that "she could see her as a Partner."  Id.

266.    In late-October 2023, Ms. Johnson (HR) reached out to Plaintiff to discuss the Firm's findings based on its investigation.  Id.; Pl. Dep. 257:12-15 ("It took the firm 77 days to do an investigation").

267.    The Formal Complaint Investigation Report concluded that the investigator did not find evidence of discriminatory behavior, actions creating a hostile work environment, or retaliatory actions.  Ex. 33.

268.    Nevertheless, the Formal Complaint Investigation Report recommended that the Firm consider training and/or coaching for Mr. Bowsher.  Id.

269.    Mr. Bowsher was never required nor recommended to undergo any counseling or training in relation to Plaintiff's complaint against him.  Bowsher Dep. 17:6-9.

## V.    PLAINTIFF IS UNLAWFULLY TERMINATED WEEKS AFTER THE INVESTIGATION INTO HER COMPLAINT IS CONCLUDED

270.    On November 29, 2023, Plaintiff received a meeting invitation for a meeting with Ms. Covert, Mr. Schiff, and Mr. Tucker at 1:30pm that same day.  Troutman Answer at ¶¶ 246-247.

271.    During this meeting, Plaintiff was informed that the Firm was terminating her employment.  Mr. Schiff began reading from prepared notes, and specifically cited Plaintiff's 2023 performance review, which she had not seen yet.  Id. at 255-256.

272.    Plaintiff was not placed on a Corrective Action Plan or a Performance Improvement Plan before her termination.  Id. at 260; Iwashyna Dep. 124:10-13.

273.    Before Plaintiff was terminated, but after Ms. Crawford had already submitted her performance evaluation for 2023, Mr. Schiff reached out to Ms. Crawford and asked her to identify concerns about Plaintiff's performance.  Crawford Dep. 73:24-74:2.

274.    Mr. Schiff did not ask Ms. Crawford for negative feedback regarding any other associate for which Ms. Crawford had submitted a performance evaluation – just Plaintiff. Crawford Dep. 74:25-75:3.

275.    Neither Ms. Smith nor Ms. Loughran were involved in the decision to terminate Plaintiff.  Troutman Answer at ¶ 272.

276.    Plaintiff's former Legal Practice Assistant ("LPA") told Plaintiff that Ms. Carmody's LPA had told her that Plaintiff was terminated because she complained about a Partner.  Pl. Dep. 276:10-14.

## VI.    TROUTMAN PEPPER'S PATTERN OF DISCRIMINATORY AND DISPARATE TREATMENT TOWARD BLACK WOMEN

### A.    Brittney Williams

277.    Brittney Williams ("Ms. Williams") worked as an attorney at Troutman Sanders LLP ("Troutman Sanders") from September 2018 to December 2019 as part of the Firm's multifamily housing finance practice group.  Ex. 58 at ¶ 2.

278.    At the time that Ms. Williams started as an attorney, another attorney, Katie Love, also started at the Firm.  A few months later, another attorney, Austin Sargent, also joined Troutman Sanders.  Id. at ¶ 3.

279.    Ms. Williams is a Black female.  Katie is a white female, and Austin is a white male.  Id. at ¶ 4.

280.    Over the course of Ms. William's first few months, her main source of work was second attorney reviews ("SARs") whereas Ms. Love and Mr. Sargent were provided more opportunities for development and more substantive work.  Id. at ¶¶ 5-6.

281.    Ms. Williams confided in other attorneys including Ms. Loughran and Ms. Smith regarding her feeling that it was unfair that her white colleagues, Austin and Katie, were

receiving more opportunities and substantive work than she was.  Id. at ¶ 8; Loughran Dep. Day 1 61:8-18.

282.    After months of receiving essentially no opportunities for growth and development, all while watching Ms. Love and Mr. Sargent be provided those opportunities she was deprived, Ms. Williams felt as though she needed to raise her concerns to Brian Iwashyna, the head of the multifamily housing finance practice group.  Ex. 58 at ¶ 10.

