# Exhibit 9

                                          Page 1

1                UNITED STATES DISTRICT COURT

2                FOR THE DISTRICT OF COLUMBIA

3

4      -------------------------------

                                        :

5      GITA F. SANKANO,                 :

                                        :

6              Plaintiff,               :   Civil Action No.

                                        :

7         v.                            :   1:24-cv-00142 (JMC)

                                        :

8      TROUTMAN PEPPER HAMILTON         :

                                        :

9      SANDERS, LLP and BRIAN           :

                                        :

10     IWASHYNA,                        :

                                        :

11             Defendants.              :

                                        :

12     -------------------------------

13

14          The video deposition of GITA F. SANKANO, the

15     plaintiff herein, held at Littler Mendelson, P.C.,

16     815 Connecticut Avenue, N.W., Suite 400, Washington,

17     D.C., convened at 10:11 a.m. on Thursday, October 17,

18     2024 and the proceedings being taken down by

19     stenotype and transcribed by Catherine B. Crump, a

20     Notary Public in and for the District of Columbia.

21

22

1    describe as crosstalk.  That's you and I talking over

2    each other.  We want to try to avoid that.  So if you

3    will allow me to finish asking my question and then I

4    will allow you to finish answering the question.

5        Now, I don't know what's going on in your head

6    or how much information you want to provide to me.

7    So you might be giving the answer and then stop to

8    take a breath and then I start asking my next

9    question.  If I have interrupted your answer, don't

10   hesitate to tell me that I'm not finished.  Okay?

11   And I will allow you to finish your answer.  Again,

12   it's because we want to make sure we have as accurate

13   as possible a record.

14        Now, your attorney may not like some of my

15   questions and have objections.  If he does object,

16   you will be expected to answer my questions unless he

17   instructs you not to.  Okay?

18        A.    [Gestures.]

19        Q.    No nodding of the head.

20        A.    I don't have anything to say.  Is that a

21   question?

22        Q.    Just yes or no.

1      A.    Okay.  I didn't know you were asking a
2   question.
3      Q.    Let's see.  Now, at the beginning of
4   this deposition, you took an oath.  Correct?
5      A.    That's correct.
6      Q.    And you understand that by taking that
7   oath, it's as if you're in a court before a judge?
8      A.    That is correct.
9      Q.    And you understand that you're required
10   to tell the truth?
11      A.    Absolutely.
12      Q.    And if you don't tell the truth, you
13   could be guilty of perjury?
14      A.    Correct.
15      Q.    And is there any reason why you would
16   not be able to remember events that may have occurred
17   during your employment at Troutman Pepper?
18      A.    Yes.
19      Q.    What might impact your memory?
20      A.    I was in a hostile, racist,
21   discriminatory environment, and when you're under
22   that, it's traumatic and sometimes you try to black

Page 12

1    it out.  So sometimes you may not remember everything

2    because it was a traumatic experience.

3            Q.    Is there anything that would refresh

4    your recollection from events that occurred during

5    that time period?

6            A.    Probably documentation, if you have

7    that.

8            Q.    Well, did you retain any documentation

9    relating to the time that you were employed at

10   Troutman Pepper?

11           A.    Yes.

12           Q.    What kind of documentation?

13           A.    Well, first of all, I believe I turned

14   everything over, which is text messages, primarily,

15   emails, primarily text messages.

16           Q.    Any diaries?

17           A.    No.

18           Q.    Calendars?

19           A.    No.

20           Q.    Do you journal?

21           A.    No.

22           Q.    Did you have a personal laptop during

1      that time you were employed at Troutman Pepper?

2              A.    I did.

3              Q.    Do you still have that laptop?

4              A.    Yes.  The last time I used it, though,

5      was when I was in law school, but I do have it.

6              Q.    Did you use it during the time that you

7      were employed with Troutman Pepper?

8              A.    Not that I know of that I can recall.

9              Q.    And what did you use to send emails

10     during the time that you were employed at Troutman

11     Pepper?

12             A.    Primarily, my laptop and my cellphone.

13             Q.    What laptop?

14             A.    The company laptop, the Troutman laptop.

15             Q.    And what about text messages?

16             A.    Can you -- I'm not understanding your

17     question.

18             Q.    What device did you use for text

19     messaging?

20             A.    My cellphone.

21             Q.    Do you still have that cellphone?

22             A.    Yes.

Page 14

1          Q.     And what is the number for that

2     cellphone?

3          A.     (917) 736-7871.

4          Q.     And did you have one cellphone during

5     the time entire time that you were employed with

6     Troutman Pepper?

7          A.     Yes.

8          Q.     Have you suffered any head injuries

9     since the time that you were employed at Troutman

10    Pepper?

11         A.     No.

12         Q.     Are you taking any medication that would

13    impact your ability to recollect events that occurred

14    at Troutman?

15         A.     No.

16         Q.     Other than meeting with counsel, what

17    did you do to prepare for your deposition today?

18         A.     I met with my counsel.  I have relatives

19    who are attorneys too.  So I asked for advice from

20    them.  I spoke to my mom.  That's about it.

21         Q.     Which of your relatives are attorneys?

22         A.     My cousins.  They're attorneys.

Page 34

1      Q.    Did your cousin Precious know any of the

2  attorneys at Troutman Sanders?

3      A.    No.

4      Q.    Had you she ever worked at Troutman

5  Sanders?

6      A.    No, and can you rephrase that question?

7  Because when you say Troutman Sanders, I didn't work

8  for Troutman Sanders.  I worked for Troutman Pepper

9  or Pepper Hamilton.

10     Q.    Did you -- did she ever work for Pepper

11 Hamilton?

12     A.    No.

13     Q.    Did she ever work for the firm that

14 existed after the merger?

15     A.    No.

16     Q.    Did she ever work with any legacy firm

17 of Pepper Hamilton?

18     A.    No.

19     Q.    When did you graduate from law school?

20     A.    2018.

21     Q.    And during the time that you were in law

22 school, did you work for any law firms?

Page 35

1          A.     I did, a boutique law firm.

2          Q.     What law firm did you work for?

3          A.     The Law Offices the Anthony Onwuanibe.

4          Q.     And you say it's a boutique law firm.

5     Why do you describe it as a boutique law firm?

6          A.      It was about two attorneys that worked

7     there.  It was very small.

8          Q.     And what type of law did they practice?

9          A.     They worked on -- he was a title agent.

10    So they worked on real estate transactions.

11         Q.     Did he work on any deals with Pepper

12    Hamilton?

13         A.     Not that I know of.

14         Q.     What about with Troutman Pepper?

15         A.     Not that I know of.  To my recollection,

16    no.

17         Q.     Did you work with any other law firms

18    during the time that you were in law school?

19         A.     No.

20         Q.     Did you seek to work for that law firm

21    after you graduated from law school?

22         A.     No.

1    school from other advisors like in law school and

2    other friends that worked at big law firms as well.

3          Q.    Why did you decide to do a clerkship

4    after law school?

5          A.    It was an appellate clerkship.  So it

6    was a prestigious clerkship.  That's number one.

7    Number two, I personally feel like as a law student

8    or someone fresh out of law school, it's best to have

9    experience in other avenues, you know, trying to see

10   if maybe litigation, I might be interested in

11   litigation, and a clerkship would give me the

12   opportunity to decide that.

13         So I felt like it would be an opportunity for

14   me, a great opportunity for me, to do that.

15         Q.    And what was the time frame of your

16   clerkship?

17         A.    August of 2018 until August of 2019.  So

18   it was a year clerkship.

19         Q.    And so when your clerkship was coming to

20   an end in August of 2019, did you apply for any law

21   firm positions in litigation?

22         A.    I did.

Page 38

1          Q.    Where did you apply to?

2          A.    That, I can't recall.

3          Q.    Did you get any offers to do litigation?

4          A.    I can't recall, to be honest.  It was so

5    long ago.

6          Q.    And who did you clerk for?

7          A.    Judge Michael Reed.

8          Q.    And how did you get your clerkship with

9    Judge Reed?

10          A.    I interviewed.

11          Q.    Did you know Judge Reed prior to

12    interviewing?

13          A.    No.

14          Q.    Have you stayed in contact with Judge

15    Reed since your clerkship ended in August of 2019?

16          A.    I did.

17          Q.    How frequently do you speak with Judge

18    Reed?

19          A.    I speak with him frequently, you know,

20    not every day, obviously, but we speak probably once

21    every three months or once -- depending, but we're in

22    contact.

1    want to be there, did you raise it with other people,

2    something along those lines; but he couldn't really

3    give me true advice in navigating a big law firm

4    because he never worked for a big law firm.

