# Exhibit 33

# Formal Complaint Investigation Report

**To:**    Elizabeth Mark, Director of Human Resources
**From:** Denise Johnson, Senior Human Resources Manager
**Re:**    Complaint from Gita Sankano, Associate, regarding treatment by Matthew (Matt) Bowsher, Partner

The undersigned conducted an investigation of alleged mistreatment and hostile work environment behavior by the above referenced employee. The initial information that served as a basis for this investigation was provided by Gita Sankano, Associate, in the form of verbal communication followed by email correspondence, which is attached as Attachment A. Gita Sankano's detailed statement was collected via interview August 23, 2023. Notes from this interview are attached as Attachment B.

The investigation was initiated on August 21, 2023, and concluded on October 17, 2023.

The documents provided to the undersigned and reviewed during the course of this investigation include:
- Email thread between Gina Sankano and Matt Bowsher, Partner (Attachment C) dated:
    - August 3, 2023
    - June 9, 2022
    - May 4, 2022
    - May 2-3, 2022
    - April 21-22, 2022
- Email of Matt Bowsher responding to the DC Multifamily Housing Team about RSVPing for Lunch Meetings (Attachment M)

The list of individuals who have been interviewed includes:
- Sona Spencer, Chief Legal Talent Officer (interviewed on August 22, 2023) (follow up discussion on September 13, 2023) (Attachment D)
- Tiffany Jordan, Director of Career Coaching & Planning (interviewed on August 23, 2023) (Attachment E)
- Jennifer Jana, Career Coaching & Planning Manager (interviewed on August 24, 2023) (Attachment F)
- Ashante Smith, Diversity, Equity & Inclusion Partner (interviewed on September 14, 2023) (Attachment G)
- Blair Schiff, Professional Development Partner (interviewed on September 19, 2023) (Attachment H)
- Nora Nickel, Professional Development Partner (interviewed on September 19, 2023) (Attachment I)
- Whitney Loughran, Associate (interviewed on September 28, 2023) (Attachment J)
- Kelly Mufarrige, Associate (interviewed on September 28, 2023) (Attachment K)
- Ari Ebi, Associate (interviewed on September 29, 2023) (Attachment L)
- Summary of conversation between Ashley Hager, Professional Development Partner and Matt Bowsher, Partner on October 13, 2023 (Attachment N)

**Investigator Findings:**
- From Gita's description, she wants to do good work and is open to constructive feedback to help her succeed and grow within the firm. In reviewing information

161935778v4

CONFIDENTIAL & SUBJECT TO PROTECTIVE ORDER

provided by Gita and others, it appears that she needs to improve her effective listening related to the feedback given to her, as she has not applied the feedback consistently in her work. Additionally, she should continue working on fully understanding the practice and what is expected of her.

- o For example, during the many conversations Gita had with others and with me, she kept repeating that she received positive feedback during her evaluation. However, the feedback was not all positive and was instead mixed, which is visible in the written feedback provided to Gita. Matt's feedback is similar to other feedback received from other partners within the group.
- o Gita also mentioned a few partners who she said gave her positive feedback on her review, when in fact, their feedback was also mixed. Those same partners stated to Legal Talent that they do not want to work with Gita anymore due to her poor quality of work.

- Gita also identified potential prior bias/racial issues she encountered, both with the challenges she faced at Pepper Hamilton and now with Matt Bowsher. It does appear from review of information that she has identified these circumstances as potentially race-related when she receives negative feedback on her work product but not in other circumstances. It is possible there is a correlation.
  - o Gita stated that she feels like "everything is happening all over again" relative to a situation she had at Pepper Hamilton where a partner was "stealing hours" from her, and she was the only black person in the group. In that incident, Gita specifically stated that she felt this incident was race-related when speaking on her time at Pepper Hamilton, but she did not indicate this related to her interactions with the Matt.

- While Matt Bowsher's feedback to Gita may be accurate based on the issues identified, there is opportunity for improvement of the professionalism and collaborative approach he could employ in his communications. This is especially true with Associates learning from him while supporting his work. It is possible that his communication style contributed to the current situation.
  - o Matt's choice of wording and tone in the August 3rd email was unprofessional and does not align with the firm expectations, and the firm could explore options for coaching and feedback for Matt on how to effectively communicate, in writing and orally.

**Conclusion**:
- After reviewing the evidence, the investigator did not find evidence of discriminatory behavior in violation of any of the firm's policies.
- After reviewing the evidence, the investigator did not find evidence of actions creating a hostile work environment based on race.
- After reviewing the evidence, the investigator did not find evidence of retaliatory actions in violation of any of the firm's policies.
- After reviewing the evidence, the investigator did find evidence of poor written and verbal communication regarding expectations and inadequate coaching of direct report.
- After reviewing the evidence, the investigator did find evidence of claimant's inability to effectively communicate consistent written instructions.

**Recommendations**:
- Gita should continue working with Jennifer Jana on her professional development and to support improvement of her performance to expected levels for a 4th year associate.

161935778v4

- Gita should focus on providing clear, concise, and consistent instructions to all those she works with and supports directly.
- The firm should consider where there is needed training/coaching for Matt Bowsher with potential topics including:
    - How to provide constructive feedback to promote growth and development.
    - How to effectively communicate, in-writing and orally.

_____     10/17/2023
Signed by Denise Johnson                            Date

161935778v4

CONFIDENTIAL & SUBJECT TO PROTECTIVE ORDER

**Attachment A – Email string from Gita Sankano outlining concerns with Matt Bowsher**

As I noted, Matt is not a partner I work with. I even tried to avoid him this year because of my strange encounters with him last year. As you will see, the most recent incident was an administrative error that I tried to fix. However, I was scolded by Matt again and my competency level was called into question. This incident was soooo minor. However, he took liberty to say to me that since I requested live feedback he was giving it to me. I felt that this was a personal attack and he's been waiting on me to make a minor error to scold me. After I told him I felt disrespected, he further doubled down and called it "constructive criticism." At the very least, he has created a hostile work environment for me. No one deserves to be treated like this at work.

I felt the need to speak up because I love the people I work with and my overall experience at this firm has been good. However, Matt is a partner in our group. Although I tried to avoid him at all cost and have not dealt with him all year, I still ended up being on a deal with him by default (I mainly dealt with Kelly). I feel as though this is someone who in the emails attached believes I do not belong at this firm for whatever reason.

Thanks,

Gita

161935778v4

**From:** Bowsher, Matthew R. <Matthew.Bowsher@troutman.com>
**Sent:** Thursday, August 3, 2023 3:48 PM
**To:** Sankano, Gita F. <Gita.Sankano@troutman.com>
**Subject:** RE: Falls of Braeswood and Falls of Dairy Ashford - NEW MATTER

That was obviously not the reaction I intended.  Thank you for your constructive criticism of my constructive criticism. I will keep that in mind next time I offer you my feedback on your performance.

Sounds like we both could benefit from continued growth and improvement regarding our communications.  Of course, that can't happen until we fully acknowledge and accept how our communications are actually perceived by others, regardless of our own intentions and subjective perceptions thereof.  Here's hoping we can both get past that difficult first stage, and unlock the growth which alludes us.

Matt

**Matthew R. Bowsher**
**Partner**
troutman **pepper**
Office: 202.274.1939 | Mobile: 301.512.0423
matthew.bowsher@troutman.com

---

**From:** Sankano, Gita F. <Gita.Sankano@troutman.com>
**Sent:** Thursday, August 3, 2023 1:59 PM
**To:** Bowsher, Matthew R. <Matthew.Bowsher@troutman.com>
**Subject:** RE: Falls of Braeswood and Falls of Dairy Ashford - NEW MATTER

Matt,

As with the prior deals we worked on with this sponsor including this one, I made it clear that this was a 70/30 split between you and Kelly. In this particular deal, it was the MFH matter department who made the error of not linking the matters and not giving Kelly the proper credit. I called it out this morning that Kelly did not receive the proper credit (see attached).  As per my initial email this morning, I stated that Kelly should be the Matter Responsible Attorney and I copied and pasted the percentage spilt. Now could I have reiterated over and over again about the spilt – absolutely!  I could have been more specific about the split as you explained below. I appreciate your feedback.

However, what I will not tolerate from you is the condescending tone, my intelligence being questioned (see below),and you belittling me. I have never disrespected you and I will appreciate if you do the same. I worked hard to be here and I deserve to be here like every other associate. I would appreciate if you treat me with respect .

161935778v4

This is very basic, elementary communication. This has nothing to do with training, or understanding of multifamily transactional law, this is daily required functioning. You expressed interest in receiving my input/feedback in real time as to your performance, so I am taking 20 minutes out of my morning right now to explain to you, in very clear objective detailed analysis, that when I see something like this, where it is so undeniably evident that you've made an obvious and surprising error, and you're saying you still don't see the error even after I've taken the time to point it out to you, and you're still saying you've done nothing wrong... I really just don't know what more I can say here. If you don't even see the problem, I'm not sure how you'll fix it, but it's definitely something you need to fix, because if you had this same type of miscommunication with a client or borrower's counsel rather than with our internal administrative team, I would have to drop everything and get on the phone immediately to do serious damage control, reassuring them that the deal is actually in capable hands. Bottom line: this is not something I would expect from a fourth-year associate.

I am in the office 4 days a week, every week, available to discuss this further in person any time you wish. Just so we are 100% clear, I have no intention of proactively contacting you to discuss this any further, as I've already given you my full and candid thoughts on the matter, nor am I necessarily implying that any further discussion need be had, rather I am merely clarifying that I leave it to your own initiative as to whether you wish to discuss it further.

**Gita F. Sankano**
**Associate**
troutman **pepper**
Direct: 202.220.1251 | Internal: 803-1251
gita.sankano@troutman.com

---

**From:** Bowsher, Matthew R. <Matthew.Bowsher@troutman.com>
**Sent:** Thursday, August 3, 2023 12:44 PM
**To:** Sankano, Gita F. <Gita.Sankano@troutman.com>
**Subject:** RE: Falls of Braeswood and Falls of Dairy Ashford - NEW MATTER

I'm concerned that you thought you were "clear". In fact, you were the opposite of clear. And the fact that you still don't see this upon further reflection, even after I've taken the time to point it out, is what worries me.

In your first email below (from 11:09am this morning), you stated "**Kelly should be the matter responsible**". Anyone reading that sentence would reasonably interpret that as a request to make Kelly the matter responsible attorney, i.e. to switch it from 100% Matt to 100% Kelly. There is no other way to interpret that sentence. If you meant to ask for them to change it from Matt being 100% responsible to Matt only being 70% responsible, that is not what that sentence conveyed. You added a sentence which said "See below", and then you added a clip of the originally-requested 70/30 split at the end, but that clip with the correct split

CONFIDENTIAL & SUBJECT TO PROTECTIVE ORDER

contradicted your initial sentence which requested that Kelly be 100% matter responsible; that contradiction is what made your communication anything but clear.  Then, adding to the confusion, in your subsequent email, you doubled-down on your initial request, by again saying "**Kelly should be the matter responsible. So it should change from Matt to Kelly.**" Again, I'm not sure how anyone could read that sentence to mean anything other than what it very clearly says, which is that you're asking to make Kelly "the" matter responsible attorney, i.e. the 100% matter responsible, the only matter responsible attorney, not a 70/30 split with Matt.

This is very basic, elementary communication.  This has nothing to do with training, or understanding of multifamily transactional law, this is daily required functioning.  You expressed interest in receiving my input/feedback in real time as to your performance, so I am taking 20 minutes out of my morning right now to explain to you, in very clear objective detailed analysis, that when I see something like this, where it is so undeniably evident that you've made an obvious and surprising error, and you're saying you still don't see the error even after I've taken the time to point it out to you, and you're still saying you've done nothing wrong… I really just don't know what more I can say here.    If you don't even see the problem, I'm not sure how you'll fix it, but it's definitely something you need to fix, because if you had this same type of miscommunication with a client or borrower's counsel rather than with our internal administrative team, I would have to drop everything and get on the phone immediately to do serious damage control, reassuring them that the deal is actually in capable hands.  Bottom line: this is not something I would expect from a fourth-year associate.

I am in the office 4 days a week, every week, available to discuss this further in person any time you wish.  Just so we are 100% clear, I have no intention of proactively contacting you to discuss this any further, as I've already given you my full and candid thoughts on the matter, nor am I necessarily implying that any further discussion need be had, rather I am merely clarifying that I leave it to your own initiative as to whether you wish to discuss it further.

Matt

**Matthew R. Bowsher**
**Partner**
**troutman** pepper
Office: 202.274.1939 | Mobile: 301.512.0423
matthew.bowsher@troutman.com

---

**From:** Sankano, Gita F. <Gita.Sankano@troutman.com>
**Sent:** Thursday, August 3, 2023 11:31 AM
**To:** Bowsher, Matthew R. <Matthew.Bowsher@troutman.com>
**Subject:** RE: Falls of Braeswood and Falls of Dairy Ashford - NEW MATTER

Thank you, Matt.

I thought I was clear with the first email I sent today as it relates to the percentage distribution (see attached).

161935778v4

CONFIDENTIAL & SUBJECT TO PROTECTIVE ORDER

**Gita F. Sankano**
**Associate**
troutman pepper
Direct: 202.220.1251 | Internal: 803-1251
gita.sankano@troutman.com

---

**From:** Bowsher, Matthew R. <Matthew.Bowsher@troutman.com>
**Sent:** Thursday, August 3, 2023 11:28 AM
**To:** Sankano, Gita F. <Gita.Sankano@troutman.com>
**Subject:** RE: Falls of Braeswood and Falls of Dairy Ashford - NEW MATTER

You are confused. Kelly is not to be the sole 100% matter responsible attorney. Per your original request, and per the other matters you've previously opened for me and Kelly, it should be 30% Kelly and 70% Matt.

