**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

GITA F. SANKANO,

       **Plaintiff,**

       **v.**

TROUTMAN PEPPER HAMILTON
SANDERS LLP AND BRIAN IWASHYNA,

       **Defendants.**

**Case No. 1:24-cv-00142-JMC**

## DEFENDANTS' REPLY BRIEF IN FURTHER SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

Defendants Troutman Pepper Hamilton Sanders LLP ("Troutman")[1] and Brian Iwashyna ("Mr. Iwashyna") (together, "Defendants") respectfully file their Reply Brief in Further Support of their Motion for Summary Judgment ("MSJ") on all claims asserted by Plaintiff Gita Sankano ("Plaintiff" or "Ms. Sankano").

Plaintiff's brief in opposition to Defendants' Motion for Summary Judgment ("Opp'n") fails to point to evidence sufficient to create a genuine issue of material fact on any of her claims against Troutman or Mr. Iwashyna. In fact, Plaintiff actually admits a number of material facts that are fatal to her claims and fails to produce record evidence that disproves the facts she does try to dispute. Faced with no actual evidence to dispute Defendants' undisputed material facts, Plaintiff resorts to mischaracterizations of testimony, references to immaterial facts, and misapplication of case law to support her case. These tactics are simply insufficient to withstand summary judgment. Because Plaintiff has not identified any material facts that are disputed by competent record evidence, summary judgment should be entered for Defendants on all of Plaintiff's claims of race discrimination, hostile work environment, and retaliation under the Civil Rights Act of 1866, 42 U.S.C. § 1981 ("Section 1981"), the D.C. Human Rights Act (the "DCHRA"), D.C. Code § 2-1401.01 *et seq.* and Title VII of the Civil Rights Act of 1964 ("Title VII").

## ARGUMENT

**A.      <u>Plaintiff's Race Discrimination Claims Should Be Dismissed as a Matter of Law</u>**

In their MSJ, Defendants outlined the three sets of factual allegations upon which Plaintiff bases her race discrimination claims: (1) Christine Carmody's instruction to Plaintiff regarding her timekeeping, (2) Matt Bowsher's comments to Ms. Sankano in a telephone call and emails, and (3) Mr. Iwashyna's termination of her employment. (MSJ 10-28) Plaintiff's response confirms

---

[1] Effective January 1, 2025, Troutman's name changed to "Troutman Pepper Locke LLP."

1

that there is no genuine issue of material fact concerning any of these allegations, and judgment is

required as a matter of law on Plaintiff's race discrimination claims.

**1.      Plaintiff Has Produced No Evidence Ms. Carmody's Timekeeping Instructions to Plaintiff Were Racially Discriminatory**

Ms. Sankano's claim of race discrimination by Ms. Carmody fails as a matter of law

because (a) Plaintiff fails to refute Ms. Carmody's stated reasons for her timekeeping instructions,

and (b) Plaintiff does not cite any evidence that those reasons were a pretext for race discrimination

under Section 1981.[2]

**a.      Plaintiff Cannot Disprove Ms. Carmody's Reasons for Her Timekeeping Instructions**

In their MSJ, Defendants demonstrated that Ms. Carmody had three legitimate, non-

discriminatory reasons for asking to review Ms. Sankano's time before it was entered into the

system and moving some time to a non-billable number.  (MSJ 12)  Ms. Sankano disagrees with

Ms. Carmody's three reasons for her timekeeping instructions, but Ms. Sankano failed to point to

any evidence that actually creates a genuine dispute relating to Ms. Carmody's testimony.

First, Ms. Carmody testified that she believed she was responsible for training Ms. Sankano

on timekeeping and billing practices because Ms. Sankano was a new associate (coming from a

judicial clerkship) who did not have experience in these practices.  (MSJ 12; SUMF ¶14)  Ms.

Sankano challenges this reason by arguing that she had prior experience working at a boutique law

firm where she was "exposed to billing and timekeeping practices."  (Opp'n 28, emphasis added)

Tellingly, however, Plaintiff does not testify that she actually had personal experience tracking

billable time for clients, much less experience recording her time in a manner similar to the process

that Pepper Hamilton used.  (*See* Pl. Ex. 60 at ¶3)  More importantly, Ms. Sankano offers no

---

[2] Plaintiff concedes that her claims that Ms. Carmody discriminated against her because of her race in violation of Title VII and the DCHRA are time-barred.  (Opp'n 32)

evidence to rebut Ms. Carmody's belief that Ms. Sankano was inexperienced in timekeeping and billing practices.[3] *See Vatel v. Alliance of Auto. Mfrs.*, 627 F.3d 1245, 1247 (D.C. Cir. 2011) ("It is settled that 'it is the perception of the decision maker, which is relevant, not the self-assessment of the plaintiff.'") (quoting *Hawkins v. PepsiCo, Inc.*, 203 F.3d 274, 280 (4th Cir. 2000)).

Second, Ms. Carmody explained that another reason she asked to review Ms. Sankano's time was because she believed it was her responsibility to supervise this new associate's work, and reviewing time would allow Ms. Carmody to provide feedback to Ms. Sankano and balance her workload. (MSJ 12; SUMF ¶15) Ms. Sankano tries to argue that whether Ms. Carmody actually supervised her is a question of fact (Opp. at 29), but then admits that it was Ms. Carmody's job to supervise Plaintiff.[4] (Pl.'s Resp. to SUMF ¶¶9, 15; Pl. Dep. 71:17-19.) Again, however, the critical question is whether Ms. Carmody believed that she was responsible for supervising Ms. Sankano's work. (SUMF ¶15) Ms. Sankano does not and cannot present evidence to dispute this fact, and Ms. Carmody's testimony therefore stands undisputed.

Third, Ms. Carmody testified that she asked to review Ms. Sankano's time before it was entered because she believed that clients should not be billed for all of the time Ms. Sankano worked on a matter, since Ms. Sankano, as a junior attorney, was not very efficient. (SUMF ¶¶16-17) Ms. Sankano debates Ms. Carmody's assessment of her efficiency and the appropriateness of

---

[3] Ms. Sankano contends that Defendants failed to explain "how or why timekeeping and billing, of all things, was of such complexity or difficulty that Plaintiff was unable to enter time the same as every other non-Black associate" (Opp. at 30), but this too misses the mark. The Court need not decide whether Ms. Carmody's explanations for her timekeeping and billing instructions were "wise, fair or correct." *Kelly v. Mills*, 677 F.Supp.2d 206, 228-29 (D.D.C. 2010). Rather, the Court must determine only whether Ms. Carmody "honestly believed" the reasons she articulated for her instructions and that Ms. Carmody "acted in good faith upon those beliefs." *Id*. That Ms. Sankano did not think timekeeping or billing was a complex or difficult task warranting oversight is again irrelevant.

