# EXHIBIT A

Page 1

1                    UNITED STATES DISTRICT COURT

2                    FOR THE DISTRICT OF COLUMBIA

3

4          -------------------------------

                                           :

5          GITA F. SANKANO,                :

                                           :

6                    Plaintiff,            :    Civil Action No.

                                           :

7              v.                          :    1:24-cv-00142 (JMC)

                                           :

8          TROUTMAN PEPPER HAMILTON        :

                                           :

9          SANDERS, LLP and BRIAN          :

                                           :

10         IWASHYNA,                       :

                                           :

11                   Defendants.           :

                                           :

12         -------------------------------

13

14              The video deposition of GITA F. SANKANO, the

15         plaintiff herein, held at Littler Mendelson, P.C.,

16         815 Connecticut Avenue, N.W., Suite 400, Washington,

17         D.C., convened at 10:11 a.m. on Thursday, October 17,

18         2024 and the proceedings being taken down by

19         stenotype and transcribed by Catherine B. Crump, a

20         Notary Public in and for the District of Columbia.

21

22

Page 61

```
1     Scott.
2            Q.    What type of deals did Scott work on?
3            A.    Scott did developer work.
4            Q.    Could you repeat that?
5            A.    He did -- basically, I don't really know
6     the logistics of exactly what he does, because he's
7     on the other side of the table.  So when I say
8     developer work, he represented borrower, I believe.
9            And I just want to add something.  So Brendan
10    was an associate at the merger for Pepper Hamilton.
11           Q.    Is he the one that you forget his name?
12           A.    No.
13           Q.    Or he's an additional one?
14           A.    He's an additional one on the Pepper
15    Hamilton side.  Brendan and I spoke a lot.  So I
16    can't believe I forget him.  So yeah.
17           Q.    And what his race?
18           A.    He's white.
19           Q.    And what did you talk to Brendan about?
20           A.    About my hours.  He couldn't believe it
21    was happening.
22           Q.    He couldn't believe what was happening?
```

1          A.     That Christine was reducing my hours to

2     that capacity.  We spoke about that.  He felt --

3     because he was one of the people I spoke to right

4     after I had my midyear evaluation with Audrey -- well

5     -- Audrey, yes -- and he told me it was a concern

6     that the fact that she mentioned that -- that the

7     first thing she mentioned as hours.

8          He told me that, typically, they don't talk

9     about your hours towards the end of your evaluation

10    and the fact she asked me flat out is Christine

11    stealing your hours was problematic in itself.

12          Q.     Who is Audrey?

13          A.     At the time, she was the head of the

14    Associate Review Committee.  I don't know what

15    acronym you gave, but yeah.

16          Q.     And what was the discussion during your

17    midyear review with Audrey about your hours?

18          A.     So it was -- that conversation was

19    crazy.

20          Okay.  So she wanted to meet with me about my

21    midyear review.  So we -- and at the time, I was

22    working from home.  So she called me and she started

Page 63

1    -- and she said, Can I ask you something, is

2    Christine stealing your hours, before she even got

3    into what was said in my review, and at the time, for

4    me, I didn't think she was stealing my hours given

5    the conversations we had.

6        I told her, Well, I email Christine my hours

7    and she tells me what to bill, and Audrey told me,

8    Going forward, I need you to enter in all of your

9    hours, and she is supposed to cut that off on the

10    back end, not on the front end, and I said okay.

11    Then she went ahead with my review and told me that

12    Christine had a lot of positive things to say about

13    me, that it was a very good evaluation, there was

14    nothing negative said about my work at all, and that

15    was the end of the conversation.

16        After that, I was stunned, because that's

17    something at the first year, you know, is she

18    stealing your hours, you're not expecting that.  So I

19    reached -- I think I reached out to Brendan and my

20    cousin Precious, and she said, Well, you have

21    instructions from the firm, so if she's telling you

22    to bill your hours, you have to bill your hours going

Page 64

1    forward.

2         I said okay.  After that, I reached out to

3    Christine, letting her know, but she still wanted to

4    continue seeing my hours and kept reducing them after

5    that.

6         Q.    Now, you described the conversation with

7    Audrey as crazy.  Why do you describe it as crazy?

8         A.    Because that is -- having a partner

9    manipulate and reduce your hours is something that's

10   unheard of in our profession.  You don't her about

11   that every day, and the fact that she asked me flat

12   out, I knew that there had to be conversations before

13   they came to a first-year associate who's only been

14   there for a few months.