283.    In or around November 2019, Ms. Williams told Mr. Iwashyna that she felt as though her race played a role in the limited opportunities that she was being provided. Specifically, she told Mr. Iwashyna, "the partners are giving work to people who look like them" and that are "culturally the same as them."  Id. at ¶ 11.

284.    With that statement, Ms. Williams let Mr. Iwashyna know that the partners in the multifamily housing finance practice group, who are almost entirely white, were assigning work to Austin and Katie, who were also white, and were only neglecting to provide her, a Black woman, with more substantive work.  Id.

285.    Mr. Iwashyna responded to Ms. William's complaint of race-based disparate treatment by telling her, "That's how the real-world works."  Id. at ¶ 12.

286.    Mr. Iwashyna did not tell Ms. Williams that he would raise her concerns to HR, nor did he ever escalate her complaint.  Id. at ¶ 13.

287.    Ms. William's felt like she had no choice but to leave Troutman Sanders and, within weeks of her conversation with Mr. Iwashyna, resigned.  Id. at ¶¶ 15-16.

**B.    Whitney Loughran**

288.    Before the merger, Ms. Loughran worked at Troutman Sanders where she started full-time in 2015.  Loughran Dep. Day 1 14:22-15:2.

289.    Ms. Loughran is a Black female.  Troutman Answer at ¶ 25.

290.    Currently, Ms. Loughran is a Partner in the multifamily housing practice group at Troutman Pepper.  Her partnership was effective on January 1, 2024.  Loughran Dep. Day 1 10:20-11:5, 70:20-23.

291.    Ms. Loughran first met Plaintiff in December of 2020.  Id. at 40:3-4.

292.    Ms. Loughran worked with Plaintiff in 2020, 2021, 2022, and 2023.  Id. at 14:2-18.

293.    Ms. Loughran staffed Plaintiff on a majority of her deals.  Id. at 34:19-24.

294.    By 2023, Plaintiff got the majority of her work from Ms. Loughran.  Id. at 41:16-18.

295.    In the years preceding Plaintiff's termination, Ms. Loughran did not believe Plaintiff was underperforming such that Plaintiff was at risk for termination.  Id. at 42:6-12.

296.    In 2021, Mr. Bowsher made reference to Ms. Loughran's pregnancy before asking her questions about a deal they were working on together.  Id. at 73:2-24.

297.    Shortly thereafter, Ms. Loughran told Mr. Iwashyna that she no longer wanted to work with Mr. Bowsher anymore.  Id. at 74:9-12.

298.    Over the course of her tenure, Ms. Loughran had gone on maternity leave in 2020, 2021, and 2023.  Id. at 22:23-23:16.

299.    Ms. Loughran did not receive a bonus for the year of 2021.  Id. at 23:25-24:3.

300.    When it was communicated to Ms. Loughran that she was not receiving a bonus for 2021, she was told by Mr. Iwashyna who explained that bonuses are for people who go above and beyond and that Ms. Loughran did not go above and beyond.  Id. at 24:8-20.

301.    Ms. Loughran told Mr. Iwashyna that she was being punished for being pregnant and having children.  Ex. 8, Whitney Loughran Deposition Transcript Day 2, ("Loughran Dep. Day 2")  at 8:23-25.

302.    When Ms. Loughran asked Mr. Iwashyna what she could have done differently to receive a bonus, Mr. Iwashyna told her, "nothing."  Id. at 9:2-8.

303.    Mr. Iwashyna did not report to HR Ms. Loughran's complaint of disparate treatment due to her pregnancy as the Firm's HR department never reached out to her or investigated the complaint.  Id. at 9:9-13.