5            Q.    Do you know what Judge Reed's background

6    was before he was elevated to the bench?

7            A.    I think he was -- I'm not going to say

8    defense.  I can't remember, but he did work in

9    criminal law.  So I can't remember exactly what side

10   he was on.

11           Q.    And what race is Judge Reed?

12           A.    He's a black man.

13           Q.    And do you know if Judge Reed is

14   acquainted with anybody who works at Troutman Pepper?

15           A.    Not to my recollection, no.

16           Q.    And what advice did Judge Reed give you

17   about Mr. Bowsher?

18           A.    I can't recall, to be honest.

19           Q.    Do you recall what you spoke to him

20   about with respect to Mr. Bowsher?

21           A.    Yeah.  I spoke to him about the fact

22   that I'm working with this man who seems to think

Page 41

1    that I'm incompetent for some reason and he has this

2    thing when it comes particularly to black women to

3    belittle our competency level, and I showed him the

4    emails that I received from him as well.

5          Q.    Do you recall which emails you showed to

6    him?

7          A.    The racist email that I received on

8    August 3rd.

9          Q.    August 3rd of what year?

10         A.    2023.

11         Q.    And what was Judge Reed's reaction when

12   you showed him the email from August 3rd?

13         A.    He felt like it was racist as well

14   because of the stereotype that's out there about

15   people who look like us in these spaces, that we did

16   not get to these positions based off our own true

17   merit, that we are just here because we're

18   affirmative action cases.  So he knew exactly what

19   this man was trying to say.

20         Q.    Had Judge Reed met Mr. Bowsher prior to

21   you showing him that email?

22         A.    No, he did not.

Page 42

1      Q.    So what Judge Reed knew about Mr.
2  Bowsher was based on conversations with you and you
3  showing him emails?
4      A.    Yes.  The emails definitely was telling
5  to him, of what he wrote in the email.
6      Q.    And that was your understanding based on
7  discussions with Judge Reed?
8      A.    Yes.
9      Q.    And did Judge Reed put anything in
10 writing to you about what his opinion was of Mr.
11 Bowsher's email?
12     A.    I believe I turned over a text, but most
13 of Judge Reed's conversations with me were over the
14 phone, because Judge Reed is not really a texter.
15     Q.    How did you come to learn about Pepper
16 Hamilton?
17     A.    Just applying.  At the time, it was on
18 the -- so there's this website called Volt and they
19 have a list of top law firms.  So I just went through
20 that list and I applied, and I also saw that they had
21 a financial services practice group and I knew that I
22 had experience already from working at that boutique

Page 43

1    law firm.  So it caught my interest.

2         Q.    Did you know anybody in the financial

3    services practice group at Pepper Hamilton?

4         A.    No.

5         Q.    Did you submit your application through

6    a portal or did you submit it directly to a partner

7    at Pepper Hamilton?

8         A.    It was -- so I either reached out to

9    Henry Liu, because I saw that he went to Maryland,

10   and I think he forwarded it to Melissa, who was the

11   office manager at the time, and that was back in

12   February, because I think they moved to another

13   location out here on K Street; and then in the spring

14   or early summer, they called me in for an interview

15   and then they wanted me to submit my application.  I

16   can't remember if I actually submitted an

17   application, to be honest, but that's how it

18   happened.

19        Q.    And did you speak to Mr. Liu about the

20   opportunities at Pepper Hamilton?

21        A.    I can't recall, but I do remember

22   sending an email to him.

Page 49

1    worked on my title.  I worked on survey, and I was

2    more involved with doing all the hard labor when it

3    came to closing the deal.

4            After the merger, when I started working with

5    the Richmond group, that was -- because it's such a

6    fast-paced environment, everybody else had their own

7    tasks.  Like, for example, they had a closing

8    department that took care of all of that.  So I

9    didn't get to see the actual paperwork that goes into

10   closing the deal as opposed to working with

11   Christine, which was I was doing all the legwork.

12           So I wouldn't be able to tell you.

13           MS. DAVIS:  We've been going almost an hour.

14   Do you want to take a break?

15           THE WITNESS:  It's up to you.

16           MS. DAVIS:  Michael?  Anybody want a break?

17           MR. WILLEMIN:  I'm okay for at least a little

18   while longer.

19           MS. DAVIS:  Okay.

20           THE WITNESS:  Yeah.  You can go on.

21   BY MS. DAVIS:

22           Q.   Okay.  Let's continue to talk about when

Page 51

1          A.    During my midyear review, when I spoke

2     to Audrey on the phone, I had a great evaluation

3     despite my hours, which was on the only issue.

4     Christine told me herself that I had a great work

5     ethic.

6          So no one really complained about me showing

7     up and working hard.

8          Q.    And this was -- when did you get your

9     midyear review?

10          A.    April of 2020.

11          Q.    And up until April of 2020, were you

12     working in the office?

13          A.    Yes.  Yes.  I was definitely in the

14     office.

15          Q.    And then we all know COVID hit.  Did

16     that change where you were working or were you still

17     coming into the office?

18          A.    Christine still wanted me to come in.

19     So during the height of COVID, I was definitely

20     coming in still.  She told me to take Uber and submit

21     it, and then something -- I think we were forced to

22     work from home, but for the most part, like March

Page 54

1    merger in July of 2020, were Pepper Hamilton

2    attorneys in one building and the original Troutman

3    Sanders attorneys in another building?

4            A.    Yes.  Correct.

5            Q.    And at the time that the merger

6    occurred, what practice group were you in?

7            A.    They -- well, the practice group changed

8    names.  So everyone became Multifamily Housing.  So

9    that just happened by default.

10           Q.    And so at the time of the merger, who

11   were the partners in the multifamily housing group in

12   D.C.?

13           A.    When we merged, you had Henry.  You had

14   Blair.  You had Christine.  You had Scott.

15           When it came to the legacy Troutman side, you

16   had Matt, Lindsey, David McPherson.  That's when the

17   merger happened, at the time of the merger that I

18   could recall.  I don't recall if I'm missing someone

19   else, but yes.

20           Q.    And who were the associates in the

21   office in the multifamily housing group?

22           A.    Okay.  On the legacy Pepper side, there

Page 61

```
 1      Scott.
 2              Q.    What type of deals did Scott work on?
 3              A.    Scott did developer work.
 4              Q.    Could you repeat that?
 5              A.    He did -- basically, I don't really know
 6      the logistics of exactly what he does, because he's
 7      on the other side of the table.  So when I say
 8      developer work, he represented borrower, I believe.
 9              And I just want to add something.  So Brendan
10      was an associate at the merger for Pepper Hamilton.
11              Q.    Is he the one that you forget his name?
12              A.    No.
13              Q.    Or he's an additional one?
14              A.    He's an additional one on the Pepper
15      Hamilton side.  Brendan and I spoke a lot.  So I
16      can't believe I forget him.  So yeah.
17              Q.    And what his race?
18              A.    He's white.
19              Q.    And what did you talk to Brendan about?
20              A.    About my hours.  He couldn't believe it
21      was happening.
22              Q.    He couldn't believe what was happening?
```

Page 63

1    -- and she said, Can I ask you something, is

2    Christine stealing your hours, before she even got

3    into what was said in my review, and at the time, for

4    me, I didn't think she was stealing my hours given

5    the conversations we had.

6         I told her, Well, I email Christine my hours

7    and she tells me what to bill, and Audrey told me,

8    Going forward, I need you to enter in all of your

9    hours, and she is supposed to cut that off on the

10   back end, not on the front end, and I said okay.

11   Then she went ahead with my review and told me that

12   Christine had a lot of positive things to say about

13   me, that it was a very good evaluation, there was

14   nothing negative said about my work at all, and that

15   was the end of the conversation.

16        After that, I was stunned, because that's

17   something at the first year, you know, is she

18   stealing your hours, you're not expecting that.  So I

19   reached -- I think I reached out to Brendan and my

20   cousin Precious, and she said, Well, you have

21   instructions from the firm, so if she's telling you

22   to bill your hours, you have to bill your hours going

1    I was working with someone who I trusted initially --

2    right -- who put me in a very uncomfortable position

3    as a first-year associate.

4           So the whole conversation was crazy.

5           Q.    And you said you could deduce friction.

6    Friction between whom?

7           A.    Christine and Audrey.  Christine was

8    very -- she didn't get -- it was weird -- right --

9    because she told me before, Oh, you know, I need to

10   get back to Audrey about your hours, you know, your

11   billable rates are just too high.  Like it was

12   something that wasn't a big thing, and the fact that

13   Audrey had something different to say and Audrey made

14   sure that was the first thing she addressed, I knew

15   that it was something serious.