**Matthew R. Bowsher**
**Partner**
troutman pepper
Office: 202.274.1939 | Mobile: 301.512.0423
matthew.bowsher@troutman.com

---

**From:** Sankano, Gita F. <Gita.Sankano@troutman.com>
**Sent:** Thursday, August 3, 2023 11:17 AM
**To:** Mauriello, Lisa M. <Lisa.Mauriello@troutman.com>; MFH New Matters <MFHNewMatters@troutman.com>
**Cc:** Mufarrige, Kelly A. <Kelly.Mufarrige@troutman.com>; Bowsher, Matthew R. <Matthew.Bowsher@troutman.com>; Staub, Julie Lynn <Julie.Staub@troutman.com>; Jackson, Tia L. <Tia.Jackson@troutman.com>; Morant, Michelle <Michelle.Morant@Troutman.com>; Stratton, Katherine E <Katie.Stratton@troutman.com>
**Subject:** RE: Falls of Braeswood and Falls of Dairy Ashford - NEW MATTER

I just got a request to change the matter assigned from to Kelly?

Kelly should be the matter responsible. So it should change from Matt to Kelly.

I hope that that makes sense!

**Gita F. Sankano**
**Associate**
troutman pepper
Direct: 202.220.1251 | Internal: 803-1251
gita.sankano@troutman.com

---

161935778v4

CONFIDENTIAL & SUBJECT TO PROTECTIVE ORDER

**From:** Mauriello, Lisa M. <Lisa.Mauriello@troutman.com>
**Sent:** Thursday, August 3, 2023 11:14 AM
**To:** Sankano, Gita F. <Gita.Sankano@troutman.com>; MFH New Matters
<MFHNewMatters@troutman.com>
**Cc:** Mufarrige, Kelly A. <Kelly.Mufarrige@troutman.com>; Bowsher, Matthew R.
<Matthew.Bowsher@troutman.com>; Staub, Julie Lynn <Julie.Staub@troutman.com>;
Jackson, Tia L. <Tia.Jackson@troutman.com>; Morant, Michelle
<Michelle.Morant@Troutman.com>; Stratton, Katherine E <Katie.Stratton@troutman.com>
**Subject:** RE: Falls of Braeswood and Falls of Dairy Ashford - NEW MATTER


Good Morning,

The change request was entered.

Thanks


**Lisa Mauriello**
**Firm Intelligence Coordinator**
troutman **pepper**
Direct: 757.687.7521 | Internal: 17-7521
lisa.mauriello@troutman.com

---

**From:** Sankano, Gita F. <Gita.Sankano@troutman.com>
**Sent:** Thursday, August 3, 2023 11:09 AM
**To:** Mauriello, Lisa M. <Lisa.Mauriello@troutman.com>; MFH New Matters
MFHNewMatters@troutman.com
**Cc:** Mufarrige, Kelly A. <Kelly.Mufarrige@troutman.com>; Bowsher, Matthew R.
<Matthew.Bowsher@troutman.com>; Staub, Julie Lynn <Julie.Staub@troutman.com>;
Jackson, Tia L. <Tia.Jackson@troutman.com>; Morant, Michelle
<Michelle.Morant@Troutman.com>; Stratton, Katherine E <Katie.Stratton@troutman.com>
**Subject:** RE: Falls of Braeswood and Falls of Dairy Ashford - NEW MATTER

Hi Lisa,

Kelly should be the matter responsible attorney for this one. See below. Please update.

Thanks!!

| Matter Responsible Atty: | Kelly Mufarrige (30%) / Matt Bowsher (70%) |
|---|---|

161935778v4

CONFIDENTIAL & SUBJECT TO PROTECTIVE ORDER

**Gita F. Sankano**
**Associate**
**troutman** pepper
Direct: 202.220.1251 | Internal: 803-1251
gita.sankano@troutman.com

---

**From:** Mauriello, Lisa M. <Lisa.Mauriello@troutman.com>
**Sent:** Wednesday, August 2, 2023 11:31 AM
**To:** Sankano, Gita F. <Gita.Sankano@troutman.com>; MFH New Matters <MFHNewMatters@troutman.com>
**Cc:** Mufarrige, Kelly A. <Kelly.Mufarrige@troutman.com>; Bowsher, Matthew R. <Matthew.Bowsher@troutman.com>; Staub, Julie Lynn <Julie.Staub@troutman.com>; Jackson, Tia L. <Tia.Jackson@troutman.com>; Morant, Michelle <Michelle.Morant@Troutman.com>; Stratton, Katherine E <Katie.Stratton@troutman.com>
**Subject:** RE: Falls of Braeswood and Falls of Dairy Ashford - NEW MATTER

Good Morning,

We combined the two properties into one matter, **018413.000867**

Thanks!

**Lisa Mauriello**
**Firm Intelligence Coordinator**
**troutman** pepper
Direct: 757.687.7521 | Internal: 17-7521
lisa.mauriello@troutman.com

---

**From:** Sankano, Gita F. <Gita.Sankano@troutman.com>
**Sent:** Monday, July 31, 2023 2:10 PM
**To:** MFH New Matters <MFHNewMatters@troutman.com>
**Cc:** Mufarrige, Kelly A. <Kelly.Mufarrige@troutman.com>; Bowsher, Matthew R. <Matthew.Bowsher@troutman.com>; Staub, Julie Lynn <Julie.Staub@troutman.com>; Jackson, Tia L. <Tia.Jackson@troutman.com>; Morant, Michelle <Michelle.Morant@Troutman.com>; Stratton, Katherine E <Katie.Stratton@troutman.com>
**Subject:** Falls of Braeswood and Falls of Dairy Ashford - NEW MATTER

Good afternoon,

Please open the two deals below. We will only need **one client matter number** for these two.

Thanks,

| Client: | JLL |
|---|---|
| Deal Type: | Freddie Mac |

161935778v4

| | |
|---|---|
| **Property Name & Location:** | **Falls of Dairy Ashford**<br><br>**12707 Bellaire Boulevard**<br><br>**Houston, TX 77072** |
| **Matter Opening Atty:** | **Matt Bowsher** |
| **Matter Responsible Atty:** | **Kelly Mufarrige (30%) / Matt Bowsher (70%)** |
| **Matter Assigned Atty:** | **Gita Sankano** |
| **Closing Date:** | **08/30/2023** |
| **Loan Amount:** | **$17,400,000** |
| **Borrower(s):** | **Falls of Dairy Ashford LP** |
| **Guarantor(s) / Key Principals(s):** | **Rao J. Polavarapu** |
| **Originator:** | **Luke Rogers** |
| **Closer:** | **Patrick McCarren** |

| | |
|---|---|
| **Client:** | **JLL** |
| **Deal Type:** | **Freddie Mac** |
| **Property Name & Location:** | **Falls of Braeswood**<br><br>**8801 South Braeswood Boulevard**<br><br>**Houston, TX 77031** |
| **Matter Opening Atty:** | **Matt Bowsher** |
| **Matter Responsible Atty:** | **Kelly Mufarrige (30%) / Matt Bowsher (70%)** |
| **Matter Assigned Atty:** | **Gita Sankano** |
| **Closing Date:** | **08/30/2023** |
| **Loan Amount:** | **$16,781,000** |
| **Borrower(s):** | **Falls of Braeswood LP** |
| **Guarantor(s) / Key Principals(s):** | **Rao J. Polavarapu** |
| **Originator:** | **Luke Rogers** |
| **Closer:** | **Patrick McCarren** |

161935778v4

Troutman_00000740

**From:** Sankano, Gita F. <Gita.Sankano@Troutman.com>
**Sent:** Thursday, June 9, 2022 8:23 AM
**To:** Bowsher, Matthew R. <Matthew.Bowsher@Troutman.com>
**Subject:** RE: Estates at Palm Bay - Legal Due Diligence Checklist


Thank you!!

**Gita F. Sankano**
**Associate**
**troutman** pepper
Direct: 202.220.1251 | Internal: 803-1251
gita.sankano@troutman.com

---

On June 8, 2022 at 11:25:26 PM EDT, Bowsher, Matthew R.
<Matthew.Bowsher@troutman.com> wrote:


Well look at you!  Nice work.


**Matthew R. Bowsher**
**Partner**
**troutman** pepper
Office: 202.274.1939 | Mobile: 301.512.0423
matthew.bowsher@troutman.com

---

**From:** Sankano, Gita F. <Gita.Sankano@troutman.com>
**Sent:** Wednesday, June 8, 2022 7:38 PM
**To:** Lee, Esther <elee@winstead.com>; Swope, Tobin <tswope@winstead.com>
**Cc:** Bowsher, Matthew R. <Matthew.Bowsher@troutman.com>
**Subject:** Estates at Palm Bay - Legal Due Diligence Checklist

**Target Closing Date: June 9, 2022**

Legal Due Diligence
- Updated Pro forma – **NEED**
- Draft Opinion Letter(s) (**in the forms provided**)
    1. Borrower
        1. Delaware- **IN; Need executed copy for closing**
        2. DE single-member LLC- **IN; Need executed copy for closing**
        3. FL – **IN; Need executed copy for closing**
    2. Guarantor (FL) – **IN; Need executed copy for closing**
    3. Non-Con Opinion Letter – **Under Review**
- Organizational Documents (Borrower/Guarantor and their sub-entities):

161935778v4

CONFIDENTIAL & SUBJECT TO PROTECTIVE ORDER

1. Lurin Real Estate Holdings VI, LLC
     1. A&R Operating Agreement -  **IN; Need executed copy for closing**

Closing Coordination
- Executed Escrow Letter from Title – **NEED (after receipt of original recording package)**
- Certified Record Documents from Title – **NEED**
- Fully Executed Settlement Statement – **NEED**

Please forward each item as soon as it is available.

Thanks,
Gita

**Gita F. Sankano**
**Associate**
Direct: 202.220.1251 | Internal: 803-1251
gita.sankano@troutman.com

―――――――――――――――――――

**troutman** pepper
401 9th Street, NW, Suite 1000
Washington, DC  20004
troutman.com

―――――――――――――――――――

Troutman Pepper is a 2021 Mansfield Certified Plus Firm

161935778v4

CONFIDENTIAL & SUBJECT TO PROTECTIVE ORDER

Troutman_00000742

**Attachment B – INTERVIEW NOTES – August 23, 2023, with Gita Sankano, Associate.**

Elizabeth Mark reached out to me on Monday, August 21, 2023, after a conversation she had with Ashley Hager regarding Gita Sankano raising a few concerns that I would need to look into further.  We agreed that my role would be to reach out to Gita Sankano, Sona Spencer, and Jennifer Jana to better understand what her concerns were and if there was anything else that we may not be aware of that will need additional attention and investigation.

I scheduled a Microsoft Teams call with Gita at 12:00pm on Wednesday, August 23, 2023.

I explained the concerns she raised were brought to my attention and before proceeding with my questions, I explained the purpose of my call and reviewed the following:

- That the Firm takes these matters seriously.
- That my goal throughout this process was to be impartial and objective.
- That all information gathered would be kept confidential to the extent possible.
- That the investigation would be fair and thorough.
- That our conversation was confidential and should not be discussed with others.

I let Gita know that I would be speaking to all parties involved and that retaliation was prohibited as addressed in section 2.01 of the Firm's policy manual. I explained that if she felt that she was being retaliated against, she should report it to me, Elizabeth Mark or Office of General Counsel immediately.

Gita stated that she understood, and we proceeded with the following questions:

1. What are your specific concerns?

2. Had there been any other incidents with Matt in the past where you felt he questioned your performance?

3. You mentioned that you think this incident is about race.  Can you share with me why you believe this may be the issue?

4. How would you like to see this situation resolved?

5. Is there anything else that would be helpful for me to know?

I closed with thanking Gita for her time. Letting her know that I will reach back out if I have any follow up questions. I also reminded her that this conversation is confidential and should not be discussed with others, that we will be fair and thorough in our investigation, and that retaliation is prohibited and should be reported immediately.

**Summary of Interview**:

Gita stated that her main concern is how Matt speaks to her in such a condescending tone which she finds very disrespectful.  He talks down to her, questions her intelligence, and

161935778v4

CONFIDENTIAL & SUBJECT TO PROTECTIVE ORDER                    Troutman_00000743

competency level and he makes her feel like she doesn't belong in the Multifamily Housing group. Gita also stated that she feels his derogatory email, dated August 3, 2023, was a personal attack against her based on her darker skin tone and that she wears braids. And that she is being treated differently than anyone else.

Gita shared that Matt is not someone she primarily works with and her working relationship with Matt started in 2022 when Matt covered a deal for David McPherson (retired partner) while David was out on medical leave. In attachments A and C, Gita submitted email correspondence to show how Matt speaks to her in what she considers a berating and condescending tone and questions her intelligence and competency level.

Attachment C, Whitney Loughran, (Associate) forwarded to Brian Iwashyna (Partner-Practice Group Leader), Nora Nickel (Professional Development Partner), and Ashante Smith (Diversity, Equity & Inclusion Partner, and Gita Sankano's mentor).

Gita went to Ari Ebi Any and discussed her interactions with Matt regarding the May 3-4, 2022, emails, and asked if Matt is normally like this and per Gita, Ari stated "No he's not. That's weird." Gita also spoke to Nora Nickels when she came to the Washington, DC office regarding attachment C and per Gita, Nora stated that Matt was completely wrong.