[4] Ms. Sankano erroneously states that Henry Liu was the managing partner of the firm (Opp. at 29), when he was only the managing partner of the firm's Washington D.C. office. (Liu Decl. ¶4) But regardless of his title, Ms. Sankano cited no evidence that Mr. Liu supervised her work.

billing a client for an associate's lack of experience, but she offers <u>no</u> evidence in support of her position. (Opp'n 30; Pl. Resp. to SUMF ¶¶16-17)

Accordingly, because Ms. Sankano cannot show a genuine issue of material fact as to Ms. Carmody's beliefs regarding Ms. Sankano's lack of timekeeping experience, Ms. Carmody's supervisory responsibilities, and Ms. Sankano's inefficiency as a brand-new associate, all of the reasons proffered for Ms. Carmody's timekeeping instruction stand undisputed.

**b.    Plaintiff Has Failed to Produce Any Evidence of Pretext**

Plaintiff's race discrimination claim with respect to Ms. Carmody also fails because she cannot show pretext. Ms. Sankano argues that Ms. Carmody's stated reasons for her timekeeping instruction were pretexts for race discrimination because Ms. Carmody did not require two white male first-year associates – Randall Hurlburt and Blair Schiff – to submit their time to her for review before it was entered. (Opp'n 28-30) This argument fails because it focuses exclusively on the fact that Mr. Hurlburt and Mr. Schiff were treated differently, but Ms. Sankano produces <u>no</u> evidence that they were similarly situated to her, such that they should be treated the same.

It is undisputed that when Ms. Sankano worked for Ms. Carmody, she was a first-year associate with no prior experience in practicing law in financial services or in timekeeping at Pepper Hamilton. (SUMF ¶9) In contrast, when Mr. Hurlburt was a first-year associate working for Ms. Carmody, Ms. Carmody knew he had prior experience with both financial services work and with Pepper Hamilton's timekeeping practices, because he had previously worked at Pepper Hamilton as a law clerk in the Financial Services practice group, prior to attending law school. (SUMF ¶12) That is why Ms. Carmody testified that she believed she did not need to review Mr. Hurlburt's time before it was entered.[5] (Carmody Decl. ¶20; SUMF ¶¶ 10-12) Mr. Schiff also

---

[5] Ms. Carmody worked in the same practice group as Mr. Hurlburt (*i.e.*, the Financial Services practice group) (SUMF ¶12; Carmody Decl. ¶¶4, 20), so she was aware of Mr. Hurlburt's prior experience.

worked for Ms. Carmody as a first-year associate (Pl.'s Stmt. of Add'l Material Facts ("PSAMF") ¶310), but Ms. Carmody did not require Mr. Schiff to submit his time to her for review because (1) Ms. Carmody was not responsible for supervising and training Mr. Schiff (because a more senior partner, who was in charge of the practice group, had that responsibility); and Mr. Schiff was working for a number of partners, not just for Ms. Carmody; and (2) Ms. Carmody knew that Mr. Schiff had previous experience working for the Financial Services practice group as a law clerk timekeeper, and as a result he was more efficient and was familiar with timekeeping practices at Pepper Hamilton and what should be billed to a client.  (Def. Resp. to PSAMF ¶310, Ex. A)

Ms. Sankano's mere reliance on buzzwords in her argument that Ms. Carmody's explanations are conclusory and self-serving (Opp'n 28-29) cannot be used to evade summary judgment.  Ms. Carmody's testimony is undisputed.  Because Ms. Sankano has produced <u>no</u> record evidence showing that Mr. Hurlburt or Mr. Schiff was similarly situated to her, Ms. Sankano's assertion of pretext fails as a matter of law.[6]

**2.    Plaintiff Does Not Present Any Evidence to Show That She Was Subjected to a Hostile Work Environment Because of Her Race**

Ms. Sankano contends that Defendants improperly limited the scope of her hostile work environment claims to four interactions she had with Mr. Bowsher over the span of two years, and asserts that her claims are based on "the full extent of the work environment she was subjected to for years."  (Opp'n 33, 40)  But Ms. Sankano's articulated basis for her hostile work environment claim is comprised only of (a) those four exchanges with Mr. Bowsher, (b) one comment that Mr. Iwashyna allegedly made to Whitney Loughran about Ms. Sankano in the spring of 2022, and (c)

---

[6] Ms. Sankano admits that Ms. Carmody is the person who decided to hire her and was aware of her race at the time of hiring.  (Pl. Resp. to SUMF ¶¶3, 5)  Ms. Sankano also contends that Ms. Carmody is the person who discriminated against her based on race "the entire time she worked exclusively for Ms. Carmody."  (Pl. Resp. to SUMF ¶13)  While Ms. Sankano argues that the "same actor" inference should not apply in this case, she does not explain <u>why</u> the concept should not apply to a claim of discriminatory treatment immediately after the employee is hired, just as it applies to a claim that the employee was discriminatorily terminated shortly after hiring.

a handful of allegations concerning other Black women who worked at the firm at various times, which had absolutely nothing to do with Ms. Sankano.  Even looking at the "totality" of these few interactions, there is simply no evidence that the conduct was sufficiently severe or pervasive (under Title VII and Section 1981) or frequent or explicit enough (under the DCHRA) to create an intimidating, hostile, or offensive work environment for Ms. Sankano.  Moreover, Ms. Sankano has not produced anything other than her speculation that any of the conduct about which she complains was based on her race.

### a. Mr. Bowsher's Comments Did Not Create a Hostile Work Environment

Ms. Sankano complains about four of her interactions with Mr. Bowsher over two years: (1) an early 2022 phone call regarding notaries; (2) email correspondence in April 2022 regarding opinion letter language; (3) email correspondence in May 2022 regarding local opinion requirements; and (4) email correspondence on August 3, 2023 regarding opening a new matter. (MSJ 19-62; Opp'n 33-39)  As Defendants previously explained (MSJ at 17-25), Ms. Sankano's allegations regarding these four interactions with Mr. Bowsher – whether viewed in totality or in isolation – do not create an abusive work environment under Title VII, Section 1981, or the DCHRA, and there is no evidence whatsoever that these interactions were based on race.