15        So the fact that she give me instructions was

16   also putting me in an uncomfortable position as a

17   first year.  Right?  Because the fact that she gave

18   me those instructions and the fact that Christine

19   told me that there were conversations, but she didn't

20   tell me the extent of those conversations, I could

21   deduce that there was some type of friction there,

22   and that put me in a very uncomfortable position that

Page 89

1          A.    That's I all I can recall at this point

2     in time and Blair after the whole debacle with hours

3     and Henry, but that was towards the latter half of

4     2020, in that time.

5          Q.    So the latter half of 2020, you did some

6     work with Blair?

7          A.    I did some work with Blair in May of

8     2020 all the way up until I would say about that

9     summer.  It was that summer of 2020.

10          Henry jumped in, although, he told Audrey he

11     didn't want to be involved with the hours situation

12     with Christine even though he was the head of the

13     practice group.  He didn't start giving me work until

14     after the merger.

15          Q.    Did Henry tell you that he didn't want

16     to be involved with the billing issue with Christine?

17          A.    Audrey did.

18          Q.    Audrey told you what?

19          A.    That Henry -- so Christine retaliated

20     against me after the whole hours thing happened.

21     Right?  My work dried up drastically around late

22     April to May, and Audrey and I spoke a lot, and I was

Page 90

1    really concerned because it was the time during
2    COVID.  We're on lockdown.  George Floyd is going on,
3    and there was a lot to deal with that I was being
4    treated this way for no reason at all, and she -- I
5    would follow up with her to ask her like what's going
6    on, and she told me that spoke to Henry, but Henry
7    told her he didn't want to be involved, and I was
8    stunned by that.
9         Q.    Did she tell you why Henry didn't want
10   to be involved?
11        A.    No.  She didn't go into specifics, no.
12        Q.    Now, you said that Christine was
13   retaliating against you.
14        A.    Yes.
15        Q.    How was she retaliating against you?
16        A.    So, initially, everything was fine,
17   because we worked -- before she -- the whole hours --
18   before she got called out for her hours by Audrey.
19   Everything was fine until I had that midyear review
20   in April 2020.
21        So after Audrey gave me instructions to bill,
22   I went to Christine and I sent her an email telling

Page 91

1    her what Audrey told me to do.  She told she still

2    needed to see my hours, and I thought like, Okay,

3    maybe she'll stop cutting them, maybe she just wants

4    to see them.  She still kept cutting my hours.

5         So at that point, I reached out to two black

6    associates in Philadelphia and they suggested that

7    since I was the only black attorney in D.C. that I

8    reach out to the DEI partner, Kassem, and Kassem told

9    me that Christine was only looking out for herself

10   and her realization rate, and he spoke to Audrey.

11        I reached out to Audrey again to tell her that

12   this was still happening, but I was scared, because

13   it was the only person I received work from and I did

14   not want to let -- I didn't want it to be known that

15   I went back to speak to Audrey, and she told me,

16   Don't worry about it, you'll be protected.

17        So I guess she must have went back and said

18   something.  I don't know, but in May, Christine just

19   stopped giving me work.  I think I billed probably

20   not even 30 hours in May of 2020, and I emailed

21   Audrey and I told her like, Hey, now all of a sudden,

22   I'm not getting work, this is not normal.  Given the

Page 92

1    the close proximity of what's going on, she just

2    stopped giving me work, and she told me to hang on

3    tight.  She's see what's going on.  She told me to

4    hang on tight, and that's how Christine retaliated

5    against me after the whole thing happened with the

6    hours thing happened with Audrey.  She just stopped

7    giving me work in May.

8            Q.    What race is Audrey?

9            A.    Audrey is white.

10           Q.    Who are the Philly associates that you

11   spoke to?

12           A.    Nicki Akande, which is A-K-A-N-D-E, and

13   Sarah Mohammed.

14           Q.    And were they in the same practice group

15   that you were in?

16           A.    No.

17           Q.    So they didn't work with Christine?

18           A.    No, but they knew that associates are

19   supposed to bill their time and get credit for it.

20   So it was very weird.  That's just standard no matter

21   what practice you're in.

22           Q.    And do you know why Christine was

Page 93

1      cutting your time?

2             A.    According to what she told me she was

3      looking out for my realization rate.  So that's what

4      she said, but to be honest with you, I don't really

5      know the real reason why.

6             Q.    And do you know if either Nicki or Sarah

7      had a conversation with Christine about why she was

8      cutting your time?

9             A.    No, but they told me they spoke to

10     Kaseem about it.

11            Q.    And did you talk to Kassem?

12            A.    I did.

13            Q.    And what discussions did you have with

14     Kassem?

15            A.    I told him what was going and he told me

16     that the reason why she was doing this was to look

17     out for her own profitability and her own realization

18     rate and that she was being greedy.