304.    In the Spring of 2022, Mr. Iwashyna went to Ms. Loughran and said that there were partners complaining about Plaintiff's performance.  During this conversation, Ms. Loughran assumed that he was speaking about Mr. Bowsher and asked Mr. Iwashyna whether the person complaining had gone directly to Plaintiff with their feedback which Ms. Loughran thought was the more appropriate avenue rather than going directly to the practice group head. Loughran Dep. Day 1 46:5-21, 47:6-17.

305.    Ms. Loughran felt as though if it was someone other than Plaintiff the procedure would have been different.  To illustrate this point, Ms. Loughran asked the question that if it was Austin Padgett, a white male, would Mr. Bowsher or another partner have gone directly to him versus going directly to the practice group leader.  Id. at 48:20-22, 49:13-17.

306.    With her illustration, Ms. Loughran was alluding to the fact that Austin is a white male so he would have been afforded the opportunity to have the conversation directly versus having a discussion about him to a practice group leader.  In response, Mr. Iwashyna told Ms. Loughran, "that doesn't mean that Matt [Bowsher] is racist." Id. at 50:24-51:4, 51:15.

**C.**    ████████████

307.    ██████████ worked at the Firm's Atlanta office for two years until she left the Firm in August of 2023 as part of a "mass exodus of black associates." Ex. 43.

308.    ██████████ explained that Troutman Pepper "has a serious problem with the way they handle their black associates, specifically their black women associates." Id.

## VII.    ADDITIONAL MATERIAL FACTS REGARDING DEFENDANT'S UNLAWFUL CONDUCT

309.    Mr. Hulbert also worked with Ms. Carmody as a first-year associate and, at that time, was not required to send his time to Ms. Carmody or have his hours reduced before his time was entered in the System.  Pl. Dep. 68:1-11 (explaining that Plaintiff asked Mr. Hulbert herself whether Ms. Carmody was reducing his time before it was entered and "he never had to deal with that throughout the course of his employment").

310.    Similarly, Ms. Carmody worked with Mr. Schiff when he was a first-year associate and did not require him to send her draft time entries before they could be input in the system.  Carmody Dep. 28:8-14; Schiff Dep. 25:22-26:10.

311.    In May 2020, Mr. Liu expressly stated that Ms. Carmody "just need[ed] to follow normal protocol" as it pertained to Plaintiff's hours. Ex. 39.

312.    Plaintiff did a variety of work for Ms. Carmody, including "disbursement agreements" and "use agreements" as well as "loan documents," for deals and closings.  Ex. 23.

313.    In early 2022, Plaintiff spoke to Whitney Loughran regarding Mr. Bowsher speaking to her in a condescending and degrading manner.  Plaintiff told Ms. Loughran "it makes me wonder [Mr. Bowsher's] personal views" to which Ms. Loughran, a Black female herself, told Plaintiff "you know what it boils down to." Ex. 24.

314.    In May 2022, Plaintiff forwarded a communication she had received from Mr. Bowsher to Ashante Smith (Partner).  Ms. Smith told Plaintiff that "this situation has been

frustrating for you" and acknowledged that Plaintiff was "likely still processing a myriad of emotions," but that the Firm was "monitoring the situation," although she could not "promise" that Plaintiff would see "changes overnight." Ex. 22.

315.    Also in May 2022, after being sent a communication from Mr. Bowsher to Plaintiff, Ms. Loughran forwarded that communication to Mr. Iwashyna, Nora Nickel (Partner), and Ms. Smith and asked to speak with them. Ex. 27.

316.    Ms. Loughran spoke to Ms. Smith because she thought it was problematic that Mr. Bowsher was making comments about Plaintiff's work but then was also wrong about a "pretty basic … knowledge point about the Freddie Mac program." Loughran Dep. Day 1 80:22-81:10.

317.    Similarly, Ms. Loughran told Ms. Nickel her perspective "of how frustrating" it was for Plaintiff "when her work is being criticized, yet in the same breath, Matt [Bowsher] was also very wrong," and Ms. Nickel simply "laughed at how wrong" Mr. Bowsher was but did not offer "any sort of advice or action points." Id. at 82:12-20.