16          Q.    And did you ever see during the time

17   that you were employed with Pepper Hamilton a copy of

18   any policy regarding recording your time?

19          A.    Yes.

20          Q.    And what do you recall you were supposed

21   to do as an associate for recording your time?

22          A.    It said associates shall enter their

1    time, their billable time.  I remember that, and not

2    only that, my offer letter spoke about me billing my

3    time appropriately.

4         Q.    And have you ever heard the term

5    "write-off"?

6         A.    Yes.

7         Q.    What do you understand are write-offs?

8         A.    From my -- I'm not a partner, but from

9    what I know is a partner will write off your time

10   after you bill them to the system and that's if

11   you're over budget.  So being the fact that Christine

12   charged flat rate, if it was over budget, she would

13   write off the time so we would be under budget.

14        Q.    What are flat rates?

15        A.    So, typically -- well, it depends.

16   Right?

17        You have some people who bill by the hour and

18   then you have some people, some partners or practice

19   groups, that bill flat rate fees, depending on the

20   transaction.  So it's completely up to a partner if

21   they want to bill a flat rate fee or the practice

22   group or bill by hour, and Christine had a flat rate

Page 67

1   fee, which is typical for our practice group.

2          Q.    And what is a flat rate fee?

3          A.    Well, I'm just giving you one fee for

4   the work that you've done.  For example, if I am the

5   lender and, instead of me charging you by the hour,

6   I'm just going to tell you for this amount of this

7   work, I'm going to charge you "X" amount.  I'm not

8   going to bill you by the hour.  That's a flat rate

9   fee, one charge.

10         Q.    And how is the flat rate fee determined?

11         A.    That's something I don't know.  That's

12  above me.

13         Q.    Now, you said you had a conversation

14  with Brandon.

15         A.    Brendan.

16         Q.    Brendan.  About Christine and the

17  recording of your hours.  Did he give you any advice

18  about what you should do?

19         A.    He told me I had to listen to Audrey and

20  that it was insane that Christine was being allowed

21  to do this and it's a huge problem and that I had to

22  follow the instructions that I received.

Page 68

1          Q.    Was Christine reducing the time for

2    other associates who worked with her?

3          A.    No.

4          Q.    How do you know that she was not

5    reducing their time?

6          A.    I asked.  So Randy was one of the

7    associates that I asked.

8          Q.    Was Randy the same year as you?

9          A.    No, but he worked with her when he was a

10   first year as well.  So he never had to deal with

11   that throughout the course of his employment with

12   her.  Well, at the firm and working with her.

13         Q.    You weren't there when Randy was a first

14   year?

15         A.    No, I was not.

16         Q.    Did Randy show you his time entries from

17   when he was a first year?

18         A.    No.

19         Q.    Did you talk to Christine about how she

20   managed Randy's time when he was a first-year

21   associate?

22         A.    No.

Page 70

1          Q.    I don't think we've used Christine's

2    last name at any point in time.  What's her full name

3    so we all are talking about the same person?

4          A.    Yeah.  Waldmann Carmody, I believe is

5    the last name.

6          Q.    Other than the timekeeping issue with

7    Christine, how would you describe your relationship

8    with her?

9          A.    Initially, she was pleasant.  Right?  I

10   didn't really have any issues with her.  It all went

11   downhill after this meeting with Audrey.

12         Q.    And until the meeting with Audrey, you

13   weren't aware that there was a problem with your

14   hours being billed?

15         A.    I raised it.

16         Q.    Who did you raise it with?

17         A.    To Christine.

18         Q.    And what were your discussions with

19   Christine about your hours?

20         A.    So back in, I would say, fourth quarter,

21   which is the busiest quarter for us in this practice,

22   Christine wanted me to not enter in none of my hours

Page 71

1    and wanted me to just send them to her, and she told

2    me that we will review your hours at the end of every

3    week.  That never happened, and I went to her like,

4    I'm noticing I have virtually no hours in November

5    2019 or December 2019 and I'm working my tail off.

6    Like we're really busy, and she told me, Oh, don't

7    worry about it, we'll discuss it later.

8          And I said okay and she told me that she

9    charges a flat rate fee and she was looking out for

10   me and my realization.  Right?

11         And I said okay, because I did not think to

12   question someone who I worked for and who hired me.

13   Later on, around the Christmas holiday, Christine

14   left to go to her sister's wedding and Randy stepped

15   in to close a deal, and around that time, I received

16   a phone call from Headquarters out in Philly and they

17   asked for my billables, because I had no hours, and I

18   told them they should check in with my supervisor,

19   which is Christine.  They told me they spoke to her

20   already, which was strange.

21         So when January came around, I told her that I

22   received this call and she told me, Don't worry about

Page 75

1              A.    So during the time when we were in

2       Pepper Hamilton, it wasn't discretionary bonuses.  It

3       was based on your hours billed.  That happened after

4       the merger.

5              So because she was reducing and manipulating

6       my hours, I wasn't up for a bonus.  Not only that,

7       it's the perception of growth.  Right?  Because it

8       measures your productivity within the firm.

9              So anybody looking at my hours would think

10      that I was just sitting just looking at my nails all

11      days and not working.  So the perception of my

12      productivity was impacted because she manipulated my

13      hours on the front end.

14             Q.    And if Christine had input your hours or

15      allowed you to put in all of your hours and then

16      wrote them off, that would reflect productivity as

17      well?

18             A.    Yes.  Well, depending.  Right?  So the

19      fact that she reduced it, it would show that I was

20      not -- a negative effect on my productivity, but if

21      she would have let me bill my hours accordingly, I

22      would have probably been around the range of meeting

Page 89

1          A.    That's I all I can recall at this point
2     in time and Blair after the whole debacle with hours
3     and Henry, but that was towards the latter half of
4     2020, in that time.
5          Q.    So the latter half of 2020, you did some
6     work with Blair?
7          A.    I did some work with Blair in May of
8     2020 all the way up until I would say about that
9     summer.  It was that summer of 2020.
10          Henry jumped in, although, he told Audrey he
11     didn't want to be involved with the hours situation
12     with Christine even though he was the head of the
13     practice group.  He didn't start giving me work until
14     after the merger.
15          Q.    Did Henry tell you that he didn't want
16     to be involved with the billing issue with Christine?
17          A.    Audrey did.
18          Q.    Audrey told you what?
19          A.    That Henry -- so Christine retaliated
20     against me after the whole hours thing happened.
21     Right?  My work dried up drastically around late
22     April to May, and Audrey and I spoke a lot, and I was

1   really concerned because it was the time during

2   COVID.  We're on lockdown.  George Floyd is going on,

3   and there was a lot to deal with that I was being

4   treated this way for no reason at all, and she -- I

5   would follow up with her to ask her like what's going

6   on, and she told me that spoke to Henry, but Henry

7   told her he didn't want to be involved, and I was

8   stunned by that.

9         Q.    Did she tell you why Henry didn't want

10  to be involved?

11        A.    No.  She didn't go into specifics, no.

12        Q.    Now, you said that Christine was

13  retaliating against you.

14        A.    Yes.

15        Q.    How was she retaliating against you?

16        A.    So, initially, everything was fine,

17  because we worked -- before she -- the whole hours --

18  before she got called out for her hours by Audrey.

19  Everything was fine until I had that midyear review

20  in April 2020.

21        So after Audrey gave me instructions to bill,

22  I went to Christine and I sent her an email telling

Page 91

1    her what Audrey told me to do.  She told she still

2    needed to see my hours, and I thought like, Okay,

3    maybe she'll stop cutting them, maybe she just wants

4    to see them.  She still kept cutting my hours.

5         So at that point, I reached out to two black

6    associates in Philadelphia and they suggested that

7    since I was the only black attorney in D.C. that I

8    reach out to the DEI partner, Kassem, and Kassem told

9    me that Christine was only looking out for herself

10   and her realization rate, and he spoke to Audrey.

11        I reached out to Audrey again to tell her that

12   this was still happening, but I was scared, because

13   it was the only person I received work from and I did

14   not want to let -- I didn't want it to be known that

15   I went back to speak to Audrey, and she told me,

16   Don't worry about it, you'll be protected.

17        So I guess she must have went back and said

18   something.  I don't know, but in May, Christine just

19   stopped giving me work.  I think I billed probably

20   not even 30 hours in May of 2020, and I emailed

21   Audrey and I told her like, Hey, now all of a sudden,

22   I'm not getting work, this is not normal.  Given the

Page 93

```
 1    cutting your time?
 2          A.    According to what she told me she was
 3    looking out for my realization rate.  So that's what
 4    she said, but to be honest with you, I don't really
 5    know the real reason why.
 6          Q.    And do you know if either Nicki or Sarah
 7    had a conversation with Christine about why she was
 8    cutting your time?
 9          A.    No, but they told me they spoke to
10    Kaseem about it.
11          Q.    And did you talk to Kassem?
12          A.    I did.
13          Q.    And what discussions did you have with
14    Kassem?
15          A.    I told him what was going and he told me
16    that the reason why she was doing this was to look
17    out for her own profitability and her own realization
18    rate and that she was being greedy.
19          Q.    Did he explain to you why she would be
20    looking out for her own profitability?
21          A.    Monetary gain.
22          Q.    What do you mean by "monetary gain"?
```

1          A.    To look more profitable in front of the

2    firm.  He's was like there's an incentive here that's

3    for a partner.