Gita reached out to other associates within the Multifamily Housing practice group and asked them if Matt treats them this way and per Gita, they all stated no and was told that Matt has been this way since he worked at Freddie Mac.

For the evaluation period for 2022, Gita stated that overall, her evaluations were good. However, she stated that Matt's feedback in her evaluation mirrored his exact same condescending tone as in his August 3, 2023, email to her. Gita stated that prior to Matt's August 3rd email, Matt had never come to her directly about her performance. Gita went to Kelly Mufarrige regarding Matt's feedback on her evaluation and Kelly suggested that Gita have a discussion with Matt. Gita went to Matt to discuss his feedback in her evaluation and stated that she was taken aback by his comments because he had never come to her about any issues. Gita shared that Matt's response was that he didn't understand what she was saying and could she articulate that again. Gita had her evaluation in her hands and read Matt's comment that he felt she didn't have a substantive understanding of the practice. Gita stated to Matt that he should have come to her throughout the course of the year and not wait until the end of the year to give her such feedback and Matt just said okay and shrugged his shoulders.

Related to the August 3, 2023, email, was all due to an administrative error. Gita shared that she feels that because she went to Matt in February 2023 to question him about his feedback in her evaluation, that Matt was waiting on an opportunity to berate her. Gita immediately forwarded the email to the management team, and she spoke to Ashante Smith and Brian Iwashyna on the way Matt addresses her and stated that it's personal. (Attachment A)

Gita stated that she spoke with Jennifer Jana to get coaching on what to do and how to handle the situation and shared that Jennifer stated that she could not help her and if Gita felt comfortable, Jennifer would share this information with Sona Spencer. Gita also stated that Jennifer commented after viewing the email correspondence (attachment A) that the email could be viewed as racist. Gita felt that it was a lot of undertones in that email.

161935778v4

Gita spoke with Sona Spencer, and Sona stated that she only could assist her with work and that the matter regarding the August 3rd email is an HR matter.

Gita feels that a resolution would be for Matt to receive some form of EEOC and communication training. She did state that she does not feel Matt is racist and just wants to be treated fairly and respected.

### Attachment C – Email Correspondence between Gita Sankano, Associate and Matt Bowsher.

Just to following up on our conversation. This is first of many emails that I am sending. However, I did not want to over kill you with emails. As such, I'm breaking these up by deals I've worked on with Matt.

For some context (which I already mentioned on our call), on this particular deal, I reviewed an opinion and sent Matt my comments before sending to Borrower counsel. Matt asked me out of the year that I've been closing deals with the group have I ever seen a certain language that he points out in the emails attached. I did not and I incorporated Matt's comments with mines and sent it to Borrower counsel. Borrower counsel pushes back and told us our firm has excepted this very same language before.

I checked iManage and it turned out that Matt closed that same exact deal accepting the same exact language that he scolded me about. When I told him he closed the deal, he stated "Meh.   No biggie" and responded to borrower counsel. I also forwarded the email Whitney and Ashante explaining my frustration with they way I was being treated. That email is also attached.

Like I said on the call. It was soo bad that I had to create a special folder for Matt.

Thanks!

**Gita F. Sankano**
**Associate**
Direct: 202.220.1251 | Internal: 803-1251
gita.sankano@troutman.com

**troutman** pepper
401 9th Street, NW, Suite 1000
Washington, DC 20004
troutman.com

161935778v4

CONFIDENTIAL & SUBJECT TO PROTECTIVE ORDER

**From:** Sankano, Gita F.
**Sent:** Wednesday, May 4, 2022 6:58 PM
**To:** Smith, Ashante L. <ashante.smith@Troutman.com>
**Cc:** Loughran, Whitney D. <whitney.loughran@Troutman.com>
**Subject:** FW: Estates at Palm Bay - Comments to the local opinion

Hi Ashante,

I feel like I'm beating a dead horse here . However, I felt the need to point this out as well (no need to send to Nora or Brian). About two weeks ago, I reviewed a DE opinion. Matt pointed out to me that the "based solely" language was incorrect in Opinion#1. He also inquired about out of the year that I've been closing deals with us have I seen that language before. You will see my response attached. Borrower's counsel pushed back and stated that they will check with their firm's opinion committee.

Matt then had me pinged the Opinion Committee. Virginia stated that we have accepted it before. However, it's incorrect and the more opinions we cleaned up the better.

Circling back to today. I asked borrower's counsel about the status of the DE opinion. She states to me that they just closed a deal with our firm and this same language was accepted. I check our records the Partner who closed the deal was Matt himself!

My thing is that his tone (once again) was harsh! Also, what makes this even frustrating is that you accepted this opinion yourself! Granted Ari was on the deal… but still!


**Gita F. Sankano**

**Associate**

troutman **pepper**

Direct: 202.220.1251 | Internal: 803-1251

gita.sankano@troutman.com

CONFIDENTIAL & SUBJECT TO PROTECTIVE ORDER

**From:** Bowsher, Matthew R. <Matthew.Bowsher@troutman.com>
**Sent:** Wednesday, May 4, 2022 11:03 PM
**To:** Lee, Esther <elee@winstead.com>; Sankano, Gita F. <Gita.Sankano@Troutman.com>
**Cc:** Swope, Tobin <tswope@winstead.com>
**Subject:** RE: Estates at Palm Bay - Comments to the local opinion

Esther and Tobin -- In response to the issue of the formation opinion discussed in the thread below, we offer the following thoughts for your consideration:

1. An opinion on due formation has been standard, customary, and market in our industry for at least the past 25 years since I've been practicing.  It is basic 101-level diligence.  And of all the opinions for borrower's counsel to give, it's one of the easiest, because the state LLC statute sets forth how an LLC is duly formed.   This entity was formed in DE, which is by far the most familiar jurisdiction of formation.   In DE, for due formation, it's simply a matter of filing a certificate of formation and entering into an operating agreement and having at least one qualified member.   These things are finite and easily confirmed by bor's counsel, regardless of whether bor's counsel was the counsel who actually did the formation.   You review the cert of formation to make sure it complies with the state law, you review the operating agreement to confirm there are no conditions which needed to be satisfied in order for the formation of the borrower to be complete (e.g., a certain equity contribution by a member), you confirm the member qualifies as a member under DE law (e.g. confirm the sole member of borrower isn't a legal minor).   Easy stuff, but the point is that it's legal diligence, it's an attorney looking at the statute and the cert of formation and the operating agreement and confirming it's all good… not merely pointing to a certificate.

2. This loan is being sold to Freddie Mac.   They have a standard form opinion.  We sent you that form upfront.   We don't have to follow it exactly to the letter, but we have to certify that the opinion we deliver is in material compliance with the form.   And what you are proposing – completely gutting your opinion on due formation by stating that your opinion is based 100% on a separate certificate – is not in material compliance with the required form.   I was the head of Freddie's opinion committee for over a decade, I helped train 2 of the 3 members who are currently on that committee, I can tell you with 100% certainty this is not acceptable to Freddie Mac.   We cannot make the certification that it's in material compliance because we have actual knowledge that it's not, so we can't accept your modification.   We can't close this loan without an acceptable opinion.   We're not trying to play hardball here, we're just explaining the situation, your opinion modification simply doesn't work.

3. Our firm handles over 40% of all Freddie Mac multifamily business.   That translates to roughly 1,200 Freddie loans annually.   All of those loans require opinions.   Given this volume, as you might imagine, over the years we've received opinions from hundreds of firms across the country, big and small.   I can tell you nobody relies entirely on a

161935778v4

certificate when giving a due formation opinion.  It's an easy opinion to give, it's standard, it's just never an issue.   We are dumbstruck as to why Winstead, which presumably has the same malpractice insurance provider as other many other firms, has taken the position that it can't issue formation opinions unless it formed the entity itself.

4.  You are correct, our firm did accept your proposed modification on a recent deal called Liberty Lofts.   I handled that deal.   That opinion was approved by another associate in our office, Ari.   He approved it because he had approved it two months prior on another deal, on a property called Epic, which I also handled with him.   On Epic, a month after providing to Winstead the required Freddie form opinion, we learned a week before closing that Winstead wasn't on board with issuing the standard formation opinion.   We explained why that's wholly unacceptable and that we did not have the luxury of being able to omit the opinion, and as a compromise Winstead offered to give the opinion solely in reliance on a certificate.   Ari, a highly experienced but overworked attorney, mistakenly assumed that because Freddie's form allows sole reliance on a certificate in the context of the good standing opinion, it would be okay to accept sole reliance on a certificate for due formation.   That was a mistake.   And I didn't overlook Ari's work given his exceptional experience and given that he didn't bring it to my attention for discussion, so the mistake went unchecked, and was repeated two months later on the deal to which you refer, Liberty Lofts.    We cannot knowingly repeat a mistake a third time.   This loan is not closing for a while, we are not under duress, we have plenty of time to do it correctly this time.

5.  We've represented this sponsor in a half-dozen prior loans over the past couple years, and their prior DE counsel – Richard Leyton Finger -- has never had a problem issuing the due formation opinion without modifications or sole reliance on certificates, even though that counsel was not the firm which formed the entity.   Again, this is incredibly routine, standard and customary practice.   It's difficult for us to understand, both legally and practically, why Winstead is taking such a markedly outlying position on this issue.  I generally dislike supporting RLF any more than necessary, but if Winstead cannot issue the opinion we need, and if RLF can, then the easy solution is to simply send RLF the cert of formation and the operating agreement and have them issue the opinion.   Again, that's not the direction I would prefer to go.

6.  We have no problem with you relying "in part" on a certificate, the problem is that you cannot rely "entirely" upon it, in the context of due formation.   The Freddie form specifically allows you to rely on certificates for whatever factual matters you need to have confirmed; that's baked into the form.   But as you know, relying solely on a certificate means you're not actually giving us any legal opinion at all, you are eschewing all legal diligence and analysis which is the very essence of a legal opinion.

7.  You two – both of you – have been exceptionally pleasant and competent and responsive throughout this entire process.   None of the foregoing is intended in any way as a personal attack or frustration with you personally.   I don't want you to take anything in this email as indicative of me having any type of tone or grievance with either of you.   You guys are flat-out awesome.   But we need this opinion, either from your firm or another firm, and we have no flexibility on this, nor is there any valid legal or practical reason why we should be flexible.   I cannot emphasize enough how unusual and vexing it is that your firm's opinion committee is unilaterally taking this unprecedented position of not issuing a clean opinion on due formation of a DE LLC.   It's not hyperbole to say that this is literally unheard of in our industry, and your firm has

161935778v4

CONFIDENTIAL & SUBJECT TO PROTECTIVE ORDER

no leg upon which to stand on this argument.  Again, this isn't me trying to be difficult or playing hardball, I'm just looking at the facts and the sheer volume of evidence to the contrary of Winstead's position.

Please take our position back to your opinion committee and see if they can't reconsider this issue.   In the meantime, you have our sincere appreciation for your continuing help in getting us over the goal line on this deal, inch by inch.

Matt

**Matthew R. Bowsher**
**Partner**
**troutman** pepper
Office: 202.274.1939 | Mobile: 301.512.0423
matthew.bowsher@troutman.com

---

**From:** Bowsher, Matthew R. <Matthew.Bowsher@troutman.com>
**Sent:** Wednesday, May 4, 2022 9:09 PM
**To:** Sankano, Gita F. <Gita.Sankano@Troutman.com>
**Subject:** RE: Estates at Palm Bay - Comments to the local opinion


Meh.   No biggie.   I'll respond.

**Matthew R. Bowsher**
**Partner**
**troutman** pepper
Office: 202.274.1939 | Mobile: 301.512.0423
matthew.bowsher@troutman.com

---

**From:** Sankano, Gita F.
**Sent:** Wednesday, May 4, 2022 6:46 PM
**To:** Bowsher, Matthew R. <Matthew.Bowsher@Troutman.com>
**Subject:** RE: Estates at Palm Bay - Comments to the local opinion

Hi Matt,

I searched the deal in our system. She's correct. It looks like you and Ari closed the deal and the very same language was accepted. How should we proceed?

Thanks,

Gita

161935778v4

CONFIDENTIAL & SUBJECT TO PROTECTIVE ORDER

1.  Borrower is a limited partnership (a) based solely on Borrower's LP Certificate, duly formed, (b) validly existing and (c) in good standing under the laws of the State of Borrower's Organization.

**Gita F. Sankano**

**Associate**

troutman **pepper**

Direct: 202.220.1251 | Internal: 803-1251

---

**From:** Sankano, Gita F.
**Sent:** Wednesday, May 4, 2022 6:34 PM
**To:** Bowsher, Matthew R. <Matthew.Bowsher@Troutman.com>
**Subject:** FW: Estates at Palm Bay - Comments to the local opinion

Yikes…

**Gita F. Sankano**

**Associate**

troutman **pepper**

Direct: 202.220.1251 | Internal: 803-1251

gita.sankano@troutman.com

---

**From:** Lee, Esther <elee@winstead.com>
**Sent:** Wednesday, May 4, 2022 6:33 PM
**To:** Sankano, Gita F. <Gita.Sankano@Troutman.com>
**Cc:** Bowsher, Matthew R. <Matthew.Bowsher@Troutman.com>; Swope, Tobin <tswope@winstead.com>
**Subject:** RE: Estates at Palm Bay - Comments to the local opinion

EXTERNAL SENDER

Gita,

Thanks for sending the comments.