### (i) Plaintiff Failed to Show Mr. Bowsher's Comments Were Sufficiently Severe or Pervasive or Otherwise Created an Intimidating, Hostile, or Offensive Work Environment

Regarding the first interaction – the phone call with Mr. Bowsher explaining notaries – there is no genuine dispute of material fact about what occurred during the conversation.  (*See* SUMF ¶142-149)  At most, Mr. Bowsher explained something to Ms. Sankano that she claims she already knew, and then abruptly ended the phone call.  (Opp'n 34)  Ms. Sankano claims she later told Ms. Loughran that she felt the manner in which Mr. Bowsher was speaking to her was

"condescending and offensive" (*Id.*, PSAMF ¶313), but there is <u>no</u> record evidence whatsoever supporting that statement. (PSAMF ¶313 citing to Pl. Ex. 24, which does not address this conversation at all)  Moreover, Ms. Sankano admitted in her deposition that "she did not think anything of [the call]." (Pl. Dep. 187:3-4)  This interaction, whether viewed in isolation or with the other three incidents, is insufficient to create an abusive work environment, especially when Ms. Sankano admits that Mr. Bowsher never mentioned her race during the call and thanked her after the call. (Pl. Resp. to SUMF ¶¶147-148)

The remaining three interactions involving Mr. Bowsher all occurred via email, so there is no genuine dispute of material fact as to the content of the interactions. In the second interaction in April 2022, Mr. Bowsher asked Ms. Sankano whether she had seen the firm accept certain language before, and in the third interaction in May 2022, Mr. Bowsher erroneously told Ms. Sankano that local opinions were needed. (SUMF ¶¶150-160)  The fourth interaction with Mr. Bowsher occurred more than a year later in August 2023, and involved Mr. Bowsher criticizing Ms. Sankano for sending confusing emails to the Multifamily Housing Finance ("MFH") New Matters department about matter origination credits.  (SUMF ¶¶161-174)

Ms. Sankano's opposition to summary judgment is based solely on her subjective interpretation of each of these interactions, while completely disregarding an objective reading of the written correspondence.  Ms. Sankano characterizes the second and third interactions as "condescending" and/or "mansplaining" (Pl. Dep. 209:21-211:20, 190:3-7, 191:6-11) and the fourth interaction as an "escalation" of Mr. Bowsher's "hostile and offensive" and "racist" behavior.  (SUMF ¶¶161-180)  But a plain reading of the actual text belies her characterization. Subjective beliefs about Mr. Bowsher's communication style are insufficient alone to establish a hostile work environment claim, which has both *subjective* and *objective* components: the plaintiff

7

must rely on facts showing that she subjectively perceived the environment as hostile <u>and</u> that the environment is one "that a reasonable person would find hostile or abusive." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21-22 (1993). The objective component is sufficiently demanding to ensure that the law is not used to become a general civility code for the workplace. *See Dequan Lin v. Salazar*, 891 F.Supp.2d 49, 58-59 (D.D.C. 2012).

At most, in the course of working with Mr. Bowsher over several years, Ms. Sankano had a few unpleasant email exchanges with Mr. Bowsher that she thought were condescending or unduly critical. However, the evidence simply does not suggest that such conduct (which Plaintiff describes as "subtle" (Pl. Dep. 202:7-8)) permeated the workplace to create a "pervasive pattern of hostility and ridicule," as Ms. Sankano wishes the Court to believe. While Ms. Sankano may feel that she was "repeatedly subjected to blatant discriminatory animus by Mr. Bowsher," all while Mr. Iwashyna and other unspecified individuals allegedly allowed the conduct to become more volatile, the record evidence simply does not support these fanciful allegations. (Opp'n 41) Rather, the evidence shows a law firm partner providing feedback to an associate about her work product, which Ms. Sankano simply did not like to receive. (SUMF ¶¶142-180) Receiving work-related criticism is a normal workplace occurrence that courts consistently find cannot create a hostile work environment as a matter of law. *See Dequan Lin*, 891 F.Supp.2d at 59-60 (noting criticism about work performance, expressions of disapproval, and even pranks or non-collegial acts are "normal strains that can occur in any office setting"). In fact, even unwarranted criticism does not rise to the level of being hostile. *See Holmes-Martin v. Sebelius*, 693 F.Supp.2d 141, 164-67 (D.D.C. 2010). "A hostile work environment claim 'is not a cause of action for the ordinary tribulations of the workplace . . . and not everything that makes an employee unhappy is an

actionable adverse action.'" *Jones v. Bush*, 160 F.Supp.3d 325, 353 (D.D.C. 2016) (quoting *Baird v. Snowbarger*, 744 F. Supp. 2d 279, 295 (D.D.C. 2010)).

The cases cited by Ms. Sankano in support of her hostile work environment claim only further support Defendants' position that the conduct about which she complains simply does not rise to the level required under the law. For example, the facts in *Lively v. Flexible Packaging Ass'n*, 830 A. 2d 874 (D.C. 2003), are not at all similar to Ms. Sankano's allegations in this case. Notably, the plaintiff in *Lively* alleged overtly derogatory and offensive words used to describe and demean women over an extended period of time. *Id.* at 876-77. Ms. Sankano does not allege (or submit any evidence to show) that Mr. Bowsher ever used overt and derogatory words based on her race. Rather, Ms. Sankano improperly asks the Court to ignore Mr. Bowsher's undisputed testimony and then speculate about Mr. Bowsher's motive based entirely on Ms. Sankano's conjecture as to the meaning behind Mr. Bowsher's criticism and communication style.

The other case cited by Ms. Sankano is likewise inapplicable here. In *Pantazes v. Jackson*, the plaintiff alleged he was subjected to a hostile work environment through his employer's unwillingness to recognize his disabilities, refusal to accommodate him, denial of training, and imposition of a performance action plan. 366 F. Supp. 2d 57, 71 (D.D.C. 2005). Ms. Sankano's complaint has absolutely nothing in common with that case, thus making the *Pantazes* court's rationale and decision irrelevant to her claims.

In sum, Ms. Sankano cannot satisfy the demanding burden for proving a hostile work environment claim based on these four interactions with Mr. Bowsher over two years that were entirely appropriate in the work context.[7] *See Aldrich v. Burwell*, 197 F. Supp. 3d 124, 138 (D.D.C.

---

[7] Troutman is entitled to summary judgment on the hostile work environment claim for the additional reason that it launched an immediate investigation into Ms. Sankano's August 2023 complaint to HR and took prompt remedial action. (MSJ 26-27) Plaintiff tries to create a dispute by misrepresenting Mr. Bowsher's testimony regarding whether he was counseled following the investigation and ignoring Mr. Iwashyna's testimony on this point. (Def. Reply to

2016) ("[U]npleasant behavior by a supervisor is not of a piece with the discriminatory, insulting, and offensive conduct normally required of a hostile-environment claim."); *Stewart v. Evans*, 275 F. 3d, 1126, 1134 (D.C. Cir. 2002) ("[O]rdinary workplace complaints do not comprise the type of "conduct that is so extreme or abusive as to cause 'a change in the terms and conditions of employment.'"); *Buie v. Berrien*, 85 F. Supp. 3d 161, 180 (D.D.C. 2015) (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)) (noting that yelling and insults did not meet the threshold of severe and pervasive conduct to establish a hostile work environment); *Bereston v. UHS of Del., Inc.*, 180 A.3d 95, 113-14 (D.C. 2018) (indicating that allegations about being bullied, harassed, ridiculed, sabotaged, or humiliated may show work-related dissatisfaction, but do not evince the kind of severe and pervasive conduct that would create a hostile work environment).