19            Q.    Did he explain to you why she would be

20     looking out for her own profitability?

21            A.    Monetary gain.

22            Q.    What do you mean by "monetary gain"?

Page 94

1          A.    To look more profitable in front of the
2    firm.  He's was like there's an incentive here that's
3    for a partner.
4          So her own comp, I guess.  He didn't really
5    get into specific details, but that was the gist that
6    he gave me about like why she was doing this, to look
7    out for her own profitability.
8          Q.    And you said that you only billed about
9    30 hours in May of 2020?
10          A.    I believe so, yes.
11          Q.    Did you start to get more hours after
12    May of 2020?
13          A.    Well, yes, after George Floyd died.
14          Q.    And when did you start getting more
15    hours after May of 2020?
16          A.    After the town hall.  The firm had a
17    town hall about race and everyone was, Oh, my God,
18    you're the only black associate here, let's give you
19    work.
20          So it was literally because of what happened
21    with George Floyd, because prior to that, that whole
22    month, they sidelined me.  They didn't care at all.

Page 116

1          A.    No.

2          Q.    So --

3          A.    Which is Freddie Mac and Fannie Mae

4     loans.  Yes.

5          Q.    What is your understanding of what an

6     entry-level associate would be doing on agency deals?

7          A.    Running the checklist, reviewing all the

8     due diligence, making sure you have out your

9     signature page prior to the deal closing, making sure

10    you're on top of the deal, making sure the loan

11    documents are drafted, that you have reviewed those

12    loan documents.

13         Within our practice group, we have something

14    called second attorney reviews.  So you want to make

15    sure that those documents are reviewed prior to

16    closing, prior to giving authorization for

17    disbursement of the closing.

18         So as a first year, you should be on top of --

19    you should be moving the deal along.  Right?

20         The partner should -- his or her role should

21    only step in where there's like complex issues or

22    running a conference call or whatever have you, but

Page 117

1    that was my understanding.

2          Q.    And after a year's experience doing

3    agency work, what did you expect to be able to do on

4    deals?

5          A.    Listing out all the things I just named

6    and ensuring that the deal was actually getting

7    closed, that it was not falling on us as Troutman,

8    because your worst fear is if a client wants a deal

9    to be closed on "X" date, that if that deal does not

10   close, it's not on our volition, it's because of

11   something else.  Right?

12         So you want to make sure you get that deal to

13   closing line.

14         Q.    And how do you do that?

15         A.    Making sure I'm on top of things --

16   right -- making sure I'm running the checklist

17   properly, making I'm following up on things, making

18   sure my signature page are out, making sure that we

19   have all the due diligence, making sure that the

20   opinions are reviewed properly, making sure that I

21   have everything I need from the title agent, making

22   sure that the paralegals have their submissions in.

Page 118

1          You have to make sure that everything is good

2    to go to make sure that the deal actually closes, and

3    you should -- and your deals should close -- the day

4    of closing, your deals should ultimately close on its

5    own.  You shouldn't be doing much.

6          So I made sure that all the trains came in on

7    time and I made sure that my deals were closed.

8          Q.    So as a second year, would you be able

9    to run a deal by yourself?

10         A.    Because deals are the same, yes.  You

11   should.

12         Q.    And did you run any deals by yourself as

13   a -- after your first year?

14         A.    Yes.

15         Q.    What deals did you run by yourself?

16         A.    The vast majority of the deals I had

17   with Lindsey, I did by myself.  I would say probably

18   all.

19         With Peter, I definitely ran -- the only thing

20   Peter really did was sent out the checklist on

21   Sundays.  With Matt, he not a closer.  He doesn't

22   know really the procedural aspects of getting a deal

1    closed, so just making sure that he had what he

2    needed.

3         So I would say those were the -- but

4    Whitney -- Whitney, I would tell her to back off a

5    lot of the time, because Whitney is more of like --

6    she likes to do a lot of the ground work.  So on

7    Whitney's deal, she likes to do everything and I

8    would have tell like, Wait, I got it all the time.

9    So Whitney just likes to do everything.  So I would

10   have to tell her to like, you know, fall back a

11   little bit.

12        So she was more still hands-on.  That's who

13   she is by nature.

14        Q.   Did Lindsey give you any feedback about

15   the deals that you were running for her?

16        A.   Yes.

17        Q.   What kind of feedback did she give you?

18        A.   She told me that I made sure the trains

19   came in on time, that I made sure all her deals were

20   closed and that what I need to focus on -- and what

21   she always said to me was just slow down.