318.    Ms. Loughran's conversation with Mr. Iwashyna "was the same," and he was "just laughing about how wrong that was." Id. at 83:2-3.

319.    Lindsey Crawford, a senior attorney who worked with Plaintiff, was "blindsided" by Plaintiff's termination and did not observe anything that, in her view, warranted Plaintiff's termination. Crawford Dep. 68:18-25.

320.    Plaintiff explained at her deposition that "[t]here are certain stereotypes" about Black professionals "who work in corporate America," including Plaintiff, that "we didn't get these jobs based on our own merit," and were instead there to "fit some quota," and that Mr.

Bowsher's conduct "was exhibiting those stereotypes" and questioning her "basic competency." Pl. Dep. 203:4-13.

321.    Plaintiff reviewed the Amended Complaint, wherein she alleges that the Firm discriminated against her due to her race by, *inter alia*, terminating her employment, before it was filed to ensure that its contents are accurate.  Pl. Dep. 140:3-7.

322.    Plaintiff complained to both Ms. Wisotsky and Mr. Schiff that she was being treated differently because she is Black.  Pl. Dep. 174:20-175:2, 176:2-6.

323.    Mr. Liu advised Ms. Carmody that Plaintiff had raised "concerns" about Ms. Carmody.  Ex. 40.

324.    Plaintiff sent contemporaneous communications to friends and colleagues regarding Ms. Carmody reducing her hours before they could be input in the System.  Ex. 52 ("I spoke to the diversity partner in confidence about my issue [with Ms. Carmody]. He was like hell nah you can't keep living like this."); Ex. 49 ("She's still cutting my hours after I told her I was instructed to enter them properly.  I had to reach out to the diversity partner he said this is not right . . . Also he said I can't continue to live like this because I'm 44% behind my yearly target goal.");

325.    Similarly, Plaintiff sent contemporaneous communications regarding Ms. Carmody not giving Plaintiff work after Plaintiff complained about Ms. Carmody cutting her hours.  Ex. 54 (Plaintiff texting a friend on March 30, 2020 "We busy as hell low interest rates"); Ex. 53 (Plaintiff texting a friend on March 31, 2020 that "We are busy because of lower interest rates.  Good thing about real estate is that we do good even in a recession. . . . We closed 208 million dollars worth of loans this month."); Ex. 47 (Plaintiff texting a colleague on April 30, 2020 that "[my] numbers are not reflecting that she's busy"); Ex. 48 (Plaintiff texting a colleague

on May 8, 2020 that "there has never been a time that [Ms. Carmody] told me she doesn't have any work"); see also Ex. 56 (contemporaneous communication stating that Plaintiff's work "completely changed" in May 2020).

326.    During the COVID-19 pandemic, Plaintiff frequently went into the office.  Ex. 51 (Plaintiff texting a friend on March 30, 2020 that "Some days I'll be home some days I have to be in the office" because "according to my boss" she is an essential worker); Ex. 53 (Plaintiff texting a friend on March 31, 2020 that "we coming in the office once a week she said"); Ex. 55 (Plaintiff texting a friend on May 18, 2020 that "Now [Ms. Carmody] wants me to come into the office tomorrow . . .  I'm about to drive [] down there this evening and get it done").  Ex. 57 (Plaintiff texting a friend on May 20, 2020 that "She got me going back into the office . . . I was there on Monday").

Respectfully submitted,

Dated:  March 26, 2025
       New York, New York

**WIGDOR LLP**

By: _____
    Michael J. Willemin
    Kassandra Vazquez
    Brooke Payton

85 Fifth Avenue
New York, NY 10003
Telephone: (212) 257-6800
Facsimile: (212) 257-6845
mwillemin@wigdorlaw.com
kvazquez@wigdorlaw.com
bpayton@wigdorlaw.com

*Counsel for Plaintiff*