4          So her own comp, I guess.  He didn't really

5    get into specific details, but that was the gist that

6    he gave me about like why she was doing this, to look

7    out for her own profitability.

8          Q.    And you said that you only billed about

9    30 hours in May of 2020?

10          A.    I believe so, yes.

11          Q.    Did you start to get more hours after

12    May of 2020?

13          A.    Well, yes, after George Floyd died.

14          Q.    And when did you start getting more

15    hours after May of 2020?

16          A.    After the town hall.  The firm had a

17    town hall about race and everyone was, Oh, my God,

18    you're the only black associate here, let's give you

19    work.

20          So it was literally because of what happened

21    with George Floyd, because prior to that, that whole

22    month, they sidelined me.  They didn't care at all.

Page 95

1    Henry told Audrey that he didn't want to be involved,

2    and after we had the town hall about race, I spoke to

3    Audrey and she told me that Blair would be reaching

4    out and, miraculously, out of nowhere, I started to

5    get work again from Blair.

6             Q.    Do you know if Blair was aware that you

7    weren't getting work from Christine prior to that?

8             A.    Yes.

9             Q.    How do you know?

10            A.    I spoke to him about it.

11            Q.    When did you speak to him?

12            A.    In June of 2020.

13            Q.    At that point in time, do you know if

14   Blair had work that he could give you?

15            A.    Yes.

16            Q.    How do you know he had work?

17            A.    Because he gave me work.

18            Q.    He gave you work in June of 2020 --

19            A.    Yes.

20            Q.    -- when you spoke to him?

21            A.    Yes.

22            Q.    And prior to June of 2020, did Blair

Page 96

1    have an associate that he was working with?

2            A.    Yes.

3            Q.    Who was he working with?

4            A.    Randy.

5            Q.    And did you continue to get work after

6    June of 2020?

7            A.    Yes.  So Blair and I spoke in June of

8    2020, and he tried to make excuses for Christine,

9    because they have like a close relationship, and I

10   told him this is not a gray area, associates are

11   supposed to bill their time and get credit for that.

12   She's supposed to write that off on the back end, not

13   the front end, and he said, Yeah, you're right.

14           He told me to come in the office and he

15   started giving me work.  Once Christine saw that I

16   was working with other partners, that's when she

17   started to try to take me away again and try to start

18   giving me work.

19           So during that time, I did get work.  There

20   was an uptick from that, but it was more so -- the

21   work that Blair was giving me was more so

22   administrative work, putting together closing binders

1    and that was it.  It was nothing substantive.

2         Q.    Did Blair do the same type of work as

3    Christine?

4         A.    Yes.

5         Q.    And you said they had a close

6    relationship.  How do you know they had a close

7    relationship?

8         A.    Because -- just what the secretary told

9    me.  Michelle works with Blair.  Blair used to work

10   for Christine as an associate.  So they're very

11   familiar with one another from what I heard.  I

12   didn't see it, but from what I heard.

13        Q.    And you said you started getting more

14   work from Christine after June of 2020?

15        A.    Once she saw that I started getting work

16   from Blair, she started to give me some assignments.

17   Yes.

18        Q.    How long did that last?

19        A.    Up until the point of, I would say,

20   maybe July until I made a demand to leave, to stop

21   working with her, because they did not -- so the

22   thing is after they knew that Christine was doing

1    this, they had no resolution to make it right.  There

2    was no path of how to further develop me, how to

3    further train me.

4         It was me that came to them with my list of

5    demands and what I wanted after the merger.  They

6    were going to let me drown.  They didn't care.  Henry

7    made it be known and so did Blair.

8         I took initiative to tell them after the

9    merger, I want to work with "X" group, because I need

10   to get that experience.  So after the merger in July

11   of 2020, I was literally just doing administrative

12   stuff, like putting together closing binders, nothing

13   substantive to further my skills or anything like

14   that to get me to the next level.

15        I spoke to Tamry, who was the only black

16   female partner at Pepper Hamilton at the time.  She

17   was very concerned that this was happening to me, and

18   she told me to just wait a month after the merger and

19   then go back to them and let them know like, Hey,

20   like what are you guys going to do?  Right?  Because

21   they didn't have no real plan to get me back up to

22   speed.

Page 100

1   the attorneys in the financial services practice

2   group?

3         A.    No.

4         Q.    Do you know if Henry had any discussions

5   with Brian about what was going to happen to

6   attorneys in the practice group?

7         A.    From my -- when I spoke to Brian in

8   August of 2020, I made the initiative to reach out to

9   him, and he told me that the plan was initially for

10   me to still keep getting work from Brian, Henry, and

11   people up in Richmond.  So I guess they spoke.  I

12   don't know.  I wasn't there for those conversations.

13         Q.    And after Audrey told you that Henry

14   didn't want to get involved, did you go speak to

15   Henry?

16         A.    No.  He came to me.

17         Q.    When did Henry come to you?

18         A.    So right before I left for vacation.

19   This was the last week of July of 2020.  I was in my

20   office and Christine -- Christine was a few doors

21   down from me.

22         So Christine used to go to long lunch breaks

1    with Scott, and Henry literally stopped my office and

2    looked side to side to make sure she wasn't there.

3    He came to my office like, Hey, I know what's going

4    on.  Virginia from Richmond, Virginia -- she was a

5    senior associate at the time -- is going to reach out

6    to me, do you want to move your office, and I told

7    him why.  He was like, Well, she's going to be really

8    mad.  I'm like, What do you think?  He said, Yeah, I

9    think it's better.

10         So he moved my office to the tenth floor, I

11    believe.  At think at the time, we was on the

12    eleventh.  No.  That's the new building, but the

13    floor -- because we were in K Street.  So no.  It

14    didn't have ten floors.

15         So he wanted to move me to the lower floor,

16    away from Christine, and he told me if I wanted to be

17    the one to tell Christine that I was no longer going

18    to work for her, and I said no.  As a first year, I

19    suffered enough.  You guys didn't do anything.  So

20    you want me to be the one to tell her that?  I was

21    like, No, I think you should tell her, and he said

22    okay.

Page 140

1    was filed, I believe, in June, early June.  So I

2    reviewed it before we went ahead and filed it.

3         Q.    And when you reviewed the amended

4    complaint, did you review it to ensure that the

5    allegations were accurate based on your recollection

6    at that time?

7         A.    Correct.

8         Q.    Can you turn to page 38, please.

9         A.    This is stapled upside down.  Yes.

10        Q.    And can you read the first cause of

11   action to yourself, please.

12        [Witness peruses document.]

13        THE WITNESS:  Okay.

14   BY MS. DAVIS:

15        Q.    Now, in paragraph 297, it states:  "As

16   described herein, the firm discriminated against

17   Plaintiff because of her race by inter alia summarily

18   terminating Plaintiff and, thus, subjecting her to

19   disparate treatment."

20        Do you see that paragraph?

21        A.    Yes.

22        Q.    And the reference to "firm", what entity

1    discussed.  I was not, and this happened while it was

2    Pepper Hamilton.

3          Q.    Yes, and my question was limited to

4    Pepper Hamilton.

5          A.    Yes, and that's what I can recall

6    currently to the best of my -- right now.  If there's

7    something extra, I'll let you know, but that's what I

8    know right now.

9          Q.    And why do you believe that working for

10   Christine is an example of race discrimination?

11         MR. WILLEMIN:  Objection.

12         THE WITNESS:  Because we have two examples.

13   Right?

14         Number one, she did not closely micromanage

15   and intentionally reduce an associate who worked with

16   her throughout the course of his employment, and he

17   was white; however, she did it to me.  Right?

18         So the only difference between Randy and I is

19   that, number one, I'm a woman and I'm black.  Randy

20   and I have the same credentials.  He's barred just

21   like I am; however, he did not deal have to deal with

22   what I had to deal with.

Page 144

1            Also, when I look at the other associates,

2       who were nonblack -- they were all white -- they

3       received proper training.  They received the proper

4       development, and Henry refused to get involved in the

5       situation with Christine until the firm merged.