The DE opinion is still under internal review. It looks like our firm recently closed on another JLL/Freddie loan last week with a formation opinion based solely on borrower's certificate (and with your firm as lender's counsel). The borrower in that deal was Culberson Apartments, Ltd. and the property was Liberty Lofts, located in Cooke County, TX. Would you mind letting us know what the difference is between the two deals? We would then relay that information to our internal board.

Thank you,

161935778v4

Esther

Esther Lee, Real Estate Development & Investments Associate

Winstead PC | 2728 N. Harwood Street | Suite 500 | Dallas, Texas 75201

214.745.5885 direct | 214.745.5390 fax | elee@winstead.com | Winstead.com

---

**From:** Sankano, Gita F. <Gita.Sankano@Troutman.com>
**Sent:** Wednesday, May 4, 2022 7:58 AM
**To:** Lee, Esther <elee@winstead.com>; Swope, Tobin <tswope@winstead.com>
**Cc:** Bowsher, Matthew R. <Matthew.Bowsher@Troutman.com>
**Subject:** Estates at Palm Bay - Comments to the local opinion

Hi Esther,

Please see our comments to the FL opinions attached. Also, can you let us know the status on the DE opinion?

Thanks,

Gita

**Gita F. Sankano**

**Associate**

Direct: 202.220.1251 | Internal: 803-1251

gita.sankano@troutman.com

**troutman** pepper

401 9th Street, NW, Suite 1000

Washington, DC  20004

troutman.com

Troutman Pepper is a 2021 Mansfield Certified Plus Firm

---

**From:** Sankano, Gita F. <Gita.Sankano@Troutman.com>
**Sent:** Friday, April 22, 2022 9:58 AM
**To:** Bowsher, Matthew R. <Matthew.Bowsher@Troutman.com>
**Subject:** RE: Estates at Palm Bay - Legal Due Diligence Checklist


Hi Matt,

161935778v4

CONFIDENTIAL & SUBJECT TO PROTECTIVE ORDER

Please see attached on your first question below.

On the second point, I have seen that language used before.

> 1.    Based solely on the Borrower Good Standing Certificates, Borrower is a Delaware limited liability company, duly organized, validly existing and in good standing under the laws of the State of Delaware, and  is qualified to transact business as a foreign limited liability company in Texas.

However, it's Fannie Mae language (wrong deal type on my part). I might have got the opinion languages confused.

In addition, Winstead has rendered opinion #1 on the Freddie Mac deals before (see attached). As such, I completely agree with your point below.  I think we can push back and have the borrower revise opinion #1.

Thank you!

**Gita F. Sankano**

**Associate**

troutman **pepper**

Direct: 202.220.1251 | Internal: 803-1251

gita.sankano@troutman.com

---

**From:** Bowsher, Matthew R. <Matthew.Bowsher@troutman.com>
**Sent:** Thursday, April 21, 2022 10:02 PM
**To:** Sankano, Gita F. <Gita.Sankano@Troutman.com>
**Subject:** RE: Estates at Palm Bay - Legal Due Diligence Checklist

My comments on the DE opinion:

1. Can you explain why you feel #21-24 are not required for this loan?
2. Not sure I'm okay with the following mod, circled in red below; have you ever seen us accept this before?   Seems to me that (i) we already allow borrower to rely broadlly on certificates from the borrower as to factual matters, in the Scope of Review section, so they don't need to specifically repeat it here, and (ii) there are more than mere factual matters involved in giving a legal opinion as to formation, it's not just a matter of fact it's a matter of law, and it's not standard/customary to allow the opinion issuer to rely exclusively on a self-serving statement by the borrower which says they are duly formed, the whole point of the opinion is for borrower's counsel to reach that conclusion on its own and to opine to it.   Not asking you to push back blindly on the bor's counsel on this, rather I'm asking you to give this some thought, consider whether you've ever seen it in the year that you've been closing loans with us, and also pull prior Winstead opinions to see if Troutman has accepted it from this firm, then let's circle-back and see if it's appropriate to reject it.

161935778v4



1.  Borrower is a [CHOOSE ONE: corporation (a)limited liability company (a) based solely on Borrower's Certificate,] duly ~~incorporated~~formed, (b) validly existing, and (c) ~~in good standing~~ OR ~~limited partnership (a) duly formed, (b) validly existing, and (c) in good standing~~ OR ~~limited liability company (a) duly organized, (b) validly existing, and (c) in good standing~~ OR ~~general partnership (a) duly formed, (b) validly existing, and (c) in good standing~~ under the laws of the State of Borrower's Organization.

**Matthew R. Bowsher**
**Partner**
**troutman** pepper
Office: 202.274.1939 | Mobile: 301.512.0423
matthew.bowsher@troutman.com

---

**From:** Sankano, Gita F. <Gita.Sankano@Troutman.com>
**Sent:** Thursday, April 21, 2022 2:12 PM
**To:** Bowsher, Matthew R. <Matthew.Bowsher@troutman.com>
**Subject:** FW: Estates at Palm Bay - Legal Due Diligence Checklist

Hi Matt,

The DE opinion looks good. I have no comments.

Thanks,

Gita

**Gita F. Sankano**

**Associate**

**troutman** pepper

Direct: 202.220.1251 | Internal: 803-1251

gita.sankano@troutman.com

---

**From:** Lee, Esther <elee@winstead.com>
**Sent:** Thursday, April 21, 2022 11:05 AM
**To:** Sankano, Gita F. <Gita.Sankano@Troutman.com>
**Cc:** Bowsher, Matthew R. <Matthew.Bowsher@Troutman.com>; Swope, Tobin <tswope@winstead.com>
**Subject:** RE: Estates at Palm Bay - Legal Due Diligence Checklist

**EXTERNAL SENDER**

Good morning Gita,

161935778v4

We reviewed the updated loan documents and it looks like our requested changes to Exhibit B of the Multifamily Loan and Security Agreement have not been included. Please see attached our revised version (with the same previously requested changes) and a redline to your most recent draft.

Also, here are a couple of more items for the checklist.

1. Attached is the draft DE opinion letter and a redline to the Freddie opinion form. (*We are still waiting on draft opinions from Florida counsel and will send those as soon as available.)

2. There are no laundry leases, asset agreement, or commercial leases.

Please let us know if you have any questions.

Thanks,

Esther

Esther Lee, Real Estate Development & Investments Associate

Winstead PC | 2728 N. Harwood Street | Suite 500 | Dallas, Texas 75201

214.745.5885 direct | 214.745.5390 fax | elee@winstead.com | Winstead.com

---

**From:** Sankano, Gita F. <Gita.Sankano@Troutman.com>
**Sent:** Friday, April 15, 2022 3:19 PM
**To:** Lee, Esther <elee@winstead.com>
**Cc:** Bowsher, Matthew R. <Matthew.Bowsher@Troutman.com>; Swope, Tobin <tswope@winstead.com>
**Subject:** RE: Estates at Palm Bay - Legal Due Diligence Checklist

Hi there,

Please see the changes that we have made so far on the loan documents. Please let me know if you have any questions,

Thanks,

Gita

**Gita F. Sankano**

**Associate**

**troutman** pepper

Direct: 202.220.1251 | Internal: 803-1251

gita.sankano@troutman.com

161935778v4

**From:** Lee, Esther <elee@winstead.com>
**Sent:** Friday, April 15, 2022 10:58 AM
**To:** Sankano, Gita F. <Gita.Sankano@Troutman.com>
**Cc:** Bowsher, Matthew R. <Matthew.Bowsher@Troutman.com>; Swope, Tobin <tswope@winstead.com>
**Subject:** RE: Estates at Palm Bay - Legal Due Diligence Checklist

EXTERNAL SENDER

Hi Gita,

Thanks for sending over the updated checklist. It looks like closing is being pushed to the end of May. Please see comments in red below.

Let us know if you have any questions.

Thanks,

Esther

Esther Lee, Real Estate Development & Investments Associate

Winstead PC | 2728 N. Harwood Street | Suite 500 | Dallas, Texas 75201

214.745.5885 direct | 214.745.5390 fax | elee@winstead.com | Winstead.com

---

**From:** Sankano, Gita F. <Gita.Sankano@Troutman.com>
**Sent:** Thursday, April 14, 2022 5:10 PM
**To:** Lee, Esther <elee@winstead.com>; Swope, Tobin <tswope@winstead.com>
**Cc:** Bowsher, Matthew R. <Matthew.Bowsher@Troutman.com>
**Subject:** Estates at Palm Bay - Legal Due Diligence Checklist

**Good Evening,**

**Please see the updated checklist below. Please send and provide the answers for the following items by Wednesday next week**

- **DE & FL Opinions (borrower and guarantor)** **[We are working on the opinions and will send drafts over as soon as possible.]**
- **Confirmation if there are any laundry leases, asset agreement, or commercial leases** **[Most likely none but will confirm again.]**
- **When will we receive the signature pages?** **[You mentioned 3-4 days prior to closing, correct?]**

**Thanks,**

**Gita**

161935778v4

**Target Closing Date: May 2, 2022** [End of May Closing]

<u>A&R Loan</u>

- Draft Assignment documents (Allonge to Note and Assignment of Mortgage) from current Lender to JLL **– Comments Sent**
- Confirmation from Title of receipt the Assignment of Mortgage**– NEED (at closing)**
- Confirmation from Troutman of receipt of the Original Allonge, and Original Note(s) – **NEED (at closing)**

<u>Legal Due Diligence</u>

- Title Commitment/Exceptions Documents – **Comments Sent**
- Copy of any agreement being recorded at closing – **NEED (or confirm none)** [If any document recorded or to be recorded on title will contain a prohibition against or any indemnification in connection with the conversion of the Property to a condominium or cooperative structure, it will need to be approved by Lender prior to rate lock]
- UCC/Judgment/Tax Lien Searches on Borrower (Borrower's counsel to order. <u>Dated within 30 days of closing</u>) – **NEED [To be ordered sometime next week so it is dated within 30 days of closing.]**
  - o Name: Lurin Real Estate Holdings VI, LLC
  - o Location:
    - The State in which the Borrower was formed (DE)
    - The local jurisdiction in which the Property is located (Okaloosa County, FL)
- Draft Opinion Letter(s) (**in the forms provided**)
  1. Borrower
     1. Delaware- **NEED**
     2. DE single-member LLC- **IN; Need executed copy for closing**
     3. FL – **NEED**
  2. Guarantor (FL) – **NEED**
  3. Non-Con Opinion Letter – **NEED**
- Asset Management Agreement (or any other agreement with affiliated fees) [*Must be subordinate to the Loan*] – **NEED (or confirm none)**
- Ground Lessor Estoppel – **(revised form approved, need final signed copy)**
- Amendment (Extension) to Ground Lease (**revised form approved, need final signed copy**)
- Organizational Documents (Borrower/Guarantor and their sub-entities):
  1. <u>Lurin Real Estate Holdings VI, LLC</u>
     1. **A&R Operating Agreement -  IN; Need executed copy at closing**
        1. **Assignment of membership interest - IN; Need executed copy at closing**
     a. Certificate of Good Standing (Dated within 30 days of closing) **– NEED**
     b. Certificate of Authority to Transact Business (Dated within 30 days of closing) – **NEED**
  2. <u>Lurin Real Estate Holdings VI KB 1, LLC</u>
     a. A&R Operating Agreement (or amendment) – **NEED (to reflect removal of pref member)  [There is no A&R Operating Agreement. The KB 1 entity is being terminated before closing and we have already started the process. The preferred member interest has been fully redeemed and the KB 1 entity has**

161935778v4

assigned all of its interest in the Borrower entity to Lurin Equity Partners VI, LLC (who is the new sole member of Borrower). Please see attached assignment of membership interest.]

    b.  Certificate of Good Standing (Dated within 30 days of closing) – **NEED**

   3.  <u>Lurin Advisors, LLC</u>

    a.  Certificate of Good Standing ( Dated within 30 days of closing) – **NEED**

- Laundry Lease – **NEED (or confirm none**)
- Commercial Leases (non-Laundry Lease) – **NEED (or confirm none**)
- Confirmation that you have reviewed/approved the draft loan documents – <u>any document modifications need to be reviewed and approved by Freddie Mac and no changes are permitted after rate lock</u> – **NEED [Sent (3/16)]** [Can you please send the updated drafts of the loan agreement, note and mortgage per our comments?]
- Signature Pages **[Sent 4/4]**
  1. Borrower – **NEED**
  2. Guarantor – **NEED**
  3. Property Manager – **NEED**

<u>Troutman / Lender</u>

- Zoning Report – *draft received*

<u>Closing Coordination</u>

- Executed Escrow Letter from Title – **NEED (after receipt of original recording package)**
- Certified Record Documents from Title – **NEED**
- Closing Protection Letter from Title, if applicable – **NEED**
- Acceptable interest rate cap documentation from Kutak Rock, if applicable – **NEED**
- Fully Executed Settlement Statement – **NEED**

Please forward each item as soon as it is available.

Thanks,

Gita

**Gita F. Sankano**

**Associate**

Direct: 202.220.1251 | Internal: 803-1251

gita.sankano@troutman.com

**troutman** pepper

401 9th Street, NW, Suite 1000

Washington, DC  20004

troutman.com

161935778v4

CONFIDENTIAL & SUBJECT TO PROTECTIVE ORDER

Troutman Pepper is a 2021 Mansfield Certified Plus Firm

The emails attached are related to the incident where Matt and I had a supplemental deal. I told borrower counsel that we only needed the opinion to cite to the state of formation for the borrower and we did not need the opinion to cite to where the property was located.