    (ii)    <u>Plaintiff Failed to Show Mr. Bowsher's Comments Were Racially Motivated</u>

While Ms. Sankano relies upon the holding in *Bowdre v. Richardson*, 131 F. Supp. 2d 179 (D.D.C. 2001), to assert that harassment need not be racial in content to create a racially hostile work environment, Ms. Sankano misses the full point of that case, which requires evidence showing that "had the plaintiff been white she would not have been treated in the same manner." *Id.* at 187. Ms. Sankano has failed to make such a showing. Indeed, she has failed to point to <u>any</u> admissible evidence showing that Mr. Bowsher treated anyone outside of her protected class more favorably or that had Ms. Sankano been white, she would not have been treated in the same manner by Mr. Bowsher. (*See generally* Opp'n)

Ms. Sankano's primary argument is that Mr. Bowsher's communications were all "indicative of Matt [Bowsher] being a racist" because such communications indirectly reflect

---

SUMF ¶ 187) Ms. Sankano also superficially disputes whether she interacted with Mr. Bowsher again after she filed her complaint with HR, but a review of the evidence she cites indicates no basis for such a dispute. (*Id.* ¶190)

"stereotypes about black folk who work in corporate America." (PSAMF ¶320)  However, none of the communications actually mention race or contain racial stereotypes.  (SUMF ¶¶173-174)  While Ms. Sankano argues that certain facially neutral but "coded" words could be used to support a hostile work environment claim, Ms. Sankano provides <u>no</u> factual or legal support for her belief that Mr. Bowsher's criticizing or questioning her work or aptitude, as she has alleged, is somehow a "code" for racism.

The facts in the cases to which Ms. Sankano cites are again markedly different from what she has alleged. In *Ash v. Tyson Foods, Inc.* 546 U.S. 454 (2006), the court discussed the supervisor's use of the term "boy" to refer to African American employees.  In *Brockman v. Naes Corp.*, No. 19 Civ 00006 (JAM), 2021 WL 86347, at *4 (D. Conn. Mar. 8 2021), the court found that a jury could reasonably conclude that a white supervisor's use of the following phrases to his African American subordinate could be race-related: "I bet you'd go in there if there was fried chicken and watermelon inside"; "you have baby mamas"; "the only people I know who have two phones are drug dealers, are you a drug dealer?"; and "wouldn't like your kind."  Clearly, Mr. Bowsher's communications do not contain any language that could be reasonably be construed as racist code words.  As such, there is no question of fact for a jury to decide.[8]

### b.    Mr. Iwashyna's Comment to Ms. Loughran About Plaintiff's Work Performance in the Spring of 2022 Was Not Harassing

The only other incident that Ms. Sankano contends created a hostile work environment for her involves a conversation in the Spring of 2022 in which Mr. Iwashyna told Ms. Loughran that

---

[8] Ms. Sankano's testimony that other people (*i.e.*, her former employer and her coach) expressed to her that they agreed with her feeling that Mr. Bowsher's behavior was racist (Op. at 46) cannot create a genuine issue of material fact for trial.  That is inadmissible hearsay.  In addition, these facts are lay opinion that is not admissible evidence. *Stoe v. Garland*, No. 16-1618 (JDB), 2021 WL 4169313, at *8 (D.D.C. Sept. 14, 2021)("courts consistently exclude lay opinion testimony under Rule 701 that amounts to a naked speculation concerning the motivation for a defendant's adverse employment decision.")(citations omitted).

11

he had received complaints about Ms. Sankano's work performance. (Opp'n 34) According to Ms. Sankano, Ms. Loughran asked whether Mr. Bowsher would have gone directly to Mr. Iwashyna with concerns about a white male associate, and Mr. Iwashyna allegedly responded "that doesn't mean that Matt is racist." (PSAMF ¶¶304-306) Ms. Sankano does not show how this exchange between Mr. Iwashyna and Ms. Loughran could possibly create a hostile work environment for Ms. Sankano. The undisputed evidence is that Mr. Iwashyna had, in fact, received complaints from a number of MFH partners, including Mr. Bowsher, about Plaintiff's work performance. (SUMF ¶¶63-66, 73-75, 78-79, 88) It is also undisputed that as Practice Group Leader, Mr. Iwashyna was responsible for monitoring the performance of the associates, so he regularly solicited and received feedback from MFH partners about associates' performance. (SUMF ¶62) There is absolutely no evidence that Mr. Iwashyna made any hostile or abusive comment about Ms. Sankano or alluded to her race during his conversation with Ms. Loughran (or at any other time). Moreover, Ms. Sankano was not a party to the conversation and only knows what Ms. Loughran told her about it. (Pl. Dep. 194:18-195:12) There is nothing for a jury to decide, and summary judgment is warranted on Plaintiff's hostile work environment claim.

### c.    Inadmissible Hearsay About the Experiences of Other Non-Comparable Associates Does Not Save Plaintiff's Hostile Work Environment Claim

In a desperate attempt to bolster her hostile work environment claim, Ms. Sankano argues that three other Black female associates had negative experiences working at Troutman. However, none of their experiences is in any way relevant to Ms. Sankano's experience or her claims.

Most prominently, Ms. Sankano relies on a declaration from a former associate, Brittney Williams, who left Troutman before Ms. Sankano joined the firm. (Opp'n 12-13, 39) Ms. Williams states that she was given less substantive work than her white peers, and she brought this

12

concern to Mr. Iwashyna, who failed to take any action.  (*Id.*)  Ms. Sankano argues that this somehow shows that Mr. Iwashyna "has a history of condoning and perpetuating discrimination against Black, female attorneys."  (Opp'n 39)

While "[e]vidence of an employer's past discriminatory or retaliatory behavior toward other employees – so-called 'me too' testimony – may, depending on the circumstances, be relevant to whether an employer discriminated or retaliated against plaintiff," such testimony is relevant only if it is sufficiently more probative than unfairly prejudicial.  *Nuskey v. Hochberg*, 723 F. Supp. 2d 229, 233 (D.D.C 2010) (citing *Sprint v. Mendelsohn*, 552 U.S. 379, 385-88 (2008)).  "Among the factors relevant to the determination as to whether or not to allow the introduction of 'me too' evidence in employment discrimination cases are whether the alleged discriminatory behavior by the employer is close in time to the events at issue in this case; whether the same decision-makers were involved; whether the witness and the plaintiff were treated in a similar manner; and whether the witness and the plaintiff were otherwise similarly situated."  *Barnett v. Pa. Consulting Group, Inc.*, 35 F. Supp. 3d 11, 22 (D.D.C. 2014).