22        Q.   Did you ask her why she thought you

Page 142

1          I worked for Christine.  Christine

2     intentionally reduced my hours.  She manipulated my

3     hours, and it was because due to my race because she

4     did not do it to Randy, who was the other associate

5     who worked for her.

6          Now, one could say, Well, Randy is not a

7     first-year associate.  Well, to my knowledge, he was

8     there as a first year and she never did it to him

9     while he was as a first year as well, because we

10    spoke about it in great detail.

11         Also, I was discriminated against because --

12    by Blair and Henry to a certain extent when it was

13    time to give me work, which they were supposed to do.

14    They didn't give it to me.  They did not look out for

15    my development as they did with their associates.

16    Case in point, Henry was the head of the practice

17    group.  He made sure that other associates within the

18    practice group, made sure that they got the proper

19    work and the proper development and the proper

20    training.

21         Blair, who was the co-managing partner at the

22    time, he also made the other partners [sic] were

Page 143

1    discussed.  I was not, and this happened while it was

2    Pepper Hamilton.

3            Q.    Yes, and my question was limited to

4    Pepper Hamilton.

5            A.    Yes, and that's what I can recall

6    currently to the best of my -- right now.  If there's

7    something extra, I'll let you know, but that's what I

8    know right now.

9            Q.    And why do you believe that working for

10   Christine is an example of race discrimination?

11           MR. WILLEMIN:  Objection.

12           THE WITNESS:  Because we have two examples.

13   Right?

14           Number one, she did not closely micromanage

15   and intentionally reduce an associate who worked with

16   her throughout the course of his employment, and he

17   was white; however, she did it to me.  Right?

18           So the only difference between Randy and I is

19   that, number one, I'm a woman and I'm black.  Randy

20   and I have the same credentials.  He's barred just

21   like I am; however, he did not deal have to deal with

22   what I had to deal with.

Page 144

1            Also, when I look at the other associates,

2     who were nonblack -- they were all white -- they

3     received proper training.  They received the proper

4     development, and Henry refused to get involved in the

5     situation with Christine until the firm merged.

6            I sat there being treated differently from my

7     counterparts and, as a result, I suffered harm from

8     that.  I lost a whole year dealing with something

9     that had nothing to with her, because a partner took

10    advantage of me being a black woman, the only black

11    attorney there, and she was greedy and she stole from

12    me.  She stole my hours.  She manipulated my hours

13    and I suffered from that.

14           I couldn't -- I was not able to be further

15    developed as a result of it, lost a whole year,

16    wasn't even eligible or given the proper

17    opportunities to even get a bonus.  So I was not

18    given the same equal footing as the rest of my

19    counterparts, and it was due to the fact that I am

20    black.

21           So the only difference between me and anyone

22    else here is the color of my skin.  That was it.

Page 146

1          Q.    And did you review Randy's work?

2          A.    I mean, I was a first year.  So no.

3          Q.    And do you know if Christine ever wrote

4     down any of his time?

5          A.    I spoke to Randy directly and he said

6     no.  So I can only go off of what Randy told me.  He

7     never had to deal with that.

8          Q.    Did you ever review Randy's timesheets

9     when he was a junior associate?

10         A.    I wasn't at the firm at the time.

11         Q.    And did Christine tell you that when

12    Randy was a junior associate, she did not write off

13    any of his time?

14         A.    Her and I never had that discussion.  So

15    I never asked her.

16         Q.    And you said that Blair and Henry

17    wouldn't give you work; is that correct?

18         A.    They stopped giving me work and Henry

19    told Audrey when this was happening that he did not

20    want anything to do with it.

21         Q.    And when you started at Pepper Hamilton

22    in the financial services practice group, how were

Page 156

1           A.    Yes.

2           Q.    And so after working with Christine for

3    about a year, you had gotten experience working on

4    HUD deals?

5           A.    It wasn't a year.  So if you take the

6    timeline, I was hired in late -- on August 31st or

7    August 30th of 2019.  So I received work from

8    Christine from, I would say, September of 2019 up

9    until April of 2020, because remember she stopped

10   giving me work.  That's not a year.

11          Q.    Okay.

12          A.    Yeah.  That's not a year.  So those were

13   like a few -- I don't know how many months that was,

14   but it wasn't a year.

15          Q.    But for those months, you were working

16   on HUD deals for Christine?