6            I sat there being treated differently from my

7       counterparts and, as a result, I suffered harm from

8       that.  I lost a whole year dealing with something

9       that had nothing to with me, because a partner took

10      advantage of me being a black woman, the only black

11      attorney there, and she was greedy and she stole from

12      me.  She stole my hours.  She manipulated my hours

13      and I suffered from that.

14           I couldn't -- I was not able to be further

15      developed as a result of it, lost a whole year,

16      wasn't even eligible or given the proper

17      opportunities to even get a bonus.  So I was not

18      given the same equal footing as the rest of my

19      counterparts, and it was due to the fact that I am

20      black.

21           So the only difference between me and anyone

22      else here is the color of my skin.  That was it.

Page 147

1    assignments given out to associates?

2            A.    So how it worked, it wasn't like after

3    the merger, we would get assignments from every

4    partner.  You were basically designated to one

5    partner.  Right?

6            So I was hired to work primarily, exclusively,

7    with Christine.

8            Q.    And who were the associates that were

9    working with Blair?

10           A.    Primarily, Randy.

11           Q.    What about with Henry?

12           A.    Henry had a whole team.  He had

13   Christian, Lauren, David Bly, Zach.  There was

14   another Zach there.  I can't recall who else, but he

15   had a whole bigger team.

16           Q.    And did Henry have enough work that he

17   needed an additional associates on that team?

18           MR. WILLEMIN:  Objection.

19           THE WITNESS:  That, I wouldn't know, because

20   Henry did agency loans.  He did Freddie Mac and

21   Fannie Mae.  I was hired to do HUD loans.

22           So within the practice group, if you were

Page 155

1    for our industry.  She knows that.  Right?

2          She treated a black associate differently from

3    a white associate and knowing that that was setting

4    me up for failure, and it was definitely due to my

5    race.  It was definitely due to the fact -- it was

6    definitely discriminatory.  She didn't do it to

7    another associate at all.

8          Q.    So Christine was not reporting all of

9    the time that you worked on deals.  Correct?

10          A.    I'd have to report it.  Right?  So she

11    was reducing my hours and telling me what to bill.

12    So that's correct.  The hours that I actually worked

13    are not representative in the system.  She

14    intentionally reduced my hours.

15          Q.    And but you were still working on the

16    deals?

17          A.    Yes.

18          Q.    And you were still getting the

19    experience working on the deals?

20          A.    Yes.

21          Q.    You were just not getting credit for the

22    hours that you worked on the deals?

Page 174

1          A.    At this time, I can't recall.

2          Q.    Is there anything that would refresh

3    your recollection if there was someone else who

4    created a hostile work environment?

5          A.    Maybe if I reviewed all my text messages

6    on my phone, but I don't have that with me right now.

7          Q.    And when you were still working for

8    Pepper Hamilton, did you tell anybody that you felt

9    that you were working in a hostile work environment?

10         A.    Yes.

11         Q.    Did you tell anybody who was a partner

12   at Pepper Hamilton?

13         A.    Yes.

14         Q.    Who did you tell?

15         A.    Blair and Audrey.

16         Q.    And did you tell Blair that you believed

17   that you were being -- you were working in a hostile

18   work environment because of your race?

19         A.    Yes.

20         Q.    When did you tell Blair that?

21         A.    That was June of 2020.  I literally

22   started crying on the phone and I told him this is

Page 175

1    only happening to me because I don't look like anyone

2    here.

3            Q.    And how did Blair respond to that?

4            A.    I can't remember, to be honest with you.

5    I don't know what he said.  I can't remember.

6            Q.    Did you make any notes of that phone

7    call with Blair?

8            A.    It's probably in my correspondence that

9    I -- it's probably within my texts.  That would be

10   the only notes.

11           I never took actual notes, but I'm probably

12   texted it to my best friend or something.

13           Q.    And what did Blair do after that phone

14   call in June o 2020?

15           A.    That's when he told me -- that's when he

16   started giving me work, to come in the office.

17           Q.    And did you ever report to anybody that

18   Blair was creating a hostile work environment for

19   you?

20           A.    No, I did not.

21           Q.    Now, when did you tell Audrey that you

22   were feeling like you were working in a hostile work

Page 176

1    environment?

2            A.    Audrey and I had multiple conversations.

3    So at some point, I did tell her that I was being

4    treated differently because I didn't look like anyone

5    else at the office.  So I don't know exactly when,

6    but her and I spoke on multiple times.

7            Q.    And you were the only black associate in

8    that practice group at that time.  Correct?

9            A.    Black attorney.  There was no other

10   black lawyer, associate, everything.  Yeah.

11           Q.    And are you aware if there were black

12   associates prior to you being in that group?

13           A.    No.  I was not aware.

14           Q.    And Christine interviewed you for the

15   position?

16           A.    Yes.

17           Q.    And you were hired specifically to work

18   for Christine?

19           A.    Yes.

20           Q.    And did you interview in person with

21   Christine?

22           A.    Yes.

Page 179

1          Q.    Why do you believe that?

2          A.    Just off of my conversations with

3    Whitney, I know that he was involved in her

4    development and was somewhat of her advocate for her

5    to get a promotion, but that's as far as what she

6    told me.

7          Q.    Did she share with you how he was

8    involved with her development?

9          A.    Not really.  I know that they worked

10    together, she told me, a lot when she was an

11    associate.  So I'm assuming that's how he was

12    involved.

13          Q.    Did you do any work with Brian?

14          A.    Yes, in the beginning.

15          Q.    You said "in the beginning".  Why do you

16    qualify it by "in the beginning"?

17          A.    When I first started to work with the

18    multifamily housing group in Richmond, Brian and I

19    worked on quite a few of Whitney's deals when she was

20    out.  So yeah.

21          Q.    And how did you work with Brian?

22          A.    Do you mean like -- when you say

1    "how" --

2            Q.    So when you were working on deals, would

3    you text him?  Email him?  Were you down in Richmond

4    with him working on the deals?

5            A.    It was mainly via email, which was back

6    in the latter half of 2020 when we were on lockdown.

7    I was working from home.  So it was mainly via email.

8            Q.    And do you know why you stopped working

9    with Brian?

10           A.    Whitney returned.

11           Q.    And do you know if Brian works or at

12   that time worked a lot with junior associates?

13           A.    I don't know if he did, but I knew that

14   he worked with other associate.

15           Q.    I'm specifically asking about junior

16   associates.

17           A.    That, I don't know.  No.

18           Q.    And the other associates that you know

19   he worked with, who were they?

20           A.    Abby, Zach.  I know those were like his

21   go-tos.

22           Q.    And do you know why they were his

Page 181

1    go-tos?

2           A.    No, I don't.

3           Q.    Anybody else that you worked with at

4    Pepper Hamilton who you felt created a hostile work

5    environment because of your race?

6           A.    Not that I can recall at this current

7    time.

8           Q.    Let's talk about Troutman.  Was there

9    anybody that you worked with at Troutman Pepper that

10   you felt like discriminated against you because of

11   your race?

12          A.    Matt.

13          Q.    Matt who?

14          A.    Bowsher.

15          Q.    Why do you feel that he discriminated

16   against you because of your race?

17          A.    So Matt had a constant theme of

18   questioning my basic competency level, and the reason

19   why I believe that it was due to my race is because

20   he did not speak to anyone else in that manner.  The

21   only other person that had an experience similar to

22   mine was Whitney.  She told me that he weaponized her

Page 182

```
 1      pregnancy against her, because -- and she felt like
 2      it was due to her race as well.
 3           She told me that -- we knew that he did not
 4      speak to Kelly, who was also pregnant at the time,
 5      and who was his go-to associate.  So there was a
 6      common theme between two black women that he just
 7      questioning our basic competency level.
 8           Ari, who is black, did not have the same
 9      experience with him, but he's a black male; however,
10      he told me it could be due to the fact he was
11      involved in training Matt on how to close deals.
12           Q.   How did Ari train Matt to close deals?
13           A.   So Matt was hired from Freddie Mac
14      because his substantive knowledge.  When you're a
15      Freddie Mac attorney, you're not really a closing
16      attorney, and what I mean by that is you're not
17      involved -- you're not lender's counsel involved with
18      title, closing the deal, getting the deal closed, or
19      anything like that.
20           So Ari was very integral in showing Matt how
21      we did things on the lender side at Troutman.  So
22      they had a very different relationship.
```

1     Whitney and I both agreed that he had -- he

2     was racist and it was a common theme of what he would

3     do.  He would constantly question my intellect level,

4     and there were many instances of that.