You will see Matt's response in the emails attached telling me to correct my statement. As you will see in the emails attached, he was completely wrong. Once again, it was not a matter of him being wrong or right. It was the aggressive emails I was receiving from him. I spoke to Ashante, Whitney, and Nora about this incident.

**Gita F. Sankano**
**Associate**
Direct: 202.220.1251 | Internal: 803-1251
gita.sankano@troutman.com

troutman **pepper**
401 9th Street, NW, Suite 1000
Washington, DC 20004
troutman.com

Troutman Pepper is a Mansfield Certified Plus Firm

161935778v4

CONFIDENTIAL & SUBJECT TO PROTECTIVE ORDER

**From:** Bowsher, Matthew R. <Matthew.Bowsher@troutman.com>
**Sent:** Tuesday, May 3, 2022 2:19 PM
**To:** McLean, Jeremy M. <Jeremy.McLean@Troutman.com>; Stitzer, Virginia Lane <virginia.stitzer@Troutman.com>
**Cc:** Sidarth, S.R. <SR.Sidarth@Troutman.com>; Sankano, Gita F. <Gita.Sankano@Troutman.com>
**Subject:** RE: Freddie: opinion question (local opinions on supplementals)

Thanks.   I'm mildly comforted by the fact that you had the same question 4 months ago per your attached email… but I still think I'm losing my mind, as I can't believe I never noticed this disconnect before, and of all people, I really should have known about it.   Thanks to Gita for bringing this to my attention!   I'll ask Freddie to update the instructions in the form opinion.

**Matthew R. Bowsher**
**Partner**
**troutman** pepper
Office: 202.274.1939 | Mobile: 301.512.0423
matthew.bowsher@troutman.com

---

**From:** McLean, Jeremy M. <Jeremy.McLean@troutman.com>
**Sent:** Tuesday, May 3, 2022 2:05 PM
**To:** Stitzer, Virginia Lane <virginia.stitzer@troutman.com>; Bowsher, Matthew R. <Matthew.Bowsher@troutman.com>
**Cc:** Sidarth, S.R. <SR.Sidarth@troutman.com>; Sankano, Gita F. <Gita.Sankano@troutman.com>
**Subject:** RE: Freddie: opinion question (local opinions on supplementals)

100% agree. The "no local law opinions required" language used to be in the Ex. F language of the commitment.  They took that out of the new commitment form, but have confirmed the Opinion Guidelines are determinative for this.  See attached for confirmation from Freddie.

**Jeremy M. McLean**
**Partner**
**troutman** pepper
Direct: 804.697.1303 | Internal: 15-1303
jeremy.mclean@troutman.com

---

**From:** Stitzer, Virginia Lane <virginia.stitzer@troutman.com>
**Sent:** Tuesday, May 3, 2022 12:27 PM
**To:** Bowsher, Matthew R. <Matthew.Bowsher@troutman.com>
**Cc:** McLean, Jeremy M. <Jeremy.McLean@troutman.com>; Sidarth, S.R.

161935778v4

<SR.Sidarth@troutman.com>; Sankano, Gita F. <Gita.Sankano@troutman.com>
**Subject:** Re: Freddie: opinion question (local opinions on supplementals)

 We don't need local opinions whatsoever. Freddie's updated the Opinion guidelines to make it clear (in my opinion) that that's what they mean.

**Virginia Lane Stitzer**
Direct: 804.697.1408 | Internal: 15-1408
virginia.stitzer@troutman.com
─────────────

**troutman** pepper
1001 Haxall Point, Suite 1500
Richmond, VA 23219
troutman.com

Troutman Pepper is a 2021 Mansfield Certified Plus Firm

On May 3, 2022, at 12:25 PM, Bowsher, Matthew R. <Matthew.Bowsher@troutman.com> wrote:

Jeremy, Virginia, and Sidarth --

On Freddie supplementals, is your position that (i) we don't need a local *enforceability* opinion, or that (ii) we don't need *any local opinion whatsoever*?

The form opinion only instructs the user to omit the enforceability opinion on supplementals; conspicuously, in a form chock full of detailed instructions on the applicability of every opinion therein, there is no instruction to omit any of the other property jurisdiction opinions on supplementals.   However, the opinion Guidelines state that "no enforceability opinion *or local law opinions*" are required.  Adding to the confusion, I'm looking back on the past several supplementals I closed, for which Kelly and Ari handled the opinions, and I notice that the only local opinion excluded from those deals was the enforceability opinion… but maybe that was more accidental than intentional, as Kelly recently instructed Gita that no local opinions of any type are required on supplementals (including on a deal where we actually <u>did</u> receive all local opinions except enforceability!).

Thanks for your thoughts.

Matt

**Matthew R. Bowsher**
**Partner**
Office: 202.274.1939 | Mobile: 301.512.0423
matthew.bowsher@troutman.com
─────────────

**troutman** pepper
401 9th Street NW, Suite 1000
Washington, DC 20004

─────────────────────────────────────────────

161935778v4

CONFIDENTIAL & SUBJECT TO PROTECTIVE ORDER                                    Troutman_00000760

**From:** Bowsher, Matthew R. <Matthew.Bowsher@troutman.com>
**Sent:** Tuesday, May 3, 2022 11:36 AM
**To:** Sankano, Gita F. <Gita.Sankano@Troutman.com>
**Subject:** RE: Andorra Point (fka Cathedral East) - Legal Due Diligence Checklist

Oh, wow!  Ha!!  That's a massive disconnect between the form opinion and the guidelines. FYI, the opinion you and Kelly reviewed on Alden South Hills has all of the local opinions except enforceability, notwithstanding Kelly's comment.   And the most recent supplemental I did with Ari also has all the local opinions except enforceability.    Feels like we're saying one thing but requiring/obtaining something else.    Thanks for bringing this to my attention!  I'll ping Jeremy and Virginia.  Hard to argue with the Guidelines, you're totally right of course, it says right there in black and white that no local law opinions are required, but that's not consistent with the actual form opinion or with what I've been seeing our DC associates require/obtain.

**Matthew R. Bowsher**
**Partner**
**troutman** pepper
Office: 202.274.1939 | Mobile: 301.512.0423
matthew.bowsher@troutman.com

---

**From:** Sankano, Gita F. <Gita.Sankano@Troutman.com>
**Sent:** Tuesday, May 3, 2022 7:16 AM
**To:** Bowsher, Matthew R. <Matthew.Bowsher@troutman.com>
**Subject:** RE: Andorra Point (fka Cathedral East) - Legal Due Diligence Checklist

Good morning Matt!

It was my understanding that all local opinions are not required for supplemental loans. In addition to the attached Freddie Mac published opinions guidelines which show no enforceability opinion or local law opinions will be required for supplemental loans, our firm annotated opinions also instructs that no enforceability or local law opinions are required for supplemental loans (see footnote 22). I also have an old email from Jeremy (2016) that Whitney forwarded to which states the same. Please let me know how you'd like to proceed. I'm happy to confirm with Jeremy and Virginia.

Lastly, on the Alden deal Kelly specifically told me that we don't need local opinions on supplemental deals. I'll forward that email shortly.

Thanks,
Gita

**Gita F. Sankano**
**Associate**
**troutman** pepper
Direct: 202.220.1251 | Internal: 803-1251
gita.sankano@troutman.com

---

161935778v4

CONFIDENTIAL & SUBJECT TO PROTECTIVE ORDER

**From:** Bowsher, Matthew R. <Matthew.Bowsher@troutman.com>
**Sent:** Tuesday, May 3, 2022 12:11 AM
**To:** Sankano, Gita F. <Gita.Sankano@Troutman.com>
**Subject:** RE: Andorra Point (fka Cathedral East) - Legal Due Diligence Checklist

Please issue a correction to your statement below.  It is not accurate to say that "no enforceability/local opinions are needed".   See attached form Freddie opinion, and do a search for "supplemental", you'll see that the only opinion which is waived on supplementals is the enforceability opinion.   All of the other opinions labeled as being required from counsel for Property Jurisdiction… i.e., all other "local opinions"… are still required, to the extent they are applicable.   For example, if our borrower is formed in DE but the property is in PA, then we still need an opinion regarding authorization to do business as a foreign LLC, which comes from local counsel.   See the Alden South Hills supplemental loan for which you recently helped review the opinion; local opinions were required/included.

**Matthew R. Bowsher**
**Partner**
**troutman** pepper
Office: 202.274.1939 | Mobile: 301.512.0423
matthew.bowsher@troutman.com

---

**From:** Sankano, Gita F. <Gita.Sankano@Troutman.com>
**Sent:** Monday, May 2, 2022 4:50 PM
**To:** Marrinucci, Andrew <amarrinucci@klehr.com>
**Cc:** Bowsher, Matthew R. <Matthew.Bowsher@troutman.com>; Maslow, Jonathan <JMaslow@klehr.com>
**Subject:** RE: Andorra Point (fka Cathedral East) - Legal Due Diligence Checklist

Thank you, Andrew! For the opinion, no enforceability/local opinions are needed because this transaction is a supplemental loan.

Thanks!

**Gita F. Sankano**
**Associate**
**troutman** pepper
Direct: 202.220.1251 | Internal: 803-1251
gita.sankano@troutman.com

---

**From:** Marrinucci, Andrew <amarrinucci@klehr.com>
**Sent:** Monday, May 2, 2022 4:47 PM
**To:** Sankano, Gita F. <Gita.Sankano@Troutman.com>
**Cc:** Bowsher, Matthew R. <Matthew.Bowsher@Troutman.com>; Maslow, Jonathan <JMaslow@klehr.com>
**Subject:** RE: Andorra Point (fka Cathedral East) - Legal Due Diligence Checklist

**EXTERNAL SENDER**

Gita,

161935778v4

Attached for your review are the following certified formation documents and standing certificates for the Borrower and Love Andorra A LLC.  Let us know if you have any questions.

Thank you,

Andrew



**ANDREW MARRINUCCI  |  ASSOCIATE**
**KLEHR HARRISON HARVEY BRANZBURG LLP**
1835 Market Street | Suite 1400 | Philadelphia, PA 19103
t 215.569.4284 | f 215.568.6603
amarrinucci@klehr.com  |  LinkedIn  |  Twitter

This email may contain material that is confidential, privileged and/or attorney work product for the sole use of the intended recipient. Any review, reliance or distribution by others or forwarding without express permission is strictly prohibited. If you are not the intended recipient, please contact the sender and delete all copies.

---

**From:** Sankano, Gita F. <Gita.Sankano@Troutman.com>
**Sent:** Saturday, April 30, 2022 12:19 PM
**To:** Marrinucci, Andrew <amarrinucci@klehr.com>; Maslow, Jonathan <JMaslow@klehr.com>
**Cc:** Bowsher, Matthew R. <Matthew.Bowsher@Troutman.com>
**Subject:** Andorra Point (fka Cathedral East) - Legal Due Diligence Checklist

Target closing date of **6/1/2022**

To help keep us on the same page, below is a legal due diligence checklist. Please review and provide any items/information as soon as available (keeping in mind the timeframes noted below for certain items). We would like to receive the documents/confirm the status highlighted in yellow sometime next week.

**Legal Due Diligence**

- Loan Document Information – **NEED ASAP (see below)**
- Title Commitment/Exceptions Documents – **Under Review**
- Survey – **Waiver Requested – (See Survey Cert provided)**
- Contact Information:
  - Contact info for the escrow / closing agent– **NEED (or confirm same as Title Contact)**
- Copy of any agreement being recorded at closing (including the draft deed if an acquisition) – **NEED (or confirm none) [If the deed (or any other document recorded or to be recorded on title) will contain a prohibition against or any indemnification in connection with the conversion of the Property to a condominium or cooperative structure, it will need to be approved by Lender prior to rate lock]**
- UCC/Judgment/Tax Lien Searches on Borrower (Borrower's counsel to order. Dated within 30 days of closing) – **NEED [See requirements below]**
- Draft Opinion Letter(s) (in the forms provided)
  - Borrower – **NEED**

161935778v4

- o   Guarantor – **NEED**
- Asset Management Agreement (or any other agreement with affiliated fees) [Must be subordinate to the Loan] – **NEED (or confirm none)**
- Laundry Lease – **NEED (or confirm none)**
- Confirmation that you have reviewed/approved the draft loan documents – any document modifications need to be reviewed and approved by Freddie Mac and no changes are permitted after rate lock – **NEED [to be circulated]**
- Signature Pages **[to be circulated]**
  - o   Borrower – **NEED**
  - o   Guarantor – **NEED**
  - o   Property Manager – **NEED**
  - o   Lender – **NEED**

**Organizational Documents (Borrower/Guarantor and their sub-entities):**

1. Love Andorra LLC
   a.   Certificate of Formation – **Confirm no changes. Cert dated  8/13/2020**
   b.   Operating Agreement – **Confirm no changes. Agreement dated 10/15/2020**
        1.   Amendment to Operating Agreement – **NEED (reference new loan)**
   c.   Certificate of Good Standing (DE) (Dated within 30 days of closing) – **NEED**
   d.   Certificate of Good Standing (PA) (Dated within 30 days of closing) – **NEED**

2. Love Andorra A, LLC
   a.   Certificate of Formation – **NEED**
   b.   Operating Agreement – **NEED**
   c.   Certificate of Good Standing (DE) (Dated within 30 days of closing) – **NEED**

**Loan Document Information (needed from Borrower)**

- Property Manager's Address – **NEED**

**UCC/tax lien/judgment lien search requirements:**
- Name: Borrower's name
- Location:
  - o   The State in which the entity was formed
  - o   The local jurisdiction in which the Property is located
  - o   The State of residence of any individual
- Date: must be dated no earlier than 30 days prior to the Origination Date

**Closing Coordination**

- Executed Escrow Letter from Title – **NEED (after receipt of original recording package)**
- Fully Executed Settlement Statement – **NEED**
- Intercreditor Agreement – **NEED**

161935778v4

Please forward each item as soon as it is available.