Ms. Williams' testimony does not meet this standard.  First, the events were not close in time.  Ms. Williams' testimony pertains to her experience during her employment in 2018 and 2019 (PSAMF ¶277) – three years before Ms. Sankano had the four interactions with Mr. Bowsher in 2022 and 2023 that she claims caused a hostile working environment for her.  Second, Ms. Williams and Ms. Sankano complain about entirely different things.  Ms. Williams complains that she received less substantive work than her peers from unnamed individuals (PSAMF ¶¶280-282), while Ms. Sankano's hostile work environment claim rests on her observation that Mr. Bowsher was rude and condescending in his communication towards her.  There is no evidence that Ms. Williams ever worked with Mr. Bowsher or complained about him.  (PSAMF ¶¶277-286)  Thus,

Ms. Williams' declaration about her own experiences at the firm years earlier are entirely irrelevant and cannot create a material issue of fact regarding whether Ms. Sankano was subjected to a hostile work environment.

Ms. Sankano also references experiences of two other Black associates – Jane Doe[9] and Ms. Loughran. (Opp'n 13-14) Yet, Ms. Sankano does not explain how these two associates' experiences are relevant to her hostile work environment claim. That is because they are not.

Jane Doe worked in the firm's Atlanta office in the Real Estate Practice Group. (PSAMF ¶307) Ms. Sankano relies on an unauthenticated text message from Jane Doe stating that she left as part of a "mass exodus of black associates." (PSAMF ¶308) At best, this shows that Jane Doe and other, unnamed Black associates voluntarily resigned due to unspecified "problems," but even if this conclusory assertion were true, that has absolutely nothing to do with Ms. Sankano, who worked in the Washington D.C. office in the MFH practice group and whose employment was terminated for poor performance. (SUMF ¶¶ 6, 50, 133, 135-136)

Similarly, Ms. Loughran's testimony about comments Mr. Bowsher allegedly made to her about her pregnancy and Ms. Loughran's belief that she was denied a bonus because of her pregnancy (PSAMF ¶¶296-303) is entirely irrelevant to Ms. Sankano's claims of race discrimination and hostile work environment. Ms. Sankano has not brought any claims of pregnancy discrimination (or even gender discrimination) in this case.

Because the experiences and allegations of these two other Black associates are completely different from Ms. Sankano's, they cannot be considered as "me too" evidence in this case. Therefore, Ms. Sankano has failed to produce any admissible evidence to support an inference of

---

[9] On March 31, 2025, the Court granted Plaintiff's Motion for Leave to File and to Seal her Opposition to Motion for Summary Judgment after this individual requested that her name be removed from the filing. Accordingly, Defendants refer to the witness as "Jane Doe."

14

a hostile work environment based on Defendants' purported "history of condoning and perpetuating discrimination against Black, female attorneys." (Opp'n 39)  All that remains as a basis for Plaintiff's hostile work environment claim are the interactions with Mr. Bowsher, which, as demonstrated above, do not rise to a level of creating or contributing to a hostile work environment as a matter of law, thus dictating summary judgment for Troutman.

### 3. Plaintiff Has Abandoned Her Claim That She Was Terminated Due to Race

In their MSJ, Defendants pointed out that Ms. Sankano abandoned her discriminatory termination claim when she testified in her deposition that "I was terminated as retaliation for filing an HR complaint, not because of discrimination." (Pl. Dep. 251:22-252:5; *see* MSJ 27-28) In her Opposition, Ms. Sankano attempts to resurrect her claim by citing her deposition testimony that she reviewed the Amended Complaint and found its contents to be accurate. (Opp'n 45 (citing PSAMF ¶321))  This convoluted argument fails because Ms. Sankano only testified that she reviewed the Amended Complaint to ensure that the factual allegations were accurate – she did not testify about the asserted legal claims. (Pl. Dep. 140:3-7)  Regardless, even if she had not abandoned her discriminatory termination claim, Troutman would be entitled to summary judgment on that claim for the reasons outlined in Defendants' MSJ. (MSJ 36)

### B. Both of Plaintiff's Retaliation Claims Fail As a Matter of Law.

### 1. There Is No Factual or Legal Support for a Retaliatory Termination Claim

In their MSJ, Defendants demonstrated, through undisputed material evidence, that Mr. Iwashyna (and by extension, Troutman) had a legitimate, non-retaliatory reason for terminating Ms. Sankano's employment: she was not performing at the level the MFH partners expected for a mid-level associate. (MSJ 6-7, 29-30)  Summary judgment is warranted on Ms. Sankano's retaliatory termination claim because she cannot disprove that reason or show that the true reason for her termination was retaliation.

15

### a.    Plaintiff Failed to Identify a Dispute of Material Fact Regarding Defendants' Stated Reason for Her Termination

Mr. Iwashyna testified that he terminated Plaintiff's employment because he concluded that Plaintiff was not performing at the firm's expectations for an associate at her level.  (SUMF ¶136)  Mr. Iwashyna's decision was based on his own review of Plaintiff's written performance evaluations and other feedback that Mr. Iwashyna had received from MFH partners, which showed performance problems including Ms. Sankano's lack of substantive knowledge on deals, sloppiness in her work product, lack of attention to detail, problems with issue spotting, and a failure to apply learnings from one deal to the next.  (SUMF ¶¶133, 136)  Defendants presented testimony from numerous other MFH partners that they observed problems with Ms. Sankano's work performance <u>and</u> that they communicated their concerns to Mr. Iwashyna.  (SUMF ¶64 Scott Fireison; ¶¶ 65-66 Jon Lautt; ¶73 MFH partners generally; ¶¶74-76, 87-89 Matt Bowsher; ¶78 S.R. Sidarth; ¶¶79, 99-100, 103 Peter Strup, ¶118 Jennifer Bojorquez)

Ms. Sankano does not dispute the MFH partners' assessments of her performance problems,[10] or that they told Mr. Iwashyna about their concerns.  Indeed, Ms. Sankano seems to acknowledge and agree that she had performance problems, but argues only that her performance was not <u>bad enough</u> for her employment to be terminated.  (Opp'n 16)  This argument fails for both legal reasons and factual reasons.