17          A.    Yes, and then she stopped giving me work

18   and then she started giving me some work around like

19   June-ish, July, and then after I was removed from

20   her, she requested to still work with me, but then

21   Audrey told her like she has to bill her time.  So

22   what she would start to do is start hiding matter

Page 158

1          Who at Pepper Hamilton created a hostile work
2     environment for you?
3          A.    Definitely Christine and definitely the
4     leadership of the financial services group.
5          Q.    And who was the leadership?
6          A.    Henry and Blair.
7          Q.    And how did Blair create a hostile work
8     environment for you?
9          A.    He allowed Christine -- they all knew
10    what Christine was doing, according to Audrey, and
11    they didn't do anything about it.  They allowed for
12    her to -- they knew that she stopped giving me work.
13    They knew what the situation was, the reason why she
14    stopped giving me work, because I couldn't bill my
15    time, and as leaders of the practice, they did
16    nothing to protect me or to make my situation
17    bearable.
18          So they created a hostile work environment
19    and, obviously, Christine did as well.
20          Q.    And when were talks and negotiations
21    going on between Pepper Hamilton and Troutman Sanders
22    to merge?

                                              Page 166

1    their experience working at Troutman?

2              A.    No.

3              Q.    Now, you mentioned the leadership of the

4    financial services practice group at Pepper Hamilton.

5    Who were you referring to?

6              A.    Well, the leadership at the time was

7    definitely Henry.  He was the co-leader of the group.

8    There was another leader and he was in Philly.  I

9    don't know his name, but he did not practice in the

10   area that we did.  He did something else.

11             Blair was the co-managing partner of the D.C.

12   Office.  So -- and he was a part of the associate

13   development team as well.

14             Q.    What type of training -- going back to

15   Pepper Hamilton, what kind of training did the

16   associates in the financial services practice group

17   get that you didn't?

18             MR. WILLEMIN:  Objection.

19             THE WITNESS:  Well, they got consistent

20   exposure to deals.  They were able to work on

21   substantive matters that required -- unlike me.  I

22   was stuck doing -- just sitting there for some time

1    when Christine retaliated against me.  I didn't get

2    any work.

3           They were able to work on actual deals and

4    got -- and received constant exposure to those deals

5    and they were actually developed properly and there

6    was structure around it.  Right?

7           For example, Kristen, we're the same class

8    year.  Her experience compared to my experience is

9    completely different, completely different.  She was

10   always consistently working with Henry on deals,

11   getting that constant exposure.

12          Her development was never interrupted as a

13   result of a partner still stealing her hours or

14   something to that effect.  She just came to work and

15   billed her time and got the exposure and development

16   and training.  So if you look and compare her

17   experience compared to mine, it's two different

18   experiences.

19   BY MS. DAVIS:

20          Q.   And did the difference in Kristen's

21   experience to yours impact your compensation?

22          MR. WILLEMIN:  Objection.

Page 185

1    things.  Yes, he did.

2          Q.    What did he teach you?

3          A.    If there -- initially, I remember when I

4    first started working there, he would call.  He used

5    to call and tell me more about the Freddie Mac

6    program and just the Freddie Mac guide and what

7    things to look for in a deal.

8          Q.    Was that helpful to you in working on

9    deals with him?

10         A.    Yes.

11         Q.    How was it helpful?

12         A.    It gave me introspection on how like --

13   you know, more knowledge on how the Freddie Mac

14   program worked, as a new attorney doing agency deals.

15         Q.    And was Mr. Bowsher the first partner at

16   Troutman Pepper who you worked on Freddie Mac deals

17   with.

18         A.    It was mainly someone up in Richmond.  I

19   can't remember who the first one was, but it was not

20   from the D.C. Office.  It was mainly the folks up in

21   Richmond.

22         Q.    How did Mr. Bowsher question your

Page 186

1    competency level?

2         A.    Okay.  So the first interaction was back

3    -- we had a deal back in, I would say, May of 2022

4    and we had a client that he asked me to join the deal

5    with him.  It was David McPherson's deal.  David

6    McPherson had a health scare and he was going out on

7    retirement, and he asked if I could assist him with

8    the deal and I said sure.

9         The client wanted their signature pages set up

10   in a certain way.  So, typically, we have certain

11   loan documents that are recorded with title and those

12   loan documents are notarized, but for this particular

13   client, she wanted -- and I knew who she was.  Her

14   name was Natalie.  She wanted her signature pages set

15   up in a different manner, and I told my assistant at

16   the time to break up the signature block according to

17   the way the client wanted.

18        Within minutes, Matt called and he started

19   mansplaining to me, thinking that I didn't know what

20   a notary was, and I let him finish and I told him

21   like, Hey, Matt, I know what a notary is, this is

22   just the way the client wants the signature pages set

Page 187

1    up, and he hung up the phone, and that was the first

2    instance.