5         Q.    How did you come to work with Mr.

6     Bowsher?

7         A.    He was a partner in the D.C. Office and

8     I was an associate and when -- in the legacy Troutman

9     side.  So when we merged, before we moved into the

10    other building, I was primarily working with people

11    in Richmond.

12        So -- and I was primarily doing agency loans,

13    and the legacy Troutman folks would always have like

14    weekly calls on the legacy Troutman -- it was very

15    weird.  It was different.

16        Legacy Troutman multifamily housing group in

17    the D.C. Office spoke on the phone regularly, every

18    week, and when they noticed that I was an associate

19    that worked in D.C., I started getting put on some of

20    their deals.  So I can't remember exactly how that

21    came about, but I just started getting work from more

22    of the legacy Troutman D.C. partners.

Page 186

1    competency level?

2         A.    Okay.  So the first interaction was back

3    -- we had a deal back in, I would say, May of 2022

4    and we had a client that he asked me to join the deal

5    with him.  It was David McPherson's deal.  David

6    McPherson had a health scare and he was going out on

7    retirement, and he asked if I could assist him with

8    the deal and I said sure.

9         The client wanted their signature pages set up

10    in a certain way.  So, typically, we have certain

11    loan documents that are recorded with title and those

12    loan documents are notarized, but for this particular

13    client, she wanted -- and I knew who she was.  Her

14    name was Natalie.  She wanted her signature pages set

15    up in a different manner, and I told my assistant at

16    the time to break up the signature block according to

17    the way the client wanted.

18         Within minutes, Matt called and he started

19    mansplaining to me, thinking that I didn't know what

20    a notary was, and I let him finish and I told him

21    like, Hey, Matt, I know what a notary is, this is

22    just the way the client wants the signature pages set

1    up, and he hung up the phone, and that was the first

2    instance.

3          I didn't think anything of it, but it was

4    strange.  Then around April, going into May, I

5    received, I believe, an email from Kelly.  I think

6    Kelly was going out on maternity leave, and she

7    wanted me to cover some deals with her, and I did,

8    and Matt happened to be on those deals.

9          The first deal that we were on, I came in

10   between the deal.  Like I didn't start the deal off.

11   It was something that Kelly worked on.  I reviewed an

12   opinion for him for the first deal, and before I even

13   sent my comments out, I always run it through the

14   partner on a deal before I send my comments out to

15   opposing counsel, and he -- because Matt tends to

16   write these long emails.  Right?

17         So he sent back his comments to me and asked

18   me, you know, out of the year you've been closing

19   deals with us, have you ever seen this language

20   before, and I said no, and that was that and I

21   incorporated his comments and I sent it along to

22   borrower's counsel.  Borrower's counsel comes back

1    and says, Hey, you know, we just closed a deal with

2    you guys and we used the same exact language that you

3    guys are saying is unacceptable, and I asked her do

4    you know what deal it was, do you know when the deal

5    closed.

6         She gave me the information.  I went in the

7    system and I saw that this deal was just closed like

8    a week prior with the same exact language that Matt

9    was mansplaining to me about and the person who

10   closed the deal was Matt, himself.  So I told him,

11   Hey, you know, it looks you closed this deal, and he

12   said no biggie.  He sent a long email to the client,

13   throwing Ari underneath the bus, not taking

14   accountability over the fact that he was the partner

15   on the deal that accepted that same exact same

16   language.

17        I remember showing that email to Ari and Ari

18   Ari was like, yeah, that strange.

19        It around this time that I then got a call

20   from Whitney telling me that Brian went into her

21   office stating that there's been concerns about my

22   work.  Now, she told me that Brian didn't tell her

Page 189

1    who it was, but her and I knew exactly who it was.

2    Right?

3          Because prior to that, I've never gotten

4    complaints, and she told Brian the complaints that

5    you're receiving, they're consistent with one of a

6    junior associate, and if this was Austin, who was a

7    white male in the group, would they even come to you

8    about it and why are they going to you instead of

9    coming directly to Gita.

10          And I can't remember exactly what he said in

11    response to her.  That was that particular instance.

12          The second one was with another opinion.  This

13    deal was a supplemental loan.  Now, typically, on

14    opinions on a regular deal, you have an opinion.  You

15    ask borrower's counsel to draft an opinion, and if

16    the borrowing entity is formed in Delaware and the

17    property is out in Florida, we will ask for the

18    opinion to opine to the formation jurisdiction, which

19    would be, obviously, Delaware and where the property

20    is located, which would be Florida; but on

21    supplemental deals, you just need formation opinions.

22          So I told the borrower, borrower's counsel,

1    that, Hey, we just need formation opinions.  Matt

2    then emails me.  In these two instances, the opinions

3    literally happened around the same time frame.  Matt

4    emailed me mansplaining again, not asking me like,

5    Hey, Gita, why would you say that or anything like

6    that and said like you need to, basically, retract

7    the statement, that's incorrect.

8         So I emailed -- I forwarded the email to

9    Whitney, and Whitney said he's wrong, hold on.  So

10   Whitney went ahead and drafted an email for me and

11   she texted me and said if he's going to go complain

12   and say that you don't what you're doing, meanwhile,

13   you're correcting him, he can't have it both ways and

14   the group has a history of pushing black woman out of

15   the group.

16        She told me that she forwarded the email to

17   Brian and Nora and Ashante and that how Brian rushed

18   into her office and said I just want to say that Matt

19   is not a racist, and she told Brian no one is calling

20   him one.  Matt, in the meantime, when I sent him the

21   email that Whitney drafted, he responded and he just

22   said, Oh, I'm sorry, and then it wasn't enough for

Page 191

1    him.  He went and he emailed Sidarth and Jeremy and

2    Virginia, who were like the internal review committee

3    when it came to opinions and just to confirm, and he

4    said I can't believe I'm getting this wrong and Gita

5    was right, something along those lines.

6         And I remember speaking to Ashante about this

7    and I told Ashante these are microaggressions.

8    Right?

9         Like he has this preconceived notion for some

10   reason that I don't know what the hell I'm doing.

11   Right?

12        And she told me she spoke to Brian about it

13   and Brian kept saying like, Well, Gita should feel

14   good about herself because she was right, and she

15   told Brian it's not about her being right.  It's the

16   fact that he's questioning -- he's making her

17   question her work.

18        So that happened and things went silent for a

19   little bit, and then I think in the fall, we worked

20   together a little bit in 2022, and then after that, I

21   got my 2022 evaluation in February.  I'm sorry this

22   is all a little longwinded, but I got my 2022

 1   stopped speaking to me.  So every morning, Matt would

 2   pass my office and say good morning.  So after that

 3   conversation in February 2023, he just started to

 4   ignore me.  So I made it my business to say good

 5   morning to him every day, and was not put on any

 6   deals with him all throughout 2023.  It wasn't until

 7   I reached out to Kelly, because interest rates were

 8   very low, and I got put on a deal with Kelly and I

 9   didn't know Matt was going to be on that deal.

10        He happened to be on the deal and that's when

11   I received that August 3rd email.

12   BY MS. DAVIS:

13        Q.   Now, you've used the term "mansplaining"

14   numerous times when describing Mr. Bowsher.  What do

15   you mean by mansplaining?

16        A.   Like it was more -- like what I mean by

17   that is that it was very aggressive, very

18   condescending.  Like he came off like I did not know

19   what I was speaking about.  That's what I mean by

20   mansplaining.

21        Q.   And I think you said that Mr. Bowsher

22   was in the habit of sending lengthy emails.

Page 194

1           A.    Yes.

2           Q.    Had you seen him send lengthy emails to

3    other associates?

4           A.    Well, no, I did not; however, when I

5    asked -- I showed my Ari emails to Ari and he told me

6    that he did not speak to him like that.

7           Q.    But you said that he sent lengthy emails

8    to other people.  So who else did get some?

9           A.    Well, Bowsher used to send emails to the

10   whole group as a whole and they were long to the

11   point that people had jokes about them.  So like

12   that's what he was known for, just sending long

13   emails.

14          Q.    Did you talk to other attorneys in the

15   group as to whether or not they got lengthy emails

16   from him?

17          A.    No.

18          Q.    You mentioned in talking about the

19   conversation that Whitney shared with you about the

20   discussion she had with Brian -- and you're assuming

21   that the discussion was about Mr. Bowsher?