Please note that Title/Survey, Borrower Organizational Documents, Draft Opinions, and any requested document modifications all require approval and must be submitted at least 10 business days before rate lock.

Please let me know if you have any questions or need anything from me.

Thanks,

**Gita F. Sankano**
**Associate**
Direct: 202.220.1251 | Internal: 803-1251
gita.sankano@troutman.com
**troutman pepper**
401 9th Street, NW, Suite 1000
Washington, DC  20004
troutman.com

Troutman Pepper is a 2021 Mansfield Certified Plus Firm

161935778v4

**Attachment D – INTERVIEW NOTES – Monday, August 22, 2023, with Sona Spencer, Chief Legal Talent Officer.**

I scheduled a meeting with Sona Spencer while she was visiting the Washington, DC office on Monday, August 22, 2023, in Sona's visiting attorney office. I introduced myself and my role with the firm and explained that a few concerns had been brought to my attention. Before proceeding with my questions, I let Sona know that Gita had raised some concerns regarding an email exchange between her and Matt Bowsher. I explained that to fully understand what occurred, we wanted to get a full understanding of the conversation she had with Gita regarding the matter.

I advised Sona that the firm takes any concerns raised seriously and that my goal was to be fair and objective while reviewing all the details.

Sona stated that she understood. Questions asked include:

1. It was reported that Gita Sankano reached out to you regarding an email exchange between she and Matt Bowsher.  Could you please walk me through that conversation?

2. Are you aware of any other issues between Gita and Matt?

3. Is there anything else that would be helpful for me to know?

I closed with thanking Sona for her time. Letting her know that I will reach back out if I have any follow up questions. I also reminded her that this conversation is confidential and should not be discussed with others. Sona understood.

**Summary of Interview**:

Related to the August 3, 2023, email, Sona received a call from Jennifer Jana that Gita wanted to speak with her because Gita felt that potential differential treatment is happening with a partner. Before Sona met with Gita, Sona went back to look at Gita's most recent feedback given at evaluation and the memo associated with it. Sona asked the coaches if Gita was filing a complaint and if she is, that is HR and that Gita would need to have that conversation with HR, separate and apart from her because she is not a confidential resource and she would be asking questions of people. Jennifer Jana relayed that information to Gita and Gita stated that she wanted to file a complaint with HR, that she still wanted to speak with Sona and that she (Gita) will reach out to HR.

When Sona spoke to Gita, Gita was very emotional discussing the August 3rd email.  Gita shared she feels she's being treated differently than other associates in the Multifamily Housing group and feels that Matt had not worked with her for 6 months prior to the incident. Note: which was around the time of the evaluations.

Gita also stated that she felt like Matt was targeting her somehow and was gunning for her because the email felt like it was a copy paste of what he said in her most recent evaluation and felt like a setup.

161935778v4

Gita walked Sona through the history of working with Matt and she stated that she feels like Matt was insulting her intelligence and made the comment "you know how they do that to us".

Sona stated she felt Gita saw her as an ally because she is a black woman and felt more comfortable making that comment to her and thinks Gita wants to feel like she is not alone. Sona stated to Gita, as words of encouragement, "that coming into this space as a black woman we may feel like we don't belong but it's up to us, as black women, not to fall into that thinking".

Gita stated that she knows that Matt is brash and harsh and the only difference between her and the other associates is that she was a black woman.

Sona shared that Gita kept repeating that she received positive feedback during her evaluation and Sona informed Gita that she read her evaluations and that the feedback was not all positive; they were mixed.  Matt's feedback is similar to other feedback received from other partners and Sona encouraged Gita to make sure she's straight on what she wants to happen now. Gita said to Sona that she feels like everything is happening all over again that she had a situation at Pepper Hamilton where a partner was stealing hours from her, and she was the only black person in the group.  Sona shared that Gita made the race statement very clearly when speaking on her time at Pepper Hamilton but not with the Matt situation and believes she is aligning the two.

Sona stated to Gita that if she wanted to file a complaint with HR, she needed to be honest with HR and be very clear about what she wanted and what she is looking for to happen.  Gita stated to Sona that she didn't want Matt to evaluate her anymore, didn't want to work with him directly, want to make sure Matt is not damaging her reputation within the Multifamily Housing group and that she would have development opportunities. Sona shared with Gita that she cannot unilaterally make that decision and that she would have to go talk to the practice group and better understand the makeup, the matters/deals, etc.  Sona asked Gita that if you don't work with Matt anymore, where is your work coming from because it sounds like Gita does a lot of work on Matt's matters, even she doesn't work directly with him, and asked Gita what that impact would look like for her overall development. Gita responded that she didn't think about that. Sona did tell Gita that she can have conversations with the practice group and see what comes back.  Sona went to Marshall and Brian Iwashyna, and they stated that Gita is an underperformer and that is not the reality of where things are.

Gita came to Sona through Legal Talent's Career Coaching & Planning team who had been speaking with Gita overall about professional development, which was prompted by Multifamily Housing practice groups recommendation.  There has been feedback given regarding Gita's performance and in the quarterly June 2023 practice group meeting, Gita's name was raised as somebody that needed more professional coaching to help her with working at the level of a 4th year associate.

The feedback Matt gave in Gita's evaluation is very similar to the feedback he had given to her in the email if you take aside the tone.

Sona shared that there are partners that don't want to work with Gita due to her being an under performer, and are the same partners that Gita is stating that she got good feedback from during her evaluation.  Sona also shared that she is concerned that if Gita's hours start to

161935778v4

decrease and going into evaluations, if honest feedback is given regarding Gita's performance it may look retaliatory because of this complaint.

Sona suggested that I should speak with Tiffany Jordan because Tiffany had a conversation with Gita as well regarding this incident and Tiffany could also explain how the Career Coaching & Planning department works and what their role is in coaching and professional development.

**September 13, 2023 – Follow up Interview.**

After meeting with Shana Beldick to review the overall complaint, I spoke with Sona again for clarification on Gita's performance and related communication. During our follow-up discussion, I asked:

1. During Gita's evaluation review, other than the written feedback that was submitted on Gita's performance, what was the verbal discussion related to her performance and why some attorneys don't want to work with her?

I closed with thanking Sona for her time. Letting her know that I will reach back out if I have any additional follow up questions. I also reminded her that this conversation is confidential and should not be discussed with others. Sona understood.

**Summary of Interview**:

Sona shared that she was not a participant in the evaluation discussions or meeting with the associates unless there are specific issues and recommended that I talk to Blair Schiff in Multifamily to get that level of detail because Blair is the one that had that conversation with Gita. Sona did state that the evaluation memo was not very detailed, and Blair would be the only one to share what was discussed in that meeting. Sona is unsure if anyone else was a part of that meeting and suggested I speak with Blair.

Sona added Brian Iwashyna wants to know how to move things forward due to the fact Gita has talked so openly about this situation with a number of people and Brian wants to make sure that he has an understanding of when the investigation is going to be over and what, if anything, is going to be the instructions for Brian in terms of managing some of the commentary he may receive. I informed Sona that I will look into this and circle back with her.

**September 25, 2023 – Follow up Answer.**

I followed up with Sona regarding her above question from Brian Iwashyna. I communicated to Sona, that HR will not inform Brian on when the investigation has closed. If anyone approaches Brian with questions or comments regarding the investigation or the incident for him to say it's an HR matter and this should not be a topic of discussion or conversation.

161935778v4

**Attachment E – INTERVIEW NOTES – August 23, 2023, with Tiffany Jordan, Director of Career Coaching & Planning**

I scheduled a call via Microsoft Teams video on Wednesday, August 23, 2023.
I explained to Tiffany that I was calling to get insight on a conversation she had with Gita Sankano and that Gita raised concerns regarding a partner within her practice group and to better understand how the Career Coaching & Planning department works and what their role is in coaching and professional development for attorneys. Before proceeding with my questions, I explained that our conversation would be kept confidential to the extent possible and that my goal was to be thorough and objective while looking at all of the details. I asked if Tiffany had any questions. She had no questions.

Questions asked include:

1) Can you explain to me the role of the Career Coaching & Planning department?

2) It is my understanding that you had a conversation with Gita Sankano regarding a recent incident between her and a partner within her practice group. Can you walk me through that conversation?

3) Is there anything else that would be helpful for me to know?

I closed by thanking Tiffany for her time. Letting her know that I will reach back out if I have any follow up questions. I reminded her that the firm takes this matter seriously and that we would be fair and thorough in reviewing what happened. I then stated that our conversation was to remain confidential and should not be discussed with others. Tiffany understood.

**Summary of Interview:**

Attorneys are recommended to reach out to the Career Coaching & Planning department that could come as part of formal performance improvement plans where one of the recommended interventions, for a time period, is to see someone in coaching.  Attorneys could also come as a recommendation from a partner, in advance of something coming down the road, something important for the attorney's improvement.  Attorneys could also reach out proactively because they want to set goals themselves and want to have accountability to do so, or they may be looking for a new opportunity and don't know where to start. Career Coaching & Planning also connect with attorneys as a part of formal separation from the firm.  As part of the separation agreement, there is an offering made to attorneys who are separating from the firm to have external career coaching services and this team helps serve as an intermediary for those services. This is not a requirement but is an offering that the firm adds to the separation agreement to help ease the exit for the attorney.

Coaching is a confidential resource for attorneys that offers a non-directive relationship designed to give the attorney agency in identifying what their challenges are and leverage

161935778v4

powerful questions, reflections, exercises, and tools in order to partner with the attorney to help and support them to develop solutions.

Tiffany shared that Gita reached out to her July 2023 because she was interested in beginning coaching sessions and to get an understanding what she was looking for in coaching. Tiffany assigned Gita to another coach on the team, Jennifer Jana. Gita then followed up with Tiffany on August 4, 2023. In this conversation, Gita shared with Tiffany the August 3rd email exchange between Gita and Matt Bowsher. Tiffany described her conversation with Gita as venting but Gita at that point did not know what she was looking for in terms of resolution. Tiffany was very mindful during the conversation to listen and not draw conclusions. At the end of the conversation, Tiffany recommended that Gita discuss this exchange she had with Matt Bowsher with Jennifer Jana who is assigned as her coach because it seemed like the email would have implications for how Gita may navigate working in the practice group.

161935778v4

CONFIDENTIAL & SUBJECT TO PROTECTIVE ORDER

**Attachment F – INTERVIEW NOTES – August 24, 2023, with Jennifer Jana, Career Coaching & Planning Manager.**

I met with Jennifer Jana via Microsoft Teams video on Thursday, August 24, 2023.
I introduced myself and my role with the firm and explained some concerns had been raised regarding Gita Sankano and Matt Bowsher. I advised Jennifer that my goal was to be objective and fair in my review and to hear all sides of the events that occurred. We reviewed confidentiality and proceeded with the conversation.

Questions asked include:

1) Can you explain to me your role as a Career Coaching & Manager?

2) It is my understanding that you had a conversation with Gita Sankano regarding a recent incident between her and a partner within her practice group. Can you walk me through that conversation?

3) Is there anything else that would be helpful for me to know as I continue to review the facts?

I thanked Jennifer for her time and let her know that I would be in touch if I had any follow up questions and that if she thought of anything that would be helpful to reach out. I then stated that our conversation was to remain confidential and should not be discussed with others. Jennifer understood.

**Summary of Interview:**

Jennifer's role as a coach is that she meets with attorneys in confidential one-on-one sessions to provide guidance on anything career related.  Some examples are how to become a partner, to needing assistance with time management, to needing assistance in finding a job when an attorney is placed on job leave.

Gita had met with Tiffany Jordan, Director of Career Coaching & Planning and because Tiffany will be going out on leave very soon, Tiffany suggested that Gita connect with Jennifer. Jennifer had scheduled a meeting with Gita and the only topic discussed in that meeting was related to the August 3rd email exchange between Gita and Matt.

Gita shared with Jennifer about her interactions with Matt Bowsher, past and present, and how those interactions made her feel, specifically the August 3rd email exchange. Gita and Jennifer discussed that there could be a spectrum of possibilities of Matt's intent within that email exchange.  Gita made clear that she felt that she was being targeted because of racial and gender bias.

161935778v4

Jennifer had the reaction of putting herself in Gita's situation as an associate and receiving that type of email.  Jennifer shared with me that being a white woman, she can listen to Gita's feelings and as a coach help her move through her next steps but can't understand firsthand the pain, the trauma, etc. of being a black woman in a professional setting in 2023.

Jennifer listened to Gita's feelings and as a coach helped her figure out next steps. Jennifer asked Gita, what do you want to do? In this conversation, Gita couldn't answer the question and needed time to think about it.  In a follow up conversation, Gita stated to Jennifer that she wanted to go to HR and file a formal complaint.

Jennifer shared that Gita also stated that she wanted to speak with Sona Spencer, Chief Legal Talent Officer. Jennifer said she will speak with Sona first to give her some context and then circle back with Gita as to what Sona could offer her.  Jennifer spoke with Sona and Sona clarified what the next steps could possibly be and suggested that Gita should reach out to the HR Manager of her practice group.

Jennifer also shared that her and Gita talked a lot about race.  Jennifer said to Gita, "at best, maybe Matt is just a jerk and that's the way he talks to people and even for her as a white woman would be emotional if she received an email like that. And at worst, maybe he's racist, who knows!"