Legally, it is not for a jury to decide whether Ms. Sankano was performing poorly enough to warrant termination versus some lesser adverse action; rather, that decision rests solely with the employer.  *Manuel v. Potter*, 685 F.Supp.2d 46, 63 (D.D.C. 2010) (noting that the court does not sit as a "super-personnel department"); *D.C. Dep't of Pub. Works v. D.C. Office of Human Rights*,

---

[10] In response to Defendants' SUMF, Ms. Sankano sometimes states that she disputes a partner's assessment of her performance, but then offers no evidence in support of her position, or cites to evidence that addresses only a portion of the paragraph.  These unsubstantiated denials are identified in Defendants' Reply to Plaintiff's SUMF.

195 A.3d 483, 492 n.10 (D.C. 2018) (stating that "courts should be hesitant to engage in judicial micromanagement of business practices").

Factually, there is no support for Ms. Sankano's argument that her performance was not poor enough to be terminated. Ms. Sankano's argument has four main points: (1) in June 2023, practice group leadership discussed the possibility of moving Ms. Sankano to a non-partnership track position and sending her to coaching; (2) her written performance reviews (including her final review in 2023) had some positive comments; (3) Ms. Loughran and Lindsey Crawford did not think her performance warranted termination; and (4) three partners discussed her potential path to partnership shortly before her employment was terminated. (Opp. at 17-19) There is no disputed issue of material fact regarding any of these points.

(i)     Discussions During the June 2023 Meeting Were Consistent with the Ultimate Decision to Terminate

Ms. Sankano first argues that Kalle Covert's notes from a June 2023 meeting of the MFH leadership team – specifically, the references to Ms. Sankano being a possible "alternate track" candidate and receiving coaching as an "initial step" – somehow show that the firm "did not believe that Plaintiff's performance warranted termination." (Opp'n 17)[11] Ms. Sankano's argument not only mischaracterizes the substance of the June 2023 meeting but also ignores the undisputed evidence that after the meeting, Mr. Iwashyna received additional information about Ms. Sankano's performance and guidance from the firm's Chief Legal Talent Officer, which informed his decision to terminate Ms. Sankano's employment in November 2023.

Defendants' witnesses consistently testified that during the June 2023 meeting, the MFH leadership team discussed that Ms. Sankano was not performing at the substantive level expected

---

[11] Ms. Sankano seems to imply that she should have been sent to coaching, as suggested in the June 2023 meeting, before she was terminated. (Opp'n 17) That is, in fact, what happened, as Ms. Sankano did work with a career coach after that date. (Pl. Dep. 278:11-279:5)

17

of a rising fifth-year associate and that it was unlikely she would be promoted to partner.  (SUMF ¶111)  This discussion during the June 2023 meeting about Ms. Sankano's performance problems is consistent with Defendants' proffered reasons for her termination.   Relying on (and mischaracterizing) Ms. Covert's notes from that meeting, Ms. Sankano argues that if she were a terrible performer or subject to termination, surely that would have been reflected in Ms. Covert's notes.  (Opp'n 17)  But Ms. Covert has explained that these notes were only a summary of key takeaways and follow-up items from the June 2023 meeting and not a record of everything that was discussed during the meeting.  (Covert Decl. ¶7)

Ms. Sankano's argument is wrongly premised on an assumption that her performance (and Mr. Iwashyna's perception of her performance) did not change after June 2023.  Ms. Sankano contends that the only thing that changed between the June 2023 meeting and her termination in November 2023 was the fact that she made an HR complaint.  (Opp'n 19-20)  However, this contention is simply not supported by the record.  Following the June 2023 meeting, Mr. Iwashyna received additional feedback about Ms. Sankano's performance – all of which echoed the same concerns and issues that he had heard from other MFH partners over the years.  (SUMF ¶¶115, 118) Then on August 14, 2023, Mr. Iwashyna met with Sona Spencer, the firm's Chief Legal Talent Officer, who advised that Ms. Sankano was not a good fit for the firm's new alternate "career track" because it was not designed for poor performing associates, like Ms. Sankano. (SUMF ¶122)  Ms. Spencer also recommended that Mr. Iwashyna wait to make a final decision about Ms. Sankano's employment until he had the opportunity to review the forthcoming written evaluations of her 2023 performance.  (SUMF ¶123)  On October 12, 2023, Mr. Iwashyna received access to Ms. Sankano's 2023 evaluations, which showed that her performance had only gotten worse.  (SUMF ¶¶124-130)  Mr. Iwashyna's subsequent decision to terminate Ms. Sankano's

18

employment, after receiving this additional feedback and guidance, is entirely consistent with the discussions about Ms. Sankano's poor performance that Mr. Iwashyna had with the other members of MFH leadership team in June 2023.  (SUMF ¶¶ 111, 132-136)

(ii)    Plaintiff's Written Performance Evaluations Did Reflect Plaintiff's Performance Problems, Which Worsened in 2023

Throughout her Opposition, Ms. Sankano characterizes her performance evaluations as "overwhelmingly" or "generally" positive, in an effort to further undermine Mr. Iwashyna's assessment of her performance.  (Opp'n 5, 17)  But this rosy characterization of the evaluations is quickly debunked when the full evaluations are reviewed.  (*See* Covert Decl. Ex. 7-10; Iwashyna Decl. Ex. 7-10)  Ms. Sankano cherry picks only the positive comments on her attitude and responsiveness (Opp'n 18 n.3), but completely ignores the consistent negative comments contained in her reviews – feedback that she received year after year with no improvement.  For instance, the written evaluations contained the following negative comments about Ms. Sankano's performance, which are the core issues that Mr. Iwashyna identified as the areas where Plaintiff was not operating at the level expected of an associate with her seniority (SUMF ¶¶132-133):

- Ms. Sankano's 2021 performance evaluation noted several areas that needed improvement, such as slowing down "so that she can better absorb the substance behind the matters"; "taking concepts/experience learned in deals and applying it to future transactions"; "increas[ing] her substantive knowledge of Freddie and Fannie"; "focus on higher level issues that arise on deals"; and "developing knowledge of the practice and her skill set." (SUMF ¶83)

- Ms. Sankano's 2022 performance evaluations continued to note several areas that needed improvement, such as "work on communication and making sure that the partner/senior associate has signed off on work product"; "greater depth of substance and the reasons behind why certain documentation is acceptable while other documentation is not"; "become more familiar with complex deal types and issues"; need to see "her problem solving skill[s] develop"; "general knowledge of the multifamily housing space"; "slow down a little in order to better understand the big picture"; "needs to become more thorough and more efficient"; and "ask questions early and often when handling a transaction." (SUMF ¶93)

19

- Ms. Sankano's 2023 performance evaluation identified a number of skills that needed improvement, including "developing her pragmatic thinking skills"; "she needs to think through the circumstances at hand and determine if what was done before really makes sense"; "better understand substance–the why behind the documents being used and advice being given"; "substantively understand the reasoning behind each step"; "work on thoroughness and developing a more in-depth understanding of the Fannie/Freddie programs"; "Gita needs to slow down and focus on the quality of her work product"; "Gita needs to work on being more diligent in her reviews and taking it to the next level"; and "Gita's development has lagged behind other associates in her class year." (SUMF ¶127)