3         I didn't think anything of it, but it was

4    strange.  Then around April, going into May, I

5    received, I believe, an email from Kelly.  I think

6    Kelly was going out on maternity leave, and she

7    wanted me to cover some deals with her, and I did,

8    and Matt happened to be on those deals.

9         The first deal that we were on, I came in

10   between the deal.  Like I didn't start the deal off.

11   It was something that Kelly worked on.  I reviewed an

12   opinion for him for the first deal, and before I even

13   sent my comments out, I always run it through the

14   partner on a deal before I send my comments out to

15   opposing counsel, and he -- because Matt tends to

16   write these long emails.  Right?

17        So he sent back his comments to me and asked

18   me, you know, out of the year you've been closing

19   deals with us, have you ever seen this language

20   before, and I said no, and that was that and I

21   incorporated his comments and I sent it along to

22   borrower's counsel.  Borrower's counsel comes back

Page 188

1    and says, Hey, you know, we just closed a deal with

2    you guys and we used the same exact language that you

3    guys are saying is unacceptable, and I asked her do

4    you know what deal it was, do you know when the deal

5    closed.

6          She gave me the information.  I went in the

7    system and I saw that this deal was just closed like

8    a week prior with the same exact language that Matt

9    was mansplaining to me about and the person who

10   closed the deal was Matt, himself.  So I told him,

11   Hey, you know, it looks you closed this deal, and he

12   said no biggie.  He sent a long email to the client,

13   throwing Ari underneath the bus, not taking

14   accountability over the fact that he was the partner

15   on the deal that accepted that same exact same

16   language.

17         I remember showing that email to Ari and Ari

18   Ari was like, yeah, that strange.

19         It around this time that I then got a call

20   from Whitney telling me that Brian went into her

21   office stating that there's been concerns about my

22   work.  Now, she told me that Brian didn't tell her

1    who it was, but her and I knew exactly who it was.

2    Right?

3         Because prior to that, I've never gotten

4    complaints, and she told Brian the complaints that

5    you're receiving, they're consistent with one of a

6    junior associate, and if this was Austin, who was a

7    white male in the group, would they even come to you

8    about it and why are they going to you instead of

9    coming directly to Gita.

10        And I can't remember exactly what he said in

11   response to her.  That was that particular instance.

12        The second one was with another opinion.  This

13   deal was a supplemental loan.  Now, typically, on

14   opinions on a regular deal, you have an opinion.  You

15   ask borrower's counsel to draft an opinion, and if

16   the borrowing entity is formed in Delaware and the

17   property is out in Florida, we will ask for the

18   opinion to opine to the formation jurisdiction, which

19   would be, obviously, Delaware and where the property

20   is located, which would be Florida; but on

21   supplemental deals, you just need formation opinions.

22        So I told the borrower, borrower's counsel,

1    that, Hey, we just need formation opinions.  Matt

2    then emails me.  In these two instances, the opinions

3    literally happened around the same time frame.  Matt

4    emailed me mansplaining again, not asking me like,

5    Hey, Gita, why would you say that or anything like

6    that and said like you need to, basically, retract

7    the statement, that's incorrect.

8         So I emailed -- I forwarded the email to

9    Whitney, and Whitney said he's wrong, hold on.  So

10   Whitney went ahead and drafted an email for me and

11   she texted me and said if he's going to go complain

12   and say that you don't what you're doing, meanwhile,

13   you're correcting him, he can't have it both ways and

14   the group has a history of pushing black woman out of

15   the group.

16        She told me that she forwarded the email to

17   Brian and Nora and Ashante and that how Brian rushed

18   into her office and said I just want to say that Matt

19   is not a racist, and she told Brian no one is calling

20   him one.  Matt, in the meantime, when I sent him the

21   email that Whitney drafted, he responded and he just

22   said, Oh, I'm sorry, and then it wasn't enough for

1    him.  He went and he emailed Sidarth and Jeremy and

2    Virginia, who were like the internal review committee

3    when it came to opinions and just to confirm, and he

4    said I can't believe I'm getting this wrong and Gita

5    was right, something along those lines.

6              And I remember speaking to Ashante about this

7    and I told Ashante these are microaggressions.

8    Right?

9              Like he has this preconceived notion for some

10   reason that I don't know what the hell I'm doing.

11   Right?

12             And she told me she spoke to Brian about it

13   and Brian kept saying like, Well, Gita should feel

14   good about herself because she was right, and she

15   told Brian it's not about her being right.  It's the

16   fact that he's questioning -- he's making her

17   question her work.