22          MR. WILLEMIN:  Objection.

Page 200

1           Q.    And what time frame would you be talking
2      about?
3           A.    I can't really recall.
4           Q.    Was this in 2020, close to the merger?
5           A.    No.  No.  It wasn't around that time
6      2021.
7           Q.    Was it in 2021?
8           A.    I can't recall.  It definitely wasn't in
9      the beginning of the merger, but any time after that.
10     So I can't recall what year it was.
11          Q.    And to your knowledge, how did COVID
12     impact deal work for the multifamily house group?
13          A.    Well, during COVID, the interest rates
14     were really low.  So we were extremely busy.  The
15     real estate market was booming and then, obviously,
16     you know, towards the latter half of '22 and '23, all
17     of the '23, the interest rates were really, really
18     high and things slowed down.
19          Q.    And how did those fluctuations impact
20     the availability of work for you?
21          A.    In '23 and '22, my work did decrease
22     because of it.

Page 202

1          A.    Yes.

2          Q.    And correct me if I'm wrong, but during

3    this conversation, you mentioned to her that Matt was

4    engaged in microaggressions?

5          A.    Yes.

6          Q.    What's a microaggression?

7          A.    So a microaggression is things that are

8    subtle.  Right?

9          Like let's just say I tell someone of color

10   like you that you sound so articulate.  Right?

11         That's because there's a preconceived notion

12   out there that people who look like us are not

13   articulate.  Right?

14         These are like little subtle micro aggressions

15   that show up because people think in order for

16   someone to be racist, they may have to show up with a

17   KKK hoodie on and that's what it's going to take, but

18   that's not how discrimination works now, especially

19   in the workplace.

20         Q.    So how do you differentiate between one

21   who is making a comment that they would make to a

22   white person from one that they would not make to a

Page 203

1    white person?

2          A.    With certain stereotypes that out there.

3    Right?

4          Like one is the fact that he was questioning

5    my intellect level.  There are certain stereotypes

6    about black folk who work in corporate America that

7    we're not -- we didn't get these job based on our own

8    merit, that we got here because to fit some quota,

9    and he was exhibiting those stereotypes as in

10   questioning my basic competency level.  Right?

11         You know, the email, he said -- what did he

12   say in the August 3rd email?  That this is elementary

13   and basic communication.  Right?

14         So he questioned my intellect level many

15   times, and that August 3rd email, he let it loose.

16   So that's what a microaggression is.  It's based over

17   stereotypes that are about marginalized groups.

18         Q.    So if Matt had sent an email to Kelly

19   commenting that something was elementary, that would

20   not be racist?

21         MR. WILLEMIN:  Objection.

22         THE WITNESS:  It would be discriminatory.  It

1           THE WITNESS:  Whenever the time calls for it.

2     He had the full range -- as a partner within the

3     group, he had autonomy to question anything.  It was

4     in the manner in which he did it which was

5     discriminatory, the aggressive, demoralizing manner

6     that he did it in, which he did not -- which other

7     associates within the group were not subjected to

8     that.

9     BY MS. DAVIS:

10          Q.    Did you have discussions with other

11    associates in the group as to whether they ever felt

12    hurt by communications from Mr. Bowsher?

13          A.    Yes.

14          Q.    Who?

15          A.    Ari, Kelly.  Ari and Kelly, who worked

16    with him the vast majority of the time.  I went

17    straight to them.

18          Q.    And did Kelly share her feelings with

19    you about communications that she received from Mr.

20    Bowsher?

21          A.    She told me he didn't speak to her like

22    that, and she saw the email that he sent me and told

Page 216

1          Matt at the time had this preconceived notion

2     that I didn't know what I was doing.  So when he

3     wrote all of this, he was loud and wrong in this

4     email thread.  Right?

5          And that's when I forwarded this email to

6     Whitney.  My response was actually drafted by Whitney

7     in response to his email.

8          So yes.  He was definitely mansplaining in the

9     whole entire paragraph and he was actually wrong.  So

10    that's what happened.

11         Q.    And why did Whitney draft the response

12    for you?

13         A.    She told me to hold on, I'm going to

14    draft something for you, and if you look at our text

15    messages during that time period, that same day, she

16    was annoyed, because this was not too long after

17    Brian came to her and she said he cannot go to Brian

18    saying you don't know what you're doing; meanwhile,

19    you're correcting him; I'm tired of them running

20    black women out of the group; the group has a history

21    of doing that.

22         Q.    What other black women were run out of

Page 224

1    like he was basically complaining about me.  Instead

2    of coming to me, he was going to the head of the

3    practice group, which was Brian, and it was either

4    Dameon or Lanre, and they just didn't understand why

5    he just wouldn't come to me about it.

6            And I asked Dameon if I could start working on

7    some of his stuff to learn what he does.  After that,

8    we didn't discuss Matt.  It wasn't until I filed my

9    HR complaint -- I haven't spoken with Dameon in some

10   time.  I was in the office.  It was like it was on

11   August 14, 2023, and as I was there in the office,

12   Dameon walked by.  He said hi and I said hi, and he

13   asked me what's wrong, and Dameon hadn't been in my

14   office in months, probably since like February at the

15   time.  He'll typically walk by and wave and that was

16   it.

17           So he came in and closed the door, and I told

18   him about the August 3, 2023 email, and he told me

19   that he didn't want to even see the email, because if

20   he saw the email, he was going to get upset.  Then he

21   went to on to say to me, I couldn't stand the sight

22   of seeing him; if I were you, I would want to leave

Page 225

1    the firm.

2        And I told him, Well, I don't really have

3    issues with anybody else here, like everyone else is

4    cool, it's just Matt for the most part; and he then

5    told me, Well, you know, you don't want to give

6    people the wrong impression, that if they give you

7    feedback, you will perceive it difficultly.

8        Then he went to say to me how would you feel

9    if you never know what type of punishment the firms

10   gives to him.  I was like, I don't expect to know,

11   I'm just an associate, he's a partner.

12       But at the time I was given the silent

13   treatment, which is a form of abuse, by the head of

14   the practice group, and they completely ignored me.

15   I was like the fact that no one has gotten back to me

16   about this email that he sent on August 3rd, it's

17   problematic.

18       Then he -- he was literally in my office for

19   almost two hours.  It was like almost an hour.  It

20   was a long conversation.

21       Then he, Okay, okay, I'm going to call and see

22   what's going on, and he also wanted to talk to me

Page 251

1    BY MS. DAVIS:

2          Q.    Who made the decision to terminate your

3    employment?

4          A.    Well, I found out after.  From my

5    knowledge, from what the firm said, it was Brian.  He

6    made the ultimate decision.  A part of that decision

7    was Marshall and Blair.

8          Q.    What input did Marshall have into the

9    decision to terminate your employment?

10          MR. WILLEMIN:  Objection.

11          THE WITNESS:  I have no idea.

12    BY MS. DAVIS:

13          Q.    What input did Blair have into the

14    decision to terminate your employment?

15          MR. WILLEMIN:  Objection.

16          THE WITNESS:  I have no idea.

17    BY MS. DAVIS:

18          Q.    Do you know if, other than Brian, there

19    were other partners who he consulted with before

20    making a decision to terminate your employment?

21          A.    I don't know.  I have no idea.

22          Q.    Why do you believe that Brian terminated

Page 252

1    your employment because of your race?

2          A.    So the claim is it wasn't -- because it

3    was retaliation, because I was terminated as

4    retaliation for filing an HR complaint, not because

5    of discrimination.

6          Q.    And why do you believe that it was

7    retaliation for --

8          A.    Because -- oh, I'm sorry.  Go ahead.

9    Sorry.

10         Q.    Why do you believe that your termination

11   was retaliation for filing an HR complaint?

12         A.    The timing.  It's a huge indicator.

13         In February of 2023, I receive my 2022

14   performance evaluation.  I had a committee meeting

15   with Blair, Nora.  At the meeting, there was no

16   mention of any performance issues.  If anything, they

17   made fun of Matt at that meeting.

18         I got an almost $60,000 discretionary bonus.

19   Brian came down to the office in February of '23 and

20   he even asked me if I was happy with my comp and

21   bonus, which he typically does do.

22         In June of '23, we went to a Fannie Mae

Page 253

1     conference.  Brian is an individual who always came
2     out his way to let me know how great I was and how I
3     was never given a fair shot.  He said that a quite a
4     few times, and in June of '23, I believe at the
5     Fannie Mae conference, he walked up to me and told me
6     that he wanted to see me move up to the next level.
7          On June 28, 2023, I received feedback from
8     Nora, and it was -- of course, you know, no one is
9     perfect in the practice of law.  It was relatively
10    good feedback.
11         In July, Brian asked me how my July was
12    looking, because he always routinely checked in, and
13    I told him it was looking good.  Then August rolls
14    around.  I get the August 3rd email.  I file my HR
15    complaint on August 10th.  Prior to that, on August
16    8th -- let me rewind back.
17         August 3rd, I get the email.  I forward the
18    email to leadership.  I get ignored.  August 8th, I
19    had a meeting with my coach and she read the email
20    and just said it was racist and even didn't know how
21    to help me and suggested I go to HR.  Lindsey did
22    too.  I sat on the email for a week, and after not

Page 254

1    hearing from leadership, I went to HR on August 10th.