161935778v4

CONFIDENTIAL & SUBJECT TO PROTECTIVE ORDER

Troutman_00000772

**Attachment G – INTERVIEW NOTES – September 14, 2023, with Ashante Smith, Diversity, Equity & Inclusion Partner.**

I met with Ashante Smith via Microsoft Teams video on Thursday, September 14, 2023. I introduced myself and my role with the firm and explained some concerns had been raised regarding Gita Sankano and Matt Bowsher. I advised Ashante that my goal was to be objective and fair in my review and to hear all sides of the events that occurred. We reviewed confidentiality and proceeded with the conversation.

Questions asked include:

1) It is my understanding that you had a conversation with Gita Sankano regarding a recent incident between her and a partner within her practice group. Can you walk me through that conversation?

2) Is there anything else that would be helpful for me to know as I continue to review the facts?

I thanked Ashante for her time and let her know that I would be in touch if I had any follow up questions and that if she thought of anything that would be helpful to please reach out. I then stated that our conversation was to remain confidential and should not be discussed with others. Ashante understood.

**Summary of Interview:**

Ashante shared that she and Gita had conversations on August 3rd related to the initial email between Gita and Matt regarding a brief response Matt sent to on a new matter follow up request.  Gita sent Ashante a text message and asked if they could have a conversation and sent the email to Ashante to discuss.

Ashante stated that most of the conversation was Gita feeling like this was a gotcha moment from Matt.  Ashante stated to Gita that she gets how the email could have made her feel but this isn't a huge substantive thing. Ashante and Gita discussed the practice point on what to do next and not let this ruin the rest of her day. Ashante stated it's a little thing to point out and make a big deal about but she can also understand Gita's frustration because Matt and Gita had instances like this in the past where Matt would question Gita in a way that could be viewed as unprofessional. Ashante shared that she understands the dynamics between a partner and an associate and how it can a power dynamic that makes that makes one have extra emotional anxiety about things. Ashante has had previous conversation with Gita where Ashante has tried to temper that kind of emotional anxiety and help Gita work out what might be personal to her and what just might be Matt's personal style.

Ashante has known Matt for almost 20 years and worked with Matt in the past and know that that is just a style Matt has had but not one that she agrees with.

161935778v4

Troutman_00000773

After her conversation with Gita, Ashante went to Brian Iwashyna, and Brian's initial response was that he didn't think Matt and Gita work together. Brian wanted to Ashante to forward the email to him but before Ashante could leave Brian's office, Matt had forwarded him the message.

Ashante shared that Gita felt there was an element of prejudice and racism that underlies his messages. Ashante informed Gita that she cannot say nor is it her place to say whether or not that's the case. Ashante's conversation with Gita lasted about 30 minutes.

Gita and Ashante had another conversation where Gita continued to voice her frustrations about the entire situation and how regardless of what it is, if it's racism, poor professional conduct, or if it's he doesn't respect her for any other reasons, Gita stated that she wasn't willing to deal with it.

Gita sent her response to Matt and copied a number of partners on that response. Ashante had followed up discussions with Gita and tried to wait for additional discussions to happen between Brian and Matt and is unsure whether or not those discussions took place. When checking with Gita, Gita had not received a response from anyone on how things were playing out and Gita shared that she had had conversations with her coach and let Ashante know that it was being elevated and later let Ashante know that she was filing a formal HR complaint.

Ashante wanted to have a conversation with Matt because she knows personally, this isn't the first time Matt has heard that the colorful language isn't serving him on anything and has been told to stop. But once she knew the matter was being escalated, she decided it wasn't best to have that conversation with Matt. Ashante has had conversations with Brian Iwashyna regarding Matt's tone and said that we wouldn't train an associate to communicate in that way and there has been a lack of changed behavior from Matt.

Ashante mentioned that this most recent incident did harken back to where there was an incident where there was an email exchange regarding an opinion letter issue and Matt had flagged some questions and Gita answered them and she actually turned out to be right. It was another incident where Matt seemingly questioned her intelligence but yet, admitted that he was wrong.

Gita mentioned to Ashante that one of her concerns was that she received less than favorable feedback in her review from Matt but also it was new to her. Gita indicated that she would close his deals and Matt will tell her good job but when it comes to review time, Matt gives feedback that was never disclosed to Gita. Gita took the initiative to have a sit-down conversation with Matt and to ask that he give her feedback in real time so she won't get surprised doing review time. Gita shared with Ashante that since that point, that Matt felt challenged with her making that request from him.

Ashante shared, in her opinion, Matt's email was very unprofessional and Multifamily Housing group is working on a team wide effective communication training.

161935778v4

**Attachment H – INTERVIEW NOTES – September 19, 2023, with Blair Schiff, Professional Development Partner.**

I met with Blair via Microsoft Teams call on Tuesday, September 19, 2023. I explained some concerns had been raised regarding Gita Sankano and Matt Bowsher. I advised Blair that my goal was to be objective and fair in my review and to hear all sides of the events that occurred. We reviewed confidentiality and proceeded with the conversation.

Questions asked include:

1) It is my understanding that you had a conversation with Gita Sankano regarding a recent incident between her and a partner within her practice group. Can you walk me through that conversation?

2) During the associate review cycle, you had a discussion with Gita regarding the feedback received on her evaluation. Can you walk me through that conversation?

3) Is there anything else that would be helpful for me to know as I continue to review the facts?

I thanked Blair for his time and stated that our conversation was to remain confidential and should not be discussed with others. Blair understood.

**Summary of Interview:**

Blair stated that Gita reached out to him regarding Matt Bowsher's email to her and she was upset.  He stated that she was most upset with the tone in the email and feeling like she was being insulted by Matt.  Blair told her that he didn't think Matt was trying to be insulting towards her but can completely understand why she may think that way.  Blair did state that she will have to work with Matt and strongly suggested to her to have an in-person conversation with Matt, not over email.  Blair offered to sit in on that conversation with her when she speaks to Matt and also offered if she wanted Brian Iwashyna to come to DC to be a part of that conversation. Gita declined.

About an hour after their conversation, Gita sent Matt a response email and Blair hadn't heard anything further regarding the incident and thought the matter was resolved..

As far as the evaluation feedback, Gita's ADC reviews from last year were generally all positive, not superstar performance but middle of the road and doing okay, per Blair, which was before the email with Matt.

Blair shared that he has heard grumblings that there was a concern that there was a ceiling on Gita's performance as she becomes more senior and that some think she is rapidly approaching that ceiling.  Blair also made mention that those concerns had not been expressed directly to him and was not in submitted in Gita's evaluations.

161935778v4

**Attachment I – INTERVIEW NOTES – September 19, 2023, with Nora Garcia Nickel, Professional Development Partner**

I met with Nora via a telephone call on Tuesday, September 19, 2023. I explained some concerns had been raised regarding Gita Sankano and Matt Bowsher. I advised Nora that my goal was to be objective and fair in my review and to hear all sides of the events that occurred. We reviewed confidentiality and proceeded with the conversation.

Questions asked include:

1) It is my understanding that you had a conversation with Gita Sankano regarding a recent incident between her and a partner within her practice group. Can you walk me through that conversation?

2) During the associate review cycle, you had a discussion with Gita regarding the feedback received on her evaluation. Can you walk me through that conversation?

3) Is there anything else that would be helpful for me to know as I continue to review the facts?

I thanked Nora for her time and stated that our conversation was to remain confidential and should not be discussed with others. Nora understood.

**Summary of Interview:**

Nora was out on vacation when she saw the August 3rd email in which Gita had forwarded to her and had planned on following up with them post their discussion and had not done so.

In reference to Gita's performance, Nora shared that Gita had been informed on multiple occasions that she needed to slow down and process the information given to her.  Nora thinks Matt had indicated on his review about Gita's performance from last year and had been "very blunt". Multiple attorneys had conversations with Gita indicating she is fine doing routine type of deals, but anything out of the box that requires additional more detailed legal analysis, Gita falls short.  Nora has tried to pair Gita up with different attorneys to work with to see if there is a different fit that may work out for all parties.

Gita is super responsive and eager to want to help but the work product sometimes doesn't come through.

Nora also shared that even before Matt was recruited as a partner of the firm, Matt used to work at Freddie Mac and he has a special type of style that he applies to everyone and has been like this "forever".  Nora stated that although she would not have responded that way, Matt's response did not surprise her. Nora shared that when Matt worked at Freddie Mac and she had to work on the other side, she would receive a 20-page response from Matt chewing her out.

161935778v4

Troutman_00000776

There has been issues with partners of not being forthright in writing during evaluations. In October, the Multifamily Housing team will have a lunch and learn regarding effective communication and feedback for October.

**Attachment J – INTERVIEW NOTES – September 28, 2023, with Whitney Loughran, Associate**

I met with Whitney via Microsoft Teams on Thursday, September 28, 2023. I explained some concerns had been raised regarding Gita Sankano and Matt Bowsher and that her name was mentioned as someone Gita had spoken to regarding this concern. We reviewed confidentiality and proceeded with the conversation.

Questions asked include:

1) It is my understanding that you had a conversation with Gita Sankano regarding a recent incident between her and a partner within her practice group. Can you walk me through that conversation?

2) You stated that you had your own personal run-ins with Matt, can you elaborate on that?

3) Is there anything else that would be helpful for me to know as I continue to review the facts?

I thanked Whitney for her time and stated that our conversation was to remain confidential and should not be discussed with others. Whitney understood.

**Summary of Interview:**

Whitney shared that Gita did speak with her about the most recent interaction she had with Matt via email. Over the course of the last few years, Whitney shared with me that she had assisted Gita in navigating through certain instances with Matt that has come across to Whitney and Gita as forms of microaggression. One situation that Whitney pointed out was in reference to an opinion letter in which Gita was reviewing the opinion for a deal she was working on with Matt.  One of Gita's comments Matt disagreed with and sent Gita a long-winded email telling Gita she was wrong, and that he expected her to know more for however long she's been with the firm. When Whitney looked at the email after Gita forwarded it to her, Whitney saw that Matt was wrong with what he was telling Gita.  Whitney drafted a response for Gita to send to Matt.  Whitney stated that regarding this incident, she had conversations with Gita and other partners in the group that she didn't understand the response on Matt's part, his tone, or the words that he chose to use. Due to Matt's tone and microaggression behavior towards Gita, Whitney's personal feeling is that Matt just doesn't like Gita but his dislike of her shouldn't come out as detrimental to Gita because of that.

Regarding the August 3rd email, Gita did forward that email to Whitney and was very upset. Whitney said the email was egregious and thought it showed an escalation of the microaggressions Gita has been experiencing from Matt.  Whitney shared that she and Gita had also talked about the prior review process and Matts comments. Whitney advised Gita to use this as an opportunity to go and talk to Matt about his feedback since, per Gita, Matt never

161935778v4

shared this information prior to the review and Gita took Whitney's advice and spoke to Matt. Whitney's perspective is that Matt felt slighted by Gita approaching Matt regarding his feedback in her review and used this as an opportunity to give Gita the real time feedback she asked for.

Whitney told Gita this is her career, and she needed to do whatever she felt most comfortable with in terms of reporting or talking to someone about this incident. Gita informed Whitney that she reached out to some of the leadership in the group and no one never got back to her and so she moved forward with filing an HR complaint. Whitney said she did not advise Gita one way or another on what to do but do know that Gita was very upset by the situation to the point it was affecting her work such that she needed to tell the other partners what was going on because she was so emotional, angry, and hurt.

Whitney shared that she has had her own run-ins with Matt. She stated that after her last situation/interaction with Matt, she did not feel comfortable working with him anymore and chose not to, with Brian Iwashyna's approval. In 2021, Whitney shared she was days away from going out on maternity leave, Matt called and asked if Whitney can take on a new deal with a lender she had worked with previously. Whitney took the deal and let Matt know that she has coverage once she starts maternity leave for a smooth transition of work and to see the deal through. Whitney starts working on the deal and keeping her colleague in the loop, Matt sends a very angry email to Whitney and her colleague stating that he doesn't see why he is getting cut out of his own deal because he hadn't seen any correspondence and Whitney said Matt was angry. Whitney went on to say that in that same email Matt says that he knows that Whitney may have a lot on her mind, and he was trying to be sincere, empathetic, and compassionate and that made Whitney really angry. A year prior to this incident, Whitney experienced a personal traumatic situation which the group new about. A very short time later, Whitney was with child and kept her pregnancy very private with only a handful of people knowing that she was expecting. Matt was not among those people who knew and she's unsure how he found out. Matts comments in the above incident from 2021 Whitney felt like his comments were being weaponized against her. At the time of this incident, Whitney was a 5th or 6th year associate and didn't need partner oversight on her deals or work and she said Matt's email made it seem like she was dropping the ball. Whitney sent a very professional email back to Matt explaining the situation, she removed herself from the deal and any other deals that came out of that relationship, and she told Brian Iwashyna that she will not do another deal with Matt and haven't. Brian understood Whitney's decision and received no pushback. Whitney shared that her decision not to work with Matt anymore didn't seem to be a negative one for her. She was more senior and had proven her ability to handle the circumstances of the job.

Whitney stated that her role in the moment was to support Gita and validate Gita's feelings and how that interaction made her feel and Gita's desire to move forward and remain professional.

161935778v4

**Attachment K – INTERVIEW NOTES – September 28, 2023, with Kelly Mufarrige, Associate**

I met with Kelly via Microsoft Teams on Thursday, September 28, 2023. I explained some concerns had been raised regarding Gita Sankano and Matt Bowsher and that her name was mentioned as someone Gita had spoken to regarding this concern. We reviewed confidentiality and proceeded with the conversation.