Similarly, Ms. Sankano focuses on the numerical ratings in 2023, arguing that she was rated "stellar," "above-average," and "satisfactory" by a majority of her evaluators. (Opp'n 17-18) However, Ms. Sankano overlooks the substantive comments in the reviews, several ratings of "needs improvement," and an overall decrease in her ratings in 2023 as compared to the previous years.[12] (SUMF ¶¶126-127) The written evaluations of Ms. Sankano's performance are objective evidence that indisputably supports Mr. Iwashyna's conclusion that Ms. Sankano was performing poorly enough to be terminated.[13]

(iii)    Ms. Loughran's and Ms. Crawford's Opinions Regarding Whether Plaintiff's Performance Warranted Termination Are Immaterial

The testimony from Ms. Loughran and Ms. Crawford that they did not believe Ms. Sankano's performance problems merited termination (Opp'n 18) does not save Ms. Sankano's claims. At the time the termination decision was made, Ms. Loughran was an associate, and Mr. Iwashyna testified that he did not consider feedback from Ms. Loughran (or any other associate) in making the decision to terminate Ms. Sankano's employment. (Iwashyna Decl. ¶44) Ms. Crawford was a partner, and Mr. Iwashyna did consider her feedback on Ms. Sankano's

---

[12] Ms. Covert testified that the average of the numerical ratings in Ms. Sankano's 2023 review was 3.63 – the second lowest of all MFH associates that year – and Ms. Sankano's average ratings had dropped each year from 2021 to 2023, which was the opposite of what Troutman expects from associates as they get more senior. (SUMF ¶¶128-130)

[13] Ms. Sankano also argues that her 2023 review was "not enough to terminate her" because Mr. Schiff approached Ms. Crawford and only asked for negative feedback about Plaintiff. (Opp'n 10, 22) This argument ignores the undisputed timeline. Mr. Schiff approached Ms. Crawford *after* Mr. Iwashyna had made the decision to terminate Ms. Sankano's employment. (SUMF ¶138; Schiff Decl. ¶23) Mr. Schiff was not looking for feedback to justify the decision, but rather wanted specific examples to provide to Ms. Sankano when communicating the firm's decision.

performance in making his decision.  (SUMF ¶136)  But Ms. Crawford was not a member of the MFH leadership team responsible for associate performance, and she was not involved in the decision to terminate.  (SUMF ¶137; Crawford Decl. ¶11)

(iv)      <u>Plaintiff's Partnership Track Discussions With Three Partners Are Immaterial</u>

In a final attempt to discredit Mr. Iwashyna's decision, Ms. Sankano argues that, shortly before her employment was terminated, she discussed her desire to become partner at the firm with three of the partners from whom Mr. Iwashyna received feedback.  (Opp'n 18)  While there is no dispute that Ms. Sankano discussed her desire to become a partner with Mr. Strup, Ms. Bojorquez, and Ms. Crawford, the conclusions she seeks to draw from those conversations is simply not supported by the record.

First, and most importantly, Mr. Strup, Ms. Bojorquez, and Ms. Crawford were <u>not</u> members of the MFH leadership team responsible for associate performance, and none of them was involved in (or aware of) the decision to terminate Ms. Sankano's employment.  (SUMF ¶137; Strup Decl. ¶16, Bojorquez Decl. ¶12, Crawford Decl. ¶11)

Second, it is undisputed that Ms. Sankano is the one who initiated these three discussions, in August 2023, shortly after Ms. Sankano met with Ms. Sulc and Ms. Covert about her performance problems.  (SUMF ¶¶260, 263-265)  In each discussion, Ms. Sankano expressed her interest in becoming a partner, and the partner gave her advice on how to make partner.  (*Id.*)  Mr. Strup and Ms. Bojorquez both stated they did not see this conversation as a performance discussion (Strup Decl. ¶14; Bojorquez Decl. ¶11),[14] and Ms. Crawford said she could see Ms. Sankano as a partner someday, but also shared constructive criticism with Ms. Sankano. (Crawford Decl. ¶10)

---

[14] Ms. Sankano admits Mr. Strup gave her the advice to "prove the haters wrong," making clear that she and Mr. Strup were well aware that there were "haters," which clearly speaks to her performance.

21

Thus, no conclusion can be drawn about the quality of Ms. Sankano's performance from these partners' discussions with her in response to her solicitation of tips for making partner.

Plaintiff cites a single case, *Small v. Office of Congressman Henry Cuellar*, 485 F. Supp.3d, 275, 281 (D.D.C. 2020), claiming that whether an employee is actually performing poorly enough to be terminated is a question for a factfinder.  However, Plaintiff misstates the findings of *Small*, and the facts are clearly distinguishable from the facts in this case.  In *Small*, the employer cited work product as a leading example of why the plaintiff was terminated and provided twelve examples of errors in the plaintiff's work.  *Id.* at 281.  Specifically, the employer claimed that the press releases the plaintiff sent to her supervisor regularly required corrections.  However, in the plaintiff's opposition, all but four of the twelve examples were discredited.  *Id.*

In contrast, Ms. Sankano does not dispute any of the feedback that Mr. Iwashyna received from eleven MFH partners; rather, she just believes that her poor performance was not bad enough to warrant termination.  This is not a case of "competing narratives" requiring a factfinder to make a creditability decision.  Instead, there is a single narrative – that Ms. Sankano was not progressing her substantive legal skills to the next level, despite years of training, experience and feedback from MFH partners. (SUMF ¶¶131-137)  Because Ms. Sankano cannot present any evidence disputing the performance feedback that Mr. Iwashyna received from other MFH partners, or any evidence which might call into question Mr. Iwashyna's (and Troutman's) stated justification for termination of her employment, Ms. Sankano's claims fail as a matter of law.

> b. **Plaintiff Fails to Show that Retaliation Was the Reason for Her Termination**

Even if Ms. Sankano could disprove Defendants' proffered reason for her termination (which she cannot), Plaintiff still cannot prevail on her retaliation claim because there is no evidence that the real reason she was terminated was retaliation.  While Ms. Sankano contends

that she is not relying entirely on temporal proximity to establish her claim of retaliatory termination (Opp'n 21-22), that is exactly what she is doing. (*See, e.g.,* Opp'n 20 "After Plaintiff engaged in protected action by filing her complaint against Mr. Bowsher, the retaliatory actions swiftly followed" and "only four days after making her formal complaint, Plaintiff was visited by Mr. Rivers."[15]) However, once an employer has put forth legitimate, non-retaliatory reasons for a challenged action, as Defendants have done here, "positive evidence beyond mere proximity is required to defeat the presumption that the proffered explanations are genuine." *Hamilton*, 666 F.3d 1344, 1359 (D.C. Cir. 2012) (quoting *Woodruff v. Peters*, 482 F.3d 521, 530 (D.C. Cir. 2007)); *see also Talavera v. Shah*, 638 F.3d 303, 313 (D.C. Cir. 2011). "If temporal proximity sufficed to rebut a legitimate proffer, then protected activities would effectively grant employees a period of immunity, during which no act, however egregious, would support summary judgment for the employer in a subsequent retaliation claim." *Woodruff*, 482 F.3d at 530; *Allen v. Johnson*, 795 F.3d 34, 47 (D.C. Cir. 2015).