18             So that happened and things went silent for a

19   little bit, and then I think in the fall, we worked

20   together a little bit in 2022, and then after that, I

21   got my 2022 evaluation in February.  I'm sorry this

22   is all a little longwinded, but I got my 2022

Page 193

1    stopped speaking to me.  So every morning, Matt would

2    pass my office and say good morning.  So after that

3    conversation in February 2023, he just started to

4    ignore me.  So I made it my business to say good

5    morning to him every day, and was not put on any

6    deals with him all throughout 2023.  It wasn't until

7    I reached out to Kelly, because interest rates were

8    very low, and I got put on a deal with Kelly and I

9    didn't know Matt was going to be on that deal.

10           He happened to be on the deal and that's when

11   I received that August 3rd email.

12   BY MS. DAVIS:

13           Q.    Now, you've used the term "mansplaining"

14   numerous times when describing Mr. Bowsher.  What do

15   you mean by mansplaining?

16           A.    Like it was more -- like what I mean by

17   that is that it was very aggressive, very

18   condescending.  Like he came off like I did not know

19   what I was speaking about.  That's what I mean by

20   mansplaining.

21           Q.    And I think you said that Mr. Bowsher

22   was in the habit of sending lengthy emails.

1          A.    Yes.

2          Q.    And correct me if I'm wrong, but during

3    this conversation, you mentioned to her that Matt was

4    engaged in microaggressions?

5          A.    Yes.

6          Q.    What's a microaggression?

7          A.    So a microaggression is things that are

8    subtle.  Right?

9          Like let's just say I tell someone of color

10   like you that you sound so articulate.  Right?

11         That's because there's a preconceived notion

12   out there that people who look like us are not

13   articulate.  Right?

14         These are like little subtle micro aggressions

15   that show up because people think in order for

16   someone to be racist, they may have to show up with a

17   KKK hoodie on and that's what it's going to take, but

18   that's not how discrimination works now, especially

19   in the workplace.

20         Q.    So how do you differentiate between one

21   who is making a comment that they would make to a

22   white person from one that they would not make to a

1    Troutman_0002720.  Do you recognize that document?

2            A.    Yes.

3            Q.    What is it?

4            A.    This is a document, correspondence

5    between Matt and I and borrower 's counsel.

6            Q.    And is there in this email chain a

7    segment that you would describe as Matt mansplaining?

8            A.    Yes.

9            Q.    Where?

10           A.    So if you look at -- so this is an email

11   thread when I sent him my comment to a Delaware

12   opinion, and when he says I'm not sure I'm okay with

13   the following mod circled in red, have you ever seen

14   us accept this before, seems to me that we already

15   allow borrowers to counsel, that whole paragraph of

16   paragraph 2.

17           Q.    All of paragraph 2 is an example of Matt

18   mansplaining or just the sentence that you read?

19           A.    The whole thing.

20           Q.    How is that mansplaining?

21           A.    Well, I wouldn't say it was him -- in

22   this context alone, no, but everything that I said in

1    totality of what led up to this event.  Right?

2         So him coming to me and telling me have I ever

3    seen this language before and things about like for

4    the past year, have you ever seen this before or the

5    past year -- what did he say here?  Not asking you to

6    push back blindly on borrower's counsel; rather, I'm

7    asking you to give you this -- some thought, consider

8    whether you've ever seen it in the year that you've

9    been closing loans with us.

10        Come to find out, he accepted the same very

11   language in not one, but other deals as well.  Right?

12        And during the time period, he was

13   complaining, stating that I didn't know what I was

14   doing.  Right?

15        And you're over here telling me to do this,

16   but at the same time, you've been accepting the same

17   exact language.

18        So you have to take everything in totality.  I

19   wouldn't just say just looking at this one paragraph

20   and that's it.  It was everything that transpired.

21        Q.    And for deals that Mr. Bowsher did, were

22   they -- I'll use the term "cookie cutter", and if you

Page 241

1    same.

2            Q.    Whose complaints are you comparing yours

3    to?

4            A.    Kelly.

5            Q.    What was Kelly's complaint?

6            A.    So there's a partner in our group who's

7    misogynistic and all the partners are aware of it.

8    Right?

9            His name is Sidarth.  I complained about him.

10   Every woman within our group complained about this

11   man.  He harassed everybody; however, when Kelly

12   filed a -- she told me.  This is from Kelly.

13           Kelly told me that she filed an HR complaint

14   against him because he kept calling her girl and sent

15   it and that Brian came down from Richmond within 24

16   to 48 hours, and at the time, Sidarth was a senior

17   associate and that he threatened to not even promote

18   him.  So her complaints were addressed.  She didn't

19   even have to reach out to him.  He reached out to her

20   and handled it; however, when I complained, I was

21   ignored.