2          When I initially went to HR and spoke to

3    Denise, she told me it was an easy fix.  She didn't

4    take it seriously at first.

5          The next day, I spoke to Sonia on August 11th

6    and told her everything, and then all of a sudden,

7    the review I received in '22 became mixed over night.

8    That's when the retaliation started, after I filed

9    the complaint.  She told me the review was mixed and

10   she told me that Matt did not represent the firm and

11   that she -- it was even problematic that she even

12   didn't know who he was; however, she couldn't help me

13   with the HR complaint because she was a legal talent

14   officer and that she could help with this, meaning

15   performance.  So all of a sudden, it became a

16   performance thing.

17         Then she went ahead and scheduled a meeting

18   with Mary Cabell and Kalle to talk about my continued

19   growth within the firm.  That was August 11th.

20   August 14th, you have Dameon -- and I told you what

21   he said -- come into my office randomly and telling

22   me I should leave and all, trying to get me to

Page 255

1    resign.

2         Then you have after that -- that was August

3    14th.  What was next in the timeline?

4         Around August 20 -- I believe.  I'll let you

5    know.

6         August 25th -- no.  August 23rd, that's when

7    HR finally reached out to me and took my statement,

8    because, initially, she told me it was an easy fix

9    and that's when she took my official statement, was

10    August 23, and I told her everything that transpired.

11         August 25th, I had a meeting with Kalle and

12    Mary Cabell.  Kalle starts the meeting off saying

13    that my hours are through the roof and how people

14    would kill for my hours.  Mary Cabell comes on and

15    she's the practice director and she says to me that

16    they're not seeing the level of depth and nuance in

17    my work and that when I started, I was a rock star.

18         To me, that meeting with Mary Cabell, what she

19    said to me was definitely retaliatory.  Right?

20         Because at the end of the day, I like Mary

21    Cabell, but she's not a partner within our group and

22    that's feedback that I've never received before ever,

Page 256

1    and they started saying that the '22 evaluation, the

2    one I had meeting for in February, was mixed, which

3    if it was truly mixed, it would have been brought up

4    prior to me filing this HR complaint.

5          After that, Mary Cabell suggested that I reach

6    out to partners that I work with and let them know

7    what I want to do with my future at Troutman.  I

8    said, Okay, cool.  As soon as I got off the phone, I

9    called Whitney and I told her about the meeting and I

10   asked her did Mary Cabell reach to you so we can have

11   this discussion, because if this is supposed to be a

12   meeting about my progress within the firm, you'd

13   think they would reach out to the main person I work

14   with.  She said no.  So I don't know where she got

15   that information from.

16          I then reached out to Peter, Jennifer, and

17   Lindsey.  Neither one of them said, Gita, we have

18   concerns about your -- about you not meeting your

19   performance goals, we have concerns about we're not

20   see your development, nothing, no red flag at all.

21   The conversation was pretty okay.  So that was August

22   25th to August 28th.

Page 257

1          Everything goes radio silent.  I was told by

2     HR that they were going to wrap up the investigation

3     by Labor Day weekend.  In October, it wasn't until my

4     boyfriend telling me like, Hey, whatever happened to

5     that investigation.  I went and I followed up with

6     HR, like what's going on with the investigation.

7     That was like the beginning of October.

8          At this time period, no one still had reached

9     out to me, not Brian.  No one reached out to me

10     within the group.  She then tells me like they're

11     about to wrap it up.  I said okay.

12          I get the findings on October 28th.  It took

13     the firm 77 days to do an investigation, although,

14     the people that -- although, HR sits on the same

15     floor as me.  The month after, I got fired for

16     performance.

17          So when you look at the timeline in itself, it

18     speaks for itself.  Yeah.  The timeline in itself

19     speaks, is a strong indicator of retaliation.

20          Q.    Prior to your complaint in August of

21     2023, had you been involved in an HR investigation?

22          A.    No, not that I can recall.

1          Q.    But she was an associate?

2          A.    Yes.

3          Q.    And Mary Cabell said she was going to

4     talk to partners?

5          A.    I don't know who she spoke to.  She

6     didn't mention anything.

7          Q.    Who is the associate that you said

8     commented Mr. Bowsher's email was racist?

9          A.    Jennifer Jana.

10         Q.    And when did you talk to Jennifer Jana?

11         A.    August 8, 2023.

12         Q.    Was that the only time you spoke to her

13    about Mr. Bowsher's email?

14         A.    No.

15         Q.    When else did you speak with her?

16         A.    We spoke one time after that via Teams,

17    because she wanted to check in on me, because she

18    knew I was very distraught about that email.  It had

19    a strong impact on me, just mentally, and she is on

20    the west coast and she visited the D.C. Office and we

21    met in person and she made a comment about Matt being

22    in one of her training sessions about race and that

Page 289

1              A.      From my understanding, I don't know all

2      her duties exactly, but I know she does oversee

3      development of associates as well.  So I don't know

4      exactly what her role fully encompasses, but I know

5      that's one of her duties.

6              Q.      Do you know if it's one of her duties to

7      investigate complaints of discrimination?

8              A.      She told me it was not.

9              Q.      Do you have any reason to doubt that it

10     was within the scope of her responsibility?

11             A.      I don't know her full scope of her

12     responsibility.  So I don't know.

13             Q.      Did you work on a deal in 2021 with Matt

14     Bowsher?

15             A.      I believe it was one deal.  It was --

16     no.  It was a couple of deals, like two deals when

17     Whitney went out.  It was Matt Bowsher.  Whitney left

18     to go on maternity leave and then Natalie stepped in.

19     So I dealt a lot with Natalie on that deal.

20             Q.      And did you receive any emails from Mr.

21     Bowsher when you were working on that deal with him?

22             A.      I can't -- well, obviously, yes, because

Page 290

1    he did send emails, but I don't if there was any -- I

2    can't recall if there was any emails directed

3    primarily to me directly.

4        Q.    Do you recall receiving emails from him

5    in 2021 where he was mansplaining?

6        A.    I didn't deal with him as much.  I dealt

7    a lot with Natalie on those deals.

8        Q.    Why were you dealing with Natalie?

9        A.    She was a senior associate on those

10    matters.

11        Q.    So you weren't running those deals?

12        A.    No.  It was -- on these deals, it was

13    three people, the partner, senior associate, and I

14    was a junior.  So I did do the legwork, but I

15    communicated a majority of the time with Natalie.

16        Q.    Now, at various times, you've referenced

17    text messages --

18        A.    Yes.

19        Q.    -- and did you exchange text messages

20    with Whitney?

21        A.    Yes.  We did.

22        Q.    And when you were providing information

Page 293

1    180"?

2          A.    The calls stopped, because I was barely

3    interacted with him.  As a result of that, there was

4    an intermediary, which was mainly Ari if I did have

5    to.  So the calls did stop.  That's what I meant by

6    the complete 180.

7          Q.    And after you sent the August 3rd email

8    -- well, first of all, who did you forward the August

9    3rd email to?

10         A.    Ashante, Lindsey, Brian, Marshall,

11   Blair, Nora, Whitney, I think to my coach, and I

12   think that's what I can recall right now.

13         Q.    And did you speak to Blair after you

14   sent the email to him?

15         A.    Yes, I did.

16         Q.    And what was your conversation with

17   Blair?

18         A.    It was very -- like Blair has a very

19   nonchalant attitude.  So it was very like vague.

20         He said to me, Well, you know, it's an asshole

21   email, you know, when you see him in the office, just

22   talk to him and whatnot, and the conversation only

Page 294

1    probably lasted for like two minutes.  It was very

2    vague and that's just the nature of Blair.

3              Q.    And did you talk to Marshall about that

4    email?

5              A.    Yes, I did.

6              Q.    And when did you talk to Marshall?

7              A.    The following day.

8              Q.    And what was your discussion with

9    Marshall?

10             A.    So I wrote him on Teams and asked him

11   can I speak to him about this, and he called and he

12   knew I was stressing about the email, and he told me

13   that he was going to speak to Brian and that he,

14   himself, had his own run-in with Matt too.

15             Q.    And do you know if Marshall spoke to

16   Brian?

17             A.    I don't know.

18             Q.    Do you know what conversations Brian had

19   about the August 3rd email with other partners?

20             A.    I do know that Ashante told me she spoke

21   to him, and she didn't tell me the context of their

22   conversation, but she wanted me to let her know if