Questions asked include:

1) It is my understanding that you had a conversation with Gita Sankano regarding a recent incident between her and a partner within her practice group. Can you walk me through that conversation?

2) In your conversation with Gita, was racial bias ever mentioned?

3) Is there anything else that would be helpful for me to know as I continue to review the facts?

I thanked Kelly for her time and stated that our conversation was to remain confidential and should not be discussed with others. Kelly understood.

**Summary of Interview:**

Kelly shared some background that Gita had worked on a couple of deals with she and Matt, and that Matt and Gita just don't get along. Kelly stated Matt is a critical partner and is not a person who will say great job if the work isn't perfect. Gita had made some mistakes on Matt's deals and that feedback was submitted in Gita's year-end review. Gita was very unhappy about that and had reached out to Matt and expressed that she wanted feedback in real time when something came up. Gita shared with Kelly that it wasn't fair that that information was now in her year-end review, and it hadn't been relayed to her in real time when it was happening.  Kelly's understanding is that Matt was making point to provide feedback in real time if Gita made a mistake on something.

Kelly's understanding was that Matt and Gita were trying to open a new matter.  There was some confusion between what Gita was emailing to the person who opens the matter and that Matt emailed Gita and told her she was the person causing the confusion. Kelly thinks that's where the email exchange needed to stop.  But Matt took it a step further and said to Gita, you asked me to provide you feedback in real-time and I'm taking the time to provide this feedback in real-time and these are the types of things that he shouldn't have to explain to a 4th year associate. Gita said to Kelly that she felt like that email was a personal attack against her.

161935778v4

Troutman_00000779

Gita came into Kelly's office on that Monday crying and very upset and felt like Matt singles her out. Kelly tried to explain to Gita that she doesn't think that's true and that anyone could pull a thousand emails from Matt to Tom Scopolitis and they're just as critical. Matt is not warm and fuzzy. Kelly did try to explain to Gita that she thought the second part of Matt's email wasn't necessary, but she truly doesn't think it had to do with Gita personally.

Kelly shared that some associates in the Multifamily Housing group feel like they are not getting any feedback while others feel like they are getting critical feedback that's not productive and more of I'm annoyed or mad at this moment.

Kelly said she just tried to be a sounding board for Gita. She also shared that one thing that is hard about Gita is that she has a hard time seeing her role or her part of a situation which can make it hard to have a productive conversation with her. Kelly continued that if a person doesn't want to hear or see anything critical about themselves it's hard to explain where Matt might have been coming from. Gita said to Kelly that she didn't do anything wrong, and Matt just decided to attack her, and Kelly thinks that couldn't be further from the truth. Kelly stated that Gita did say the wrong thing in the email.

Kelly stated that she 100% thinks that Gita feels it was racial bias towards her from Matt. Kelly shared that there is nothing that Matt has said or done that she has seen that supports that he is being racially biased towards Gita. Kelly thinks that Matt may feel Gita doesn't do good work, that he may feel like she is continuing to be a part of the group and skirt along even though she doesn't do good work or he may feel he'll take it upon himself to point out every time she does something wrong since no one else is being critical of her work.

Kelly said the last thing she want is for Gita to feel uncomfortable or unhappy in the group and certainly would never want her to feel that her race had anything to do with certain feedback or criticism that she had receive or will receive. Kelly is hopeful that this could be resolved.

161935778v4

CONFIDENTIAL & SUBJECT TO PROTECTIVE ORDER

**Attachment L – INTERVIEW NOTES – September 29, 2023, with Ari Ebi, Associate**

I met with Ari via Microsoft Teams on Friday, September 29, 2023. I explained some concerns had been raised regarding Gita Sankano and Matt Bowsher and that his name was mentioned as someone Gita had spoken to regarding this concern. We reviewed confidentiality and proceeded with the conversation.

Questions asked include:

1) It is my understanding that you had a conversation with Gita Sankano regarding a recent incident between her and a partner within her practice group. Can you walk me through that conversation?

2) In your conversation with Gita, was racial bias ever mentioned?

3) Is there anything else that would be helpful for me to know as I continue to review the facts?

I thanked Ari for his time and stated that our conversation was to remain confidential and should not be discussed with others. Ari understood.

**Summary of Interview:**

Ari shared that Gita came to him very upset after sending him the email. Gita mentioned she have had difficulties working with Matt due to their working styles and personalities doesn't really mesh. Ari recalls the August 3rd email had something to do about a matter being opened and there was a mistake, and it wasn't something that Gita had done but a mistake on the behalf of the people who are responsible for opening the matter for Multifamily. Gita had contacted the people to explain and try to correct the mistake and then she received an email from Matt that was long and the tone of it was not very kind. Gita shared with Ari that she felt like Matt was singling her out because of their history of not working well together.

Ari stated that Gita did bring up the fact that she feels that she's treated differently and held at different standards because she's a black woman and because of her accent.

Gita also shared with Ari that she spoke to her career coach about the August 3rd email and that after reading the email, her career coach stated that Matt's response in the email was racist. Ari shared that he didn't read the email that way and let Gita know that he's supportive of her and her development in the group.

Ari described Matt's personality as very abrasive, and it often comes across in emails. He's direct to a fault, whether it's with others in our group or opposing counsel. Ari doesn't think Gita was targeted personally.

161935778v4

**Attachment M – Email from Matt Bowsher to the DC Multifamily Housing Team – October 9, 2023**

**From:** Bowsher, Matthew R. <Matthew.Bowsher@troutman.com>
**Sent:** Monday, October 9, 2023 3:32 PM
**To:** Campbell, McKenna J. <McKenna.Campbell@troutman.com>; Blanchard, Michael L. <Michael.Blanchard@troutman.com>; Crawford, Lindsey <Lindsey.Crawford@troutman.com>; Duckworth, Amanda Gilmore <Amanda.Duckworth@troutman.com>; Ebi, Ari M. <Ari.Ebi@troutman.com>; Echard, Taylor <Taylor.Echard@troutman.com>; Ehudin, Zack S. <Zack.Ehudin@troutman.com>; Ernst, Kristen <kristen.ernst@troutman.com>; Fireison, Scott <Scott.Fireison@Troutman.com>; Gershen, Alexander E. <Alexander.Gershen@troutman.com>; Gesang, Drolma <Drolma.Gesang@troutman.com>; Hemnani, Vishal M. <Vishal.Hemnani@troutman.com>; Hurlburt, Randall <Randall.Hurlburt@troutman.com>; Koester, Lauren E. <Lauren.Koester@troutman.com>; Krugovykh, Alina <Alina.Krugovykh@troutman.com>; Liu, Henry <Henry.Liu@troutman.com>; Mufarrige, Kelly A. <Kelly.Mufarrige@troutman.com>; Nabozny, Samson R. <Samson.Nabozny@troutman.com>; Popoola, Lanre <Lanre.Popoola@troutman.com>; Rivers, Dameon M. <Dameon.Rivers@troutman.com>; Sankano, Gita F. <Gita.Sankano@troutman.com>; Schaefer, Ellis <Ellis.Schaefer@troutman.com>; Schiff, Blair L. <Blair.Schiff@Troutman.com>; Sidarth, S.R. <SR.Sidarth@troutman.com>; Song, HG <HG.Song@troutman.com>; Sullivan, Cristina M. <Cristina.Sullivan@troutman.com>; Waldmann, Christine <Christine.Waldmann@Troutman.com>; Yozzi, Adriana <Adriana.Yozzi@troutman.com>
**Subject:** RE: 10/16 L&L Lunch Count -- *** RSVP OR YOU DON'T GET LUNCH ***


Allow me to be more blunt than McKenna:  It's really annoying when folks can't seem to take 5 seconds to send an RSVP, yet they still show-up at a function and take a lunch from someone who did.  This has happened at least twice in the past couple months, and it's not cool, because on these lunch-and-learns we are only ordering lunches for people who RSVP, these are not the type of splashy corporate events where there's a boatload of food for an indeterminate hoard of people, 60% of which ends up in the trash.  That's why the subject line says "Lunch Count"'; we need an exact number.


Thanks.


Matt


161935778v4

**Matthew R. Bowsher**
**Partner**
troutman **pepper**
Office: 202.274.1939 | Mobile: 301.512.0423
matthew.bowsher@troutman.com

**From:** Campbell, McKenna J. <McKenna.Campbell@troutman.com>
**Sent:** Monday, October 9, 2023 2:05 PM
**To:** Blanchard, Michael L. <Michael.Blanchard@troutman.com>; Bowsher, Matthew R. <Matthew.Bowsher@troutman.com>; Crawford, Lindsey <Lindsey.Crawford@troutman.com>; Duckworth, Amanda Gilmore <Amanda.Duckworth@troutman.com>; Ebi, Ari M. <Ari.Ebi@troutman.com>; Echard, Taylor <Taylor.Echard@troutman.com>; Ehudin, Zack S. <Zack.Ehudin@troutman.com>; Ernst, Kristen <kristen.ernst@troutman.com>; Fireison, Scott <Scott.Fireison@Troutman.com>; Gershen, Alexander E. <Alexander.Gershen@troutman.com>; Gesang, Drolma <Drolma.Gesang@troutman.com>; Hemnani, Vishal M. <Vishal.Hemnani@troutman.com>; Hurlburt, Randall <Randall.Hurlburt@troutman.com>; Koester, Lauren E. <Lauren.Koester@troutman.com>; Krugovykh, Alina <Alina.Krugovykh@troutman.com>; Liu, Henry <Henry.Liu@troutman.com>; Mufarrige, Kelly A. <Kelly.Mufarrige@troutman.com>; Nabozny, Samson R. <Samson.Nabozny@troutman.com>; Popoola, Lanre <Lanre.Popoola@troutman.com>; Rivers, Dameon M. <Dameon.Rivers@troutman.com>; Sankano, Gita F. <Gita.Sankano@troutman.com>; Schaefer, Ellis <Ellis.Schaefer@troutman.com>; Schiff, Blair L. <Blair.Schiff@Troutman.com>; Sidarth, S.R. <SR.Sidarth@troutman.com>; Song, HG <HG.Song@troutman.com>; Sullivan, Cristina M. <Cristina.Sullivan@troutman.com>; Waldmann, Christine <Christine.Waldmann@Troutman.com>; Yozzi, Adriana <Adriana.Yozzi@troutman.com>
**Subject:** 10/16 L&L Lunch Count

Good afternoon all,

In preparation for Wednesday's Lunch & Learn session, below is the list of "yes" RSVP's I received.  If you are planning to attend and do not see your name on this list, please send me an email by EOD and I'll have you added for the lunch count.  Thanks!

| |
|---|
| Schiff, Blair |
| Bowsher, Matt |
| Mufarrige, Kelly |
| Ehudin, Zack |
| Krugovykh, Alina |
| Hemnani, Vishal |

161935778v4

CONFIDENTIAL & SUBJECT TO PROTECTIVE ORDER

| |
|---|
| Sidarth, SR |
| Liu, Henry |
| Nabozny, Samson |
| Schaefer, Ellis |
| Ernst, Kristen |
| Gesang, Drolma |
| Crawford, Lindsey |
| Yerhot, Laura |
| Sankano, Gita |
| Song, HG |

**McKenna J. Campbell**
**Administrative Coordinator**
Direct: 804.697.1301
mckenna.campbell@troutman.com
Pronouns: she, her, hers

troutman **pepper**

1001 Haxall Point, Suite 1500
Richmond, VA 23219
troutman.com

Troutman Pepper is a Mansfield Certified Plus Firm

161935778v4

CONFIDENTIAL & SUBJECT TO PROTECTIVE ORDER

**Attachment N – Summary of Conversation between Ashley Hager, Professional Development Partner and Matt Bowsher, Partner – October 13, 2023**

Ashley shared that Matt was not happy and surprised by Gita's accusation of racial bias. Matt informed Ashley that he really tried to help Gita by meeting with her every Tuesday morning for 45 minutes to train her on how to do Multifamily Housing work. Something he has never done before with any other associate as he typically does not work with junior associates.

Matt stated that he was told that when giving feedback to also provide examples, which he did, when he submitted feedback in Gita's 2022 review period. One example Matt provided was when Gita sent an email with three major mistakes in it. She attached the wrong borrower's information to an email that was sent to another borrower – confidential information. Matt said he specifically chose an example that he had previously brought to Gita's attention so she wouldn't be blind-sided but Gita still comes out of the review upset at his feedback. Matt shared that he rated Gita 4's and 5's and some 3's, and Gita don't only get to hear the good stuff.

Matt wanted things to work out with Gita, but her work product just wasn't very good. Matt also shared that Gita's communication is jibberish. Not because of her accent but because she was using verbs as nouns and her communication just wasn't clear.

Ashley shared with Matt, on screen, the August 3rd, May 4, 2022, and May 3, 2022, emails that Gita provided. Matt took ownership that his August 3rd email and was apologetic and admitted that he was harsher than he should have been, and his response was out of frustration. In the May emails, Matt didn't feel he stated anything wrong. He was trying to get Gita to think like a 4th year associate and think back over the past year and think "have I done it this way" and pull other deals to see if it was done. Matt also pointed out that he complimented Gita on pointing that what the opposing counsel was asking was done before.

Ashley stated to Matt that the investigation has concluded, and we substantiated that the emails were harsh, but we did not find any evidence that it was because of her race. Ashley advised Matt

Defendants' Privilege

# Defendants' Privilege

Matt stated if the firm wanted to send him to a communication course, he would be open to it and he's open to trying to change and he will not retaliate.

161935778v4