Moreover, as explained in Defendants' MSJ, the sequence of undisputed events leading to Ms. Sankano's termination actually supports Defendants' proffered reason for the termination (MSJ 34-36), and Ms. Sankano does not dispute those events. Mr. Iwashyna testified that he reached a "tipping point" in **April 2023**, after another partner, Mr. Rivers, told Mr. Iwashyna that he would no longer work with Ms. Sankano on his deals, and Mr. Iwashyna told Marshall Tucker and Nora Nickel that he thought they would have to make a "hard decision" on Ms. Sankano soon. (SUMF ¶¶100-102) Then, in **June 2023**, the MFH leadership team responsible for associate development discussed Ms. Sankano's performance problems with Legal Talent and the Associate

---

[15] Ms. Sankano's reference to Mr. Rivers' visit as evidence of retaliation is disingenuous, as Mr. Rivers testified that he only went into her office that day because she looked sad; he was not sent by firm management, as Ms. Sankano speculates; and his discussion with her was based on his own personal beliefs. (Rivers Decl. ¶ 32)

Development Committee. (SUMF ¶111) In **August 2023**, Mr. Iwashyna discussed Ms. Sankano's situation with Ms. Spencer, the firm's Chief Legal Talent Officer, who told him that he needed to make the "hard decision" but suggested that Mr. Iwashyna review Ms. Sankano's 2023 evaluations before taking any action. (SUMF ¶¶119, 123) When the 2023 evaluations were given to the practice groups in **October 2023**, Mr. Iwashyna saw that Ms. Sankano's evaluations had gotten worse, discussed with the MFH leadership team the fact that Plaintiff was not meeting expectations for an associate at her level, and decided to terminate her employment. (SUMF ¶¶124, 127, 131-136) Ms. Sankano does not dispute any of these facts.

This undisputed sequence of events demonstrates that Mr. Iwashyna's decision to terminate Ms. Sankano's employment started in April 2023 (several months before she engaged in any protected activity), developed over the next five months as Troutman followed its usual processes, and culminated with termination in December 2023. (MSJ 36) Defendants were not required to stop this process simply because Ms. Sankano engaged in protected activity by filing an HR complaint. *See Woodruff*, 482 F.3d at 530. Thus, the Court should enter summary judgment on Plaintiff's claim of retaliatory termination.

> **2.    Plaintiff Has Failed to Show That Ms. Carmody Retaliated Against Her**

In their MSJ, Defendants established that Ms. Sankano cannot claim that Ms. Carmody retaliated against her because Ms. Carmody was not aware that Plaintiff engaged in any protected activity, and Ms. Carmody had legitimate, non-retaliatory reasons for her work assignments to Ms. Sankano in 2020. (MSJ 37-38) Plaintiff's Opposition fails to create a disputed issue of material fact on either point.

Although Ms. Sankano contends that a jury could determine that Ms. Carmody was aware of her protected activity; however, Ms. Sankano provides no record evidence to support such a conclusion. (Opp'n 24-25) First, Ms. Sankano alleges that she reported her concerns that Ms.

Carmody treated her differently than her white colleagues to Audrey Wisotsky, Mr. Schiff, and Kassem Lucas. (*Id*.) Even if this were true,[16] there is no evidence in the record that any of these individuals communicated Ms. Sankano's purported concern to Ms. Carmody. In fact, Ms. Sankano <u>admitted</u> that no one told Ms. Carmody that Ms. Sankano believed she was reviewing and reassigning her time because of her race. (Pl. Resp. SUMF ¶46)

Second, Ms. Sankano argues that Ms. Carmody was aware that she had raised "concerns" about Ms. Carmody, based on a single statement by Mr. Liu in an email he sent to Ms. Carmody on July 31, 2020, stating that Ms. Sankano was being reassigned to a different group of attorneys because she had raised concerns. (Def. Resp. to PSAMF ¶323, Pl. Ex. 40) Not only was this statement made in July 2020 – after the time when Ms. Carmody was allegedly not giving Ms. Sankano work or cutting Ms. Sankano's hours (s*ee* Def. Reply to SUMF ¶13) – but Mr. Liu does not indicate anywhere in the email that the "concerns" related to Ms. Sankano's race. (Pl. Ex. 40)

Accordingly, because there is no evidence to support Ms. Sankano's claim that Ms. Carmody retaliated against her for objecting to allegedly discriminatory conduct, that claim must be dismissed as a matter of law.[17]

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court grant summary judgment in their favor on all Counts in Plaintiff's Amended Complaint.

---

[16] Ms. Sankano never testified that she told Mr. Lucas that she thought Ms. Carmody was cutting her hours because of her race. The only "evidence" she cites in support of this allegation is a text message that she sent to a friend that she spoke with Mr. Lucas about her "issue." (Opp'n 25 at n.5; *see* PSAMF ¶¶212, 324)

[17] Similarly, Ms. Sankano has not produced any actual evidence to rebut Ms. Carmody's explanation that the amount of work Ms. Carmody could give Ms. Sankano slowed down for a period of time during the COVID-19 pandemic, in part because Ms. Sankano was working remotely and the work Ms. Carmody had for her was more hands-on. (SUMF ¶¶28-30) The facts, including Ms. Sankano's own testimony, are consistent with Ms. Carmody's explanation. (*See* Def. Reply to SUMF ¶¶28-30; *see also* Def. Resp. to PSAMF ¶326, noting that Ms. Sankano's texts to friends during this time are consistent with Ms. Carmody's testimony).

Dated: April 23, 2025

/s/ Alison N. Davis
Alison N. Davis, Bar No. 429700
andavis@littler.com
Paul Kennedy, Bar No. 428623
pkennedy@littler.com
Morgan Kinney, Bar No. 8888325169
mkinney@littler.com
LITTLER MENDELSON, P.C.
815 Connecticut Avenue NW
Suite 400
Washington, DC 20006.4046
Telephone:    202.842.3400
Facsimile:    202.842.0011

*Attorneys for Defendants*

26