22           Q.    Now, when did this incident with Sidarth

Page 251

1    BY MS. DAVIS:

2         Q.    Who made the decision to terminate your

3    employment?

4         A.    Well, I found out after.  From my

5    knowledge, from what the firm said, it was Brian.  He

6    made the ultimate decision.  A part of that decision

7    was Marshall and Blair.

8         Q.    What input did Marshall have into the

9    decision to terminate your employment?

10        MR. WILLEMIN:  Objection.

11        THE WITNESS:  I have no idea.

12   BY MS. DAVIS:

13        Q.    What input did Blair have into the

14   decision to terminate your employment?

15        MR. WILLEMIN:  Objection.

16        THE WITNESS:  I have no idea.

17   BY MS. DAVIS:

18        Q.    Do you know if, other than Brian, there

19   were other partners who he consulted with before

20   making a decision to terminate your employment?

21        A.    I don't know.  I have no idea.

22        Q.    Why do you believe that Brian terminated

1          Q.    And who did he work for when he came in?

2          A.    He worked a lot with Zach Ehudin, and I

3    don't know who else he worked with, but I know he

4    worked primarily with Zach Ehudin.

5          Q.    And do you know if he was hired

6    specifically to work with Zach?

7          A.    I'm not sure.

8          Q.    Were you involved in recruiting him to

9    Troutman?

10         A.    No.

11         Q.    Did you interview him?

12         A.    No.

13         Q.    Who is Taylor Echard?

14    Am I pronouncing that correctly?

15         A.    I don't know how to pronounce the last

16    name either, but she was hired for Blair, to work

17    with Blair primarily, and she hired to do HUD loans;

18    however, her overall development was different from

19    mine as well.  She started working with the Richmond

20    group as well.

21         Q.    So was she hired initially with Pepper

22    Hamilton or with Troutman Pepper?

Page 282

```
1              A.    Troutman Pepper.

2              Q.    How was her development different from

3     you?

4              A.    Well, to my knowledge, she didn't have a

5     partner stealing her hours and was retaliated for it

6     against -- she wasn't retaliated against.  That's

7     number one.  She had experience doing HUD -- she was

8     supposed to HUD loans and agency work unlike me, and

9     that was promised to me when the whole situation with

10    Christine happened.

11             So her overall development, her overall

12    experience was not chaotic and dysfunctional like

13    mine was.

14             Q.    But she was hired by Troutman Pepper?

15             A.    Correct.

16             Q.    Not by Christine?

17             A.    Correct.

18             Q.    Drolma Gaesang, who is that?

19             A.    She's an associate.

20             Q.    In what group?

21             A.    My group, multifamily housing.

22             Q.    When was she hired?
```

Page 308

```
 1              A.    This was a part of my midyear review.
 2     So when I had my midyear review, your hours also
 3     plays a role when you have your review.  So I guess
 4     that's why they were looking.
 5              Q.    And, to your knowledge, was that the
 6     only time they looked at your productivity?
 7              A.    Your productivity is always looked at
 8     every time you get reviewed.
 9              Q.    Other than you're being reviewed, do you
10     know if they looked at your productivity?
11              A.    No one brought that to my attention.  So
12     I can't recall what other times there would be.
13              Q.    In your interim review with Audrey, did
14     you get any negative comments about your hours?
15              A.    That was the first thing she mentioned.
16              Q.    And did she blame you for your hours?
17              A.    No.  She asked if Christine is stealing
18     my hours.  She knew it was Christine.
19              Q.    And the time that associates spend
20     learning how to do a deal, should that be billed to
21     the client?
22              MR. WILLEMIN:  Objection.
```

Page 320

1                    CERTIFICATE OF NOTARY PUBLIC

2              I, CATHERINE B. CRUMP, the officer before

3        whom the foregoing deposition was taken, do hereby

4        testify that the witness whose testimony appears in

5        the foregoing deposition was duly sworn by me; that

6        the testimony of said witness was taken by me

7        stenographically and thereafter reduced to

8        typewriting under my direction; that said deposition

9        is a true record of the testimony given by said

10       witness; that I am neither counsel for, related to,

11       nor employed by any of the parties to the action in

12       which this deposition was taken; and further, that I

13       am not a relative or employee of any attorney or

14       counsel employed by the parties hereto nor

15       financially or otherwise interested in the outcome of

16       the action.

17

18                    CATHERINE B. CRUMP

19                    Notary Public in and for the

20                    District of Columbia

21

22       My Commission Expires:  October 31, 2027